UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TOEHL HARDING,                              :
                                             Hon. Robert P. Patterson
                  *Plaintiff,*           :

                                             07-CV-08767 (RPP)
            – against –                          :

DAVID NASEMAN,                              :

                  *Defendant.*           :
------------------------------------------------------------X

## DECLARATION OF JUDD BURSTEIN

I, Judd Burstein, declare as follows:

### INTRODUCTION

      1.      I am a Principal of Judd Burstein, P.C. ("JBPC"), attorneys for Plaintiff Toehl Harding ("Harding" or "Plaintiff"), in the above-captioned action. I submit this Declaration in opposition to Defendant David Naseman's ("Naseman" or "Defendant") motion for summary judgment, or in the alternative, for enforcement of an alleged settlement agreement, together with such other and further relief as this Court deems just and proper.

      2.      I make this declaration based upon personal knowledge.

      3.      The purpose of this declaration is to provide relevant factual background about my communications with Robert S. Cohen, Esq., concerning a potential settlement of the above-captioned matter. As the following makes clear, there was never a meeting of the minds as to the terms of any proposed settlement, which is the precise reason why we have been continuing with the litigation to date without incident.

## THE RELEVANT PROCEDURAL HISTORY SHOWS THE ABSENCE OF A MEETING OF THE MINDS AS TO SETTLEMENT

**A.     The Communications Between Counsel and the Court Do Not Support a Finding of Settlement**

4.     A pretrial Court conference was scheduled in this case for December 13, 2007. The case had been transferred from the United States District Court, District of Nevada, where Plaintiff had been represented by different counsel. As of December 13, we had yet to file an appearance on behalf of Plaintiff. Indeed, it was unclear at the time whether we would ever be retained by Plaintiff. Accordingly, an associate in our law firm, Alexander M. Levy, Esq., attended the conference and explained the circumstances to the Court. The Court then adjourned the conference to December 19, 2007.

5.     On December 18, 2007, there still had been no decision whether we would be retained by Plaintiff. Nonetheless, as a courtesy to Plaintiff, I conveyed to Defendant's counsel the following message: "If there is any way to let me know **today** (email would be fine) whether your client will agree to the walk-away, it would be much appreciated." (Defendant's Ex. 12) (emphasis supplied). I should explain to the Court that I have known Mr. Cohen for many years, which explains the informal tone of my communications with him. In any event, Mr. Cohen and I also had contemporaneous discussions, and he knew that while I was trying to facilitate a settlement as a courtesy, we had not been retained.

6.     I do not believe that my December 18 e-mail can fairly be read as an unequivocal offer to settle. In the first instance, while the e-mail asks whether Defendant would agree to a walk-away, it does not state that a walk-away would be acceptable to Plaintiff. Pointedly, I also never wrote in words or substance that Plaintiff would agree to be bound by a mere reply to my e-mail, or

some other express mechanism. Furthermore, the e-mail cannot objectively be construed to include all material terms of any proposed settlement. In fact, as Mr. Cohen knew full well, I could not have done so, as JBPC had not been retained at the time. Rather, the intent of my e-mail, which I believe to be fairly expressed in its language, was to make an inquiry on Plaintiff's behalf as to whether a walk-away was something that Defendant would consider.

7.  But even if the Court were to conclude that my December 18 e-mail did constitute a definitive offer to settle by a walk-away, and putting aside Mr. Cohen's knowledge that we were not retained, by its own terms the alleged offer expired as of December 19th. This is so, because I required notification "today", *i.e.*, as of December 18. Defendant points to no response on December 18, 2007, supposedly agreeing to a walk-away, because there was none on that day or any other.

8.  Rather, Mr. Cohen responded as follows at 3:08 p.m., on December 18, 2007: "I have called Naseman. Waiting to hear back. Will let you know as soon as I hear." (Defendant's Exhibit 15). Hence, the matter was left open, and the supposed unconditional settlement offer expired on December 19th by its own terms.

9.  On December 19, 2007, *i.e.*, after the allegedly unequivocal offer for a walk-away had expired, I spoke with Mr. Cohen who had by then had an opportunity to discuss matters with Defendant. Far from reaching an agreement in principle, certain comments made by Mr. Cohen gave me serious pause. Accordingly, I wrote as follows:

Bob–

We await your settlement **draft**, but I want to make one point very clear. Your comments to me about your client's concern about fraud allegations showing up on Google suggested to me that your client was going to request some sort of acknowledgment from Ms. Harding that her allegations of fraud lack merit. I just wanted you to know that **such a condition is a non-starter**. Rather, our offer is a

3

walk-away with plain vanilla releases, and no suggestion that her allegations did not have merit. **If your client is not amenable to such a settlement, the litigation would have to go forward**.

(Defendant's Ex. 15) (emphasis supplied).

10. My December 19 e-mail thus confirmed several important points.

11. **First**, we contemplated that any settlement agreement would be set forth in a subsequent writing, as I was awaiting a "settlement draft". (Emphasis supplied). As an attorney with more than 20 years experience, I know full well that the devil is often in the details when it comes to settling cases.

12. **Second,** Mr. Cohen had raised his client's concerns about the fraud allegations against him being a public record, and proposed a requirement that there be some form of retraction as to the merits of Plaintiff's claims against Defendant. Any such condition was totally unacceptable, and I made that clear to Mr. Cohen both verbally and in this e-mail. Mr. Cohen's statements in this regard made it all the more important that Plaintiff have an opportunity to review any proposed settlement in writing.

13. As noted above, the adjourned pretrial conference in this case was scheduled for December 19, 2008. As of that date, however, it still was uncertain whether the litigation would proceed, as the parties were actively involved in settlement negotiations, or whether JBPC would even be formally retained as counsel. Accordingly, to afford the parties additional time to explore settlement, on December 19, 2007, Mr. Cohen wrote the Court a letter requesting an adjournment of the conference that was scheduled for that same day. In other words, the parties were under time pressure to seek what was then a second adjournment. Hence, while the parties were hopeful that

4

a settlement could be reached, the letter made clear that this had not yet occurred – which was of course why the additional time was needed.

14. Thus, Mr. Cohen's December 19th letter to the Court provides that his law firm "fully **expect[ed]** that at that time of [the adjourned conference] there will be withdrawal documents filed with the Court". (Defendant's Ex. 13) (emphasis supplied). Plainly, an expectation is not a certainty, and Mr. Cohen's letter in no way states that the parties had reached an agreement as to all material terms of any settlement. In this regard, the language that Defendant seeks to rely upon – "Plaintiff has agreed to withdraw the action" – does not even purport to apprise the Court of all of the terms of the alleged settlement. In particular, Mr. Cohen's December 19th letter never mentions the reciprocal requirement that Defendant would have to drop his counterclaim, which would be a necessary component of any walk-away. *See id.*

15. Another highly telling aspect of Mr. Cohen's December 19th letter is the caveat that "**Mr. Burstein's office** has seen this letter and agrees to its contents." *Id.* (Emphasis supplied). Mr. Cohen was careful not to represent, in words or substance, that Plaintiff's attorneys had reviewed the letter and agreed to its contents. This is so, because as set forth in the accompanying Declaration of my partner, Peter B. Schalk ("Schalk Dec."), Mr. Schalk spoke with Mr. Cohen on December 19th and explicitly told Mr. Cohen that he (Mr. Cohen) could not represent to the Court that JBPC would be appearing on Plaintiff's behalf, because as of that point, it was not certain that we would.

16. As further confirmed by Mr. Schalk in a contemporaneous e-mail, Mr. Cohen advised Mr. Schalk that a straightforward dismissal would not be sufficient, and further asked if we would appear on behalf of Plaintiff in order to negotiate the details of any settlement. Thus, as Mr. Schalk detailed in his December 19, 2008 e-mail to me, a redacted version of which is annexed hereto as

Exhibit 1,[1] Mr. Cohen stated the following to Mr. Schalk on December 19, 2007: "He [Mr. Cohen] was going on about public filings here and in nevada about a lawyer, and how **there had to be <u>more than a mere dismissal</u> ...**" Ex. 1 (Emphasis supplied). Indeed, Mr. Schalk further confirmed that when Mr. Cohen asked whether "we would appear **to negotiate the details** [of any settlement], etc. I told him <u>I had no idea</u>**." *Id.* (Emphasis supplied). Of course, there would have been no need to negotiate the details of a settlement that had already been finalized.

17. Mr. Schalk then conveyed to me that Mr. Cohen had confirmed that "he won't represent to the Court that we will appear." It was for this reason that Mr. Cohen used the carefully chosen phrase that "Mr. Burstein's **office** has seen the letter," as opposed to Plaintiff's counsel.

18. In sum, there was no meeting of the minds as of Mr. Cohen's December 19, 2007 writing to the Court, considering that:

    a.    Mr. Cohen stated that there had to be "more than a mere dismissal," which was all he represented to the Court that Plaintiff had agreed to do;

    b.    When Mr. Cohen asked Mr. Schalk if JBPC would appear "to negotiate the details" of a settlement, Mr. Schalk responded that he "had no idea"; and

    c.    Mr. Cohen confirmed that he would not represent to the Court that JBPC would be appearing for Plaintiff, and then used the carefully chosen words "Mr. Burstein's office" had reviewed the letter, as opposed to Plaintiff's counsel.

---

[1] Out of privilege concerns, we have redacted Mr. Schalk's e-mail so that it only contains written confirmation of the contemporaneous statements that Messrs. Cohen and Schalk made to one another on December 19, 2007, which plainly are not privileged communications. We are prepared to provide an unredacted version of the December 19th e-mail to the Court *in camera*.

19. I have respect for Mr. Cohen, and we are operating under the assumption that he simply had a failure of recollection as to the actual events as they occurred some 6 months ago.

20. In response to Mr. Cohen's December 19, 2007 letter, the Court moved the conference to January 10, 2008.

21. Thereafter, Mr. Cohen and I spoke on or about December 20, 2007, and he discussed settlement conditions with me that were unacceptable to Plaintiff. I advised Mr. Cohen that certain of these requirements were "deal breakers", and then confirmed them in writing as follows:

> I just want to confirm.
>
> Your client will agree to dismissal of Toehl's claims and your client's counterclaims with prejudice. You **insist** that the stipulation specifically recite that there is no consideration for Toehl's dismissal, thereby allowing your client to argue publicly that Toehl dismissed the suit because it was meritless. Your client will **not agree** to a confidentiality provision barring both parties from speaking publicly about the litigation, its merits or settlement.

(Defendant's Ex. 16) (emphasis supplied).

22. Hence, as Mr. Cohen knew based upon our oral communications, the purpose of my December 20, 2007 e-mail was to confirm Defendant's position as to any proposed settlement, aspects of which were not acceptable to Plaintiff. Nothing in this e-mail leads to the conclusion that I was confirming settlement conditions that were agreed to by Plaintiff. In fact, the opposite is true, as use of the words "insist" and "not agree" plainly signify the absence of agreement. Indeed, Defendant's conditions as confirmed by me amounted to an acknowledgment that Plaintiff's fraud claims lacked merit, which I had already advised Mr. Cohen in my December 19, 2007 e-mail was a "nonstarter". (Defendant's Ex. 15).

23. It is also notable that Defendant's conditions as confirmed in my December 19th e-mail (Defendant's Ex. 15) were not included in Mr. Cohen's December 20, 2007 letter to the Court. *See* Defendant's Ex. 13. Hence, the existence of a supposedly definitive agreement, let alone its terms, was never conveyed to the Court.

24. Thereafter, on January 2, 2008, Mr. Cohen sent me proposed releases. The cover e-mail explicitly identifies its attachment as being a "draft" release. (Defendant's Ex. 17, p. 1). Mr. Cohen further writes: "Let me know if this is acceptable." *Id.* This language in and of itself demonstrates that there was no settlement, but there is more.

25. The supposed "plain vanilla" release was anything but. In particular, Defendant somewhat remarkably insisted that Plaintiff provide a general release not only in his favor, but also on behalf of the attorneys who had represented him in the underlying litigation and negotiation of the Property Settlement Agreement ("PSA") that is at issue in this case. Thus, as opposed to a Blumberg form release, Defendant's proposed release reads in relevant part:

> Harding hereby expressly acknowledges and agrees that this release shall also specifically apply to and release and discharge each of Leonard Florescue, Esq. and Gary Silverman, Esq. ... and their respective present or former law firms to the same extent and with the same effect as the release and discharge granted to Naseman herein.

(Defendant's Ex. 17 at p. 2).

26. Harding never agreed to release two lawyers let alone their respective law firms for all claims, including those that may have accrued after the PSA was executed in May 1993 to the present. These plainly material terms were added by Defendant and never agreed to by Harding, further underscoring that the parties failed to achieve a meeting of the minds as to settlement. It is also notable that Mr. Cohen never conveyed these requirements to the Court either. (*See* Defendant's

Ex. 13). Indeed, Defendant can point to no communication, written or otherwise, agreeing to the terms of the proposed release.

27. The release further provided that "Harding and Naseman each hereby reaffirm the provisions of the Property Settlement Agreement entered into by the Parties on May 4, 1993, as amended on May 5, 1993." (Defendant's Ex. 17 at p. 3). This qualification also runs afoul of the requirement set forth in my December 19th e-mail that any acknowledgment by Plaintiff that her allegations of fraud supposedly lacked merit was a "non-starter." (Defendant's Ex. 15). If Harding may have been willing for a time to walk-away from the valid claims she has under the PSA, she never agreed to reaffirm the provisions of that contract that she believes, and indeed knows full well, were induced by fraud. (*See* the accompanying Harding Dec. at ¶ 54).

28. In sum, the objective evidence demonstrates no less than four supposed settlement proposals, none of which was ever finalized:

    a. A walk-away which, at a minimum, had to be agreed to by December 18, 2008, and never was (Defendant's Ex. 12);

    b. Plaintiff withdrawing the action with no stated reciprocal dismissal of Naseman's claims (Defendant's Ex. 13);

    c. (i) a dismissal of all claims and counterclaims with prejudice, but (ii) a stipulation specifically reciting that there was no consideration for Plaintiff's dismissal, allowing Defendant to argue publicly that Plaintiff dismissed the suit because it was meritless, with (iii) no confidentiality provision barring the parties from speaking publicly about the litigation, its merits or settlement (Defendant's Ex. 16); or

   d.  Plaintiff agreeing to provide general releases in favor of Defendant's prior counsel and their law firms, who for all she knows may have been active participants in Defendant's fraud, plus a reaffirmation of the PSA. (Defendant's Ex. 17; *see also* Harding Dec at ¶ 54).

B. **The Subsequent Actions of Defendant and His Attorneys Confirmed the Absence of a Meeting of the Minds as to Settlement**

  29. Another clear indication that the parties did not reach a settlement is the silence of Defendant once the parties resumed the litigation. Hence, Defendant's counsel acknowledged that there had been no settlement by signing the Rule 26(f) Report, dated January 8, 2008, which confirmed the parties' discovery plan. (A true and complete copy of the "So Ordered" Rule 26(f) Report, signed by Defendant's counsel, is annexed hereto as Exhibit 2). At the adjourned date of the **pretrial** conference in this case, January 19, 2008, the parties apprised the Court that they had been unable to reach a settlement, and the Court "So Ordered" the Rule 26(f) Report signed by Defendant's counsel. *See* Ex. 2 hereto, and the Schalk Dec., at ¶ 10.

  30. Hence, well after the settlement was supposedly reached, Defendant's counsel entered into a stipulation and order agreeing to the timing requirements for all material discovery and motion practice in this litigation. If there had in fact been a settlement at the time, one would have expected Defendant's counsel to instead protest in some way that the parties were squandering both judicial and client resources by pointlessly proceeding with a litigation that had supposedly already been resolved.

  31. In addition, Naseman appeared for deposition in this case while represented by counsel and without objection. Defendant further produced discovery in response to Plaintiff's

10

written discovery requests. Defendant also retained an expert and produced an expert report to be used in support of his summary judgment motion.

## CONCLUSION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 20th day of June, 2008, in Fairfield County, Connecticut.

JUDD BURSTEIN