# Exhibit A

**TOEHL HARDING v. DAVID NASEMAN**

**Naseman, David Milford**

**May 12, 2008**

**Volume 1**

COMPUTER REPORTING INC.
501 Fifth Avenue
Suite 500
New York, New York 10017
(212)986-1344
FAX: 212-983-9149
www.crinyc.com

SCANNED
Date: 5-14-08
Initials

JUDD BURSTEIN, P.C.
1790 Broadway
Suite 1501
New York, New York 10019

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
TOEHL HARDING,
Plaintiff, 07-CV-08767
-against- (RPP)
DAVID NASEMAN,
Defendant.
-----------------------------------x

May 12, 2008
10:20 a.m.

Deposition of DAVID MILFORD NASEMAN, held at the offices of Judd Burstein, P.C., 1790 Broadway, New York, New York, pursuant to Notice, before Maureen McCormick, a Notary Public of the State of New York.

Page 2

APPEARANCES:

JUDD BURSTEIN, P.C.
Attorneys for Plaintiff
1790 Broadway
New York, New York 10019
BY: JUDD BURSTEIN, ESQ.
PETER B. SCHALK, ESQ.

COHEN LANS LLP
Attorneys for Defendant
885 Third Avenue, 32nd Floor
New York, New York 10022
BY: DAN ROTTENSTREICH, ESQ.
of Counsel

ALSO PRESENT:
TOEHL HARDING

Page 3

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom the within deposition was taken.

Page 4

DAVID MILFORD NASEMAN,
called as a witness, having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY
MR. BURSTEIN:
Q. What is your name?
A. David Milford Naseman.
Q. Where do you reside?
A. 10040 East Happy Valley Road, No. 556, Scottsdale, Arizona 85255.
Q. Good morning, Mr. Naseman. My name is Judd Burstein. I represent your ex-wife, Ms. Harding. Have you ever been deposed before?
A. Yes, I have.
Q. How many times?
A. Oh, approximately four or five.
Q. Can you tell me what proceedings you were deposed in?
A. Let's see. I was deposed in a divorce proceeding.
Q. Which divorce proceeding?
A. With Marcia Duncan in Phoenix, Arizona. I was deposed in a lien shareholder

Page 5

D. Naseman

litigation. I was deposed in a construction action in Scottsdale, Arizona, relating to the construction of my residence.

I got a feeling I was deposed maybe one more time on something. I can't think of it, so...

Q. So you've been through this drill before?

A. Yes.

Q. I'm going to ask you questions. You understand you are under oath?

A. Yes.

Q. And just wait till my question is over before you answer. The court reporter really can't take down two people speaking at the same time.

Any time you would like to speak to your attorney, you have the freedom to do so except when a question is pending.

And just for other background, have you taken any medications? Are you ill today or is there any other reason why you wouldn't be able to go forward with this deposition with a clear head?

Page 6

D. Naseman

A. No. I take Avalid. It's a blood -- you know, high blood pressure, whatever it is.

Q. But your head is clear today?

A. Yes. I can hear you.

Q. Not hear me, but your head is not cloudy in any way because of any medication?

A. Not that I know of, no. No, not from medication.

Q. Have you ever been a party to any litigation, other than this litigation?

A. Yes.

Q. What are those cases to which you have been a party?

A. Define litigation. Any legal proceeding?

Q. Any legal. A party to any legal proceeding.

A. A divorce action with my first wife. A divorce action with Ms. Harding. A divorce action with Marcia Duncan. A construction litigation with Stenjem Builders.

Q. What was that litigation about?

A. It related to the construction of my house in Scottsdale, Arizona.

Page 7

D. Naseman

Q. Were you a plaintiff or a defendant?

A. I was a defendant in a counterclaim.

Q. What was the claim against you? Broad strokes.

A. It's -- the builder was suing me for additional amounts under a contract which I didn't believe he was entitled to, because he never finished the job.

Q. Was the case resolved?

A. No. It went to judgment. I lost, and on appeal I settled it.

Q. What was the judgment entered against you?

A. I'd say approximately -- I don't know if it was the judgment per se, but it cost me about 120 to 150,000, somewhere in that range.

Q. That was the settlement?

A. Yes.

Q. Did you settle for less than the full amount of the judgment?

A. Yeah, I think that the attorney's fees would have been added on top of that, and I think they went away to allow settlement to go forward. And the lien shareholder litigation.

Page 8

D. Naseman

Q. You were a party in that?

A. I was a party to the litigation, not the initial litigation, but I was added as a party after the McCaw revised deal went forward, because I was a shareholder -- I'm sorry. I was the secretary to the company who signed a proxy statement which was the gist of part of that lawsuit.

Q. What is your education?

A. I graduated from high school in Upstate, New York. I graduated from Boston University College of Liberal Arts in 1971 with a degree in political science and economics.

I then went to Tulane University, where I received a JD in 1975, and so I think that's -- I also took a couple of courses at NYU in a tax program after I got here to New York, but I did not matriculate through the entire program.

Q. After you got out of law school, can you give me a summary of your professional background?

A. Yes. I was at -- I started out at Fried Frank Harris Shriver & Jacobson in 19 -- in the fall of 1975. I was in their New York office

Page 9

D. Naseman

and also their London office.

In September of 1983, I became general counsel, secretary, and vice president of LIN Broadcasting Corporation. I was there until November of 1990, at which time I retired.

In March of 1998, I became a partner at Blumenfeld & Cohen in Washington, D.C. I was there as a partner until 2002, at which time we merged into another law firm in California called Gray Cary and couple of other names, and I was there for two years, at which point I left and became senior counsel at Crowell & Moring, which is where I am presently in Washington, D.C.

Q. Are you a member of the DC bar?
A. Yes.
Q. Are you a member of the bar of any other states?
A. Other than New York?
Q. Are you a member of the New York Bar?
A. Yes. That's where I started, yes.
Q. New York, DC. Any other states?
A. No.
Q. From the period of 1990 to 1998, after you left LIN and then you went back to -- '98 at

Page 10

D. Naseman

Blumenfeld & Cohen, were you working at all between 1990 and 1998?
A. I wasn't, if you will, gainfully employed with some, you know, formal arrangement with somebody. Occasionally I would do things for Jeff Blumenfeld, who was a friend from my days at LIN, so I would consult with him.

It was only one occasion I think where I might have received some consulting compensation at the end of '97 or beginning of '98 or somewhere in that range, but that sort of led to me becoming a partner in the firm because then they needed some corporate expertise in that firm.
Q. Do you presently own any real property?
A. Yes, I do.
Q. Can you identify it for me, please?
A. Sure. I own 8.7 acres and a house and barn and other buildings in Lenox, Massachusetts. I own a residence and lot at my address I gave you earlier in Scottsdale, Arizona. I also own a residence on San Bernardo Drive in Scottsdale, Arizona, which is where my father currently resides.

Page 11

D. Naseman

I don't think I own any other real property.
Q. Do you have any property that you have out for sale at the moment, real property?
A. No.
Q. Nothing is on the market?
A. No, no.
Q. Do you have any intention of selling any of your real property in the near future?
A. Not a present intention, no.

MR. BURSTEIN: Mark that as Exhibit 1.

(Plaintiff's Exhibit 1, Plaintiff's First Request, marked for identification.)

Q. Mr. Naseman, have you seen this document before?

MR. ROTTENSTREICH: Go through the whole document by the page, make sure you are comfortable with it.

A. I mean, generally looks like the request for production of documents that my counsel forwarded to me from you.
Q. I'll represent to you that it is.

Did you review these document requests when you received a copy of them?

Page 12

D. Naseman

A. Yes, I did.
Q. Did you make a search for documents that were responsive to this request?
A. Yes.
Q. Where did you search for your documents?
A. I searched at my three residences. I also -- which is Lenox, Massachusetts, Scottsdale, Arizona, and my apartment in Washington, D.C.

I also searched the residence at San Bernardo Drive, because I had been there for various periods of time, to see if anything was at that location, as well.
Q. If you go to Page 3 of this, do you see there's a section called definitions. Do you see that at the top of the page?
A. Yes, I do.
Q. Under Schedule A?
A. Yes.
Q. You look down, you see No. 6, Shearson account?
A. Yes.
Q. There's a definition of that as refers to any brokerage or other accounts with the entity

Page 13

D. Naseman

formerly known as Shearson Lehman Brothers, also known as Lehman Brothers, and any of the successors in which you have ever had an interest in such an account.

Do you see that? You understood the definition of Shearson account?

A. Including but not limited to one in -- yes, yes, yes.

Q. If we go to Section 1, actually Page 4, Section 2, Request No. 1.

A. Right.

Q. There's a request for all account statements for Shearson, for the Shearson account.

What search did you make to find any account statements for the Shearson account?

A. I looked at the locations that I previously indicated.

Q. Do you recall whether you found any statements for any month for the Shearson account?

A. For any month. I certainly found the ones for after -- I believe it was June of 1993. I did not find any monthly statements prior to that time.

MR. BURSTEIN: I would note that we

Page 14

D. Naseman

didn't get any monthly statements produced to us.

MR. ROTTENSTREICH: Post June 1993? Our objection was we weren't producing documents post 1993.

Q. You found none prior to June of 1993?

A. That's correct.

Well, let me take that back. I believe I gave you a monthly statement for a Shearson account from -- that derived from 1998, or -- I'm sorry, 1988, which I don't know -- it may have been just a report of a transaction, but if you want to consider that a monthly rather than the annual that I provided, that may qualify. Just want to be responsive.

MR. SCHALK: One transaction document and one annual statement. That's all we have.

THE WITNESS: I believe you have more than one annual statement.

Q. Did you provide more than one annual statement to your attorney?

A. Yes, I believe there were three.

Q. Without telling me what the documents

Page 15

D. Naseman

were, did you produce any documents to your attorney which were not produced to my office?

MR. ROTTENSTREICH: Objection. I don't know if he would be able to answer that, but I'm happy to go on the record and say that whatever we received we produced to you. We didn't withhold.

I didn't do an independent search and pull documents from what he gave to me.

Q. So you didn't give your attorney any monthly statements for the period 1993 forward?

A. Right, as long as that 1988 document isn't a monthly, that's correct.

Q. Was that 1998 statement which was for an account at Republic Bank -- that was the only statement you were able to find for --

MR. ROTTENSTREICH: Objection to the form of the question.

MR. BURSTEIN: Let's take it out and --

A. I think you are referring to the 1988 Shearson, not Republic Bank.

Q. I may be wrong. I have it here.

Did there come a time when you learned

Page 16

D. Naseman

that your -- that Marcia Bothe, is your divorce final with her or are you still --

A. There was a final decree of dissolution that was entered in that case. The proceeding is not over with, but...

Q. Did there come a time when you learned that Ms. Bothe provided some documents to Toehl Harding?

A. Yes, I believe.

Q. When did you learn that?

A. Oh, I believe I saw a reference to that sometime in -- I'd say it was July maybe of 2 -- give me that question again.

Q. When did you first learn that -- I'll call her Marcia. It's easier -- Marcia had given copies of documents to Toehl Harding?

A. Copies of documents as opposed to correspondence?

Q. Any documents.

A. Oh. I believe -- I believe that was probably at Marcia's deposition in August of 2006.

Q. When you were married to Marcia, where did the two of you reside?

A. We initially resided in Lenox,

Page 17

D. Naseman

Massachusetts, and subsequently we split our time between Lenox, Massachusetts, and Scottsdale, Arizona.

Q. And there came a time when you separated?

A. Yes.

Q. Immediately prior to when you separated, where in Arizona were the two of you residing?

A. At the -- my residence address at Desert Islands, which is the 10040 East Happy Valley Road address.

Q. Did there come a time when Marcia lived there alone?

A. Yes, following the commencement of the divorce proceeding.

Q. For how long did she live there alone?

A. Until, I'd say, from November, say, 8 of 2004 until October 31, 2005.

Q. Did you move out of your home as a result of a court order or voluntarily?

MR. ROTTENSTREICH: I'm going to -- obviously, I've given you some latitude to go into the background, but at this point

Page 18

D. Naseman

I'm going to start objecting.

MR. BURSTEIN: You have every right to object. He has to answer.

MR. ROTTENSTREICH: But there will be a point where -- asking completely irrelevant questions to the allegations in this action will be just a basis for harassment, embarrassment, et cetera, and there's no need for it.

MR. BURSTEIN: When you want to do that, you have every right to try and do it.

MR. ROTTENSTREICH: I'm sort of putting the flag up there, and, you know, at some point I will tell him enough answering irrelevant questions.

Q. Did you leave voluntarily or did you leave pursuant to a court order?

A. I'm trying to be accurate. I was excluded from the residence pursuant to an ex-parte order of a magistrate.

Q. Did there come a time when you collected any belongings from the house?

A. Yes, yes.

Q. How soon after you were excluded did

Page 19

D. Naseman

you remove belongings from the house?

A. I was excluded -- I want to say if there was a Friday night, November -- I want to say 19 or somewhere in that range.

I was not allowed back into the residence until accompanied by my attorney in February, roughly somewhere in the 23rd, in the following year, in 2005.

Q. When you went back into the residence, did you take anything out of the residence?

A. Yes.

MR. ROTTENSTREICH: Could I get a proffer?

MR. BURSTEIN: Outside of the witness's presence. If the witness wants to leave, I'll give you a proffer outside of his hearing.

MR. ROTTENSTREICH: On the record?

MR. BURSTEIN: On the record, but not with the witness here.

MR. ROTTENSTREICH: Okay. Just step out for a second.

MR. BURSTEIN: And with a representation that you're not going to at

Page 20

D. Naseman

some point communicate to him.

MR. ROTTENSTREICH: I can probably tell you what's going on, but I want to know.

MR. BURSTEIN: I want to be able to establish what was left in the house so that I can then ascertain whether or not it's likely that the records that Marcia found were records that belonged to him.

If he comes and tells me that all I took out at the time was clothing, it's relevant to my finding out -- to establishing that these were his records.

MR. ROTTENSTREICH: If he says I left whatever I left inside the house, and Marcia took a copy of whatever she says she copied, but he'll say some of those documents aren't mine, where do we go from there?

MR. BURSTEIN: It's discovery.

MR. ROTTENSTREICH: It's discovery on collateral ancillary issues.

MR. BURSTEIN: This is not discovery on collateral issues. I'm entitled to set out exactly the circumstances under which

D. Naseman

she might have found the documents and what she left.

If he could testify I walked -- I came in with a truck and took out every possible personal document I had, that's something I want to know what he's going to say. That's why.

MR. ROTTENSTREICH: All right. We get to it -- I'm not trying to tell you how to do your questioning.

MR. BURSTEIN: I appreciate that.

MR. ROTTENSTREICH: The more you're asking him about the circumstances of excluding him, I don't want to get into a whole situation where we're relitigating his recent divorce.

MR. BURSTEIN: I'm not interested in litigating his recent divorce. There will be things that are going to come into it that are relevant, but, you know, I am interested in using what I -- finding out what I need for this case.

I will tell you that it's my view that it's clear under the federal rules, so it

D. Naseman

will be clear you have only, you know, two options, if you don't want him to answer.

One is if you have a basis for privilege, you can direct him not to answer. Two, you can end the deposition and make a motion for a protective order.

Alternatively, I suppose you could try and call the magistrate, but, you know, you don't have the right to direct him not to answer under any circumstances under the federal rules. You have absolutely no right to do it.

MR. ROTTENSTREICH: I can direct him not to answer a set of questions that I believe are just --

MR. BURSTEIN: No, you can't.

MR. ROTTENSTREICH: Let me finish. I can direct him not to answer a set of questions if it just keeps going on and on and has nothing to do with the claims in this case, so that we can finish your line of questioning with respect to the claims that are clearly non-objectionable, and we can have that portion of the records --

D. Naseman

MR. BURSTEIN: Get the rules. That's not what the rules say. The rules say --

MR. ROTTENSTREICH: What you're saying is end the whole depo and get the protective order, and what I'm saying is continue the depo on all issues except for this one area that we disagree upon, that we disagree upon, and we can go get a protective order on that.

MR. BURSTEIN: I have a right to conduct my deposition in the order that I want to direct it, and I'm not interested in having it truncated on a basis that's not appropriate.

Let's just put the rule on the record so that we have no issues. You can have him come back in at this point. I don't care.

MR. SCHALK: Let's see, there may be some other issues that come up in terms of this argument that should be had outside the presence of the witness.

MR. BURSTEIN: A person may instruct the deponent -- this is Rule 30 (d) (1).

"A person may instruct the deponent

D. Naseman

not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under Rule 30 (d) (4)."

And Rule 30 (d) (4) says, "Any time during the deposition a motion of a party or of the deponent and upon showing that the examination is being conducted in bad faith or such manner as unreasonably to annoy and embarrass," et cetera, "the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition or may limit the scope."

If you want to make a motion, you can make an motion.

MR. ROTTENSTREICH: You read it. It's on the record. My position stands. I can instruct him not to answer a line of questions that is just being propounded for purposes of harassing or embarrassment and have nothing to do with the claims in this case, so I can make my motion and --

Page 25

D. Naseman

MR. BURSTEIN: You can make your motion, but let's see if you do it, instead of fighting over theories.

May I have the last question read back.

(Question read.)

Q. What did you take out?

A. I took -- I couldn't tell you an entire laundry list, but the character of things I took out were diplomas, some personal clothing, some documents. There was a large trunk, a footlocker kind of trunk.

There was a couple of antiques in terms of a jack for a covered wagon from the 1800s, and a few things like that, but only to the extent it would fit in the car, my car that I had, the rental car, and the car that my attorney had, so no furniture or anything of that nature.

Q. You said you took out documents. What documents did you take out?

A. I couldn't tell you exactly all of them, but I took out some that were client related. I took out some that were personal documents of mine from the past.

Page 26

D. Naseman

There were some documents that were located in the footlocker. That's sort of the general nature.

Q. Did you take any documents that were stored in boxes?

A. That were stored in boxes. Off the top of my head, I can't remember right now. Certainly they could have been.

I mean, my entire office was in total -- totally torn up at that point with things in various places where they had never been before, and some things were in boxes, and I'm sure that I put some things in boxes and put it in the back of my car. Whether they started there or not is another issue.

Q. At the time you were excluded from your home, did you have in your home any documents that referred to Toehl Harding?

A. Yes.

Q. Do you recall what documents you had?

A. I'm sorry?

Q. Do you recall what those documents were?

A. Yes. They would have been documents

Page 27

D. Naseman

relating to the divorce proceeding between us and confidential communications between myself and my counsel during that period.

Let's see if there was anything else. Oh, there were tax returns from the period of the marriage from 1982 through 1993, and there would have been some receipts or bank statements from those periods that might have been mixed in with the stuff.

Q. Do you recall whether or not you took any of those documents that you just referred to out of the house when you retrieved documents from the house in February of -- what year was that again?

A. 2005.

Q. February 2005?

A. Yes, I do -- did take some of those documents, to the extent they still existed.

Q. What documents? Have those documents been produced?

A. Yes.

MR. BURSTEIN: Can I have a representation, counsel, that they have all been produced?

Page 28

D. Naseman

MR. ROTTENSTREICH: Again, I produced whatever it is I received from Mr. Naseman.

Q. You gave to your attorney every document that referred to Toehl Harding in when you -- have you given your attorney every document referencing Toehl Harding that you took from the house in February 2005?

A. I have not -- there may have been copies of the same document that I didn't deliver, but other than that, everything, I think, that I had has been delivered.

Q. Do you still have those copies of documents that you did not deliver?

A. Yeah, they're identical.

RQ MR. BURSTEIN: I'd ask that they be produced.

THE WITNESS: More than happy to. It's a Xerox machine.

MR. ROTTENSTREICH: Take it under advisement.

Q. Prior to your being excluded from the marital home in November of 2004, did you have records in the house that reflected your assets and liabilities as during the period of time you

Page 29

D. Naseman

were married to Toehl Harding?

A. Assets and liabilities. The answer would be yes.

Q. Are those documents to which you are referring different than the documents you were describing when I asked you questions about documents referring to Toehl Harding?

A. Yes.

Q. What were those documents?

A. Those would have been loan applications and documents relating to real estate that we had owned together. She would have been referred to on those, and I think I produced all of those as well.

Q. Whether or not she was referred to in those documents, I asked you a different question.

A. I'm sorry.

Q. Were there documents you had in your possession in the home --

A. Right.

Q. -- prior to your being excluded in November of 1994 that did not refer to Toehl Harding, but did refer or reflect your assets or liabilities during the period that you were

Page 30

D. Naseman

married to Toehl Harding?

A. Yes.

Q. That was -- loan applications is one of those?

A. Yes, I think that's what comes to mind at the moment.

Q. Any other documents that you can recall?

A. Nothing that presently presents itself.

Q. Did you produce all such documents to your attorney?

A. Yes.

Q. I'm going to ask you the same question as to what documents you possessed at the time that you were excluded from the home November of 1994.

MS. HARDING: 2004.

Q. November 2004, with respect to documents that would have reflected your income during the time that you were married to Toehl Harding?

Do you understand the question?

A. Yeah. You're asking me if I -- if

Page 31

D. Naseman

there were documents there that reflected my income during the period we were married?

Q. Right.

A. The answer is yes.

Q. Are those documents different than the documents you already -- that either referred to Toehl Harding or did not refer to Toehl Harding, but reflected your financial condition?

A. Yes, yes.

Q. What were those documents?

A. Those documents would have been tax returns, including form W-2s and those kind of things that were attached to it.

And here we're -- again we're talking about my earnings?

Q. Yes, income.

A. Income. Yes, there would have been a couple of, I believe, annual statements for the Shearson account. There would have been -- and that's the '91 through the early -- well, the end of '92.

There would have been the 1988 Shearson Lehman documents reflecting the sale of the stock initially during that year. That would

Page 32

D. Naseman

have been income to me.

And there would have been documents reflecting my termination of employment with LIN Broadcasting and the buyouts that occurred at that time. That was income to me. Things of that nature. I mean, I'm not sure I can off the top of my head remember every one of them.

Q. Did you produce all of those documents to your attorney?

A. Yes.

Q. Let me have the separation agreement.

MR. BURSTEIN: I'm going to mark this as Exhibit 2.

(Plaintiff's Exhibit 2, Separation Agreement, marked for identification.)

MR. BURSTEIN: Let's take a break for a minute.

(Recess taken.)

Q. Do you recognize this document?

A. Without going page by page, yes, I recognize the general document, yes.

Q. This is your property settlement agreement with Ms. Harding?

A. Yes, it is. And the exhibit thereto.

Page 33

D. Naseman

Q. Yes.

MR. BURSTEIN: Give me one second. I apologize. I thought I had this marked, but I didn't.

(Discussion off the record.)

Q. Take a look at Page 25 of the agreement, and it's Bates stamped TH 734.

Is that your initial on the bottom corner of this page?

A. Yes, yes.

Q. Let's look at Paragraph 4, and I'm going to read it.

"Ms. Harding has had the opportunity to make independent inquiry into the complete financial circumstances of Mr. Naseman and represents to Mr. Naseman that she is satisfactorily informed with the income, assets, property, and financial prospect of Mr. Naseman, she is aware of all separate property and all marital property as those terms are defined in domestic relations law Section 236 B. She is satisfied that full disclosure has been made."

Do you see that?

A. Yes.

Page 34

D. Naseman

Q. What --

MR. ROTTENSTREICH: For the record, there's additional language.

MR. BURSTEIN: Of course there is. It speaks for itself.

Q. What disclosure was made to Ms. Harding in connection with this agreement?

MR. ROTTENSTREICH: Objection to the question.

Q. You can answer.

A. What disclosure was made? I think that we offered to exchange information to her upon her exchanging information with us, and that was -- the attorneys decided that was not necessary.

Q. So to your knowledge, there was never any disclosure exchanged?

A. None that I'm aware of. I think that there were discussions and references in the letters in here concerning, you know, income percentages or those kind of things, but in terms of a financial statement or something of that nature, I don't believe that ever was done.

Q. Do you recall if tax returns were

Page 35

D. Naseman

exchanged?

A. No, they were not.

Q. They were not.

And you have a distinct memory that no tax returns were provided to Ms. Harding?

A. Yes, yes.

Q. What specific documents do you recall were given to Ms. Harding?

A. Specific documents. Well, I was told that a letter from me of March 29 was delivered to her. Other than that, I had no communications with her, and so I do not know what was given to her and not given to her during the period.

I know there is a document that I certainly gave her, which was the draft of the November -- draft of this property settlement agreement that was left at her residence.

Other than that, I'm not sure what you're asking.

Q. Let's take a look at TH 790.

A. TH 790.

Q. This is a letter from -- you recall that Ms. Harding was represented by Mr. Cohen?

A. Yes, I did.

Page 36

D. Naseman

Q. Your lawyer was Leonard Florescue at Tenzer Greenblatt, right?

A. Yes, at the time.

Q. Looking at Section A of this letter, there was a request for bank accounts you maintained, the balances of those accounts, what investments you have, whether or not there are any sources, other sources of income, and the couple's last five years of tax returns.

Were you aware that those requests had been made of you?

A. Oh, yes.

Q. Did you provide any information in response to those requests?

A. We offered to provide that information, but I don't believe it was ever provided. On a reciprocal basis, I may add.

Q. The tax returns were joint tax returns, correct?

A. Right. I --

MR. ROTTENSTREICH: Let him finish the question.

Q. The tax returns were joint tax returns?

Page 37

D. Naseman

A. They were joint tax returns, yes.

Q. But are you saying you didn't provide those because there wasn't reciprocal disclosure on the other side?

A. First I would be under the impression that she already had the tax returns, but secondly, during the time frame when this was being requested, I didn't even have the tax returns to provide, so -- and when we ultimately offered to exchange on a global basis, which she wanted to go that route, lots of different documents, I'm sure that would have been among the documents that were exchanged, if she didn't have them.

Q. Why is it that you didn't have the tax returns at that point in time?

A. I was physically located in Incline Village, Nevada.

Q. You had no capacity to provide the tax returns; is that what you're saying?

A. Right, they were not with me. Yes.

Q. When did you move to Nevada?

A. I think the date was either January -- yes, January 30 or 31 of 1993.

Page 38

D. Naseman

Q. When did you first start negotiating this property settlement agreement?

A. Tell me what you mean by property settlement agreement.

Q. That's what this is called, the property settlement agreement.

When did you first start negotiating an agreement by which you and Ms. Harding would divide up your marital estate?

A. There were discussions prior to delivery of a draft agreement in November, and then this -- a draft agreement of the property settlement was delivered to her in mid November of 1992.

Q. But as of March of 1993, you didn't have access to your tax returns?

A. Well, this is in February.

Q. As of February?

A. February, yes.

Q. Did there come a time before this property settlement agreement Exhibit 2 was executed that you did gain access to your tax returns?

A. Yes.

Page 39

D. Naseman

Q. When was that?

A. I want to say sometime in March of 1993 when I was back in Lenox.

Q. So as of March, before this was signed, you had tax returns?

A. Yes.

Q. Did you provide them to Ms. Harding?

A. No, I did not.

Q. The first draft that you gave your wife, I think you said November of 1993 first draft of the settlement agreement?

A. '92.

Q. Who drafted that for you?

A. Leonard Florescue.

Q. Take a look at T 794. This is a letter written by Mr. Florescue to Mr. Cohen, dated March 29, 1993. I'll ask you take a look through it.

Do you recall seeing this letter before it went out?

A. I don't know if I saw this exact letter. I probably would have seen something very close to it, so...

Q. It says there at the bottom of the

Page 40

D. Naseman

second paragraph, "As I'm sure you know, the true differences are enormous, and Mr. Naseman has probably earned at least 70 percent of the couple's income through the length of the marriage."

Do you recall whether or not you reviewed any documents that supported the conclusion that at least 70 percent of the couple's income through the length of the marriage was earned by you?

A. Yes.

Q. What did you review?

A. I probably -- well, based on my recollection, okay, I would have reviewed some notes I had regarding the income that was reflected on the tax returns, and I probably would have reviewed one or more of the tax returns.

Q. Was it your view that over the course of the marriage you had contributed approximately 70 percent of the income?

A. No. It was my view that it was substantially higher than that, but that certainly is at least 70 percent.

Q. What did you believe the number was?

Page 41

D. Naseman

A. I think it was north of 80 percent. It was maybe 85 or somewhere in that neighborhood.

Q. You understood this was a letter that was setting out your position about what a fair division of assets would be, right?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I think we were -- I think the letter addresses a trying to reach an amicable settlement.

Q. One of the things you wanted to point out in the course of trying to reach an amicable settlement were the various equities of your respective positions, including the fact that you had contributed a vast majority of the income to the marriage; is that a fair statement?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I think that's one factor that...

Q. So the question is: If you believe that you had contributed approximately 85 percent of the income during the course of the marriage, what was the reason for picking the 70 percent number?

Page 42

D. Naseman

MR. ROTTENSTREICH: Objection to the form of the question.

A. I don't think that I focused on that particular issue. We also -- this was in response, as I recall, to a letter that was to some degree I perceived as insulting to me.

I had some very strong reactions to it, but at a certain level we did not want to argue over those kind of issues because my objective here was to obtain an amicable settlement, not to initiate a full-blown divorce proceeding that would take an extended part of time to conclude.

Q. The numbers were the numbers. You'll agree with that, won't you?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Yes.

Q. I mean --

A. Whatever they were, they were.

Q. And you considered that the relative contributions in terms of income during the course of the marriage was something relevant to consider in figuring out what an equitable resolution of

Page 43

D. Naseman

your differences would be, correct?

MR. ROTTENSTREICH: Objection to the form of the question.

A. That was certainly a factor, yes.

Q. So why would you list 70 percent as your income contribution when the number was 85 percent or more?

MR. ROTTENSTREICH: Objection to the form of the question.

A. As I said previously, I'm not sure that I was focusing on that particular number, so, you know, whatever it was, it was in there, and this was a draft that my attorney prepared, so...

Q. In terms of the settlement that was ultimately arrived at, did you have a view of what -- prior to entering into it, did you have a view of what would be equitable in terms of a division of all the marital assets?

MR. ROTTENSTREICH: Could you repeat that?

Q. Prior to executing the agreement, during the course of the negotiation -- actually I'll start earlier.

When you first started the negotiation

Page 44

D. Naseman

of the agreement with Ms. Harding, did you in your mind have a view of what an equitable distribution of assets would be from a percentage basis?

MR. ROTTENSTREICH: Objection to the form of the question.

A. No, I don't think I -- when the negotiation started, I don't think I was focusing on percentages.

Q. The March 29 letter starting at 794 describes, if you especially go over to 795 -- describes and moving forward after that the general outline of a possible settlement of your marital estate. Wouldn't you agree?

MR. ROTTENSTREICH: Objection. The document speaks for itself.

Q. Perhaps I can help you. If you look at Page 795, Mr. Florescue writes, second full paragraph down, second sentence, "The assets offered to Ms. Harding by Mr. Naseman conservatively total --"

A. Wait, where are you now?

Q. This is TH 795, second full paragraph, second sentence.

A. The assets.

Page 45

D. Naseman

Q. Assets offered to Ms. Harding by Mr. Naseman conservatively total $750,000 from the two apartments, and goes on to talk about other assets.

So as of March 1993, you'll agree there was an offer on the table to Ms. Harding to resolve your differences over how the marital property should be divided?

MR. ROTTENSTREICH: Objection to the form of the question.

A. There was an ongoing discussion and negotiation over the parameters of what that would be. It existed prior to this letter.

Q. I understand that. I'm saying but as of the date of this letter, there was an offer on the table?

A. An offer and a counteroffer, if you will. This is in response to Ms. Harding's lawyer's letter to Mr. Florescue.

Q. I understand that. Let's go back.

Mr. Florescue in this letter was recounting what you had offered.

MR. ROTTENSTREICH: Objection to the form of the question. The document speaks

Page 46

D. Naseman

for itself.

A. He is commenting on that, yes, in the paragraph you referred to.

Q. When you made your offer that's referred to in this letter, did you have a view as to what percentage of the total marital estate you were offering Ms. Harding?

A. At that point in time in terms of a specific percentage, the answer is no. I had a general view of my overwhelming contribution to the marriage.

Q. What was your view at that point in time? Not a specific percentage, but best you can estimate, what percentage of the total marital estate did you think you were offering Ms. Harding?

A. I was not offering a percentage. All right? That was not -- that was not the genesis of my offer.

My offer was something that would provide for her going forward, all right? It was not done in terms of this is X percent, therefore, I believe it's fair or equitable or whatever. It was if she -- if she receives this out of what I

Page 47

D. Naseman

earned and contributed to the marriage, will that provide for her over the rest of her life, hopefully. That was the – that was the offer that was being made.

Q. Thank you, but let me see if I can get my question answered.

Whether or not you were thinking in terms, your offer was based on the percentage.

Given what you were offering, what percentage of the total marital estate were you offering?

MR. ROTTENSTREICH: Objection to form.

Q. As best you can recall.

MR. ROTTENSTREICH: Objection to the form of the question.

A. I'm trying to be responsive. If you are asking do I have a present recollection of what percentage I thought back then, the answer is I don't have a present recollection.

If you're asking me to retroactively at this point in time project what that was in terms of a percentage, I can do that, just depending --

Q. I'm asking the first question. You

Page 48

D. Naseman

have no recollection?

A. I do not have an independent recollection.

Q. Do you recall whether percentage -- the percentage of the marital estate that you retained was a matter of importance to you?

MR. ROTTENSTREICH: Objection to the form of the question.

A. If the percentage was important. Important how?

Q. In your view, you had contributed as much as 85 percent of the income during the marriage, right?

A. Yes.

Q. And based upon that, you felt that you were entitled to keep more of what had accumulated during the marriage than Ms. Harding, correct?

A. I didn't -- I didn't necessarily view it in those terms. It certainly resulted in that, but --

Q. How long had you been married?

A. At the time the negotiations started, approximately ten years.

Q. Did Ms. Harding ever express the view

D. Naseman

to you that she thought she was entitled to 50 percent of whatever it is that had been accumulated during the marriage?

A. No.

Q. Never raised that issue with you?

A. No.

Q. Anybody ever raise the issue with you that Ms. Harding wanted 50 percent of what had been accumulated during the marriage?

A. Not that I recall.

Q. Did you ever in your mind consider the possibility of giving her 50 percent of all of the assets that had been acquired during the marriage?

MR. ROTTENSTREICH: Objection to the form of the question.

A. If you are including the investment account, which was then my business, the answer is absolutely no.

Q. Did you consider what would be a percentage that you in your mind would have been a fair division of marital assets?

MR. ROTTENSTREICH: Objection to the form of the question.

A. In terms of a present recollection of

D. Naseman

what I viewed at that point, the answer is no.

As I said, I was not viewing it when making the proposal in terms of percentages.

Q. To your recollection, you were never -- Ms. Harding never said to you or it was never communicated to you that she wanted 50 percent of all the marital assets?

A. Not that I recall. If it's in one of these documents, it's in there, but I certainly don't recall it.

Q. You understood that -- although you say the investment account was your business, you understood that that reflected income that was earned by you during the course of the marriage?

A. Certainly. I earned it.

Q. You understood that it was within the meaning of the law a marital asset?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I'm not going to speculate on what I knew or didn't know at the time as to whether it qualified as a definition.

I knew that was the money that I had earned, and that was the money that was providing

D. Naseman

my income going forward when I was retired.

Q. Are you aware of any document in which you indicated to Ms. Harding or a representative of Ms. Harding or authorized a communication to Ms. Harding or her representative that you were prepared to discuss a division of assets, but your investment account was off the table in terms of being shared?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I don't know if that was in a document, because that was the premise on which I made a proposal to resolve the property issues between us.

Q. Do you recall, whether it was orally or in writing, communicating to Ms. Harding that giving her any share of your investment account was not going to happen?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I don't believe it was necessarily put in that form. We had discussions that she was employed and -- but what I was going to do going forward, and I was going to continue the investing

D. Naseman

that I had been doing for the previous two years.

Q. Do you remember ever saying to her in words or substance, Toehl, you know, I have a few million dollars in another account, but I'm not going to share that with you?

MR. ROTTENSTREICH: Objection to the form of the question.

A. As I sit here, was there a present recollection of that? Could have happened. I can't recall.

It certainly would have come up at one of those discussions, I would think, but that's how I was earning my money at the time.

Q. Let's go to TH 799.

A. Yes.

Q. You see this is a letter sent by Mr. Cohen to your attorney?

A. Yes.

Q. Let's go to Page 5 of that letter, which is TH 803, and I'm going to read you a paragraph in the middle of the page that says, "Second, you, meaning Mr. Florescue, state that Mr. Naseman believes that the details of the proposals were essentially accepted," those two

D. Naseman

words in quotes, "by Ms. Harding. This is not true. Ms. Harding told Mr. Naseman that she would accept the distribution of at least one-half of the total assets, and that he should make her an offer."

Does that refresh your recollection that Ms. Harding was taking the position that she wanted 50 percent or more of the marital assets?

A. No. That's not the way I certainly interpreted that, because the -- my earning capacity and investment account was totally off the table.

Q. Is there any document -- I'm going to ask you again -- which your attorney, that you are aware of, or you ever wrote to Ms. Harding or her representative which said when you talk about -- in words or substance, if you talk about 50 percent, it's 50 percent of everything but the investment account?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I can't recall whether there was a document or not. I -- this is 15 years, 16 years ago.

D. Naseman

Q. But I mean the investment account was your largest certainly liquid asset, wasn't it?

A. It was an asset. It was also a livelihood. I was managing and trading in that account and earning -- that was my income.

Q. And yet you don't recall whether or not there was ever a letter in which you stated I'm not willing to share any portion of that?

MR. ROTTENSTREICH: Objection. Asked and answered.

A. Well, I said that was -- that was the basis on which my proposal to her was premised, and that she would be provided for going forward.

Q. It was your understanding that when Ms. Harding communicated to you -- I mean, you now recall that Ms. Harding did communicate to you that she wanted at least one-half of the total assets?

MR. ROTTENSTREICH: Objection. Asked and answered.

A. There is language in here representing that she said she would accept the distribution of at least one-half of the total assets. Whether that was true or not, I don't have a present

D. Naseman

recollection, but she certainly accepted less than that.

I certainly wouldn't have -- if that's the definition you're trying to give to that, I certainly wouldn't have even offered.

Q. Let's go back to exhibit -- this is the same document. We were on page --

A. What page?

Q. Paragraph 4 on Page 25, TH 734, a paragraph I read to you before.

A. Okay.

Q. I want to ask you a question or two about your understanding of this paragraph.

Is it your understanding of this paragraph that if you gave Ms. Harding a document, a copy of a tax return which falsely reflected the amount of income you had earned in a given year, that she would be barred from seeking to overturn this agreement?

MR. ROTTENSTREICH: Objection to the form of the question.

Q. You can answer.

MR. ROTTENSTREICH: Calls for a legal conclusion.

D. Naseman

MR. BURSTEIN: It doesn't. I'm asking him what his understanding is.

MR. ROTTENSTREICH: Objection to the form of the question.

A. Let me just say that that scenario never entered my mind.

Q. I'm asking you now is your understanding of this agreement -- that scenario never entered your mind, you're saying, I take it, because you never did give her -- according to you, you never gave her any false information?

A. That's correct.

Q. I'm asking a different question.

Would you agree that this paragraph, your understanding of this paragraph, would not insulate you from a challenge in the agreement if you had given her a false document, falsely reflecting what your true income had been?

DI MR. ROTTENSTREICH: Objection to the form of the question, and I will instruct him not to answer because this is totally for purposes of harassing him.

His opinion as to the legal consequences of the language is completely

Page 57

D. Naseman

irrelevant.

MR. BURSTEIN: Are you making -- are you --

MR. ROTTENSTREICH: I'm instructing --

MR. BURSTEIN: Are you terminating this deposition?

MR. ROTTENSTREICH: No, I'm not.

MR. BURSTEIN: He has an obligation to answer.

MR. ROTTENSTREICH: We went through this before, Judd. He doesn't. I'm preserving the record.

MR. BURSTEIN: Get the magistrate on the phone. We have a magistrate, Ellis.

(Discussion off the record.)

(Telephonic Ruling Before Magistrate Ronald Ellis.)

MR. BURSTEIN: This is a case which involves a dispute. My client claims that she was fraudulently induced into entering into a property settlement agreement with the defendant approximately 15 years ago. One of the key issues in the case, the defendant claims that there was a financial

Page 58

D. Naseman

disclosure provision in the agreement which says that, among other things, that there was full disclosure, that my client is satisfied that full disclosure has been made.

The defendant takes the position that this language, which also includes language that my client cannot appropriately make a claim against Mr. Naseman by reason of his failure to disclose or her failure of knowledge of the financial circumstances of Mr. Naseman. Their defense is this action is barred by reason of this provision.

I want to -- I've started asking questions of Mr. Naseman about his understanding of this provision, in particular that the heart of this case is our claim that my client was given a tax return which purported to show that Mr. Naseman had only earned about a million dollars in a given year, when in fact the actual tax return that was filed showed that he had earned $5 million in that year.

I have sought to ask Mr. Naseman -- in

Page 59

D. Naseman

essence the question was, is it your understanding of this paragraph that Ms. Harding would be barred from seeking to challenge this agreement if in fact you gave her a document which fraudulently understated your income, only seeking the defendant's understanding of a paragraph which is at the heart of this case, and my adversary, I think in clear violation of Rule 30, has directed him not to answer, has not chosen to make a motion for protective order on the theory that it calls for a legal conclusion. It doesn't. It calls for his understanding of this provision.

MR. ROTTENSTREICH: May I be heard?

THE LAW CLERK: No, I'm going to describe the issue to the judge, and I'll return.

MR. BURSTEIN: You are putting us on hold?

THE LAW CLERK: Yes. Please hold.

THE COURT: Good morning. This is Judge Ellis. Who's on the line?

MR. BURSTEIN: This is Judd Burstein

Page 60

D. Naseman

for the plaintiff, Toehl Harding.

MR. ROTTENSTREICH: And Dan Rottenstreich for the defendant David Naseman, your Honor.

THE COURT: I understand that you are in the middle of a deposition, and there's some question that's come up.

MR. BURSTEIN: Yes.

THE COURT: What is the questions and what's the problem?

MR. BURSTEIN: Your Honor, this is a case I know your Honor hasn't really been presented with anything, because I guess we have be getting along so well.

This is a case in which my client, Toehl Harding, claims that she was fraudulently induced into entering into a property settlement agreement with her ex-husband, because she was given a tax return for a key year in the marriage showing that the defendant had earned approximately $1 million. She was given that, and in fact the defendant admits he denies giving her that tax return, but it's

Page 61

D. Naseman

admitted the defendant's actual tax return that was signed showed $5 million in income for the year.

The primary defense, as I understand it -- I'm sure they have factual defenses also, but one of their primary defenses is a paragraph in the agreement which reads -- and the key part is that my client is aware of all the marital property in the estate, and that this is the key part, she is satisfied that full disclosure has been made, and that she cannot appropriately make a claim against Mr. Naseman by reason of his failure to disclose or her failure of knowledge of the financial circumstances of Mr. Naseman.

The defendant's contention is that this is -- this is a bar to the action. In deposing Mr. Naseman, I have sought to ascertain his understanding of this provision, in particular whether he understands this provision to insulate him from having given my client fraudulent documents, you know, and I'm going to go on

Page 62

D. Naseman

to ask him questions about whether it was -- some questions of that ilk.

My adversary has taken the position that, although this is not a question of privilege, that the purpose of the question is to harass and that it calls for a legal conclusion. He hasn't asked to suspend the deposition for a motion for protective order.

I think the objection is improper under Rule 30, and plainly it's a relevant question on a claim we're going to -- case where we're going to claim that at -- you know, worse for us this provision is ambiguous, we should be allowed to inquire into the defendant as to his understanding of a key provision.

THE COURT: Am I to understand that the call is based on a direction not to answer?

MR. BURSTEIN: Yes.

THE COURT: Okay. Let me hear from the defendant and --

MR. ROTTENSTREICH: Thank you. Your

Page 63

D. Naseman

Honor, there is actually a lot more to the paragraph than has been quoted to you by opposing counsel, but the short of it is this: The language speaks for itself. Whatever the contract, the document, says, it says.

The question being put to my witness multiple times is what is his understanding of the legal consequence of that paragraph, of the clear and unambiguous language.

That's not a proper question for a witness to answer. That's the decision that the court's going to make in this case at the end of the day. It's the very legal issue that we're grappling within in case, and to repeatedly ask my client what do you think this language means, if our claim is that you gave her a false return, can she still make a claim against you?

He's answered that I didn't give her a false return. I don't have an understanding because I didn't give her a false return, but the question keeps coming up again and again, what do you understand the language

Page 64

D. Naseman

to mean, and that's a legal conclusion for the court to make, not for a witness to make, and to ask it multiple times, it's just to harass and intimidate him and it's not really advancing the ball on the merits of the case.

MR. BURSTEIN: May I respond briefly?

THE COURT: Go ahead.

MR. BURSTEIN: I haven't asked it multiple times, but besides that -- and also Mr. Naseman is a lawyer, but beyond that, you know, this is an objection that is a trial objection.

My adversary says, you know, this -- the language is clear on its face. He didn't move to dismiss the complaint. The issue is that -- the issue -- we are in discovery. We take a position that it's at least ambiguous.

One of the tests of ambiguity is whether or not the language can be reasonably understood in one way or the other, and this is putting the cart before the horse. He can argue parole evidence,

D. Naseman

but that doesn't mean I'm not allowed to try and elicit parole evidence in a deposition.

MR. ROTTENSTREICH: But it's not the parole evidence aspect. It's asking a witness to give the legal conclusion, can their claims survive the language of this agreement. That's effectively the question. Can they maintain their cause of action based on a language of this agreement. That's the trial. That's what the whole case is about.

THE COURT: Counsel, counsel. In this one, obviously the parties understand that there are only a limited number of bases for terminating a deposition, and in this instance the question is whether or not the question is being asked in bad faith or to harass. I don't think you made out a case that's true.

You certainly have a disagreement as to what the import of the provision appears to be. Whether or not it's plain and ambiguous, frankly, I can't answer that question, but if the deponent can answer the

D. Naseman

question, I see no reason why he cannot be asked the question.

You may be right, counsel, that at trial, you may not -- you may get an objection that the judge may sustain an objection if the court determines that the language is unambiguous, although at this stage of the game, I think it's premature to rule that the question cannot be asked on discovery.

MR. ROTTENSTREICH: But if they ask it multiple times, and he gives the same answer, how many times can the question be asked again?

THE COURT: Well, I'm not sure what was the answer the first time.

MR. ROTTENSTREICH: That he didn't have any understanding because he didn't supply her with a false return.

MR. BURSTEIN: That's not -- I understand. I'm not going to ask it ten times, but, you know, if I have a witness who in my view is obfuscating, I certainly have the right to ask the question in three

D. Naseman

or four different ways to see if I can get to the answer.

You know, again, I only have seven hours. I have one day. I'm not going to spend my time asking, you know, the question in a hundred different ways if I know I'm not going to get an answer.

On the other hand, I want to make sure I haven't left open any particular space here, and he's right. If I ask the question ten times, it's the same question, get the same answer, then that's not proper, but I've never done that, and I'm not going to do it now.

MR. ROTTENSTREICH: We are up to about three.

THE COURT: In this case so far, I don't think that the plaintiff has exhausted the reasonableness in terms of the answering of the question, and indeed, I'm not so sure that the response is a final response, and that the witness can still have an opinion about the provision even if the actions alleged didn't take place.

D. Naseman

MR. ROTTENSTREICH: It's a legal opinion. It calls for a legal determination.

THE COURT: Well, it may not be admissible, but the party's understanding of what the provisions are, I don't think that that's objectionable under the discovery rules.

MR. ROTTENSTREICH: What the understanding of a language is, that's not a problem, but what the legal consequence of the language is, I think is a problem.

I mean, you're asking somebody to on something that he may -- you know you're basically telling him to guess at what the court will do.

THE COURT: At this point, as I understand it, the witness has indicated he hasn't had an opinion, so at this point, I don't think he's expressed a legal opinion, and I agree with plaintiff's counsel that if you're asking a question, and the answer is not clear and unequivocal, you can attempt to get it a different ways.

D. Naseman

I don't have to rule on how many times he gets to try to get at it, but --

MR. ROTTENSTREICH: No, you don't, your Honor, but what you just said is actually the point that's a little confusing to me.

If he doesn't -- you know, if he doesn't have a legal opinion, an opinion on the legal consequences of the language, what is he supposed to say? Just say that or guess? That's where we're at right now.

THE COURT: Unless I am going to go back and listen to how each of the questions was formulated, at this point, you told me he's been inquiring into one particular area. He's got -- frankly, the parties are taking -- so far you have taken up at least 15 minutes just on this inquiry here.

I don't think that based upon what I've been told that it's inappropriate to ask the question during discovery. Again, if I don't know how it's been asked, and I don't know exactly how the answer's been formulated, but I gather the plaintiff is

D. Naseman

certainly at a point where they're ready to move on, and they may ask it one time or more, I don't know, but this certainly doesn't merit the termination of the deposition, and if -- and in a sense it doesn't merit the termination of the deposition, I don't know that it merits a direction not to answer.

So I expect that the plaintiff will use his deposition -- use his time judiciously, so gentlemen --

MR. BURSTEIN: Thank you, your Honor.

MR. ROTTENSTREICH: Thank you, your Honor.

THE COURT: Proceed.

Q. Let me ask you a couple of other ways.

Reading Paragraph 4 on page TH 734, do you understand this paragraph to permit you -- to have permitted you to provide false documentation of your income to Ms. Harding?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Based on my reading of this paragraph, it does not go to the issue of providing

D. Naseman

information.

Q. It says that there has been full disclosure?

A. I'm sorry? That is one --

MR. ROTTENSTREICH: Objection to the form of the question.

Q. Is it your understanding that this agreement, you would have -- that full disclosure would be made under this agreement or into the language as you interpreted, full disclosure would permit you to provide a tax return showing that you had made about a million dollars in one year, and in fact, your tax return, your actual tax return, showed $5 million income.

MR. ROTTENSTREICH: Objection to the form of the question.

A. Without at all agreeing to the premise on which the question was based, that hypothetical would -- the conclusion relating to that hypothetical under this paragraph would at least to me depend upon the other terms as well of the paragraph in reaching an ultimate determination.

Q. Looking at the whole paragraph, is it your view that Ms. Harding's receipt from you --

D. Naseman

and I understand we have a difference as to whether you gave her anything. I'm asking a hypothetical to get your understanding of this paragraph.

A. Uh-huh.

Q. I want you to assume for the moment for the purpose of this question and maybe a few more that in the course of negotiating this agreement you provided Ms. Harding a copy of a tax return for a year showing you earned approximately a million dollars when in fact your actual tax return that was filed showed that you made $5 million.

You got that hypothetical?

A. On that assumption.

Q. I want you to read the language that she cannot appropriately make a claim against Mr. Naseman by failure -- by reason of his failure to disclose or her failure of knowledge of the financial circumstances of Mr. Naseman.

Do you see that language?

A. Uh-huh.

Q. Is it your understanding of that language that even if you gave Ms. Harding a

D. Naseman

completely false document showing that you had -- claiming that you only made a million instead of $5 million, that this part of the paragraph would bar her from seeking relief against you?

MR. ROTTENSTREICH: Objection to the form of the question.

A. From those totally -- just those set of facts, I'm not sure they're sufficient to form a conclusion, because it certainly would depend on if that disclosure or delivery would have to be viewed in the context of other information for her to assess whether full disclosure had been made even if she received a false document of one of many, if you will. Okay?

Q. Are you aware of any documents you provided to Ms. Harding in the course of the negotiation of this agreement which put her on notice that in 1990 you had made approximately $5 million in income instead of the -- that you had approximately $5 million in income?

A. On the limited time frame that you were discussing, I don't believe I provided a document.

Q. I want you to assume now that in the

D. Naseman

course of negotiating this agreement the only document that you gave to Ms. Harding from which she could have ascertained what your income was in 1990 was a document -- was a tax return which showed that you had earned $1 million, when in fact your actual tax return was showed that you had $5 million in income, and I want you to assume that was the only document you gave her.

A. That I gave her?

Q. That she had. How about that? The only document she had and the only document you gave her was a false tax return.

A. Uh-huh.

Q. On that hypothetical, so we're clear, she has no other information as to your income for the year 1990. The only information she has is a false tax return that you gave her. Got that hypothetical?

A. Let me start out with first assumption. The assumption is that she has no other information whatsoever in all of time?

Q. Right.

A. Okay. So the only document she has gotten is this particular document?

D. Naseman

Q. Right.

A. Okay.

Q. Is it your view that if the only information she had for all of time was a $1 million tax return you gave her when in fact your actual taxes, tax return, showed $5 million in income, is it your understanding that she would be barred according to the language of this agreement from challenging this agreement?

MR. ROTTENSTREICH: Objection.

A. On that hypothetical -- and I'm not trying to be evasive, but it goes to the issue of -- at the end of the day, I think the way this paragraph is structured as to the reasonableness of the reliance on solely that document, but if that was the only document and the only knowledge and it was reasonable for her to rely solely on that document as presented, she certainly is saying that she would be precluded because she is satisfied, but I'm not sure that at the end of the day somebody -- somebody would be looking at the reasonableness of the reliance in judging the provision and the effect.

Q. Let's take your hypothetical. She has

D. Naseman

no other information. The only document -- let me reframe the hypothetical, okay? Let me reframe the hypothetical.

In the course of the negotiations, you send Ms. Harding a letter. I understand these aren't the facts. I'm trying to get at your understanding. You send Ms. Harding a letter which says, Dear Toehl, I know you have no knowledge about our income for the year 1990, so in order to give you this information to help you make a determination, here is a tax return showing that I only made about a million dollars for the year, and then in fact the tax return, the actual tax return, is $5 million.

You got that hypothetical?

A. Okay.

Q. Is it your belief that under those circumstances that Paragraph 4 would bar Ms. Harding from challenging this agreement? Not a legal conclusion, just your understanding of what the language means.

MR. ROTTENSTREICH: Objection to the form of the question.

A. She had no other knowledge. That was

Page 77

D. Naseman

the only document she received.

Q. And you wrote saying I know you have no other knowledge, and here is the document, and the document was fraudulent.

A. Again, it goes to her reasonableness in reliance upon the statement given the status of the parties in the context at which you're talking about.

Q. Is your answer to my question that you think it would bar her?

MR. ROTTENSTREICH: Objection.

A. On the limited hypothetical, you know, it seems to me I need to know some more facts.

Q. Those are the only facts I'm giving.

A. I'm not sure that they fit with the entire context here, because we're talking about opportunities and all those kind of things in this provision.

Q. I'm asking you on those facts. Are you telling me you can't give an answer, you're not sure?

MR. ROTTENSTREICH: Asked and answered.

Q. Yes?

Page 78

D. Naseman

A. Well, I think that it's too limited to offer a, quote, understanding based on just those facts.

Q. Let me ask you another question.

Did you believe or do you believe that this paragraph in the agreement permitted you to provide Ms. Harding false information with no consequences?

MR. ROTTENSTREICH: Objection to the form of the question.

A. If false information was provided, and it was not material, or it was subject to being otherwise verified and determined, then merely the delivery of -- and again, I deny that this -- but the mere delivery of something with a false statement in it doesn't seem to preclude the application of this to prevent her from challenging that.

MR. ROTTENSTREICH: Wait. Could you read back the answer? I think you might have said --

MR. BURSTEIN: He meant preclude.

MR. ROTTENSTREICH: Thank you. Does not --

Page 79

D. Naseman

MR. BURSTEIN: Mean that she's not precluded.

Q. Let me take your changed facts.

Do you believe that this paragraph permitted you to provide Toehl Harding materially false information on an issue, on an issue as to which she did not have a reasonable opportunity to find out the truth through other means?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I don't believe that this -- I don't believe this paragraph contemplates or addresses a permission to do anything of the nature that you're suggesting. Okay? It's not an enabling provision. It is a disclaimer provision that is based on the various factors that are in here.

Q. So your view is -- and correct me if I'm wrong -- that even if you did give a false tax return to Ms. Harding showing that you only made a million dollars in a year, when in fact you made $5 million, that that fact would be immaterial?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I'm not saying that it would be

Page 80

D. Naseman

immaterial, but the ultimate effect of this provision, my understanding of the ultimate effect, it may -- it still may apply despite that fact because of other factors that are in place as well that would basically say, for instance, I knew you made $5 million, so I don't care what document you give me that shows, one, I already know that it was five and this is false; therefore I would not be able to rely on that at all.

Q. Really it would depend on the circumstances?

A. It does.

Q. And the underlying facts?

A. I think that this particular provision talks about opportunities and lots of different factors in reaching the ultimate effect of the provision.

Q. The answer depends on the underlying factual circumstances?

MR. ROTTENSTREICH: Objection to the form of the question.

A. I think it depends on the parameters of the various provisions that are here in this Paragraph 4 that gets you to the ultimate

Page 81

D. Naseman

conclusion.

Q. I'm not quite sure what you mean by that. Could you explain what you mean by that?

MR. ROTTENSTREICH: Objection to the form of the question.

A. It talks about opportunities to make independent inquiry into the complete circumstances that she says that she is satisfactorily informed. She is making a representation and an acknowledgment, okay, and that she is aware of all of the separate properties and that she is satisfied that full disclosure was made, not that in fact full disclosure, but that she is satisfied that full disclosure has been made.

That is different than an objective standing, and we're talking obviously academically here and hypothetically, but the issue here is being satisfied, not necessarily the ultimate conclusion that it's true or false.

Q. So your understanding is that, if you were to have given her false information in the form of a tax return, that would be irrelevant as long as she was satisfied with what you had given

Page 82

D. Naseman

her?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Again, she could be satisfied in ignoring that because she has other information that she's not relying on that document to start with, but she is satisfied that she still has a knowledge of all of the assets.

Q. Let's go back to this hypothetical.

Assume she has no other knowledge. The only knowledge she has is the tax return. The tax return is false.

As I understand what you're saying -- correct me if I'm wrong -- that so long as she's satisfied with the information, with information you've given her, that she doesn't know is false, then there's -- then she has no rights under this paragraph?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Yes, I believe she's made her conclusion that she is satisfied.

Q. Even when you -- even if you have hidden the true facts from her?

Page 83

D. Naseman

MR. ROTTENSTREICH: Objection to the form of the question.

A. Again, that's -- it's a basis to some extent, it seems to me, of her reliance on that issue.

Q. What information, to your knowledge, did Toehl Harding have that you earned $5 million in 1990?

A. What time frame? Ever?

Q. No, as in 1992 and 1993, up to the signing of this agreement.

Prior to the execution of this agreement in 1993, Exhibit 2, what, to your knowledge, did Toehl Harding know about the extent of your income in 1990?

A. She knew all there was to know.

Q. She knew that you had -- to your knowledge, she knew that you had earned $5 million in that year, 1990?

A. Yeah, right.

Q. What is the basis for your claim that she had that knowledge?

A. Well, discussions. The tax return that was signed and filed and the attachments

Page 84

D. Naseman

thereto. I mean, the W-2 specifically indicates the amount of income that LIN gave me -- well, I earned.

The proxy statement that came out in '91 that recorded those things -- I mean, there's a host of things.

Q. I'm trying to figure out not just a host of things. So far you have identified conversations, the tax return, and the documents attached to the tax return, the proxy statement.

What else?

A. What else? Offhand, 15 years ago, I can't recall, but certainly those three things. I mean, there may be others. There may be.

Q. Do you recall whether or not you showed her any of the bank statements that contained the proceeds of that income, that $5 million?

A. She certainly may have seen them. I don't know if -- I didn't -- if you're saying did I pull her aside and say, see this deposit slip? I don't have an independent recollection of that, nor I don't think that's consistent with my -- the normal way that I act.

Page 85

D. Naseman

Q. Do you recall any conversation with -- let's go back to something I asked earlier, because it's more relevant now.

Do you recall -- you say you had conversations with Ms. Harding about the money you had earned from LIN in 1990.

A. In 1990, yes.

Q. And you disclosed that to her?

A. Yes.

Q. When you started talking divorce with her, did the subject of the money you had ever -- that you had earned from LIN in 1990 ever come up if terms of whether or not she should receive any portion of it?

A. No.

Q. Never?

A. That was ancient history by that time. I mean, the proceeds were there, but the income is -- you know, that's gone.

Q. Forgetting about the income, did you have any discussions with Toehl Harding about how the proceeds of that income from the 1990 LIN transaction -- did you have any discussions with her about how the proceeds of that transaction

Page 86

D. Naseman

should be divided?

A. Not -- not to my recollection. Only because that was my account. Those were my funds, and that -- those -- the proceeds of those funds in the investment account was the basis on which I earned my income.

Q. Did you ever tell her that you had a separate investment account?

A. Sure, yeah.

Q. Where did the statements for the investment account get sent?

A. At that particular time -- well, tell me the time frame you're asking now.

Q. 1990.

A. Well, in 1990, it didn't exist. In -- it started -- I believe the first investment was made in February of 1991, and the statements at that point in time were going to be sent to Massachusetts, because that's where I was going to be residing.

MR. BURSTEIN: Let me go off the record for a second.

(Luncheon recess.)

Q. Go to TH 794, Mr. Naseman. This is a

Page 87

D. Naseman

letter sent by your attorney to Mr. Cohen on March 29, 1993, and it refers in the first paragraph to the fact that you had written a personal note to Toehl Harding. Do you see that?

A. Yes, I do.

Q. Let me show you what we'll mark was Exhibit 3.

(Plaintiff's Exhibit 3, Letter 3/29/93, marked for identification.)

Q. I'm showing you a letter marked Exhibit 3 with the Bates stamp DN 00580. That's a letter marked -- dated March 29, 1993.

Is this the letter that's referred to in Exhibit 2, also dated March 29, 1993?

A. Yes.

Q. Is this your handwriting?

A. Yes, it is.

Q. In 1993 -- I want to go back for a moment to talk about the investment account.

Do you recall how much money you had in the investment account at that time?

A. It was usually approximately 2.7 was the value. It would go up or down. Just generally it was in that neighborhood.

Page 88

D. Naseman

Q. Do you recall what kind of income you were earning on that amount?

A. I think it was slightly in excess of 200, like in 220, or somewhere in that range.

Q. When you wrote this letter, I note that there are no crossed out words, no inkblots, whatever. Is this a -- did you write a draft of that letter before you wrote this letter?

A. Yeah, I'm sure I did.

Q. Do you remember if you would have typed a draft?

A. I may have.

Q. Let me show you what we'll mark as Exhibit 4.

(Plaintiff's Exhibit 4, Preliminary Draft, 3/93, marked for identification.)

Q. Is Exhibit 4, which is entitled, "Preliminary Draft," and you'll see that at least the first paragraph is the same, is this the draft of the letter you sent to your wife?

A. It certainly appears to be.

Q. Let's take a look at -- go to Page 583 on Exhibit 3, the handwritten -- you wrote -- let me read this paragraph here.

Page 89

D. Naseman

"I sincerely believe that this revised settlement proposal was incredibly fair, and Mr. Cohen's letter has not changed my perception."

A. I'm sorry. Okay. Go ahead.

Q. "You know the true underlying facts, parens, even if Mr. Cohen doesn't yet, but there is little point now in going into these matters, and I seriously hope there will never be. From the beginning I have fervently hoped both for our sakes and those of our respective families that we could reach as amicable a settlement and spare ourselves the turmoil and expense associated with a contested divorce. Unfortunately, that has not been the case to date, and I feel badly if any of my actions have constituted -- have contributed to that since November. I would ask that you reconsider certain of the antagonistic positions taken in Mr. Cohen's letter in light of the further concessions my lawyers indicated to your lawyer today by letter. I look forward to hearing from you."

Let's go to Exhibit 4. We go to Page 895. You see there's on Page 895, you have a sentence there saying, "I sincerely believe that

Page 90

D. Naseman

this revised settlement proposal was exceedingly fair and nothing has come yet to my attention --" the first sentence is correct, right? Same as in both versions?

A. Yes. You've read it wrong, but let me just -- no, they're not identical.

Q. Just the first sentence, the first phrase, "I sincerely believe that this revised settlement proposal was exceedingly fair"?

A. Yes, the first -- that clause is the same.

Q. If we go down in Exhibit 4 on 895, in that same paragraph, that started, "I sincerely believe this revised settlement proposal was exceedingly fair."

You then say, "I would simply note at present --" do you see that sentence in sort of the middle of the last paragraph?

A. Yes.

Q. "-- that you are well aware, A, of the frequency of my presence in New York City," and then let's skip down to B, "that my severance arrangements provided me with an income of over $325,000, covering the majority of that period."

Page 91

D. Naseman

Do you see that?

A. Uh-huh.

Q. Is there a reason why when you sent the final letter to Ms. Harding you left out a sentence which said that she was well aware that your severance arrangements provided you with an income of over $325,000?

A. Let me see what -- yeah, I -- I deleted that entire sentence, all the various parts of it.

My objective here was not to be confrontational, and probably on reading it again I thought it was too confrontational. Yes. This was to be frankly one last plea that we do this amicably or the alternative would be an extended and protracted proceeding.

Q. So am I correct that your answer to my question is that you took out information which you conveyed that you had assets that gave you an income of over $325,000, because you didn't want to be antagonistic?

MR. ROTTENSTREICH: Objection to the form of the question.

A. No, that's not what I said, and that's

Page 92

D. Naseman

not a correct paraphrase. I said that the whole end of this, not just including Paragraph B relating to severance arrangements and the amount, but the whole -- all three elements, as well as the different provisions that followed that, were totally redone to be less confrontational and hopefully result in an amicable arrangement.

Q. Let's try and compare these letters. Let's do it paragraph by paragraph.

Did you take anything out of the first paragraph of the final letter that was in your preliminary draft?

A. The first paragraph seems to be word for word.

Q. In that paragraph what you said to her was that you found the tone or her lawyer's letter offensive, right?

A. Yes.

Q. And that what he said significantly deviated from your discussions with Toehl Harding.

A. Yes, our discussions, yes.

Q. And then you then say, "I find it inconceivable that --" in the final letter, "that a lack of generosity or fairness towards you is

D. Naseman

one of my shortcomings during our ten-year marriage."

In the typed one you said, "Throughout the ten years of our marriage, I find it inconceivable that you would consider that a lack of generosity or fairness towards you was one of my shortcomings," and that sentence, you would agree is those -- the draft and the final expressed the same sentiment, just rearranged so that one is a little more grammatically appropriate?

A. Yes.

Q. There's no difference in what --

A. There's no significant difference.

Q. In the final you say, "Whether it was spending tens of thousands of dollars for furs and jewelry, paying hundreds of thousands dollars to retire indebtedness on the New York and Lenox properties and providing you with new cars, along with free insurance coverage and garaging in New York to ease your commutation, I did them freely and voluntarily to afford you a more comfortable lifestyle."

Look at the draft. Is there any, in

D. Naseman

your view, significant toning down of the language in that paragraph so it would be less confrontational than in the second paragraph of your final?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Well, yeah. I think the word coercion there is -- you know, it's not a term that is -- it certainly was replaced by the word voluntarily, which is much softer and more apropos for an amicable letter rather than something more confrontational.

Q. What you said was in the draft -- so your testimony is that "I did them freely and without coercion to make your life more comfortable and enjoyable" was a more confrontational than the sentence "I did them freely and voluntarily to afford you a more comfortable and enjoyable life"?

A. No, I just stated just to the opposite. Okay?

Q. So less, you're right.

A. Yes.

Q. That the sentence "I did them freely

D. Naseman

and without coercion to make your life more comfortable and enjoyable" was less confrontational than "I did them freely and voluntarily to afford you a more comfortable and enjoyable life"?

MR. ROTTENSTREICH: Objection to the form of that question.

A. No. In the draft, the word coercion is used.

Q. I screwed that up again.

A. Yes.

Q. I apologize.

When you said in the draft I did -- when you wrote in the final agreement "I did them freely and voluntarily," in your view, that was less confrontational than what you had in your draft when you said "I did them freely and without coercion"?

A. Correct.

Q. I mean, your view of the words "I did it without coercion" is somehow confrontational, more confrontational than the word voluntarily?

A. Yeah, it's certainly a harsher term.

Q. Even with the word without next to it?

D. Naseman

A. Even with the word without.

Q. What about telling her that you had spent tens of thousands of dollars for furs and jewelry, paid hundreds of thousands of dollars to retire indebtedness, provided her with new cars and free insurance coverage? You didn't think that was confrontational?

A. No, I didn't.

Q. But leaving the word coercion in would have been confrontational?

A. Well, I think it was a harsher tone.

Q. Then we move -- what about the words "I find it inconceivable"?

Did you think that that was in any event a -- what was the word? Confrontational?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Clearly I didn't, because I didn't change it.

Q. We go now to the next sentence. "When we can no longer live together, it was with these --

A. Where are we?

Q. Next page of the original.

Page 97

D. Naseman

"When we could no longer live together, it was with these same concerns and spirit of generosity that I fashioned the initial property settlement proposal. I discussed it with you last summer, i.e., in an amicable and prompt settlement, you wanted to receive both of the New York apartments and their furnishings, the Volvo 760 sedan, and $250,000 in cash. It was my belief that with all of your assets free of any indebtedness, the net income from the rental of Apartment 6 A and the investment of the 250,000, parens, or if you sold the Apartment 6 A, the income from the investment of those proceeds and 250,000, close parens, would provide you with a comfortable continuous income in addition to your own substantial salary. This income would be in addition to and apart from the financial assets and benefits you have or will attain on your own through your employment with NYNEX Corporation and US Industries and your savings over the last four years, parens, in making the proposal I was not aware of the extent of your financial assets and benefits, but in an attempt to reach a prompt amicable resolution, I was willing to not include

Page 98

D. Naseman

an uneducated estimate of your assets in the calculation."

Take a look at the third paragraph in the draft. Is there any language that was changed from the draft to the final document that rendered the final document less confrontational in that paragraph?

A. Well, I mean, the changes will speak for themselves. Obviously, there has been a parenthetical that was added to the end of the final letter, and that was essentially so that she was aware that I didn't try and just plug in a number and do anything on that fashion, so that, you know, I was at that point just ignoring what assets she had in terms of fashioning my proposal, so at the end of the day, whatever she had was going to be given to her and retained by her without any participation by me whatsoever.

Q. And in your view, that made the letter less confrontational?

A. Well, I think it -- it was intended, at least from my perspective, to convey a sense that I was not trying to reach out and take a portion of her assets that were hers, so if you

Page 99

D. Naseman

will, it's an assurance kind of provision.

Q. Go down to the next paragraph. You actually have that language in about the parenthetical. The last part of the paragraph here in the final letter that we just read is in the next paragraph of your draft.

A. Where is that?

Q. Indeed, second page of Page 2 -- "Indeed, with this revised component of the proposal, the settlement would provide you with more than 1 million in assets without any consideration of your personal financial holdings over and above your contribution to those assets."

A. That is not the same parenthetical. Sorry, that's a different -- those aren't the same words that are in the final.

Q. But what is -- I mean, do you think that there is a -- certainly in both of those you did write, "This income would be in addition to and apart from the financial assets of benefits you have or will obtain."

MR. ROTTENSTREICH: Objection to the form of the question.

MR. BURSTEIN: We will move on.

Page 100

D. Naseman

A. Yeah.

Q. Is it your view that there's something in the first -- other than the word coercion, is there something between the first page up to the end of the first full paragraph on Page 2 which is less confrontational than the final letter up to the middle of Page 3?

A. Since this is my personal letter, I was making the judgments as to what I determined to be the tone of the letter, and the message that it was to convey consistent with that tone.

If you're saying that you personally don't find any substantive difference in the two, okay, that's fine with me, but I think that the way I set it out in the final, at the point in time that this was being drafted, I determined to be a more -- a better form and tone of conveying the message that is in this letter.

Q. And that's the only reason why you left out the fact that you had over $325,000 a year in income from your severance payments?

MR. ROTTENSTREICH: Objection to the form of the question.

A. As I previously indicated, that is not

Page 101

D. Naseman

the only thing that was left out of this letter or changed, and that entire sentence was left out with many different elements in it.

MR. BURSTEIN: Let's move on and mark as Exhibit 5.

(Plaintiff's Exhibit 5, Analysis, marked for identification.)

Q. Have you seen this document before?

A. If I answer your question, am I waiving anything?

Q. I would have no idea. Even though you're not allowed to ask a question, if you think there's a privilege issue, you can --

MR. ROTTENSTREICH: Let me state on the record. I know what the issue is, so I'll state it on the record.

The document that has been marked as Exhibit 5, the witness will tell you what I'm proffering to you is a document that's his handwritten notes that he prepared to discuss with and did discuss with his divorce counsel back in 1993, and that the document was obtained by his former wife, Marcia Bothe Duncan improperly going through

Page 102

D. Naseman

his personal belongings and subsequently making their way to you and plaintiff Ms. Harding. Nevertheless it's still a privileged document.

MR. BURSTEIN: Has there been any motion --

MR. ROTTENSTREICH: Let me finish. Still maintain it's a privileged document, and what I'm prepared to do, if you are willing, to allow you to question him on it, save some time, and not take a blanket objection it's a privileged document as long as you agree it's without prejudice to our right to preserve privilege.

MR. BURSTEIN: That's fine.

Q. Can you tell me what that document is?

A. This document is a communication with my attorney on the -- well, I could leave it at that.

MR. BURSTEIN: Let me take a two-minute break to get from my office what I need.

(Recess taken.)

Q. Looking at Exhibit 5, let's look at

Page 103

D. Naseman

the No. 1, and let me make sure I'm writing it.

"I keep 75 percent of my assets, 3 million --" reading it correctly -- "I keep 75 percent of my assets, $3,832,000, $3.1 million in cash." Do I have that right?

A. That certainly appears to be.

Q. That's your handwriting?

A. Yes, this is my handwriting.

Q. Did you end up keeping approximately $3.8 million out of the divorce?

A. Based on the assumptions and valuations, yeah, it's approximately that.

Q. And you ended up with $3.1 million in cash?

A. Cash and liquid assets. I mean, that particular reference includes the investment account that you see over on the last page.

THE WITNESS: Excuse me.

(The witness consults with his attorney.)

THE WITNESS: You mind if I just state for the record? This document has numerous comments on it that are not mine.

Q. I understand that. We're going to get

Page 104

D. Naseman

to that. That's why I'm making a point of asking you when I read something if that's your handwriting.

It says going down to the bottom third of the page, "If the deal blows, she hasn't gotten higher ground." Am I -- is the circle around the word hasn't -- is that something you wrote or is it -- that's added?

A. That is added. That was not in the original.

Q. But the rest of that sentence without the circle, is that your handwriting?

A. Yes.

Q. So "If deal blows, she hasn't gotten higher ground," you wrote that?

A. Yes.

Q. And then it goes -- but again, we understand that the circle around the word hasn't is not your handwriting. That was added.

A. Uh-huh.

Q. And then it says, "A, she used divorce as leverage to extort 60 percent of my assets, but none of hers -- her in pot, and she put only 18 percent to marriage." Is that --

Page 105

D. Naseman

A. That's not accurate. Let me read it.

"She used divorce as leverage to extract 60 percent of my assets and put none of her in pot, and she put only 18 percent to marriage."

Q. So let me ask -- that is all your handwriting, correct?

A. That's correct.

Q. When you said there she put only 18 percent to marriage, am I correct what you meant was that out of the income that was earned by both of you during the marriage, she only contributed 18 percent?

A. That's correct.

Q. And so that you contributed 88 percent, 82 percent?

A. Yeah.

Q. And was this analysis prepared for Mr. Florescue?

A. Yes. That's the notation up at the top of the page. It says "Len's secretary, Ed, that's appointment for that evening."

Q. And when you said "She used divorce as leverage to extract 60 percent of my assets," what

Page 106

D. Naseman

assets were you referring to?

A. I was referring there to the non-investment account assets, because that was -- I viewed that as separate.

Q. And then you said "I will argue for 80 percent of the assets." The next line is -- we don't have what that says.

A. We do at the bottom of the next page.

Q. I see, yes, yes.

"Since I put in 82 percent of income, and TH can keep hers without my --"

A. "Any claim of mine."

Q. "Any claim of mine."

Is this -- were you saying this is what you would argue in the event of no settlement?

A. Yes, these are various scenarios to discuss with my attorney.

Q. And then to the left of the next paragraph there's a circle around the words "TH feels she is --" or is that just on yours? I can't tell sometimes.

A. Second page.

Q. The second page, the word "TH feels

Page 107

D. Naseman

she has won by taking most of everything," and there's a star next to that.

Is that your handwriting?

A. That's my handwriting.

Q. What do you mean by that?

A. What's in the next -- the adjacent paragraph that's labeled C is she gets a majority of the cash and the majority of the real estate value on various assumptions, and I pay all costs.

Q. When you say that she gets -- why do you say that she feels she has won?

A. Because you need to understand the context in which this was won.

This was her proposal or her -- I'm sorry. Her attorney's proposal back to us on the 15th, which was a Thursday evening, that -- and it was transmitted about seven o'clock at night, as I recall.

We had to respond by the opening of business on Monday, and so that's why I'm trying to get ahold of Lenny in the evening to discuss this, and this is in response to the fact that if we accept her proposal with these various elements, she will feel that she has won by taking

Page 108

D. Naseman

most of everything.

Q. In fact, she wasn't taking most of everything, because you were keeping the investment account?

A. That phrase is not next to the investment account. That is a clear reference to Paragraph C, which is right next to it, is a majority of the cash, the majority of the real estate, and all the costs.

This was her proposal back, and the reason you can tell is that this entire analysis relates to the $500,000 in cash that is inherent. It's in the back page of the financial terms, but it goes throughout the various paragraphs in it, so that's the timing of this particular document.

Q. Let's go to the last page. Is there anything on this page that is not your handwriting?

A. Yes.

Q. What is that?

A. Certainly the star next to the last area on the page, and let me see if there's anything else. I can't quite tell from this, the squiggles that are underneath the No. 3,832,000 in

Page 109

D. Naseman

my column. I don't know if that was somebody else doing something, and I'm not sure about the doodle, but it may be mine.

Q. Anything else?

A. No. I think the rest of it, you know, from a cursory look is mine.

Q. On this page, you were doing a breakdown what each of you got taking into account the investment account.

A. Yes, of Toehl's proposal back to us, right.

Q. As you analyzed it, you ended up with approximately 75 percent of the total pot, right?

A. Yes, that's the 74.78 number, right.

Q. When you said earlier in this document that Toehl feels she has won by taking most of everything, when you used the word feels, am I to understand that you didn't mean that she feels she has won because you were not telling her about the money in the investment account?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Repeat that one for me again?

Q. Am I correct that when you said -- is

Page 110

D. Naseman

it your testimony that when you said Toehl feels she has won by taking most of everything, what you meant was she feels that she has won by taking most of everything, because you had not told her about $2.7 million in investments?

A. No, that's absolutely false. The characterization of that is she made the last proposal, and we were essentially accepting it, which we ultimately did, with only one condition, which was nonfinancial.

Q. Let's go back to the second page where you said that you would argue for 80 percent of the assets I produce, since I put in 82 percent. Do you see that?

A. Of income, correct.

Q. Of income, and that 82 percent differential was in part because in 1990 you earned close to $5 million, or was it $4 million? $5 million, because of your departure from LIN, correct?

A. Yes, certainly that's in -- within that percentage figure.

Q. And then so you said, "I will argue for 80 percent in the event that we don't have a

Page 111

D. Naseman

settlement," right?

A. Correct.

Q. And yet the settlement you ultimately ended up with gave you almost 75 percent?

A. Correct, correct.

Q. And so from your perspective, the difference between a settlement and what you were prepared to argue for was only 5 percent of the total marital pot?

A. Well, if you want to focus solely on the financial aspects, okay, which -- and that's indicated on this page, the 5 percent figure in calculation has been done, but if you want to argue only on financial terms, that is accurate, but financial terms were not my sole consideration at this time between -- in judging a settlement versus a fight, okay, to get to the 80 percent.

Q. Let's go back to that same page with the 80 percent.

Right above that you say she used divorce as leverage to extract 60 percent of your assets. When you were referring to 60 percent of your assets, were you including the $5 million or including the investment account?

Page 112

D. Naseman

A. If your question is only the investment account, that was not included in that 60 percent.

Q. So --

A. Or the assets on which the 60 percent was based.

Q. You're saying then that she -- she was -- in the event of a litigation, she was only -- you thought she would be seeking 60 percent of the assets, other than the investment account?

A. No, I -- I don't know what would come up during that particular thing, but this is not going to what is eventually going to be in a fight, okay.

This is a recognition that, at least in my judgment, that she was using the speed that I wanted the divorce to extract more than a majority, which is 60 percent of the, quote, available assets, because I didn't consider the investment account as available because that was my source of income.

Q. You just testified that when you asked for 80 percent of assets, because you produced -- you put in 82 percent of the income, you were

D. Naseman

including the $5 million from LIN, right?

A. That's right.

Q. And when you were arguing --

A. No, no. Wait, wait. No, I -- it's not $5 million from LIN, okay, in the --

Q. You're right. You were including the investment account.

A. I was including the proceeds of that -- what was in the investment account.

Q. So let me rephrase it.

When you said you were arguing -- you put in 82 percent of income -- well, of income, what you were saying was that if you compared the income over the marriage, put it in one pot, regardless of what you had as of the time of the divorce, if you put the income that you both had earned into one pot, you would have contributed 82 percent of it?

A. Yeah. Let me just say that this analysis was done on a very expedited fashion, so the difference between 80, 82, 87, I was going from memory in jotting down these issues, so this -- and again, this was prepared for my attorney, not for publication. Okay?

D. Naseman

Q. I understand that.

A. Right.

Q. But you testified earlier that when you said you would argue for 80 percent of the assets, what you meant was the total pot, including the money in the investment account, correct?

A. Sure.

Q. But is your testimony that when you used -- when you talked above about she would use the divorce as leverage to extract 60 percent of my assets, there when you used the words assets, you didn't include the investment account, because --

A. That's correct.

Q. -- because it was available assets?

A. That's correct.

Q. Is there a reason why you didn't put in -- you used my assets in A and not my available assets?

A. As I just said, this was done on a -- I mean, these are notes I'm making to myself, and also to convey to Lenny so that he can understand my thought process.

D. Naseman

This is not a definitive analysis that is for publication somewhere, so any imprecision in language is inadvertent, and certainly I don't think you can draw any conclusions from available assets versus assets.

Q. What is your understanding of what percentage of available assets Toehl Harding received in the divorce?

A. Like I say, I was estimating in 60 percent. If somebody's done the numbers, I'd -- I thought it was getting the majority of those, because of the property valuations, and she was in fact getting more cash at that point because it went up by $100,000 over the 400 in my column.

Q. When you said she used divorce as leverage to extract 60 percent of my assets, you were talking about what she would get in the event there was no settlement and you ended up with litigation, correct?

A. No, no. Absolutely not. These are, these are -- I'm trying to explain to you.

These are thought processes set down on a piece of paper. There was no way that in my estimation if A and B were both the issues, then

D. Naseman

somebody would be ending up at 140 percent of the entire total, because I certainly believed at that point that if this thing ever went to an extended proceeding, that I was going to get at least 80 percent, and whatever my percentage was going in of the total pie, so the question is whether I was giving up 5 percent at this point in time, which is the calculation made over on the last page, by willing to accept 75 percent, then sticking around and going through a long proceeding and winding up with 80 or more percent of the assets.

Q. If you take A and B together, it's 140 percent, but that's not what you were saying here?

A. No. I'm sorry. You are misinterpreting what is being said for your own purposes. I'm making mental notes here to discuss with my attorney, okay. I said before, there is no precision in these particular paragraphs, and you seem to want to try and insert some precision when there is none.

Q. Let's try this. You see if we start with -- on that page, that same page, you have Nos. 4, 5, 6, 7. That's your handwriting, right, on TH 813?