Page 117

1  D. Naseman
2  A.  Without the --
3  Q.  Without the squiggle.
4  A.  The squiggle and the repeat of Page 1,
5  yes.
6  Q.  And then under set -- and 7 says, "If
7  deal blows, she hasn't gotten higher ground," and
8  you say -- and underneath it it's A and B.
9  A.  And C.
10 Q.  So would you agree that when you -- A,
11 B, and C relate to what would happen if the deal
12 blows.
13 A.  I think I've answered the question. I
14 believe my answer is, as you apparently don't want
15 to take my explanation for it, and you'll decide
16 how you want to view it.
17 Q.  That's not acceptable. I've asked you
18 a different question.
19     Are A and B and C descriptions of what
20 you believe might happen if the deal blows?
21 A.  No.
22 Q.  No?
23 A.  A is not.
24 Q.  And the fact that it's a sub -- it's
25 in an outline and under the -- under a broader

Page 118

1  D. Naseman
3      B, certainly, I will argue for 80
4  percent of the assets, is what you would do if the
5  deal blows, correct?
6  A.  Certainly the first part of that is
7  accurate. The last part of that, "And TH can keep
8  her without any claim of mine," certainly wouldn't
9  be the case if we were in an extended proceeding.
10     That's why I'm saying these paragraphs
11 are not precise, okay, as you're trying to read
12 them. These are factors to consider.
13 Q.  But A is when you said, "She used
14 divorce as leverage to extract 60 percent of my
15 assets." Certainly within your assets were the
16 investment account, correct?
17 A.  As I have previously said, no. That's
18 not what was meant there.
19 Q.  I'm not asking what was meant. Your
20 assets at that time, regardless of what was in
21 this clause, your assets included the investment
22 account, correct?
23 A.  If you're talking about an abstract
24 outside of this document, yes, that is true.
25 Q.  When you say -- and 7 B, "I will argue

Page 119

1  D. Naseman
2  for 80 percent of the assets I produced, since I
3  put in 82 percent of the income," that was your
4  assessment of what you would argue if the deal
5  blew, right?
6  A.  That is correct, up to that point.
7  Q.  You weren't saying -- so when you said
8  "I will argue for 80 percent of the assets," and
9  I'm going to leave the rest of that out, "And
10 Toehl can keep hers without any claim of mine,"
11 weren't you saying there that if you -- if the
12 deal blows, the position you would take is that
13 you'd keep 80 percent, and she can keep assets in
14 her name without any claim of mine?
15 A.  No.
16 Q.  No. And you remember that here today,
17 that that's what -- that's not what you meant?
18     MR. ROTTENSTREICH: Objection to the
19     form of the question.
20 A.  Let me see if I can explain it this
21 way.
22 Q.  That's not my question, sir?
23 A.  I'm trying to explain to you --
24 Q.  Excuse me. You'll answer my
25 questions, not what you want to say.

Page 120

1  D. Naseman
2  A.  If you don't want to hear the answer,
3  I'm sorry.
4  Q.  Were you -- is the answer yes or no?
5  When you said, "I will argue for 80 percent of
6  assets I produced, since I put in 82 percent of
7  income, and Toehl Harding can keep hers with -- TH
8  can keep hers without any claim of money," isn't
9  it a fact that you were describing the position
10 you would take if there were litigation because
11 the deal blew? Yes or no.
12     MR. ROTTENSTREICH: Objection to the
13     form of the question.
14 A.  Based on my understanding of your
15 question, the answer is no.
16 Q.  You have a recollection today that
17 that's -- your interpretation of this paragraph is
18 what you believed at the time you wrote it?
19 A.  Yes.
20 Q.  Where did you write this document?
21 A.  This document was written in Incline
22 Village, Nevada.
23 Q.  And there -- so 7 B, at least the
24 first sentence, had to do with what would happen
25 if the deal blows, right? I think we're in

Page 121

```
 1           D. Naseman
 2   agreement on that.
 3         MR. ROTTENSTREICH:  Objection to the
 4      form of the question.
 5      A.   It certainly relates to if the deal
 6   blows.
 7      Q.   But no part of A -- your testimony has
 8   to do with what argument Toehl Harding would make
 9   in the event that the deal blew?
10         MR. ROTTENSTREICH:  Objection to the
11      form of the question.
12      A.   No, because she wouldn't be using any
13   leverage at that point.  Doesn't apply.
14      Q.   So since you recall writing this and
15   what you meant at the time, why is it that you put
16   A underneath a section that starts with the word
17   if deal blows?
18      A.   As I sit here today -- as I said, I
19   was writing down thoughts for my counsel and
20   various factors, and this was where this one fell
21   as I was going through the process.
22      Q.   So pure coincidence that it happened
23   to be under Section 7?
24         MR. ROTTENSTREICH:  Objection to the
25      form of the question.
```

Page 122

```
 1           D. Naseman
 2      Q.   Go to Page 2, T 814.  Is that your
 3   handwriting on the page?
 4      A.   Yes.  I'm not sure what the squiggle
 5   is at the top.  That's unidentifiable, but maybe
 6   just --
 7      Q.   Let's go to TH 817.
 8      A.   Right.
 9      Q.   And it says -- you see the line
10   towards the bottom on the left said, "Things to
11   hide"?
12      A.   That certainly appears that the last
13   word --
14      Q.   What do you mean when you wrote things
15   to hide?
16      A.   I'm asking my -- can I ask him a
17   question?
18      Q.   Not during this, while the question is
19   pending.
20      A.   Read the question again, please.
21         (Question read.)
22      A.   This was a response of issues that
23   could come out in a later contested proceeding if
24   we did not accept the offer that Mr. Cohen had
25   made on the 15th of April.
```

Page 123

```
 1           D. Naseman
 2      Q.   These were things, 1 through 5, that
 3   you wanted to hide from Toehl Harding by settling
 4   the case; isn't that right?
 5      A.   It -- the word hide is obviously an
 6   inappropriate choice of words here.  What this was
 7   conveying was is that there were certain existing
 8   circumstances and certain things planned in the
 9   future that if you have an ongoing and long
10   contested proceeding, those things would
11   inevitably bubble up during that proceeding.
12      Q.   These were things that were going to
13   happen or had happened?
14      A.   Well, some were going to happen, some
15   had already happened, but you'll notice that the
16   word is to hide a futuristic concept, not
17   something that has been hidden, if you will.
18   Okay?
19      Q.   Could you explain to me -- at the time
20   you wrote this, the first one says "Marcia
21   relationship."
22      A.   Correct.
23      Q.   Did Toehl Harding know about the
24   Marcia relationship at the time you wrote this
25   document?
```

Page 124

```
 1           D. Naseman
 2      A.   It was my hope that she did not, okay.
 3   Let me finish.  However, at a -- at a particular
 4   point in time, probably in November, that
 5   relationship became more public.
 6         Toehl had many friends in the
 7   Berkshires.  It's not inconceivable that word
 8   would have gotten back to her, although I had
 9   hoped that it had not.
10      Q.   When did your relationship with Marcia
11   begin?
12      A.   That would have been, I believe,
13   sometime in July.
14      Q.   Was that something you tried to hide
15   from Toehl Harding?
16      A.   Well, it certainly wasn't something
17   that I was shouting from the rooftops.
18      Q.   I mean, forget about shouting from the
19   rooftops.
20         Did you ever say to her, Toehl, I
21   can't be around because I got to go and meet my
22   girlfriend?
23      A.   No, I certainly did not tell her that.
24      Q.   Certainly you tried -- and I take it
25   there were times when you were with your
```

Page 125

1    D. Naseman
2  girlfriend that you told Toehl Harding you had
3  been someplace else.
4       MR. ROTTENSTREICH: Objection to the
5    form.
6    A.   I can't recall offhand the particular
7  instance of that occurring, because Toehl was not
8  in the Berkshires on an ongoing basis.
9       Let's put it this way. On a daily
10 basis, she might have been up during weekends, but
11 there may not have been any reason for her to make
12 that statement to her because she's not there.
13   Q.   Is your testimony here you didn't try
14 to hide your relationship from Marcia from your
15 wife?
16      MR. ROTTENSTREICH: Objection to the
17   form of the question.
18   A.   No. I -- let me say that I certainly
19 did not want to hurt Toehl with her finding out
20 other than through me that a relationship existed.
21   Q.   Yes or no.
22      Prior to November, prior to the time
23 that you wrote this document, Exhibit 5, yes or
24 no, did you try to hide your relationship with
25 Marcia from your wife, Toehl Harding? Yes or no.

Page 126

1    D. Naseman
2       MR. ROTTENSTREICH: Objection to the
3    form of the question.
4    A.   In a -- in a broad sense the answer is
5  yes.
6    Q.   How about in a narrow sense?
7    A.   You'll have to give me what the narrow
8  one is.
9    Q.   You testified just now that in a broad
10 sense the answer is yes, so I'm asking in what
11 narrow sense the answer would be no.
12   A.   Well, in the broadest sense, as I said
13 before, I didn't want her to hear it other than
14 from me, if it arose, but at the same time, she
15 was not in the Berkshires, and Marcia and I were
16 out and about, and she may, okay, so that there
17 was no assurance that, you know, even if best
18 efforts of hiding it or not disclosing it would be
19 successful. I mean --
20   Q.   You understood the difference between
21 you seeking to hide something and Toehl Harding
22 finding out regardless of your effort to hide it?
23      MR. ROTTENSTREICH: Objection to the
24   form of the question.
25   A.   That one I'm not --

Page 127

1    D. Naseman
2    Q.   You would agree that the fact that you
3  sought to hide the relationship wouldn't change --
4  be changed by the fact that she found out. It
5  would only mean that you had been unsuccessful in
6  hiding it.
7       MR. ROTTENSTREICH: Objection.
8    A.   I don't equate those two. I'm sorry.
9    Q.   You don't?
10   A.   No.
11   Q.   So is it your view that if there's a
12 possibility that something -- another person --
13 you don't want another person to know, if there's
14 a possibility that they could find out, then
15 you're not hiding anything? Is that what you're
16 testifying to?
17      MR. ROTTENSTREICH: Objection to the
18   form of the question.
19   A.   Maybe it's late, but you have lost me.
20   Q.   I'm trying. I think what you
21 testified to was that you didn't seek to hide the
22 relationship with Marcia from Toehl because there
23 was a possibility that Toehl might find out about
24 the relationship from third parties.
25   A.   Well, there's -- there is no need

Page 128

1    D. Naseman
2  particularly to hide the relationship when Toehl
3  is not around, all right? I mean -- so in --
4  that's the majority of the time we're talking
5  about.
6    Q.   How about the times when she was
7  around? Did you tell her?
8    A.   No, certainly did not.
9    Q.   How about No. 2, Marcia debt, 80
10 percent. What does that relate to?
11   A.   That relates to, I believe, three
12 loans that were made to Marcia in connection with
13 her business.
14   Q.   Were those loans made prior to you
15 writing your notes in Exhibit 5?
16   A.   Yes.
17   Q.   Did you seek to hide the fact of those
18 loans from Toehl Harding?
19   A.   Again, we will get into the same
20 metaphysical, but this was in my view -- although
21 it had personal aspects it to, it was just another
22 investment like I would be making in the
23 investment account, but -- and no, I didn't go up
24 to Toehl with a piece of paper and say see the
25 loan I made for $50,000 or $27,000 or whatever to

Page 129

1        D. Naseman
2   Marcia.
3        In fact, the only loan that was made
4   when Toehl was in fact around I believe was the
5   initial loan in August.
6        Q.   When you say she was around, you mean
7   the only time that Toehl was in the Berkshires
8   when you actually gave Marcia the money? Is that
9   what you mean?
10       A.   Well, I don't believe that Toehl was
11  present when I gave her the money, but it's the
12  time frame in which the loan was made, so the
13  later -- the other loans, anything over $50,000
14  was made when Toehl was not in any kind of regular
15  -- I mean, it's after a separation.
16       Q.   You were still married?
17       A.   Certainly still married.
18       Q.   Why is it that you put that under the
19  heading things to hide if you weren't hiding it?
20       MR. ROTTENSTREICH: Objection to the
21       form of the question.
22       A.   Keep in mind, again, it was very
23  imprecise and in retrospect an unfortunate term to
24  use, but this was essentially -- I was being asked
25  to say, okay, if you didn't take the deal, and you

Page 130

1        D. Naseman
2   went to a contested issue, what are the things
3   that could come up that you know might cause you
4   some concern, and these were things that I off the
5   top of my head came up with to respond to that my
6   counsel's question.
7        Q.   Is it -- was it your intention that if
8   the deal blew, so to speak, that you would do what
9   you could so that Toehl Harding would not find out
10  about these items?
11       MR. ROTTENSTREICH: Objection to the
12       form of the question.
13       A.   While it's speculative, okay, I will
14  certainly say that if -- if I had ever been served
15  in a divorce proceeding with the kinds of
16  discovery requests you have made here, which are
17  not unusual, given the fact that I just went
18  through one, I think some of these -- some of
19  these things would certainly have come up and been
20  disclosed, so I don't think -- my perspective at
21  that point was these things aren't going to be
22  hidden, okay, if there's a contested divorce
23  proceeding.
24       They are going to come up, people are
25  going to get hurt, and you know, with the

Page 131

1        D. Naseman
2   revelation of certain of these issues.
3        Q.   Were there circumstances under which
4   you planned to hide these five items?
5        MR. ROTTENSTREICH: Objection to the
6        form of the question.
7        A.   No.
8        Q.   What would the surgery cost?
9        A.   Those were the costs related to the
10  reversal of a tubal ligation that occurred -- that
11  Marcia had shortly after she had had her first son
12  or, you know, somewhere in that time frame.
13       Q.   When did the reversal take place?
14       A.   That -- my recollection is -- I forget
15  the name of the procedure, but I think that was
16  like January 27, 1993, somewhere around there.
17       Q.   So by that time were you separated
18  from Toehl?
19       A.   Yes.
20       Q.   Where did the money for the surgery
21  cost come?
22       A.   The only reason I -- I find that a
23  little strange is because there's been dueling
24  statements about where the costs were satisfied.
25  It is my position.

Page 132

1        D. Naseman
2        Q.   I'm not interested in whose position
3   it is. I want to know where the money came from,
4   not what your position is.
5        MR. ROTTENSTREICH: Objection. He
6        should be allowed to finish his answer,
7        because he was giving you his answer.
8        MR. BURSTEIN: It's nonresponsive.
9        MR. ROTTENSTREICH: Move to strike it.
10       MR. BURSTEIN: I'll withdraw the
11       question.
12       MR. ROTTENSTREICH: Let him answer
13       when he's answering.
14       MR. BURSTEIN: I'll withdraw the
15       question.
16       Q.   I'm not interested in what your
17  position is. I'm asking where the money for the
18  surgery costs came from.
19       A.   Would you object if I said it was my
20  understanding that the surgery costs were
21  satisfied from my assets in terms of whether it
22  was income or other assets that existed at the
23  time those costs were in fact satisfied?
24       Q.   Did the costs -- were the costs paid
25  out of your investment account?

33 (Pages 129 to 132)

**Page 133**

D. Naseman

A. I couldn't say whether that was the specific source.

Q. Were there any other assets besides the investment account which you claim -- which you believed were your assets and not part of the marital pot?

MR. ROTTENSTREICH: Objection to the form of the question.

A. Sure. Well, I mean, if you're trying to include the 12,000 within, quote, the marital pot, I'm not going to argue with that because it's a metaphysical distinction.

I had money that was in the Lee bank account. I considered that mine, just as Toehl would consider money that was in her Bankers Trust account to be hers, so -- but if you want to say everything was the marital pot, yes.

If you accept the -- my understanding that the $12,000 was satisfied from cash that came out of a check or some form of payment from me, that is accurate.

The real question and caveat to that is the timing which that payment was made, and that may have been after the divorce was final. I

**Page 134**

D. Naseman

just don't know the answer to that, but given the delays in billing and payments, that certainly could have happened.

Q. Where did the money for the loans to Marcia come from?

A. The second loan, which was in December 16 or 15, somewhere around there, for 27,000, that came from the Lee bank account, after a deposit, as I recall, of $50,000 from the -- my Republic account, and off the top of my head, I can't recall exactly where the 50,000 came from, but that certainly could have been from the investment account.

Q. How about --

A. In August.

Q. How about the diamond ring? When did you buy the diamond ring for Marcia?

A. The time frame for the purchase of that was either April 23 or sometime in the beginning of May. I just can't figure out --

Q. Which year?

A. Oh, 1993.

Q. And then below we have something that says two relations, 50,000/5,000. What does that

**Page 135**

D. Naseman

refer to?

A. That refers to categories of payments either made or to be made to relatives over whatever period of time that contested proceeding involved.

For instance, I gave one cousin a couple of thousand dollars so that he could attend the Olympics in 1992 to watch his wife dive for the US team. I think I gave my brother some funds.

I was planning an extension on the Michigan property that was going to cost a significant amount of money, so I was sort of ballparking and guesstimating what might be involved in that category.

Q. Why was that -- those payments listed under things to hide?

A. As I said previously, the word hide is not the correct word there. It was things that would essentially come up during a proceeding that might be objected to. That's all.

Q. Do you remember testifying in your divorce case in a deposition in January of 2006?

A. Yes.

**Page 136**

D. Naseman

Q. I'm going to read you a question and answer from that at 104.

"Again, under things to hide, money to relatives, it says $50,000 to something.

"Answer: Yeah, I don't know what that reference is to."

What has happened between January 17, 2006, to May -- what are we 12, 2008, to refresh your recollection as to what that money was for?

A. Two years -- well, not two years, but two years have elapsed. The complaint has been filed against me. I reviewed a great many more things that I hadn't looked at in years, and that I certainly had not looked at prior to the fact that this single page was put in front of me in a deposition without any explanation as to what exactly it was.

Q. What documents have you looked at that have helped refresh your recollection?

A. I looked at the documents relating to the Michigan property.

Q. Did you produce them to your attorney?

A. Yeah. The deeds and those kind of things?

Page 137

```
 1              D. Naseman
 2       Q.    What in the deeds helped you refresh
 3   your recollection about -- for example, how about
 4   the money for the Olympics?
 5             What has helped you refresh your
 6   recollection about paying for somebody to go to
 7   the Olympics?
 8       A.    Look at one of the -- the Shearson --
 9   whatever the name, Shearson Prudential, whatever
10   account you want to call it that was produced.
11            In the back there are expenditures
12   from that account that are listed, and I believe
13   you'll see one to an Oldenhaus. I think you'll
14   also see in there there is -- that is responsive
15   to the Olympics. I think there was a graduation
16   gift to a Kirkola, which was another second cousin
17   of mine, so, you know, these are things that, you
18   know, have -- could be the subject of a dispute.
19       Q.    Why is it that you had that under
20   things to hide?
21       A.    As I said, the word hide is not an
22   appropriate term which would come up during a
23   protracted proceeding.
24       Q.    Would you consider yourself a person
25   who is careful with language?
```

Page 138

```
 1              D. Naseman
 2            MR. ROTTENSTREICH: Objection to the
 3       form of the question.
 4       A.    If I am doing it for publication, yes.
 5   If I am making notes to myself, and I know what
 6   I'm talking about, I don't necessarily sit there
 7   and actually fuss over it, and particularly since
 8   this was being done in such a time crunch, okay,
 9   given the fact that we had to respond to this
10   offer by the -- I believe it was the 18th, and I
11   had to get ahold of Len to discuss these terms.
12            MR. BURSTEIN: Why don't we take a
13       break?
14            (Recess taken.)
15            (Plaintiff's Exhibit 6, History,
16       marked for identification.)
17       Q.    Have you seen this document before?
18       A.    Let me say two things. I've seen
19   these two documents before. There's a document
20   that is a cover page and -- well, let's use the
21   Bates stamps.
22            TH 818 to 823 is a document that I
23   sent to my counsel at his request. TH 824 labeled
24   supplemental information is not a part of that
25   document, and I first saw in -- I want to say July
```

Page 139

```
 1              D. Naseman
 2   of 2006 or in that time frame.
 3       Q.    Did you -- let's talk about 818 to
 4   823. Was this a document that was left in your
 5   house and found by Marcia?
 6       A.    I don't think found is the correct
 7   term. This was a document that was locked in my
 8   footlocker, which was jimmied open, and this
 9   document was taken from there for whatever. I
10   mean --
11       Q.    You said this was prepared, and I'm
12   only talking about 818 through 823. Which lawyer
13   was this prepared for?
14       A.    This was prepared for Leonard
15   Florescue.
16       Q.    Do you recall when it was done?
17       A.    It would have been after February 24,
18   okay? And let me just say that I don't presently
19   recall when the handwritten changes were made to
20   what was typewritten on here, and the circle
21   around stocks is not of my doing, but it was in
22   the, I'd say, latter part of February, beginning
23   of March period.
24       Q.    Was this prepared on a computer or a
25   typewriter?
```

Page 140

```
 1              D. Naseman
 2       A.    This was on a typewriter. I didn't
 3   have a computer in Nevada.
 4       Q.    Do you still have that typewriter?
 5       A.    No. It's long gone. 15 years ago.
 6       Q.    When you say it was long gone, when
 7   did you get rid of it?
 8       A.    Probably it broke down. It might have
 9   been eight years, ten years ago.
10       Q.    Before your marriage with Marcia ran
11   into difficulty, would that be fair to say?
12       A.    Yes.
13       Q.    Let's go to 824, and I understand that
14   you have -- you claim that you did not prepare
15   this. So who do you believe prepared this?
16       A.    I am not going to speculate on who I
17   believe prepared it. There's some interesting
18   things in here, but I'm not going to speculate.
19   That's up to somebody else to determine.
20       Q.    Do you believe this document was in
21   your footlocker with T 818 through 823?
22       A.    Certainly not to my knowledge.
23       Q.    But you would agree that this is a
24   document that was initially produced by Marcia in
25   your divorce?
```

35 (Pages 137 to 140)

COMPUTER REPORTING INC.                              (212) 986-1344

Page 141

D. Naseman

2  A. Yes. That's where I first saw it.
3  Q. And I want to go back to the time that
4  your -- eight years ago when you lost your or you
5  threw your typewriter away; would that be fair to
6  say?
7  A. Without holding me to the time frame,
8  yeah, I'm sure it was disposed of somewhere.
9  Q. I'd like to ask you sitting here
10 today, can you think of anyone who eight years ago
11 or approximately eight years ago would have had a
12 motive to add the sheets, create the sheets
13 supplement information?
14 A. I'm not -- I don't think I've
15 indicated anything relating to how this first --
16 how this -- the time when this was prepared or
17 that it was prepared on a particular typewriter.
18 Q. You said it was prepared on a
19 typewriter.
20 A. I said my document was prepared on a
21 typewriter.
22 Q. I understand that. I want to ask you
23 -- and I'll tell you why I'm asking you. I
24 believe that expert opinion will establish this
25 document, TH 824, was created on the same

Page 142

D. Naseman

2  typewriter as TH 818 through 823, so my question
3  is: First of all, who had access to your
4  typewriter in the years between your divorce and
5  when you threw your typewriter away?
6  A. Well, certainly Marcia would have. I
7  would have. Who else was around? I'm trying to
8  think of where it was. It was in the Lenox --
9  there were some people that stayed in the Lenox
10 house when we were living during the winters in
11 Scottsdale, so they could have had access to it.
12 Q. Who were these people?
13 A. They were some friends of Marcia's.
14 I'm trying to think of their last name. There was
15 a couple -- I can't think of the last name
16 offhand, and then there was a woman who was
17 separated from her husband that would have been
18 there maybe during that time frame.
19 Q. And the typewriter was in Lenox the
20 whole time?
21 A. It was in Lenox for -- yeah, a portion
22 of the time, and then it may have eventually
23 gotten to Scottsdale, and where it was thrown out.
24 I didn't keep track.
25 Q. Did you ever discuss your finances

Page 143

D. Naseman

2  with any of the people who were living in the
3  Lenox house?
4  Did you ever discuss with them your
5  finances as of the time you were getting a divorce
6  from Toehl Harding?
7  A. The Lenox house?
8  Q. The Massachusetts house.
9  A. Did I discuss the terms of my
10 financial arrangements?
11 Q. Yes.
12 A. No, no.
13 Q. Do you know if Marcia ever discussed
14 the terms of your financial status as of the time
15 of the divorce from Toehl Harding with those
16 people?
17 A. I don't know.
18 Q. Let's go through this. This is T 824.
19 I'm going to read you the first Paragraph 1
20 entitled, "Credit Cards and Retail Accounts."
21 TH, Toehl Harding, and DN, that's you,
22 right?
23 A. That's correct.
24 Q. "Maintained separate credit cards and
25 retail accounts and each was responsible for his

Page 144

D. Naseman

2  or her prospective balances." Was that true
3  during the time of your marriage?
4  A. Yes.
5  Q. "Neither TH nor DMN has ever used the
6  other's credit cards or charged merchandise to the
7  other's retail accounts."
8  Is that to the best of your knowledge
9  true?
10 A. Yes.
11 Q. Who, to your knowledge, other than you
12 and Toehl Harding possessed that knowledge about
13 the way you maintained your credit cards
14 between -- between the period, say, February,
15 January 1992 and the time when you stopped -- you
16 ended your possession, so to speak, of your
17 typewriter?
18 A. Let's see. Certainly I would. Toehl
19 would have. I'm sure that potentially our
20 respective counsel's would have when they were
21 discussing things. Potentially people who read
22 the correspondence. If there's references to
23 things in there, they could have divined them from
24 that.
25 Q. Who read the correspondence?

36 (Pages 141 to 144)

COMPUTER REPORTING INC.                              (212) 986-1344

Page 145

D. Naseman

1  
2   A.  Well, certainly Marcia did. I mean —
3   Q.  Other than Marcia?
4   A.  Well, I don't know. I mean, there's
5   other -- you're asking me a range of people who
6   could have had knowledge of this, and I'm saying
7   that if it was reflected in the correspondence,
8   anybody reading that could.
9   Q.  Who to your knowledge with access to
10  your typewriter would have had knowledge of the
11  information in Paragraph 1?
12  A.  Based on what I would say, what I have
13  said, it would probably be limited to me and
14  Marcia, if we're talking about just the
15  typewriter.
16  Q.  Yes. No. 2, entitled, "TH Toehl
17  Harding," right?
18  A.  Correct.
19  Q.  "Information. DMN has never had
20  access to and does not presently know any of TH's
21  bank accounts investment interests or her
22  corporate benefit plans, and DMN does not know any
23  of the tax balances -- any of the -- any of Toehl
24  Harding's balances in any of the foregoing."
25      Was that true as of the time you were

Page 146

D. Naseman

1  
2  getting a divorce from Toehl Harding?
3   A.  Yes.
4   Q.  "Based upon tax information, she has
5  provided at year end, I believe that Toehl
6  Harding's balances could be substantial."
7      Other than you, who else during the
8  time that you owned the typewriter had knowledge
9  that you never had access to Toehl Harding's bank
10 accounts, et cetera?
11  A.  Probably anybody who read the
12 correspondence, including -- or Toehl, myself, and
13 the lawyers.
14  Q.  I'm asking with access to the
15 typewriter.
16  A.  Access to the typewriter. I would say
17 that that's at least within the parameters you're
18 talking about, it would be Marcia and myself
19 probably.
20  Q.  Toehl wouldn't have had access to the
21 typewriter after February of 1992; isn't that so?
22  A.  Not -- February of 1992? She
23 certainly shouldn't have, let's put it that way.
24  Q.  It says No. 3 -- what about -- "Based
25 upon tax information was provided, she has

Page 147

D. Naseman

1  
2  provided at year end, I believe that Toehl
3  Harding's balances could be substantial."
4      Was that true? Did you believe that
5  as of the time you were getting divorced from
6  Toehl Harding?
7   A.  Yeah, I think that's reflected in the
8  correspondence. Yeah.
9   Q.  Let's go to three.
10     "For various reasons, Toehl Harding is
11 unaware of the existence of the Shearson Lehman
12 Brothers account or the income that has been
13 generated by that account over the last two years.
14 Similarly, Toehl Harding is not presently aware of
15 the extent of my income for the 1990 and 1991 tax
16 years, nor for the year 1992, just completed."
17     I take it your testimony is that that
18 statement is not true.
19  A.  That statement is not true.
20  Q.  And we can discuss the reasons for
21 this at your convenience. You don't -- you didn't
22 write that either?
23  A.  No.
24  Q.  And 4, "During the marital period, DMN
25 has earned over 80 percent of the total income

Page 148

D. Naseman

1  
2  generated by Toehl Harding and DMN."
3      You believe that could be accurate as
4  of the time you were getting the divorce?
5   A.  Yes, yes.
6   Q.  And who with access to the typewriter
7  would have known that you had earned 80 percent of
8  the total income?
9   A.  Certainly myself and anybody who read
10 the correspondence.
11  Q.  With access to the typewriter.
12  A.  Marcia -- I'm sorry. I'm sorry.
13  Q.  "This has been primarily due to LIN
14 Broadcasting stock options which were exercised or
15 otherwise cashed in in 1998 and -- 1988 and 1990."
16 Is that statement true?
17  A.  Yes, that's true.
18  Q.  And am I correct that the only people
19 with access to the typewriter who would have known
20 that to be so are you and Marcia?
21  A.  Yes.
22  Q.  Then it says -- you can read the rest
23 of that sentence, starting "TH has received NYNEX
24 stock," and I'm going to ask you first are the
25 statements starting with the sentence, "TH has

37 (Pages 145 to 148)

Page 149

1  D. Naseman
2  received" to the end of the paragraph with the
3  word USI, are those statements true?
4    A.  They certainly may be true. I'm not
5  sure that they are necessarily true.
6    Q.  Let me rephrase the question.
7        Did you believe this -- did you
8  believe the information conveyed in that part of
9  Paragraph 4 to be true as of the time that you
10 were getting a divorce from Toehl Harding?
11   A.  Did I believe it to be true? The
12 answer is no, because I wouldn't have seen it, but
13 secondly, I'm going to the issue that if it read
14 NYNEX securities, okay, so instead of options it
15 might have been stock, it might have been, you
16 know, whatever, that may be accurate, because I
17 would certainly expect her to be getting some kind
18 of equity interest in NYNEX, and my understanding
19 or my belief was, or still is, that Toehl had some
20 kind of equity with USI as well when she was
21 there.
22   Q.  Is there anyone who had access to the
23 typewriter other than you and Marcia who had
24 knowledge that this was your belief?
25   A.  Knowledge that this was my belief.

Page 150

1  D. Naseman
2    Q.  As of the time that you were getting a
3  divorce from Toehl.
4    A.  Well, it -- I don't know who had
5  access to my beliefs.
6    Q.  Who did you -- did you tell anyone
7  other than -- who had access to the typewriter,
8  other than Marcia, that you believed that Toehl
9  had potential income coming to her from NYNEX and
10 US Industries?
11   A.  I don't know what you're asking. I'm
12 not connecting.
13   Q.  At the time of the divorce, you
14 believed that Toehl Harding was going to receive
15 income in some form from NYNEX and income in some
16 form from US Industries, correct?
17   A.  No, no. I would -- she -- if we're
18 going back at the time, I would have believed that
19 she was getting some kind of NYNEX equity on an
20 ongoing basis. US Industries was in the past.
21 That was over, I believe. I mean, it's reflected,
22 I think, in a tax return.
23   Q.  But you believed that she had received
24 income from US Industries?
25   A.  Oh, had. Yes, yes.

Page 151

1  D. Naseman
2    Q.  Who with access to your typewriter did
3  you communicate if anyone that belief?
4    A.  I don't know whether I would have
5  communicated that to anybody. I might have
6  communicated it to Lenny, Len Florescue.
7    Q.  With access to your typewriter?
8    A.  I don't know whether that has gotten
9  into any of the correspondence or notes or
10 anything like that.
11   Q.  How about --
12   A.  It's a mystery to me.
13   Q.  How about going back to -- let me --
14 No. 1, credit cards and retail accounts, the
15 information in that is accurate, right?
16   A.  Yes.
17   Q.  Am I correct that the only people who
18 might have had that information were you, Marcia,
19 Toehl, and perhaps lawyers?
20   A.  And if it was reflected in any of the
21 documentation, anybody who was reading it.
22   Q.  Who else was, to your knowledge -- was
23 reading the documentation?
24   A.  Well, as I said, Marcia certainly was,
25 or has.

Page 152

1  D. Naseman
2    Q.  I added Marcia.
3    A.  I'm sorry, and based on events that
4  have occurred at the Lenox property, anybody who
5  breaks into the house and starts rummaging through
6  things, so from -- I mean, but realistically
7  speaking on a reasonable basis, absent some
8  extraneous thing, I think that's the -- that's the
9  parameters.
10   Q.  Just so we're clear, you, Marcia,
11 Toehl, the lawyers, and perhaps people who might
12 have broken into the Lenox house?
13   A.  Yeah, that's the only --
14   Q.  No. 2 is also substantially -- is
15 correct, the information conveyed in No. 2?
16   A.  If I was saying it -- I think that
17 that would be true.
18   Q.  Am I correct the only people, to your
19 knowledge, who would have had the information
20 conveyed in No. 2 would have been you, Marcia,
21 Toehl, and perhaps somebody who might have broken
22 into the Massachusetts house and the lawyers?
23   A.  Yeah, and anybody reading the
24 correspondence.
25   Q.  But other than you, Marcia, Toehl, the

Page 153

D. Naseman

1 lawyers, and perhaps these vandals, was there
2 anybody else, to your knowledge, who had access to
3 the correspondence to read it?
4     A.   No, not that I know of. At least my
5 correspondence. You know, I can't account for
6 anybody else's.
7     Q.   No. 4, would you agree that the
8 information in No. 4 is substantially true?
9     A.   4. Oh, yeah, with the caveat I gave
10 before about set of options limiting, instead of
11 limiting options -- I shouldn't say.
12         Subject to the caveat I made before
13 regarding equities instead of limiting it to
14 options.
15     Q.   I understand what you're saying. Let
16 me be clear.
17         No. 4 is correct except that the
18 sentence "TH has received NYNEX stock options
19 periodically," is inaccurate to the extent you may
20 have -- it may have been equity as opposed to
21 stock options?
22     A.   Right, may have been a stock purchase
23 program or a stock grant program rather than just
24 the right to purchase.

Page 154

D. Naseman

1     Q.   Who else other than you, Marcia, the
2 lawyers, Toehl Harding -- let's take out Toehl
3 Harding. You, Marcia, the lawyers, and vandals,
4 would have known all of the information in
5 paragraph -- all of the information in Paragraph
6 4?
7     A.   I'm not sure why you took out Toehl
8 Harding.
9     Q.   You can add Toehl Harding.
10     A.   I mean, certainly she would know. Who
11 would know. Offhand, I can't think of anybody at
12 the moment.
13     Q.   Am I correct that -- so 1, 2, and 4 on
14 TH 824 are accurate, but for the caveat with
15 regard to the NYNEX stock options, and the only
16 people who would have had this knowledge, to your
17 knowledge, are Toehl Harding, you, Marcia, the
18 lawyers, and possible vandals?
19         MR. ROTTENSTREICH: Objection.
20     A.   Vandals, others who read the
21 documentation.
22     Q.   I thought you said the only others you
23 can think of were people who broke into the house
24 and rummaged around.

Page 155

D. Naseman

1     A.   You're not talking about who could
2 know. Not tied to the typewriter.
3     Q.   Not tied to the typewriter.
4     A.   So it would have been somebody in
5 Lenny's office.
6     Q.   I meant the lawyers. I meant the
7 lawyer in the lawyer's offices.
8     A.   Okay, I'll go with that.
9     Q.   So the only portion of TH 824
10 according to you that is untrue is No. 3, right?
11     A.   Certainly, yeah.
12     Q.   Do you know the brand of the
13 typewriter you had?
14     A.   Offhand I think -- it's been so long.
15     Q.   Was it an electric typewriter?
16     A.   Yeah, one you plug in a wall and --
17     Q.   IBM? Smith Corona?
18     A.   No to IBM. I have no idea. It was
19 purchased in Nevada once I got out there, because
20 I didn't bring anything with me, so I purchased
21 that and a fax machine and a few other things.
22     Q.   You purchased it in Nevada?
23     A.   Uh-huh.
24     Q.   How big was it?

Page 156

D. Naseman

1     A.   It was one of those carry kind.
2     Q.   You took it back and forth with you to
3 Massachusetts?
4     A.   I'm not sure I would say I took it
5 back and forth. It was there. It was then in
6 Massachusetts. It was then in Scottsdale. It may
7 have gone back once or twice when we made the
8 transitions from Scottsdale to Lenox during the
9 summer and then back again, so it would have been
10 in either of those two places.
11     Q.   Is your testimony that at -- there
12 were times when you had the typewriter after you
13 were separated from Toehl Harding that the
14 typewriter was left in a house where you were not
15 residing at the time?
16     A.   Certainly, yes. Certainly could be.
17     Q.   Let me ask you one question while he's
18 doing that.
19         I asked you a question. You said you
20 didn't want to speculate, but I'd ask you yes or
21 no.
22         Do you have a belief as to who
23 prepared -- I think it's TH 824. Do you have a
24 belief as to who prepared TH 824? Yes or no.

### Page 157

1  D. Naseman
2  A. I try not to.
3  Q. If you try not to, it sounds to me
4  that you might have been unsuccessful in that
5  endeavor, so --
6  A. There could be.
7  Q. Who is it that you -- who is the
8  belief that you could have?
9  A. I'm not going to respond that.
10  Q. I think you are required to. I think
11  your lawyer will tell you that you are required to
12  respond to that.
13  A. That question?
14  MR. BURSTEIN: I think you have to
15  direct him.
16  MR. ROTTENSTREICH: Could I talk to
17  him?
18  MR. BURSTEIN: Sure. If you want to
19  take a break, go outside, don't hesitate.
20  (The witness consults with his
21  attorney.)
22  A. This is in response to your last
23  question. Given the information that's in there,
24  it could be a combination singularly or in
25  combination of Marcia and Toehl Harding.

### Page 158

1  D. Naseman
2  MR. BURSTEIN: Let's mark this as 7.
3  (Plaintiff's Exhibit 7, 1987 Tax
4  Return, marked for identification.)
5  Q. I ask you to look at 87 and ask you
6  whether this is a true and accurate copy of the
7  tax return you filed with Toehl Harding in 1987.
8  A. Tax returns plural?
9  Q. State and federal tax returns.
10  A. I have two copies of the state.
11  Q. There may be two copies.
12  A. Yeah, it -- you know, I have no reason
13  to believe -- yeah, there's two copies attached.
14  Q. Is the handwriting on these, this tax
15  return or both tax returns your handwriting?
16  A. Yes, the handwriting itself, yes.
17  Q. So the numbers that are put in there,
18  you wrote those numbers?
19  A. Yes.
20  MR. BURSTEIN: Let's mark this as
21  Exhibit 8.
22  (Plaintiff's Exhibit 8, 1988 Tax
23  Return, marked for identification.)
24  Q. And look at this document. Are these
25  true and accurate copies of tax returns, state and

### Page 159

1  D. Naseman
2  federal, that you filed in 19 -- for 1988 with Ms.
3  Harding?
4  A. Yeah, without vouching that everything
5  is in there. Yeah, it certainly looks like the --
6  Q. The handwriting is yours on these tax
7  returns?
8  A. Yes, it is.
9  Q. And the numbers that were put in were
10  written in by you?
11  A. The ones in pen rather than typing,
12  yes.
13  MR. BURSTEIN: Make this next. I
14  guess it's 9.
15  (Plaintiff's Exhibit 9, 1989 1040,
16  marked for identification.)
17  Q. I ask you the same questions.
18  Are these true and accurate copies of
19  tax returns you filed with Toehl Harding for tax
20  year 1989?
21  A. It certainly -- they certainly appear
22  to be.
23  Q. Do you recognize the handwriting on
24  the tax returns as yours?
25  A. Yes.

### Page 160

1  D. Naseman
2  Q. And the handwritten numbers you put in
3  there?
4  A. That is correct.
5  MR. BURSTEIN: Let's do the federal as
6  10.
7  (Plaintiff's Exhibit 10, 1990 1040,
8  marked for identification.)
9  Q. Is this a true and accurate copy of
10  the federal tax returns you filed with Toehl
11  Harding in 19 -- for the tax year 1990?
12  A. Let's put it this way. It appears to
13  be, but this is not the tax return for 1990 I
14  produced.
15  MR. BURSTEIN: Why don't we take a
16  break and get that one, so there's no issue.
17  I'd rather do that so that we don't
18  have any question.
19  (Recess taken.)
20  (Plaintiff's Exhibit 11, 1990 1040,
21  marked for identification.)
22  Q. I'm going to ask you is Exhibit 11 a
23  true and accurate copy of the tax joint tax return
24  you filed with Toehl Harding for the tax year
25  1990? Don't worry about Exhibit 10. I'm just

Page 161

1      D. Naseman
2  asking about Exhibit 11.
3      A.   Exhibit 11?
4      Q.   This is the one that you produced?
5      A.   This is the one I produced, yes.
6      Q.   That's your handwriting on the tax
7  return?
8      A.   Yes, it is.
9      Q.   And the numbers written in are numbers
10 written in by you?
11     A.   Yes.
12     Q.   This truly and accurately reflects the
13 income that you earned?
14     A.   In 19900, yes.
15     Q.   In 1990?
16          If we look to DN 00421, you see that
17 there is a check from you with a 1370 Avenue of
18 the Americas address for $163,573.94?
19     A.   Correct.
20     Q.   Was 1370 Avenue of the Americas your
21 office at the time?
22     A.   Yes, LIN Broadcasting.
23     Q.   We go to the next page. There's
24 $100,000 check drawn on a joint account from --
25 listed at the address of 425 East 51st Street.

Page 162

1      D. Naseman
2          Is that -- was that your home address
3  at the time?
4      A.   Yes, it was.
5      Q.   That check is $100,000 from the joint
6  account, right?
7      A.   Correct.
8      Q.   Is there a reason why you broke up the
9  checks so that $100,000 went to the joint account
10 and 160,573.74, was paid out of an account with
11 your office address?
12     A.   There would have been a reason, and in
13 trying to reconstruct this, the -- it may have
14 been that this -- this -- one of these accounts
15 would --
16 MO     MR. BURSTEIN: I'm going to move to
17    strike.
18     Q.   I didn't ask what it may have been.
19 I'm asking if you recall why --
20     A.   Do I recall why?
21     Q.   -- the tax payment was made in two
22 different checks.
23     A.   As I sit here right now, the answer is
24 no.
25     Q.   Are there any documents that you could

Page 163

1      D. Naseman
2  review that would refresh your recollection as to
3  why you broke it up into two checks?
4      A.   No.
5      Q.   Did the --
6      A.   Not that I can recall right now. If
7  you give me something, I'm more than happy to.
8      Q.   Did the check that was written on the
9  1370 Avenue of the Americas account, where did the
10 statements for that account -- where were they
11 sent to?
12     A.   Probably sent to my office, right.
13         MR. BURSTEIN: Let's mark this 12.
14         (Plaintiff's Exhibit 12, 1990 1040,
15     marked for identification.)
16     Q.   Have you seen this document before,
17 Exhibit 12?
18     A.   Yes, I have.
19     Q.   When was the first time you saw this
20 document?
21     A.   I believe it was November 3 of 2005.
22     Q.   That was in connection with your
23 divorce with Marcia?
24     A.   Correct.
25     Q.   And do you recognize any of your

Page 164

1      D. Naseman
2  handwriting on this document?
3      A.   It is difficult to say. It certainly
4  is a close approximation of mine, and I've looked
5  at this before. I can't tell you whether parts of
6  this was a draft or what, but it certainly isn't a
7  document that I prepared.
8      Q.   Look at the number on Line 7.
9      A.   Line 7.
10     Q.   The first page?
11     A.   Right.
12     Q.   The number 1,252,059.88. Is that
13 numbering -- did you write that numbering there?
14     A.   Couldn't tell you.
15     Q.   You don't recall?
16     A.   No, it -- as I -- as I'm saying, I
17 don't know whether this is a close approximation
18 of mine that somebody did or whether this was a
19 draft of another tax return, but you can see that
20 the 252 seems to be different or in some context
21 from the 059. I mean, just size wise it's
22 different.
23     Q.   When you say it could be a draft of
24 the different tax return, what do you mean?
25     A.   Well, I mean that when I did a tax

Page 165

1  D. Naseman
2  return, I would do various drafts as things got
3  added, and if I was preparing the final, if I made
4  a typo or something like that, I would start over
5  again and redo the form.
6     Q.   When were you paid the $5 million from
7  LIN, what month of the year?
8     A.   Well, it's -- it's not that simple.
9  There was probably about 3.9 million that was -- I
10 think technically speaking I don't think it was
11 LIN. It was McCaw, and that would have been in
12 March 1990.
13        Then additional payments, the balance
14 would have been made either throughout the year as
15 my salary was going on during this period, and
16 then in November -- on November 1 or somewhere in
17 that month, they paid out the rest of the money
18 when I retired.
19    Q.   Certainly then by the time you were --
20 by the time you secured a copy of a 1990 1040, you
21 knew that you had earned at least $3 million from
22 LIN in the year 1990?
23    A.   Certainly, absolutely.
24    Q.   So if this was a draft that you
25 prepared, on what basis would you have filled in

Page 166

1  D. Naseman
2  the number 1,252,059.88?
3     A.   That's what I'm saying, it could have
4  been a mistake.
5     Q.   A mistake by you?
6     A.   A mistake by me or intentionally done
7  by somebody else with a close approximation. If
8  somebody was giving me information over the phone
9  and I'm trying to -- I'm trying to do your
10 conceivable issue here.
11        The fact of the matter is I did not
12 prepare that form, but if you want to look at the
13 W-2, I think if somebody was giving me --
14    Q.   On what exhibit?
15    A.   I'm sorry.
16    Q.   Exhibit 12?
17    A.   On Exhibit 11. DMN 0421.
18        If somebody was giving me the federal
19 income tax instead of the other number just to the
20 next of it of wages and tips, you'd get a totally
21 different result, but I am saying, I -- this is
22 baffling.
23    Q.   You know that the -- the entry for
24 federal income tax on February -- on No. 9 --
25    A.   Right.

Page 167

1  D. Naseman
2     Q.   -- was for the income tax that was
3  paid, not for the money that you were given?
4     A.   Certainly, I know that, yes.
5     Q.   In fact, if you look on Page 2 of this
6  Exhibit 12, how is it that only 237,028.52 is
7  listed?
8     A.   Don't ask me. I didn't prepare it.
9     Q.   So this is not your signature on the
10 bottom, the signature page of TH 454?
11    A.   No, that's a copy of a signature which
12 is identical to the tax -- 1990 tax return that is
13 Exhibit 11 on Page 2.
14    Q.   And what do you draw from that?
15        MR. ROTTENSTREICH: Objection to the
16 form.
17    Q.   What conclusion do you draw from that?
18    A.   That somebody copied the signature
19 block on Exhibit 11, Page 2, and pasted it onto
20 the signature block on Exhibit 12, Page 2.
21    Q.   And take a look at 1989, which I think
22 is Exhibit 9 and look and the signature line on
23 the second page of that exhibit.
24    A.   Yes.
25    Q.   Do you see any significant difference

Page 168

1  D. Naseman
2  between the signature line on 45 on the 1990 tax
3  return, the Exhibit 12, with the 1,252,000 income
4  figure, and the signature line on Exhibit 9, TH
5  442, which you have acknowledged is your
6  signature?
7     A.   Yeah, they're different.
8     Q.   You think they're different?
9     A.   Yeah.
10        Let me make sure I understand what
11 you're asking me. Are you saying they're
12 identical? Because they certainly are not.
13        The M and the A doesn't come at the
14 same point. The N is differently framed, and the
15 line that's in the D, for instance, goes further
16 in than on one than the other, so -- and Toehl's
17 name is much darker on one, and the G is
18 differently -- I mean, they're not identical
19 signatures. People don't do identical signatures.
20    Q.   Comparing Exhibit 11 to Exhibit 12, do
21 you have an opinion as to who would have created
22 Exhibit 12?
23    A.   Do I have an opinion? Are you making
24 a distinction between an opinion and a belief?
25    Q.   Do you have a belief as to who

Page 169

1    D. Naseman
2 prepared Exhibit 12?
3    A.  Yes.
4    Q.  Who do you believe prepared it?
5    A.  I believe Marcia or somebody under her
6 direction prepared it.
7    Q.  Do you have a belief as to why Marcia
8 would have done this?
9    A.  I think that the trial in our divorce
10 was about to commence, and they needed something
11 to show to the judge to get a deferral of that to
12 allow her lawyer more time to work on the case.
13        MR. BURSTEIN: Let's mark this as 13.
14        (Plaintiff's Exhibit 13, 1990 IT 201,
15    marked for identification.)
16    Q.  Is this a document you prepared?
17    A.  Which document are you asking me
18 about?
19    Q.  Exhibit 13.
20    A.  No.
21    Q.  Do you have a belief as to who
22 prepared this document?
23    A.  The same belief as I indicated before.
24    Q.  That would be Marcia or somebody
25 acting under Marcia's direction?

Page 170

1    D. Naseman
2    A.  That is correct.
3        MR. BURSTEIN: I think we are almost
4    done, so let's take a ten-minute break and
5    then --
6        (Recess taken.)
7    Q.  Has looking at exhibit -- I guess
8 which is -- is it 13? Is the 1040 with the --
9 that's the state one, and Exhibit 12 is the
10 federal one with the 1 million number?
11    A.  Correct.
12    Q.  To your knowledge, has a handwriting
13 expert reviewed -- done an analysis of the
14 signatures on Exhibit 12 and 13?
15    A.  To my knowledge, I don't know. I've
16 heard the issue on the signature. I've heard the
17 statements regarding the signature block. I don't
18 know if an analysis is being done on that.
19    Q.  If we go to Exhibit 11, which is the
20 1990 return that was filed, we see that -- go to
21 426. We see that your account for the Republic
22 National Bank Account No. 318188309 -- do you see
23 that?
24    A.  Where? What are you reading from?
25    Q.  426 on the bottom.

Page 171

1    D. Naseman
2    A.  Where is number?
3    Q.  Under account number in the square.
4    A.  Oh, okay.
5    Q.  You see that the -- and we see that
6 309, that account was sent to you at your office
7 at 1370 Avenue of the Americas, right?
8    A.  Correct.
9        (Plaintiff's Exhibit 14, Bank
10    Statement, marked for identification.)
11    Q.  I show you 14, and this is -- as you
12 will see, if you look under the line, do you see
13 where it says "Service Summaries" on the left-hand
14 side? Let me stand over and --
15    A.  Service summaries, okay.
16    Q.  Right below it says money director.
17    A.  Right.
18    Q.  And you see the account number
19 0318188309, the same account number that's on 426
20 on Exhibit 11?
21    A.  Yes.
22    Q.  If you notice that the -- this
23 statement went to your home as of December 30,
24 1988. Do you see that?
25    A.  Uh-huh.

Page 172

1    D. Naseman
2    Q.  Is there a reason why sometime between
3 19 -- 12/30/88, and when you filed your -- you
4 received the document that's 426 in Exhibit 11,
5 that you changed the address of the account?
6    A.  As I recall, we were changing
7 apartments at that time, and I was having things
8 sent to me at my office address.
9    Q.  Is there a reason why you didn't do
10 that -- if we look at 425 on Exhibit 11 --
11    A.  425. Okay. Where are -- oh, 425.
12    Q.  Do you see that is a statement for
13 another account, a joint account with you and
14 Toehl Harding. Do you see that?
15    A.  Right.
16    Q.  That's sent to 425 East 51st?
17    A.  Right.
18    Q.  So my question is: If you were moving
19 the other account to your office address because
20 you were in the process of moving apartments, why
21 didn't you change the address for the joint
22 account of Republic National Bank?
23    A.  Only because this was a pre-existing
24 account. When this -- let's see. This was in --
25 if you go to -- I believe you're talking about the

43 (Pages 169 to 172)

Page 173

```
 1            D. Naseman
 2   1990 time frame here, and you went to the next
 3   page.
 4        This is reflecting the interest on --
 5   this is reflecting the deposit from the money from
 6   the retirement of the options.
 7      Q.   That's not my question.
 8      A.   No, I'm explaining to you exactly why
 9   the change was made, because this money was
10   flowing into this other account. Okay? There was
11   nothing flowing into the joint account at that
12   time. These funds that were coming from my
13   options were flowing into the 8309 account.
14      Q.   But if the reason why you had the 8309
15   account transferred was because you were removing
16   apartments -- that's what you said, sir.
17      A.   No. I'm sorry. What I said was that
18   that was being done at that time, but it was
19   coincidental that -- the reason why it was done is
20   because there was a deposit being made into the
21   account.
22        MR. BURSTEIN: Could read back the
23     answer to the question we had before?
24        (Answer read.)
25      Q.   If as you said -- I asked you why you
```

Page 174

```
 1            D. Naseman
 2   had that account statement, the mailing address
 3   changed from your home to your office. You said
 4   because you were moving apartments, and you
 5   started having things sent to your office.
 6      A.   Yeah, and it all coincided with the
 7   fact that a deposit was being made in that account
 8   at that time.
 9      Q.   You didn't say, sir, that it was just
10   that account. You said you were moving things to
11   your office. Why would you have moved a -- if you
12   were moving the one statement because you were
13   presumably concerned about the fact that you were
14   moving apartments, why did you move the joint
15   account statement?
16      A.   I stand corrected. My answer was
17   incomplete at the time.
18        Mentally I put those two things
19   together because the time frames we were talking
20   about is when I was getting the income. It was
21   going into the special account, and that was the
22   justification for changing the account. It was --
23   Rosemary probably asked me at the time, you know,
24   is there any changes in this account, and I
25   probably said, you know, send it to me here.
```

Page 175

```
 1            D. Naseman
 2      Q.   When did you move apartments?
 3      A.   I don't recall offhand.
 4      Q.   I mean, you recall that this happened,
 5   that you made this change because you were moving
 6   apartments, so how is it that you know that that
 7   was when the change was made if you don't recall
 8   when you were moving apartments?
 9      A.   I think it was within this time frame
10   here.
11      Q.   Didn't you move within the same
12   building?
13      A.   Yeah, we did.
14      Q.   You were in the same building,
15   correct?
16      A.   Correct, yeah.
17      Q.   And you continued to own both
18   apartments, correct?
19      A.   Yes.
20      Q.   So notwithstanding that you thought it
21   was important to have one of the accounts sent to
22   your office because you were moving apartments --
23      A.   That's not my testimony whatsoever.
24   You're mischaracterizing it. What I said was
25   there was an occurrence and a question that was
```

Page 176

```
 1            D. Naseman
 2   asked at the time. It was coincidental, and I
 3   explained it and said just send it to me at the
 4   office. I had other things sent to me at the
 5   office.
 6      Q.   What other things did you have sent to
 7   you?
 8      A.   I can't recall offhand.
 9      Q.   But you recall this?
10      A.   I do.
11        MR. BURSTEIN: I don't have anything
12     further. Nothing further.
13        MR. ROTTENSTREICH: No questions.
14        (Time noted: 4:13 p.m.)
15
16
17        _____
18        DAVID MILFORD NASEMAN
19
20   Subscribed and sworn to before me
21   this ___ day of _____, 2008.
22
23   _____
24
25
```

Page 177

1
2         CERTIFICATE
3
4    STATE OF NEW YORK    )
5                        : ss.
6    COUNTY OF NEW YORK   )
7
8         I, MAUREEN MC CORMICK, a Notary Public
9    within and for the State of New York, do hereby
10   certify:
11        That DAVID MILFORD NASEMAN, the
12   witness whose deposition is hereinbefore set
13   forth, was duly sworn by me and that such
14   deposition is a true record of the testimony given
15   by the witness.
16        I further certify that I am not
17   related to any of the parties to this action by
18   blood or marriage, and that I am in no way
19   interested in the outcome of this matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 13th day of May, 2008.
22
23        _____
24        MAUREEN MC CORMICK
25

Page 178

1
2    May 12, 2008
3
4    ----------------- I N D E X -----------------
5    WITNESS         EXAMINATION BY         PAGE
6    Mr. Naseman     Mr. Burstein           4
7
8    ----------- INFORMATION REQUESTS -------------
9    DIRECTIONS: 56
10   REQUESTS:   28
11   MOTIONS:    162
12
13        EXHIBITS
14   PLAINTIFF'S EXHIBIT              PAGE
15   1,   Plaintiff's First Request    11
16   2,   Separation Agreement         32
17   3,   Letter 3/29/93               87
18   4,   Preliminary Draft, 3/93      88
19   5,   Analysis                     101
20   6,   History                      138
21   7,   1987 Tax Return              158
22   8,   1988 Tax Return              158
23   9,   1989 1040                    159
24   10,  1990 1040                    160
25   11,  1990 1040                    160

Page 179

1
2        EXHIBITS
3    PLAINTIFF'S EXHIBIT              PAGE
4    12,  1990 1040                   163
5    13,  1990 IT 201                 169
6    14,  Bank Statement              171