**AKABAS & COHEN**
. ATTORNEYS AT LAW

## C.  Comments on Mr. Naseman's Draft Agreement

Given the foregoing general comments, the following are our comments on the specific terms in Mr. Naseman's draft agreement:

1. **Article 2** -- Ms. Harding has no interest in expending any time or effort participating in the procurement of a religious divorce.

2. **Article 5, paragraphs 1 and 2** -- To the extent that these paragraphs in any way refer to Ms. Harding's "failure or neglect," they are unacceptable since Mr. Naseman was the sole preparer of the income tax returns, with Ms. Harding's role merely that of signing the prepared returns. Therefore, Ms. Harding does not want to be involved in any future claim, suit or litigation.

**Article 6, paragraph 3** -- With regard to the power of attorney to negotiate and consummate a settlement, we propose that any settlement must be approved by, and consented to, by Ms. Harding, with her consent not to be unreasonably withheld.

**Article 6, paragraph 4** -- Are there any tax credits or refunds due or anticipated?

3. **Article 11, paragraphs 1 and 2** -- Ms. Harding will be happy to maintain Mr. Naseman's medical insurance as long as she is employed by NYNEX and, thereafter, to the extent that COBRA allows, provided that Mr. Naseman bears all costs associated with COBRA. Other than as set forth above, she is not willing to maintain his health insurance after her employment with NYNEX ends.
Similarly, in paragraph 2, she should be required only to take "all _reasonable_ steps" to keep his health insurance in effect. Finally, in paragraph 2, referring to the wife executing all documents necessary to convert the husband's present insurance to an individual policy, it should be added "not inconsistent with the terms, conditions and requirements of the effective policy."

**Article 11, paragraph 3** -- Ms. Harding has no desire to search out Mr. Naseman to deliver to him any necessary forms. Therefore, we propose that Mr. Naseman designate someone in New York for that purpose, perhaps his attorney.

4. **Article 12, paragraph 3** -- Mr. Naseman should pay all the attendant expenses.

3

**AKABAS & COHEN**
ATTORNEYS AT LAW

Article 12, paragraph 6 -- This indemnification provision should similarly be inserted into the properties which are going to Mr. Naseman.

Article 12, paragraph 7 -- For the reasons stated in Section B, above, the division proposed in the Draft Agreement is totally unacceptable. An equitable distribution would give $350,000 to Mr. Naseman, and $575,000 to Ms. Harding. Ms. Harding does not object to the division of automobiles set forth in paragraph 8 of this Article, but notes the inequity of giving a Jaguar, a truck and a Model T to Mr. Naseman and a 1989 Volvo to Ms. Harding.

Article 12, paragraphs 9(b) and 11(b) -- Ms. Harding has no idea whether these properties are encumbered, especially since title is in Mr. Naseman's name alone.

5. Article 13, paragraph 4 -- As noted above, we would like additional information concerning Mr. Naseman's finances.

6. Article 15, paragraph 5 -- Ms. Harding's counsel fees should be paid by Mr. Naseman.


After you and your client have reviewed this letter, please feel free to call me.

Regards,

Richard B. Cohen

RBC/cc

4

TH793

TENZER, GREENBLATT, FALLON & KAPLAN

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

THE CHRYSLER BUILDING
405 LEXINGTON AVENUE
NEW YORK, NEW YORK 10174
(212) 573-4300

CABLE: "TENGRAN NEW YORK"
TELECOPIER: (212) 573-4313

NEW JERSEY OFFICE
TENZER, GREENBLATT & ZUNZ, P A
15 WARREN STREET
HACKENSACK, N.J. 07601
(201) 487-7511

WASHINGTON, D.C. OFFICE
MARSHALL, TENZER, GREENBLATT
FALLON & KAPLAN
SUITE 102
4444 CONNECTICUT AVENUE, N W
WASHINGTON, D.C. 20018

COUNSEL
LEONARD G. FLORESCUE
DIRECT DIAL
(212) 573-4396

FOR SETTLEMENT NEGOTIATION PURPOSES ONLY

March 29, 1993

BY FAX 354-6468
BY FIRST CLASS MAIL

Richard B. Cohen, Esq.
Akabas & Cohen
1500 Broadway
New York, New York 10036

Re: <u>Naseman with Harding</u>

Dear Mr. Cohen:

This is, and is intended to be, a formal lawyer's letter. Mr. Naseman advised me that he has sent to me to forward on to Ms. Harding a personal note which she can share with you if she chooses to do so. Upon my receipt of it, I will forward it un-opened. I'll confine myself to the legal issues here.

Preliminarily, we need to respond briefly to the introductory two or three pages in your February 5, 1993 letter. While it would be possible (but not productive now) to refute each of your comments, I will point out that Mr. Naseman's income from his November 1990 severance and consulting arrangements far exceeded Ms. Harding's in 1991 and, indeed, only twice (and not since 1984) has her income been greater than his through 1991. We don't yet know the 1992 comparison. As I'm sure you know, the true differences are enormous and Mr. Naseman has probably earned at least 70% of the couple's income throughout the length of the marriage.

It was, thus, extremely unhelpful for you to have made comments about Mr. Naseman's "lack of work" the last 2 1/2 years. The parties have significant assets which would not exist but for Mr. Naseman's earnings. If you wish to divide assets based upon

21479/0001/LGF/6253

TH794

TENZER, GREENBLATT, FALLON & KAPLAN

Richard B. Cohen, Esq.
March 29, 1993
Page 2

who brought more money into the family, we'll be happy to do so, but I doubt Ms. Harding will do as well as we initially proposed.

Simultaneously, as you also know (I presume), Mr. Naseman and Ms. Harding have never had joint accounts or pooled their monies whether for bill paying, investment or any other purpose. Thus, I do not believe that there ever was an "economic partnership" here and, under e.g. Kobylack and Delgado, ("the parties conducted their financial dealings in an arm's length fashion" 129 A.D.2d at 428), I don't believe Ms. Harding would do nearly as well after litigation as Mr. Naseman has offered.

Since the couple never pooled their resources, a return on investment approach can be enlightening. The assets offered to Ms. Naseman conservatively total: $750,000 in the two apartments (one a source of income as well), $46,000 in furnishings, a car worth $12,000, and $325,000 in cash ($75,000 of which was meant to cover the after-tax carrying costs on both apartments 5-A and 6-A for at least 5 years. When our clients first spoke, he offered her $250,000 but raised the amount in response to Ms. Harding's concern over carrying costs.) The apartments are mortgage free and Ms. Harding will, in just a few years, be eligible to utilize IRC § 121 when she sells.

We believe that Ms. Harding's earnings during the marriage, were approximately $1,374,000 and assuming 40% taxes (reasonable for New York City), that would leave $824,400. The offer is valued conservatively at $1,133,000 (approx.) and thus, represents a 38% return on her maximum dollar financial contributions. Since, in the real world, she would need to have paid for rent, food, commuting, clothes, recreation etc., it is clear that her real rate of return (on what she could have invested if unmarried) is probably 200-300% over the ten years (for two of which, as you noted, they have been living relatively apart). That is hardly unfair and in light of the lack of any true economic partnership here, I think Mr. Naseman's offer was excellent.

It is even more so when you also consider the fact that Ms. Harding's pension and personal savings (as to which Mr. Naseman has as much equitable claim as she does to his assets, perhaps more. Kobylack, DelGado) aren't being included at all. Companies like NYNEX tend to have excellent pension benefits and I expect the present value of her pension will be several hundred thousand dollars. Mr. Naseman's offer also doesn't include anything for Ms. Harding's bank assets and other investments. At

TENZER, GREENBLATT, FALLON & KAPLAN

Richard B. Cohen, Esq.
March 29, 1993
Page 3

this point, only you know what they are, but I wouldn't be at all
surprised if they also weren't well into the six-figure range.

I don't want to continue in this vein any longer, but I
do believe that any notion on Ms. Harding's part that she can
achieve even equality if we don't settle (let alone do better
than that) is highly dubious.

I'll now turn to the portion of your February 5, 1993
letter responding to our proposed separation agreement. I will
use your numbers for ease of reference.

1. All that is asked of Ms. Harding is to sign a
letter confirming that the marriage wasn't sanctioned by the
Roman Catholic church. Nothing else is required of her. I fail
to see why that should be a problem.

2. a) The reference is only to undisclosed income or
overstated deductions or credits by her, not to the preparation
of returns. If, as I presume, Ms. Harding will represent that
she had advised Mr. Naseman of all income and correctly stated
all deductions or credits attributable solely to her, and she
will indemnify Mr. Naseman if that is untrue, that will suffice
and we will modify the text accordingly.

b) Since Mr. Naseman is responsible for all the
taxes, we don't quite understand your concern. Pease elucidate
further.

c) Mr. Naseman knows of no anticipated credits or
refunds.

3. a) Agreed as to the insurance and Mr. Naseman's
payment.

b) Agreed.

c) Agreed.

d) Agreed; although I assume we can make that
reciprocal.

4. a) Agreed but not to exceed a set dollar amount
to be negotiated. What do you anticipate the expenses will be?

b) Agreed.

21479/0001/LGF/6253

TH796

TENZER, GREENBLATT, FALLON & KAPLAN

Richard B. Cohen, Esq.
March 29, 1993
Page 4

~~c) I will defer responding to this until the end~~
of this letter.

         d) Would a representation that Ms. Harding knows
of no such mortgages, liens or encumbrances placed by her
omission or commission be acceptable?

     5. We will exchange all financial information
reasonably quickly after you are prepared to do so too. That
will include Ms. Harding's investments, and last pension
statement as well. Her information should also include each
aspect of her severance arrangements with NYNEX. I think we may
well have omitted very considerable assets, in Ms. Harding's
hands, in our proposal.

     6. Mr. Naseman will pay Ms. Harding's counsel fees up
to the <u>lesser</u> of $7,500 or my fees, <u>provided</u> that this matter is
settled substantially on the terms of his proposal (as modified
below) and that we settle on or before April 30, 1993. Given the
equitable distribution offered, we don't believe Ms. Harding has
any entitlement to counsel fees at all. As I'm sure you know
there are only two or three reported cases where counsel fees
have been awarded under similar economic circumstances and then
only as a result of litigative misconduct. Accordingly, if this
matter is dragged out further or if Ms. Harding wishes to haggle
over the details of the proposal (which Mr. Naseman believes was
essentially accepted by her in their conversations, before I
drafted the proposed agreement), Ms. Harding will have to finance
events herself.

     Finally, I address your comments about the division of
the $925,000 account. Based upon my opening comments here, I
think the original offer was generous. (If the <u>Kobylack/Delgado</u>
rule were applied, Ms. Harding would receive, at most, about
$280,000 and that assumes she earned 30% of the total income, a
figure I think may be overly generous to her.)

     Nonetheless, because he feels badly (not guilty) about
how things worked out, in order to settle this, Mr. Naseman will
increase his offer by $50,000. That number is firm (if you ask
anyone who knows me they will tell you I don't take "far-out"
positions in order to come to the middle). Since, as noted, Ms.
Harding, in my opinion, will never recover significant counsel
fees, she should consider that point and realize that the $50,000
she'll have to spend to litigate, will be lost too. Thus, she's

21479/0001/LGF/6253

TENZER, GREENBLATT, FALLON & KAPLAN

Richard B. Cohen, Esq.
March 29, 1993
Page 5

about $110,000 (including counsel fees) ahead and that
~~essentially splits the difference between the proposed amount and~~
a 50-50 distribution of the account.

I look forward to hearing from you.

Very truly yours,

Leonard G. Florescue

LGF:be
21479-0001

21479/0001/LGF/6253

TH798

SRG&B P.C.                     TEL No.                    Apr 15,93 18:08  P.02

## AKABAS & COHEN
### ATTORNEYS AT LAW
1500 BROADWAY
21ST FLOOR
NEW YORK, NY 10036
(212) 869-2249
TELECOPIER (212) 944-7377

SETH A. AKABAS
RICHARD B. COHEN

COUNSEL:
LOUIS P. KAROL
LOUIS J. LAMATINA*
SUITE 108
1530 PALISADE AVENUE
FORT LEE, NJ 07024
(201) 585-1122
* ADMITTED NY & NJ

<u>PRIVILEGED COMMUNICATION -- FOR SETTLEMENT PURPOSES ONLY</u>

April 15, 1993

<u>VIA TELECOPIER AND FIRST CLASS MAIL</u>
Leonard Florescue, Esq.
Tenzer, Greenblatt, Fallon & Kaplan
405 Lexington Avenue
New York, NY 10174

Re: <u>Naseman and Harding</u>

Dear Mr. Florescue:

I am in receipt of your letter dated March 29, 1993 which sets forth Mr. Naseman's position relating to the distribution of property. I will address the points contained in your letter, and outline Ms. Harding's position, below.

Initially, it is our position that an appropriate analysis of equitable distribution must consider more than just "who brought more money into the family," as you suggest in your letter. As you know, the New York equitable distribution statute, Dom. Rel. section 236B(5)(d), sets forth twelve elements that a court must consider in determining an equitable distribution of property. For example, while your letter, at page two, assumes that the sole factor for consideration is the earnings of the respective parties during the marriage, the statute mandates consideration of, <u>inter</u> <u>alia</u>, the age of the parties, the length of the marriage, the probable future financial circumstances of each party, the wasteful dissipation of assets by either spouse, and any other factor that the court deems just and proper. Indeed, in the <u>Del Gado</u> case that you cite, the Court considered not just the "arms length" financial

1

TH799

SR6&B P.C.                    TEL No.                    Apr 15.93 18:09    P.03

**AKABAS & COHEN**
ATTORNEYS AT LAW

dealing between the parties, but also the parties' present salaries
and future earning potential, which were, in that case,
approximately equal.

Given the discussion of the status and condition of the
respective parties that is set forth in my earlier letter to you at
pages 1-2, and the following discussion of the points raised in
your letter, we believe that Ms. Harding is entitled to, and will
be able to so demonstrate to a court, a substantially greater
proportion of the marital assets than you suggest. Nonetheless, we
feel that after you review this letter, you will see that our
counterproposal presents a fair and equitable distribution, and
obviates the necessity of lengthy and expensive litigation.

1.  Your estimate of the value of the two New York apartments
-- $750,000 -- is inflated way beyond their present market value.
Last year, a comparable apartment in the same building sold for
approximately $160,000; at present a comparable apartment in the
building is listed for $285,000; a comparable apartment across the
street in the Morad Beekman is presently listed for sale at
$275,000.  Based upon this appraisal, the two apartments are worth,
at most, $275,000 each, and considerably less if expenses such as
brokers' fees are factored in.  Mr. Naseman suggests, on page 2 of
his letter to Ms. Harding, that under his proposal Ms. Harding
would be provided a "comfortable continuous income" from investing
the proceeds of the sale of apartment 6A.  However, a calculation
based upon this suggestion (at 3 1/2%, the amount of interest being
earned on the bank account), when the true market value of the
apartment is factored in, results in only a not-so-comfortable
$8,750/year return.

2.  Although our estimate of the value of the 1989 Volvo is
less than your estimate of $12,000, this is not significant enough
to be an issue.  We note, however, that the mileage is 75,000, that
Ms. Harding will have to purchase a new car in the near future, and
that it is highly unlikely that she will receive $12,000 for the
Volvo at that time.

3.  Paragraph 2 of page 2 of your letter states that Ms.
Harding was offered $325,000 in cash, which is $25,000 less than
was offered in your first draft Separation Agreement at article 12,
paragraph 7.  Your "increased offer" of $50,000 set forth on page
4 of your letter is therefore only an increase of $25,000.  Is this
a typo?

2

TH800

**AKABAS & COHEN**
ATTORNEYS AT LAW

Further, with respect to the "$46,000 in furnishings" that you mention, you have failed to take note of the value of the furnishings in the Massachusetts house, which, if items like the tractors and the antique sleigh are taken into account, probably exceeds the value of the furnishings in New York. Accordingly, since we believe that the value of the furnishings are approximately equivalent, these items should not be factored into the equation.

4. Your allocation of $75,000 to cover the after-tax carrying costs on both apartments "for at least 5 years," actually comes out to only three years when calculated on a cash-flow basis; and in any event, there is no provision for the undoubted increase in maintenance costs.

5. For Ms. Harding to avail herself of the exclusion set forth in IRC section 121, she will have to wait for six years, something that is too remote to have any value to her now, since she may have to seek employment outside New York.

6. Your paragraph 3 on page 2 assumes that "financial contribution" is the sole factor in determining equitable distribution. Since we believe that the court will consider more than this factor, we believe that hypothesizing the value of the "real rate of return" to Ms. Harding if she was not married is a non-starter.

7. Your paragraph 4 on page 2 discusses Ms. Harding's pension and personal savings and states that your calculation does not include them. Page 3 of Mr. Naseman's letter to Ms. Harding similarly raises this point.

Please note that we have not included in our proposals the value of the two houses purchased by Mr. Naseman for his parents during the marriage or the gifts that he has made to his family, which we calculate are valued well into the six figures. Ms. Harding specifically asked that these assets not be made an issue of controversy out of consideration for Mr. Naseman and his family. If you now wish to raise the issue of Ms. Harding's investments, than Mr. Naseman's other assets must also come into play. We hope that this will not be the case.

Putting that aside, however, you should understand that

3

TH801

**AKABAS & COHEN**
ATTORNEYS AT LAW

approximately 75% of Ms. Harding's pension and personal investments
are in IRA and 401(K) plans, and are unavailable to her before she
reaches the age of 59 1/2, without the incurring of significant
penalties.  Further, her corporate pension plan is of de minimis
value to her since she will be unemployed very shortly and will
receive no distribution that is available for investment, and she
must wait until the age of 65 to receive any payments (which would
only come to about $1500/month, in any event).

    8.   Your paragraph 1 on page 3 states that "[a]ll that is
asked of Ms. Harding is to sign a letter confirming that the
marriage wasn't sanctioned by the Roman Catholic church.  Nothing
else is required of her."  Article 2 of your original draft
Separation Agreement requires more than that.  Please let us know
if you are therefore agreeing to delete the balance of Article 2.
Ms. Harding would also like to see the text of the letter that she
would be asked to sign; if it is as you state, this should not be
a problem.

    9.   With respect to your paragraph 2(a) on page 3, since Mr.
Naseman has all the financial and tax records, Ms. Harding will
make such a representation "to the best of her knowledge."  Our
concern with Article 6, paragraph 3 is that to the extent that Ms.
Harding is responsible for any back taxes, i.e., due to alleged
"failure or neglect" on her part (Article 6, paragraphs 1, 2), she
must be allowed to review and approve any settlement.  This seems
fair and reasonable and hardly cause for objection.

    10.  With respect to paragraph 3(d) on page 3 (referring to
Article 11, paragraph 3 of your draft Separation Agreement),
reciprocity seems superfluous since Mr. Naseman purports to have no
medical insurance separate and apart from his coverage under Ms.
Harding's policy.

    11.  With respect to the costs associated with Article 12,
paragraph 3 of your draft Separation Agreement (referred to at
paragraph 4(a) of page 3 of your letter), please be advised of the
following costs:

    -- Transfer tax -- 1% of fair market value (which the parties
can agree to) to New York City, .4% to New York State.  At a fair
market value of $500,000 for both apartments, this comes to $7,000.

4

TH802

AKABAS & COHEN
ATTORNEYS AT LAW

-- <u>Fee to managing agent</u> -- in the neighborhood of $400.

-- <u>State stock transfer tax collected by transfer agent</u>
<u>(managing agent)</u> -- $.05/share, or $62.75.

12.  Paragraph 4(d) on page 4 of your letter --  agreed.

13.  Paragraph 5 on page 4 of your letter -- while noting our
discussion, above, of Ms. Harding's pension, any possible severance
arrangement is unknown to her at this time.

14.  Paragraph 6 on page 4 of your letter -- First, since Ms.
Harding has now been required to retain two attorneys, given the
fact that Mr. Naseman has commenced an action in Nevada, this
figure regarding attorneys' fees seems unreasonably low.  We are
also at a disadvantage since we have no way of knowing your fee
arrangement with Mr. Naseman.

Second, you state that Mr. Naseman believes that the details
of the proposal were "essentially accepted" by Ms. Harding.  This
is not true.  Ms. Harding told Mr. Naseman that she would accept a
distribution of at least one-half of the total assets, and that he
should "make her an offer."

15.  With reference to the division of the bank account, which
you discuss on pages 4-5:

First, we have discussed above what we feel is the proper
analysis of the factors to be reviewed and considered in
determining an equitable distribution.  Second, as we discussed
above, your $50,000 increase appears to be only a $25,000 increase.
Third, Mr. Naseman will similarly be required to expend $50,000 or
more should he choose to litigate.

Accordingly, in light of the totality of circumstances and the
various financial calculations that we discussed above, and in my
earlier letter, your increased offer (of $25,000 or $50,000) is not
acceptable.  Nonetheless, we will, in the interest of resolving
this matter amicably, and with a minimum of delay and expenditure
of money to both parties, decrease our demand from our original
$575,000 to $500,000.  This is a significant concession, and we
feel that the resulting division is eminently fair and justified,

5

SR6&b P.C. __    TEL No. __ __ __    _____ ___ __ Apr 15,93 18:12  P.07 __

AKABAS & COHEN
ATTORNEYS AT LAW

and could result in an expeditious resolution of the other, less
~~significant issues, without undue further expense and delay.~~

16.    One last point concerning Article 16 of the draft
Separation Agreement.    Now that the Nevada action has been
commenced by Mr. Naseman, we have re-read this article and feel
that paragraph 4 should provide that any action to enforce the
terms of the agreement, decree or judgment, should have
jurisdiction based in New York.

Contrary to Mr. Naseman's statement to Mr. Harding in his
letter, I do not believe that my earlier letter to you was
"antagonistic." I was, of course, merely seeking to protect Ms.
Harding's interests. However, Mr. Naseman's surreptitious "move"
to Nevada, and the institution of the divorce suit without prior
disclosure to us while we were awaiting a response to our first
letter and believed that we were negotiating in good faith, has
hardly helped to resolve this matter amicably. Nonetheless, we
believe that our positions, as set forth in this letter, are
reasonable and fair to both parties, given what we consider is the
appropriate standard to be employed in determining equitable
distribution.

As to your letter of April 13, 1993, there seems to be some
misunderstanding. I told you that we wanted to extend the time
before a default could be taken until some time in May, or upon 10
days notice. This was not requested in order to give Ms. Harding
three additional weeks to respond. We planned to respond within
a few days of our request (and have done so). The additional time
was to allow Mr. Naseman to consider the contents of this letter
and to respond, with a view to settling all matters prior to the
adjourned date and to avoid the expense of filing a responsive
pleading on Ms. Harding's behalf. Accordingly, I need to know by
the opening of business on Monday, April 19, 1993, whether the
position on time extensions stated in your letter is firm. If so,
we will have no other choice but to file in Nevada ~ a needless
expense and another item of controversy for the parties to deal
with.

6

TH804

**AKABAS & COHEN**
ATTORNEYS AT LAW

I look forward to hearing from you no later than the opening
of business on Monday, April 19, 1993.

Very truly yours,

Richard B. Cohen

RBC/cc

7

# TENZER, GREENBLATT, FALLON & KAPLAN

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

THE CHRYSLER BUILDING
405 LEXINGTON AVENUE
NEW YORK, NEW YORK 10174
(212) 573-4300

CABLE: "TENGRAN NEW YORK"
TELECOPIER: (212) 573-4313

NEW JERSEY OFFICE
TENZER, GREENBLATT & ZINZ, P. A.
15 WARREN STREET
HACKENSACK, N. J. 07601
(201) 487-7511

COUNSEL
LEONARD G. FLORESCUE
DIRECT DIAL
(212) 573-4306

WASHINGTON, D. C. OFFICE
MARSHALL, TENZER, GREENBLATT,
FALLON & KAPLAN
SUITE 102
4444 CONNECTICUT AVENUE, N. W.
WASHINGTON, D.C. 20015
(202) 362-6300

FOR SETTLEMENT NEGOTIATION PURPOSES ONLY

April 19, 1993

BY FAX - (212) 354-6468
BY FIRST CLASS MAIL

Richard B. Cohen, Esq.
Akabas & Cohen
1500 Broadway
New York, New York 10036

Re:  Naseman

Dear Richard:

1.  Mr. Naseman and I have reviewed your letter of April 15, 1993.  Subject to paragraph 2 regarding the Nevada proceeding, with one small exception, he is willing to accept your counter-offer.

That one exception is that he will agree to pay up to a grand total of $15,000 toward: (a) Ms. Harding's counsel fees (in all jurisdictions) against your time records and bills, and (b) the apartment transfer costs which you represent in your April 15th letter to be $7,462.75.

2.  Mr. Naseman's acceptance of Ms. Harding's counter-proposal is strictly conditioned on Ms. Harding's agreement to the following:

(a)  Mr. Naseman may take an uncontested divorce in Nevada on or about April 20, 1993, without appearance or opposition from Ms. Harding or her counsel, either at the time of the hearing or thereafter;

21479/0001/LGF/18834

TH806

TENZER, GREENBLATT, FALLON & KAPLAN

Richard Cohen, Esq.
April 19, 1993
Page 2

　　　　　(b)  Ms. Harding agrees now that she will not
thereafter contest the validity of the Nevada divorce by appeal
or by separate action in any jurisdiction.

　　　　　(c)  Provisions memorializing and further
implementing (a) and (b) of this paragraph 2 will be included in
the final separation and property agreement.

　　　　　Please fax to me today your client's written agreement
to these points.

　　　　　3.  As you are, of course, aware, Ms. Harding, even if
she defaults in Nevada, will be able to commence an action in New
York for equitable distribution following a foreign divorce.
Thus, she has no economic risks by agreeing to our paragraph 2.

　　　　　Accordingly, we will view any action that delays the
Nevada divorce or contests it (now or later) as being simply
mean-spirited.  If that occurs, all offers will be off the table,
including the original proposal last fall.

　　　　　4.  Please don't misconstrue this response as
validating the arguments in your letters or any reluctance to
litigate if need be.  Mr. Naseman simply wants this promptly
resolved and as amicably as possible.

　　　　　Since this response is all but complete acquiesce in
your counter-offer, we cannot imagine that your client won't
accept it.  The choice either to settle this matter amicably and
promptly or to engage in expensive litigation is your client's.

　　　　　　　　　　　　　　Yours truly,

　　　　　　　　　　　　　　Leonard G. Florescue

　　　　　　　　　　　　　　Leonard G. Florescue

LGF:be
cc:  David Naseman

21479/0001/LGF/18834

TH807

SRG&B P.C.          TEL No.                    Apr 19,93 19:07  P.02.

# AKABAS & COHEN
## ATTORNEYS AT LAW
1500 BROADWAY
21 ST FLOOR
NEW YORK, NY 10036
(212) 869-2249
TELECOPIER (212) 944-737X

SETH A. AKABAS
RICHARD B. COHEN

COUNSEL
LOUIS P. KARDI
LOU'S J. LAMATINA*
SUITE 106
1530 PALISADE AVENUE
FORT LEE, NJ 07024
(201) 868-1122

* ADMITTED NY & NJ

April 19, 1993

VIA TELECOPIER
Leonard Florescue, Esq.
Tenzer, Greenblatt, Fallon & Kaplan
405 Lexington Avenue
New York, NY 10174

Re: Naseman and Harding

Dear Mr. Florescue:

I am in receipt of your letter dated and faxed on April 19, 1993. As per our telephone conversation today, we have agreed to the following, as attorneys for our respective clients, who have authorized and directed us to enter into this agreement, that in order for our clients to settle their differences amicably and to distribute their property equitably: (1) the Nevada attorneys for our respective clients will stipulate that the divorce action commenced by Mr. Naseman against Ms. Harding in Nevada will be bifurcated, (2) Ms. Harding will not appear in, or contest, the status divorce aspect of the divorce action commenced against her in Nevada by Mr. Naseman, or will withdraw any such appearance or opposition, (3) the Nevada court will retain jurisdiction over the property and alimony issues, until execution of the final agreement referred to herein and (4) our clients will execute Mr. Naseman's draft Separation Agreement dated November 1992, as modified and amended by the following correspondence between us: my letter dated February 5, 1993; your letter dated March 29, 1993; my letter dated April 15, 1993; and your letter of today, and file it with the Nevada court. I understand that you will prepare and send to me as soon as possible, within one week, the final Separation Agreement reflecting the agreed upon modifications and amendments,

1

AKABAS & COHEN
ATTORNEYS AT LAW

**Page 2**
**April 19, 1993**

so that we can have our clients execute it without delay.

Finally, we have agreed that, notwithstanding their otherwise privileged designation or nature, the draft Separation Agreement and correspondence referred to above may be used as evidence in any action or proceeding brought to enforce the terms of the agreement set forth in this letter.

Please sign below indicating that you, on behalf of Mr. Naseman, agree to the terms of this letter, and fax a copy back to me today.

Thank you very much for your cooperation.

Very truly yours,

Richard B. Cohen
Counsel to Ms. Harding

Agreed to:

Leonard Florescue, Esq.
Counsel to Mr. Naseman

2

TH809

G&B P.C.                TEL No.                    Apr 21,93 14:37  P.02

Toehl Harding
425 East 51st Street, Apt. 5A
New York, NY 10022

April 21, 1993

Second Judicial District Court,
State of Nevada
County of Washoe
Family Division

Re: Naseman v. Harding

Your Honor:

I am the defendant in the above-referenced matrimonial
litigation. I have read the stipulation telecopied to me by my
attorney in this litigation, Cassandra Campbell, Esq., and have
discussed it with my attorney in New York, Richard B. Cohen, Esq.,
and I fully understand its contents. I hereby authorize and direct
Ms. Campbell to enter into this stipulation on my behalf.

Respectfully,

Toehl Harding

cc: Cassandra Campbell, Esq.
    Richard B. Cohen, Esq.

TH810

425 East 51st Street
Apartment 5A
New York, New York  10022

April 28, 1993

Gentlemen:

This letter will confirm that the marriage of the undersigned to David M. Naseman on October 19, 1982 (which ended in a divorce by order dated April 21, 1993) was not performed or sanctioned by an official of the Roman Catholic Church either at its inception or at any time during the duration of the marriage.

Very truly yours,

Toehl Harding

TH811