# Exhibit 6

## HISTORY OF GROSS INCOME AS REPORTED ON TAX RETURNS
## DURING THE MARRIAGE PERIOD

| YEAR | TOEHL HARDING | DAVID M. NASEMAN |
|------|---------------|------------------|
| 1982 | $  84,153.63 | $    68,136.86 |
| 1983 | 81,908.43 | 85,782.78 |
| 1984 | 131,023.74* | 110,450.00 |
| 1985 | 87,945.46 | 136,701.08 |
| 1986 | 101,597.19 | 114,097.92 |
| 1987 | 117,447.83 | 169,395.00 |
| 1988 | [130,000.00]** /33,042.80 | [2,270,000.00]** 2,386,125.27 |
| 1989 | 143,182.80 | 318,974.16 |
| 1990 | 153,713.33 | 5,408,014.86 |
| 1991 | 167,859.87 | 289,743.05 |
| 1992 | [180,000.00]*** | [200,000.00]*** |

---

\*    Includes $53,302.50 in distributions from U.S. Indus-
tries in connection with the termination of her
employment following a hostile takeover of that com-
pany. I believe that amount was rolled over tax-free
into a qualifying retirement account for her benefit.

\*\*   Amounts are approximate (+/- 10%); exact figures will
be supplied when Form 1040 is available.

\*\*\*   Amounts are rough guesstimates; information on her
income is not available to me and information on
my income is still being received as of February 24th.

NOTE:   All tax returns were prepared by me and each of us
would be individually liable to make up any taxes
due on April 15th based on a computation of our
respective tax obligations on a stand alone basis.
For example, if $5,000 in taxes were due and I had
paid more than $5,000 in excess of my individually
computed tax obligation for that year, Toehl would
have to pay the tax due. Obviously, the reverse was
also true. Since most deficiencies upon audit were
minor, I usually paid those without contribution from
Toehl.



PLAINTIFF'S
EXHIBIT
6
5/22/08 MMC

### STATEMENT OF ASSETS AND LIABILITIES
### OF DAVID M. NASEMAN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(a)  Unless otherwise indicated, all amounts are as of February 24, 1993.

(b)  All fair market values are ballpark estimates based upon my opinion only. Subsequent appraisals and valuations may be required to establish a definitive valuation in the absence of agreement.

Amounts indicated for Real Estate and Motor Vehicles are believed to be accurate but are subject to verification.

(c)  Financial assets are subject to tax liabilities for 1992 to the extent they exceed estimated tax payments already sent to taxing authorities.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ASSETS

1.  Bank Accounts

   (a) Republic National Bank of      $  925,000.00
       New York (N.Y., N.Y.)
       Account established in 1987 in
       name of both DMN and TH in con-
       nection with grant of mortgage
       for purchase of N.Y. Apt. 6A.
       All funds in account result from
       DMN deposits in 1988 and 1990
       and interest thereon; TH has
       never had access to checks or
       written any checks on account.

   (b) First Interstate Bank of Nevada
       (Incline Village, Nevada)
       Established in DMN's name only
       on February 4, 1993.

                   1. Money Market Account      8,005.00
                   2. Checking Account          1,000.00

   (c) Lee Bank (Lee, Massachusetts)           14,000.00
       Money market account establish-
       ed in April 1990 in DMN's name
       only.

TH819

    (d) First Florida Bank (Venice,        $    4,616.51
        Florida) NOW account estab-
        lished in April 1990 in names
        of DMN and DMN's mother.

2. Investments

    (a) Shearson Lehman Bros. (N.Y.,
        N.Y.) Account established in
        February 1991. $2,750,000 was
        transferred to SLB in three
        wire transfers from a seperate
        Republic National Bank account
        in DMN's name only that was
        closed in the Fall of 1992.

| | |
|---|---:|
| 1. Cash Balance | 981.74 |
| 2. Money Funds | 144,581.72 |
| 3. Stocks | 1,763,806.76 |
| 4. Bonds | 860,631.75 |
| Total: | $2,770,001.97 |

    (b) McCaw Communications Corp.,
        Inc.-61 shares of Common Stock
        registered in DMN's name only        2,236.50

3. Real Estate

    All properties are free and clear
    of any mortgages or other encum-
    brances (other than periodic
    maintenance charges and taxes, all
    of which are current to my know-
    ledge).

    (a) 425 East 51st St., Apt. 5A, N.Y.,  $  375,000.00
        N.Y. ("NY Apt. 5A")
            Purchase Price:  $150,000
            Improvements:     20,000
        Primary residence of TH; pur-
        chased in 1986 in coop conver-
        sion at insider price; TH made
        downpayment of 20%; DMN paid off
        mortgage of about $115,000 in
        July 1988. This was TH's apt prior
        to my moving in in 1981. We each
        paid 50% of rent and expenses
        until 1988; TH pays thereafter.

    (b) 425 East 51st St., Apt. 6A, N.Y.,    375,000.00
        N.Y. ("NY Apt.6A")

Page 2

Purchase Price:  $395,000
Improvements:        15,000

Purchased in Spring 1987; TH makes
downpayment of 10% and DMN makes
interest payments for 1 year while
Apt. 6A is rented to seller; DMN
pays off $356,000 mortgage in July
1988. Apt. 6A serves as TH and DMN
primary residence  from late 1988
to March 1992, when Apt. 5A renovat-
ions are completed and DN moves
NY furnishings back to Apt. 5A. TH
pays for renovations to prepare
Apt. 6A for rental.

(c) 150 Lee Road, Lenox, Massachusetts    $225,000
    ("Mass House").
        Purchase Price:  $ 97,500
        Improvements:       ~~145,000~~ *174,753*

Purchased in April 1982 (6 months
prior to marriage; DMN and TH share
downpayment; DMN pays for 80%+ of
Improvements. Mass House is for
weekend and summer use until Feb.
1991, when it becomes DMN's legal
residence. DMN pays off $67,000
mortgage in July 1988.

(d) Nine Mile Point Drive, Clarlevoix,    $120,000
    Michigan ("Mich. Property")
        Purchase Price:  $105,000
        Improvements:       9,000

Purchased in early 1987 as primary
residence for DMN's parents. DMN
pays all costs associated with
property and pays off mortgage of
$66,000 in July 1988. TH executes
waiver of dower at time of pur-
chase. If property sold, by prior
agreement, DMN's parents receive
excess of sale price over total
costs of acquisition and mainten-
ance to date of sale.

(e) 512 Venice Avenue West, Unit 603,    $107,500
    Venice, Florida ("Florida Condo").
        Purchase Price:  $105,000

Purchased in March 1990 for DMN's
parents' winter residence due to
their health problems. DMN paid
100% of purchase price and all
maintenance and tax obligations.
Property is in DMN's name only
and TH signed waiver of dower at

Page 3

TH821

time of purchase.

4. Furnishings

    (a) N.Y. Apt. 5A                  $ 46,000

    (b) Mass. House                    19,500

    (c) Florida Condo               3,000

    NOTE: There are no furnishings in the
           N.Y. Apt.6A or the Mich. Prop-
           erty in which either TH or DMN
           has an interest.

5. Motor Vehicles

    (a) 1989 Jaguar Vanden Plas Sedan     20,000
        Purchase Price: $49,000

    (b) 1989 Volvo 760 Sedan           12,000
        Purchase Price: $30,000

    (c) 1991 Ford F-150 Pick-up Truck     9,000
        Purchase Price: $18,000

    (d) 1922 Ford Model T Touring Car     5,500
        Purchase Price: $ 9,680

All vehicles (other than the Volvo)
were paid for entirely by DMN. The Volvo
was a corporate perk by DMN's employer,
and DMN incurred imputed income each year
and paid for the car in 1990 as part of
his severance package from LIN Broadcast-
ing. Volvo has been used exclusively by
TH (commuting to work and personal use)
since she picked it out in 1989. All
vehicles are in DMN's name only and DMN
has paid all insurance and garaging costs
for all vehicles (and their predecessors)
during the marriage period.

6. Retirement Benefits

    (a) LIN Broadcasting Profit Sharing Plan   63,505
        Account is in DMN's name only;
        valuation is as of Sept. 30,1992.
        Invested in guaranteed income
        instruments.

Page 4

TH822

(b) Merrill Lynch IRA Account       $  5,689
Account is in DMN's name only;
valuation is as of Nov. 27, 1992.

## LIABILITIES

1. Mortgages:  None

2. Tanglewood New Theatre Fund       6,667
A pledge of $10,000 was made by DMN
only in the Fall of 1992 for this
building project in Lenox, Mass. The
first of three annual installments of
$3,333 was paid by DMN in January 1993.

Page 5

TH823

## SUPPLEMENTAL  INFORMATION

1. **Credit Cards/Retail Accounts.** TH and DMN maintain separate credit cards and retail accounts and each is responsible for his or her respective balances. Neither TH nor DMN has ever used the other's credit cards or charged merchandise to the other's retail accounts.

2. **TH Information.** DMN has never had access to, and does not presently know, any of TH's bank accounts, investment instruments or her corporate benefit plans, and DMN does not know any of TH's balances in any of the foregoing. Based upon tax information she has provided at year end, I believe that TH's balances could by substantial.

3. For various reasons, TH is unaware of the existence of the Shearson Lehman Bros. account or the income that has been generated by that account over the last two years. Similarly, TH is not presently aware of the extent of my income for the 1990 and 1991 tax years, nor for the year 1992 just completed. We can discuss the reasons for this at your convience.

4. During the marital period, DMN has earned over 80% of the total income generated by TH and DMN. This has been primarily due to LIN Broadcasting stock options, which were exercised or otherwise cashed in in 1988 and 1990. TH has received NYNEX stock options periodically since 1985, but DMN is not aware of any of the details of her option grants. Similarly, TH had options from U.S. Industries, which she cashed in and deposited in her account in 1984 in connection with the takeover of USI.