Exhibit D

REPORT OF EXAMINATION
HARDING V. NASEMAN
JUNE 2, 2008
MY FILE NO. 2008-030

# GUS R. LESNEVICH

*Forensic Document Examiner*

1684 Henrietta Mountain Road
Martinsburg, PA 16662

Telephone:    (814) 793-2377
Facsimile:     (814) 793-3790

June 2, 2008

Peter B. Schalk, Esquire
Judd Burstein, P.C.
1790 Broadway, Suite 1501
New York, NY 10019

      Re:   Document Analysis
            Harding v. Naseman
            My File No. 2008-030

## REPORT OF EXAMINATION

I.    **EXHIBITS EXAMINED:**

      A.    Copy of a Internal Revenue Service 1990 Form 1040 showing an Adjusted Gross Income of $5,561,728.19, bearing questioned written Signatures, Dates and Occupations on page 2. These documents are further identified by Bates numbers DN00419 and DN00420; Schedule A – Itemized Deductions further identified by Bates numbers DN00423 and DN00424.

      B.    Copy of a Internal Revenue Service 1990 Form 1040 showing an Adjusted Gross Income of $1,323,916.85, bearing questioned written Signatures, Dates and Occupations on page 2. These documents are further identified by Bates numbers TH453 and TH454; Schedule A – Itemized Deductions further identified by Bates numbers TH457 and TH458.

      C.    Copy of a New York State 1990 Form IT-201 showing an Adjusted Gross Income of $5,561,728.19 bearing questioned written Signatures, Dates and Occupations on page 2. These documents are further identified by Bates numbers DN00432 and DN00433.

Peter B. Schalk, Esquire                        June 2, 2008
Page 2 of 2


I.   **EXHIBITS EXAMINED:**                        **(Continued)**

   D.   Copy of a New York State 1990 Form IT-201 showing an
        Adjusted Gross Income of $1,323,916.85 bearing
        questioned written Signatures, Dates and Occupations on
        page 2.  These documents are further identified by
        Bates numbers TH466 and TH467.

        *Note:*      *The Exhibits A, B, C and D documents listed*
                     *above were attached to my Report of*
                     *Examination dated May 29, 2008.*

II.  **PROBLEM:**

        To determine if any of the written numerals appearing
   on the Exhibit B and D documents listed above were produced
   (written) through the process of a tracing, utilizing
   numerals found on the A and C documents.

III. **RESULTS OF EXAMINATION:**

   1.   The bulk of the numerals appearing on the Exhibit B and
        D documents were found to be dissimilar in the
        formation of the numerals or the design of the
        numerals, and also in the spacing and placement of the
        numerals when compared to the numerals found on the
        Exhibit A and C documents.  In a few cases, it was not
        possible to make any determination in reference to
        tracing due to the poor reproductive quality of the
        exhibits submitted.

        *Note:*      *In this case it should be noted that the*
                     *writer(s) of the written text and numerals*
                     *appearing on the Exhibit A, B, C and D*
                     *documents exhibited careful precision in the*
                     *execution of all the written text appearing*
                     *on the exhibits.*

                                   GUS R. LESNEVICH
                                   Forensic Document Examiner

# Exhibit E

REPORT OF EXAMINATION
HARDING V. NASEMAN
JUNE 2, 2008
MY FILE NO. 2008-030
(TYPED TEXT)

# GUS R. LESNEVICH
*Forensic Document Examiner*

1684 Henrietta Mountain Road

Martinsburg, PA 16662

Telephone:    (814) 793-2377

Facsimile:    (814) 793-3790

June 2, 2008

Peter B. Schalk, Esquire
Judd Burstein, P.C.
1790 Broadway, Suite 1501
New York, NY 10019

      Re:   Document Analysis
           Harding v. Naseman
           My Report of Examination dated May 29,2008
           File No. 2008-030

## REPORT OF EXAMINATION

## I.  EXHIBITS EXAMINED:

A.   Copy of a one-page document titled <u>SUPPLEMENTAL</u> <u>INFORMATION</u>.  This document is also identified by the Bate number TH824.

B.   Copy of a six-page document titled HISTORY OF GROSS INCOME AS REPORTED ON TAX RETURNS DURING THE MARRIAGE PERIOD. This document is also identified by the Bate numbers TH818 through TH823.

        *Note:*     *Copies of the Exhibit A and Exhibit B documents listed above have been attached for easy identification.*

## II PROBLEM:

To determine if the typed text appearing on the Exhibit A and B documents were produced by the same typewriter or printed on the same printer.

Peter B. Schalk, Esquire                                    June 2, 2008
Page 2 of 2

### III. RESULTS OF EXAMINATION:

1.  The Exhibit A and B documents appear to have been produced utilizing a similar type font.  However, it could not be determined if they were typed on the same typewriter or printed on the same or similar printer.

    *Note:*     *The use of the term "appear to have been" is a very weak opinion and far is from conclusive.*

              *If the original or 1st generation copies of the Exhibit A and B documents could be obtained, a re-examination of the evidence could lead to more conclusive opinions.*

### IV. REMARKS:

I have attached a two-page chart illustration utilizing Exhibit A for illustration purposes.  I have identified the typed letter "h" that appears three times in three consecutively typed words. The variation (differences) found in the reproduction of the printing of these three letters illustrates that it is not possible, with the copies submitted, to render any definitive conclusion in reference to whether or not the typed text appearing on the Exhibit A and B documents were produced by the same typewriter or printed on the same printer.

GUS R. LESNEVICH
Forensic Document Examiner

## SUPPLEMENTAL   INFORMATION

1. Credit Cards/Retail Accounts.  TH and DMN maintain separate credit cards and retail accounts and each is responsible for his or her respective balances. Neither TH nor DMN has ever used the other's credit cards or charged merchandise to the other's retail accounts.

2. TH Information.  DMN has never had access to, and does not presently know, any of TH's bank accounts, investment instruments or her corporate benefit plans, and DMN does not know any of TH's balances in any of the foregoing.  Based upon tax information she has provided at year end, I believe that TH's balances could by substantial.

3. For various reasons, TH is unaware of the existence of the Shearson Lehman Bros. account or the income that has been generated by that account over the last two years.  Similarly, TH is not presently aware of the extent of my income for the 1990 and 1991 tax years, nor for the year 1992 just completed.  We can discuss the reasons for this at your convience.

4. During the marital period, DMN has earned over 80% of the total income generated by TH and DMN.  This has been primarily due to LIN Broadcasting stock options, which were exercised or otherwise cashed in in 1988 and 1990.  TH has received NYNEX stock options periodically since 1985, but DMN is not aware of any of the details of her option grants. Similarly, TH had options from U.S. Industries, which she cashed in and deposited in her account in 1984 in connection with the takeover of USI.

EXHIBIT "A"

TH824

### HISTORY OF GROSS INCOME AS REPORTED ON TAX RETURNS DURING THE MARRIAGE PERIOD

| YEAR | TOEHL HARDING | DAVID M. NASEMAN |
|------|---------------|------------------|
| 1982 | $  84,153.63 | $   68,136.86 |
| 1983 | 81,908.43 | 85,782.78 |
| 1984 | 131,023.74* | 110,450.00 |
| 1985 | 87,945.46 | 136,701.08 |
| 1986 | 101,597.19 | 114,097.92 |
| 1987 | 117,447.83 | 169,395.00 |
| 1988 | [130,000.00]** 133,042.90 | [2,270,000.00]** 2,386,725.27 |
| 1989 | 143,182.80 | 318,974.16 |
| 1990 | 153,713.33 | 5,408,014.86 |
| 1991 | 167,859.87 | 289,743.05 |
| 1992 | [180,000.00]*** | [200,000.00]*** |

---

  **\***   Includes $53,302.50 in distributions from U.S. Indus-
    tries in connection with the termination of her
    employment following a hostile takeover of that com-
    pany. I believe that amount was rolled over tax-free
    into a qualifying retirement account for her benefit.

 **\*\***   Amounts are approximate (+/- 10%); exact figures will
    be supplied when Form 1040 is available.

**\*\*\***   Amounts are rough guesstimates; information on her
    income is not available to me and information on
    my income is still being received as of February 24th.

**NOTE:**   All tax returns were prepared by me and each of us
    would be individually liable to make up any taxes
    due on April 15th based on a computation of our
    respective tax obligations on a stand alone basis.
    For example, if $5,000 in taxes were due and I had
    paid more than $5,000 in excess of my individually
    computed tax obligation for that year, Toehl would
    have to pay the tax due. Obviously, the reverse was
    also true. Since most deficiencies upon audit were
    minor, I usually paid those without contribution from
    Toehl.



PLAINTIFF'S EXHIBIT

_Exhibit "B"_

TH818

STATEMENT OF ASSETS AND LIABILITIES
OF DAVID M. NASEMAN

**********************************

(a) Unless otherwise indicated, all amounts are as of February 24, 1993.

(b) All fair market values are ballpark estimates based upon my opinion only. Subsequent appraisals and valuations may be required to establish a definitive valuation in the absence of agreement.

Amounts indicated for Real Estate and Motor Vehicles are believed to be accurate but are subject to verification.

(c) Financial assets are subject to tax liabilities for 1992 to the extent they exceed estimated tax payments already sent to taxing authorities.

**********************************

ASSETS

1. Bank Accounts

(a) Republic National Bank of          $  925,000.00
New York (N.Y., N.Y.)
Account established in 1987 in
name of both DMN and TH in con-
nection with grant-of mortgage
for purchase of N.Y. Apt. 5A.
All funds in account result from
DMN deposits in 1988 and 1990
and interest thereon; TH has
never had access to checks or
written any checks on account.

(b) First Interstate Bank of Nevada
(Incline Village, Nevada)
Established in DMN's name only
on February 4, 1993.

       1. Money Market Account        8,005.00
       2. Checking Account            1,000.00

(c) Lee Bank (Lee, Massachusetts)      14,000.00
Money market account establish-
ed in April 1990 in DMN's name
only.

TH619

(d) First Florida Bank (Venice,                    $    4,616.51
Florida) NOW account estab-
lished in April 1990 in names
of DMN and DMN's mother.

## 2. Investments

(a) Shearson Lehman Bros. (N.Y.,
N.Y.) Account established in
February 1991. $2,750,000 was
transferred to SLB in three
wire transfers from a separate
Republic National Bank account
in DMN's name only that was
closed in the Fall of 1992.

|   |   |   |
|---|---|---|
| 1. Cash Balance | | 981.74 |
| 2. Money Funds | | 144,581.72 |
| 3. Stocks | | 1,763,806.76 |
| 4. Bonds | | 860,631.75 |
| | Total: | $2,770,001.97 |

(b) McCaw Communications Corp.,
Inc.—6½ shares of Common Stock
registered in DMN's name only          2,236.50

## 3. Real Estate

All properties are free and clear
of any mortgages or other encum-
brances (other than periodic
maintenance charges and taxes, all
of which are current to my know-
ledge).

(a) 425 East 51st St., Apt. 5A, N.Y.,  $  375,000.00
N.Y. ("NY Apt. 5A")
     Purchase Price:   $150,000
     Improvements:       20,000
Primary residence of TH; pur-
chased in 1986 in coop conver-
sion at insider price; TH made
downpayment of 20%; DMN paid off
mortgage of about $115,000 in
July 1988. This was TH's apt prior
to my moving in in 1981. We each
paid 50% of rent and expenses
until 1988; TH pays thereafter.

(b) 425 East 51st St., Apt. 6A, N.Y.,       375,000.00
N.Y. ("NY Apt. 6A")

                                              Page 2

TH820

Purchase Price:  $395,000
Improvements:        15,000
Purchased in Spring 1987; TH makes
downpayment of 10% and DMN makes
interest payments for 1 year while
Apt. 6A is rented to seller; DMN
pays off $356,000 mortgage in July
1988. Apt. 6A serves as TH and DMN
primary residence from late 1988
to March 1992, when Apt. 5A renovat-
ions are completed and DN moves
NY furnishings back to Apt. 5A. TH
pays for renovations to prepare
Apt. 6A for rental.

(c) 150 Lee Road, Lenox, Massachusetts    $225,000
    ("Mass House").
        Purchase Price:  $ 97,500
        Improvements:    145,000 74,753
    Purchased in April 1982 (6 months
    prior to marriage; DMN and TH share
    downpayment; DMN pays for 80%+ of
    Improvements. Mass House is for
    weekend and summer use until Feb.
    1991, when it becomes DMN's legal
    residence. DMN pays off $57,000
    mortgage in July 1988.

(d) Nine Mile Point Drive, Charlevoix.    $120,000
    Michigan ("Mich. Property")
        Purchase Price:  $105,000
        Improvements:       9,000
    Purchased in early 1987 as primary
    residence for DMN's parents. DMN
    pays all costs associated with
    property and pays off mortgage of
    $65,000 in July 1988. TH executes
    waiver of dower at time of pur-
    chase. If property sold, by prior
    agreement, DMN's parents receive
    excess of sale price over total
    costs of acquisition and mainten-
    ance to date of sale.

(e) 512 Venice Avenue West, Unit 603,    $107,500
    Venice, Florida ("Florida Condo").
        Purchase Price:  $105,000
    Purchased in March 1990 for DMN's
    parents' winter residence due to
    their health problems. DMN paid
    100% of purchase price and all
    maintenance and tax obligations.
    Property is in DMN's name only
    and TH signed waiver of dower at

Page 3

TH821

time of purchase.

4. Furnishings

    (a) N.Y. Apt. 5A                  $ 46,000

    (b) Mass. House                   19,500

    (c) Florida Condo                3,000

    NOTE: There are no furnishings in the
           N.Y. Apt. 6A or the Mich. Prop-
           erty in which either TH or DMN
           has an interest.

5. Motor Vehicles

    (a) 1989 Jaguar Vanden Plas Sedan      20,000
        Purchase Price:  $49,000

    (b) 1989 Volvo 760 Sedan            12,000
        Purchase Price:  $30,000

    (c) 1991 Ford F-150 Pick-up Truck      9,000
        Purchase Price:  $18,000

    (d) 1922 Ford Model T Touring Car      5,500
        Purchase Price:  $ 9,680

All vehicles (other than the Volvo)
were paid for entirely by DMN. The Volvo
was a corporate perk by DMN's employer,
and DMN incurred imputed income each year
and paid for the car in 1990 as part of
his severance package from LIN Broadcast-
ing. Volvo has been used exclusively by
TH (commuting to work and personal use)
since she picked it out in 1989. All
vehicles are in DMN's name only and DMN
has paid all insurance and garaging costs
for all vehicles (and their predecessors)
during the marriage period.

6. Retirement Benefits

    (a) LIN Broadcasting Profit Sharing Plan   63,505
        Account is in DMN's name only;
        valuation is as of Sept. 30,1992.
        Invested in guaranteed income
        instruments.

Page 4

TH822

        (b) Merrill Lynch IRA Account         $ 5,689
            Account is in DMN's name only;
            valuation is as of Nov. 27, 1992.

## LIABILITIES

1. Mortgages:  None

2. Tanglewood New Theatre Fund       6,667
   A pledge of $10,000 was made by DMN
   only in the Fall of 1992 for this
   building project in Lenox, Mass. The
   first of three annual installments of
   $3,333 was paid by DMN in January 1993.

Page 5

# COMPARISON CHART

## SUPPLEMENTAL   INFORMATION

1.  Credit Cards/Retail Accounts. TH and DMN maintain
    separate credit cards and retail accounts and each
    is responsible for his or her respective balances.
    Neither TH nor DMN has ever used the other's credit
    cards or charged merchandise to the other's retail
    accounts.

2.  TH Information. DMN has never had access to, and
    does not presently know, any of TH's bank accounts,
    investment instruments or her corporate benefit
    plans, and DMN does not know any of TH's balances
    in any of the foregoing. Based upon tax information
    she has provided at year end, I believe that TH's
    balances could by substantial.

3.  For various reasons, TH is unaware of the existance
    of the Shearson Lehman Bros. account or the income
    that has been generated by that account over the
    last two years. Similarly, TH is not presently
    aware of the extent of my income for the 1990 and
    1991 tax years, nor for the year 1992 just com-
    pleted. We can discuss the reasons for this at
    your convience.

4.  During the marital period, DMN has earned over 80%
    of the total income generated by TH and DMN. This
    has been primarily due to LIN Broadcasting stock
    options, which were exercised or otherwise cashed
    in in 1988 and 1990. TH has received NYNEX stock
    options periodically since 1985, but DMN is not
    aware of any of the details of her option grants.
    Similarly, TH had options from U.S. Industries,
    which she cashed in and deposited in her account in
    1984 in connection with the takeover of USI.

ENLARGED ON FOLLOWING PAGE FOR
ILLUSTRATION PURPOSES

TH824

