UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TOEHL HARDING,                                  :
                                                              Hon. Robert P. Patterson
                  *Plaintiff*,              :
                                                              07-CV-08767 (RPP)
        – against –                             :

DAVID NASEMAN,                                  :

                  *Defendant*.             :
------------------------------------------------------------X

## DECLARATION OF PLAINTIFF TOEHL HARDING

I, Toehl Harding, declare as follows:

### INTRODUCTION

1.  I am the Plaintiff in the above-captioned action. I submit this Declaration in opposition to Defendant's motion for summary judgment or, in the alternative, for enforcement of an alleged settlement agreement, together with such other and further relief as this Court deems just and proper.

2.  I make this declaration based upon personal knowledge.

3.  Before providing the relevant factual background to this motion, I wish to make something unequivocally clear to the Court. In late 1992 to early 1993, when Defendant David Naseman ("Naseman") and I negotiated the terms of the Property Settlement Agreement ("PSA") at issue in this case, I had no knowledge that Naseman maintained a brokerage account with Shearson Lehman Brothers (the "Shearson Acct.") or an individual account with Republic National Bank of New York, Acct. No. 318188309 (the "Individual Republic Account"). (The Shearson Acct. and the Individual Republic Account are collectively referred to herein as the "Secret Accounts").

In particular, I had no knowledge that the Shearson Acct. contained over $2.7 million in equities, bonds, and cash when Naseman and I signed the PSA in May 1993.

4.   To the contrary, based upon Naseman's knowingly false representations discussed herein, my settlement negotiations with Naseman were totally premised on the basis that the entire marital estate consisted of (a) the real property identified in the PSA, (b) a jointly held account with Republic National Bank, Account No. 318181371 (the "Joint Republic Acct."), which contained approximately $1,000,000, (c) the motor vehicles identified in the PSA, (d) the retirement accounts identified in the PSA, and (e) funds in our individual checking accounts, which were *de minimis*. Due to Naseman's misrepresentations, I was unaware that our marital estate was at least $2.7 million greater than I had been led to believe.

5.   Consequently, the Secret Accounts were not part of the settlement negotiations and are not referred to in the PSA for the simple reason that I was totally unaware of their existence, because they had been actively concealed from me. Any claim by Naseman that (a) we discussed either of the Secret Accounts, (b) I agreed to forgo my claim to a share of the Secret Accounts, or (c) I was aware that we had reported over $5 million in joint income in 1990 is materially false and disputed.

## RELEVANT FACTUAL BACKGROUND

### A.   The Outset of the Marriage

6.   Naseman and I became romantically involved in or around 1980. We were both attorneys.

7.   Naseman and I were married in 1982, and we resided in the apartment I had been renting, Apartment 5A, located at 425 East 51st Street, in Manhattan, New York.

2

8. In or around 1982, Naseman was working as an associate in the New York offices of the law firm Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"). At the time, however, Naseman was planning to leave Fried Frank and he secured opportunities to move either to a small law firm or to accept employment at LIN Broadcasting Corporation ("LIN"). While Naseman was leaning towards accepting the offer at the small law firm, I urged him to take the job with LIN, in large part due to the corporate benefits.

9. In 1983, Naseman ultimately opted to take a job with LIN as Vice President, General Counsel and Secretary.

10. At times throughout our marriage, if I became irritated with Naseman, I would joke and say in words or substance: "If we ever split up, I'm entitled to half the assets." Apparently, Naseman took my statements to heart, and he engineered a way to deprive me of my rightful share of our marital estate.

11. In 1985, the property at 425 East 51st Street converted to a cooperative, and Naseman and I jointly purchased Apartment 5A as part of the conversion.

12. In 1987, Naseman and I jointly purchased Apartment 6A, also located at 425 East 51st Street, with the plan of connecting the unit with Apartment 5A.

13. It was in connection with the purchase of the second unit at 425 East 51st Street, Apartment 6A, that Naseman prepared the loan application and accompanying financial statement that he purports to rely upon now to claim that I was on notice of the LIN stock options that ultimately funded the Shearson Acct. (Defendant's Ex. 5). I do not recall these documents. However, I was on the Board of the 425 East 51st Street Co-op, and I do remember that we had to file an application with the Board for approval of the purchase of Apartment 6A. I distinctly recall

that our application for approval to the Board reflected that the LIN options were worth approximately $2 million in 1987.

14. As discussed *infra*, a $2 million valuation of the LIN options as of 1987 is entirely consistent with what I understood to be the subsequent disposition of the proceeds from the exercise of the LIN options in 1988. My recollection of the LIN options being worth approximately $2 million in 1987 is confirmed by the 1987 financial statement which shows a figure of $1,812,108 in "aggregate equity", *i.e.*, option value. *See* Defendant's Ex. 5 at Bates No. DN00524. Therefore, the 1987 financial statement that Naseman now claims should have put me on notice of his fraud was entirely consistent with my recollection of the value of the options at that time.

**B.    The 1988 Exercise of LIN Stock Options**

15. I was aware that Naseman was accruing stock options as part of his compensation during his time with LIN. However, in or around 1988, Naseman exercised what he told me was the vast majority of stock options that he had accrued with LIN as of that date.

16. In what Naseman and I had deemed to be a prudent financial course, we used the proceeds of the LIN options exercised in 1988 to pay off all of the mortgages on the real property that we owned either jointly or individually. In particular, we paid off the mortgages on the following properties:

    a.    425 East 51st Street, both Apartments 5A and 6A;

    b.    A farm house and attendant properties located in Lenox, Mass., that we had purchased prior to the marriage and owned as tenants in common; and

4

  c. Lots Nos. 34 and 35 located at Nine Mile Point Drive of Michigan Shores, Michigan, with a residence located on Lot No. 34, which Naseman owned individually and where his parents resided.

17. The remainder of the funds generated from the 1988 exercise of options in the amount of approximately $1 million was deposited into the Joint Republic Acct.

18. I did not stand over my husband's shoulder with a calculator checking his math as to the disposition of the proceeds of the LIN options. Nonetheless, I had believed that the mortgages we paid off described above totaled approximately $750,000, and there remained approximately $1 million that we deposited into the Joint Republic Acct. Taking into account taxes and any appreciation in LIN stock from 1987 when I knew the options were worth approximately $2 million, and 1988 when they were exercised, $1.75 million was entirely consistent with what I had thought to be the net value of the proceeds from the LIN stock options as of the time they were exercised.

19. I was unaware that in or around this time, Naseman had also separately opened the Individual Republic Acct.

C. **Issues Relating to Tax Returns**

20. For many years, Naseman and I had what I thought was a successful marriage. From a financial standpoint, we supported each other in our careers and were able to increase the marital estate.

21. While we were financially successful as a couple, we were not regularly earning millions of dollars a year in joint income. For example, our 1987 tax returns reported joint income in the amount of $284,123.

22.   The tax returns Naseman and I filed for 1988 reflected the income from the LIN options exercised that year, and thus showed $2,486,666 in joint income. 1988 was the first time that Naseman and I filed a tax return reflecting more than $1 million in joint income. Indeed, in so far as I was aware during our marriage, 1988 was the only year when Naseman and I filed tax returns showing more than $1 million in joint income.[1] Filing a $1 million tax return was a notable event for us, and not typical of our finances.

23.   In 1988, Naseman began to ask me to sign copies of tax returns in blank. Naseman's stated rationale for my doing so was that I traveled frequently for work and might be away when he would need to file our joint returns. Naseman was my husband and I trusted him to prepare our tax returns accurately. Accordingly, I acceded to and did not question his request that I sign returns in blank to facilitate his filing our tax returns.

**D.   The 1990 McCaw-LIN Takeover and Related Matters**

24.   In or around June 1989, McCaw Cellular Communications Inc. ("McCaw") launched a takeover bid for LIN. At the time, Naseman was the Vice President, General Counsel, and Secretary of LIN and he was consumed by the takeover process. Furthermore, Naseman had signed a LIN proxy statement relating to the McCaw takeover, and he was sued individually in a related shareholder litigation.

---

[1]   As discussed in more detail *infra*, as part of Naseman's financial disclosure made in anticipation of our entering into the PSA, Naseman did provide me with 1990 state and federal tax returns (which ultimately turned out to be fraudulent), showing approximately $1.2 million in joint income. Hence, as part of the financial disclosure attendant to our divorce proceeding, I did become aware that we had earned in excess of $1 million on more than one occasion. Nonetheless, although somewhat higher than I had thought, the income reflected on the fraudulent 1990 tax returns was not so great as to materially change the composition of what I believed to be the marital estate. Obviously, that was Naseman's intent in creating the fraudulent tax returns because he knew full well that I never would have signed the PSA as drafted once I saw a $5+ million tax return.

6

25. The process was extremely draining for Naseman, and I did everything in my power to support him.

26. As the McCaw takeover of LIN proceeded, I knew that the options held by high level LIN employees were going to be "cashed out" as part of the process. I have a distinct memory of walking with Naseman and asking him directly whether we were going to make any money as a result of LIN stock options relating to the takeover. Naseman responded that we were going to get "very little," explaining that we had exercised the vast majority of the options in 1988. I pressed the matter, asking how we would have done if we had not exercised options back in 1988. Naseman responded that Michael Plouf, LIN's Treasurer, had never previously exercised any options and that he was going to receive approximately $4 million.

27. In or around 1990, I believed that Naseman and I had a successful marriage and I trusted him. I was unaware of any reason why I should refer to the public filings relating to the McCaw-LIN takeover to see if Naseman was lying to me about what we were receiving as a result of the cash out of any remaining LIN options. I certainly had no inkling that Naseman was already scheming to put into effect a long term plan to divorce me two years later, while stripping me of my rightful share of the bulk of the liquid assets belonging to our marital estate.

28. I was aware that Naseman had received a buyout package as part of the McCaw takeover of LIN. However, based upon Naseman's representations to me at the time, the numbers to my understanding were in the hundreds of thousands of dollars range, not millions. I further understood that Naseman was using monies he received as part of the buyout to take some time away from work to relax, play golf, and ski, etc. I did not begrudge Naseman the time off because I knew that he had been through an exhausting ordeal.

7

29.     After a year or so, I began to urge Naseman either to return to work or, at a minimum, to speak with investment advisors that were available to us through my employer so that the $1 million in the Joint Republic Acct. could be invested and earn a greater return than simple interest. Naseman never wanted to speak with a financial advisor, however.

**E.     The Move Between Apartments**

30.     In or around 1990, Naseman and I began renovating Apartment 5A, and we moved into Apartment 6A. However, during the renovation process, Naseman and I still owned both Apartments 5A and 6A. The renovations to Apartment 5A did not affect our ability to receive mail in any way, as the mailboxes were in the same location.

31.     Hence, the deposition testimony Naseman gave in this case that in 1990 he switched the mailing address on the Individual Republic Acct. from our home to his work address because we were "moving" is patently false. There was, however, a compelling reason at the time for Naseman to change the address on the Individual Account; in 1990, Naseman had arranged for millions of dollars in income that he had concealed from me, and indeed affirmatively lied about, to be paid into the Individual Republic Acct. Plainly, Naseman could not take a risk that I would learn of his deception by opening mail from Republic.

**F.     The Negotiation of the Property Settlement Agreement**

32.     In late August to early September 1992, Naseman advised me for the first time that he wanted a divorce. I was devastated. I had invested 10 years of my life in this marriage and, now that I was fifty years old, he wanted a divorce.

33.     Moreover, Naseman knew that I was extremely unhappy in my job at the time. My division at NYNEX was being sold and I was going to be out of a job as a result. More generally,

8

my position as general counsel had been changing for the worse for some time, in that my division had been transformed from one where we had been acquiring new companies and building a business, to an environment of downsizing and related litigation. As a 50-year-old woman in a difficult job market, my prospects for finding comparable employment were poor.

34. I was facing a perilous financial future given the impending loss of my job. I had already agreed to divide the marital assets that I knew about 50/50 with Naseman. Therefore, the idea that I would knowingly and willingly relinquish my share of over $2.7 million in marital assets so that Naseman could pay for his continued "retirement" with income from the Secret Accounts is ludicrous.

35. In the Fall of 1992, Naseman presented me with a written draft of the PSA which offered, *inter alia*, significantly less than half of the funds in the Joint Republic Acct.

36. While Naseman has testified that the draft was prepared by his attorney, I was not represented by counsel at the time, and did not retain a matrimonial attorney until January 1993.

37. I advised Naseman that his initial proposal was unacceptable. Throughout my negotiations with Naseman, I stated repeatedly and unequivocally that I expected to receive 50% of the marital assets. My attorneys confirmed this position in a letter to Naseman's counsel and the assertion was never disputed. Any claim by Naseman to have been unaware that I was seeking at least 50% of the marital assets is simply false.

38. Contrary to Naseman's claim, he did turn over financial disclosure at the time the PSA was being entered into. Indeed, I have several distinct memories about the financial disclosure provided by Naseman. I remember being in the offices of my attorneys, Akbas & Cohen, to review Naseman's financial disclosure. I specifically recall looking at the account statement for the Joint

9

Republic Acct. that Naseman had provided. The $925,000 reflected on the Joint Republic Acct. statement corresponded to the $1 million that I knew had been deposited into it in 1988, less the interest and approximately $75,000 of principal that Naseman had drawn down for expenses incurred during his "retirement."

39. I also distinctly recall that Naseman's attorney telephoned while I was at Akbas & Cohen's offices, and asked if Naseman could forgo turning over his 1992 tax returns. I was told by my attorney that Naseman's counsel had stated that Naseman was traveling and did not have access to his 1992 tax returns. I acceded to the request as to the 1992 tax returns. I recall that the other tax returns requested by my attorneys had been produced. There is simply no way that in reviewing the tax returns Naseman turned over as part of the financial disclosure I would have missed a $5+ million dollar tax return. The 1988 tax returns were unusual and a $5+ million tax return would have jumped out at me. In entering into the PSA, I relied upon the fraudulent 1990 tax returns.

40. The PSA was to my understanding providing me with approximately 50% of the marital estate. The New York apartments were worth more than the remainder of the real property that Naseman was going to keep, and I was receiving slightly more than the majority of the funds remaining in the Joint Republic Acct. However, these considerations were offset in my mind by the greater carrying costs associated with the New York apartments, and Naseman's having used the interest income and some of the principal from the Joint Republic Acct. to support his "retirement."

41. Based upon Naseman's own false representations to me, I was made to believe that the proceeds of Naseman's LIN stock options were accounted for, and was unaware that in 1990, Naseman had received millions of dollars in income as a result of his cashing out additional LIN stock options. Naseman took advantage of my lack of knowledge in this regard to conceal over $4

10

million in income that we received in 1990, and then shield over $2.7 million in assets from inclusion in the marital estate. By doing so, when we entered into the PSA, Naseman was able to keep close to 75% of the "marital pie" for himself, while he nonetheless made it appear that I was receiving slightly more than 50%.

42. Naseman confirmed his plan to defraud me in a contemporaneous, handwritten memorandum that he has admitted drafting, which provides in relevant part: "TH **feels** she has won by taking most of everything..... she has deal that she gets (a) maj. of cash, (b) maj. of real estate value (at her $500,000 valuation), (c) I pay all costs." *See* Ex. 4 to the accompanying June 17, 2008 Declaration of Marcia Bothe ["Both Dec."], at p. 2, Bates No. TH 813 (emphasis supplied). In view of the $2.7 million sitting in the Shearson Acct. that Naseman had arranged to keep for himself, in contrast to how I was made to "feel", Naseman received the vast majority of our marital estate as a direct result of his fraud.

43. Naseman and I never had any discussion whatsoever during which he stated in words or substance that the Shearson Acct. or the Individual Republic Account were in effect "off the table" as marital assets. Nor did I ever agree to any such proposal. I further never agreed to waive my share to the 1990 income Naseman hid from me.

44. I know Naseman to be an extraordinarily careful and precise individual. As an example of his care in financial matters, before ever mentioning a divorce, Naseman had previously asked me to sign quit claim deeds for the Florida condominium and the Michigan property. Naseman's parents had lived at both properties, and Naseman said that he wanted them to be protected if anything happened. I agreed.

11

45.     Nevertheless, as part of the PSA, in addition to the releases I was asked to provide for all liquid assets and real property identified in the PSA that I did not keep, I was also asked to provide releases for the Michigan and Florida properties. *See* the PSA at Article 12, Secs. 7(a) and (c), 9 (a) and (c), and 11(a) and (c). Naseman owned the Michigan and Florida properties individually, and I had already provided the quit claim deeds for those properties at the time of their purchase. The combined value of the Florida and Michigan properties was approximately $220,000.

46.     Naseman never asked for or received any waiver or release from me of my right to a portion of the funds and assets in either of the Secret Accounts. It is inconceivable that Naseman would have neglected to demand a release as to the Secret Accounts which contained more that $2.7 million, **if** I in fact knew about them, and had waived my entitlement to share in those accounts.

### G.     **The Fraud Is Uncovered**

47.     On January 18, 2006, Marcia Bothe, formerly Marcia Naseman, telephoned me. During the discussion, Ms. Bothe asked me questions about Naseman's and my joint income for 1990. In particular, Ms. Bothe inquired as to whether Naseman and I had earned in excess of $5 million for 1990. I advised Ms. Bothe that Naseman and I had never earned anything close to $5 million, and inquired as to the basis for her statements. Ms. Bothe stated that among other documents, she had located a tax return for $5 million. I was incredulous. (A true and accurate copy of the note I took memorializing this discussion is annexed hereto as Ex. 1).

48.     Shortly thereafter, on or about January 21, 2006, I received overnight delivery of some of the documents that Ms. Bothe advised me she had found. (A true and accurate copy of the shipping label demonstrating the first delivery is annexed hereto as Ex. 2). Included in these documents were the following:

12

    a.    Two sets of state and federal tax returns for 1990, one set showing $1,252,059.88 in joint income (Exs. 1 and 2 to Bothe Dec.), and the other showing $5,329,797.39 (A true and accurate copy of the 1990 federal and state $5+ million tax returns and supporting documentation as sent to me by Ms. Both are annexed hereto as Exs. 3 and 4 respectively);

    b.    A typed memorandum discussing Naseman's and my finances during our marriage, immediately followed by a document titled "Supplemental Information." The document titled "Supplemental Information" expressly confirmed that I had been unaware of the Shearson Acct. and other important financial matters during the time we were negotiating the PSA (Ex. 3 to Bothe Dec.); and

    c.    An analysis in Naseman's handwriting, which I recognize, that includes a subsection titled "Objective in Nevada" on the fourth page, and which contains another subsection titled "Things to hide" on the sixth or last page. This document confirmed, among other things, that Naseman had improperly diverted marital assets to pay for Ms. Bothe's tubal reconstructive surgery, as well as purchase her an engagement ring, and loaned money to her business, all at a time when Naseman and I were still married (Ex. 4 to Bother Dec).

49.    I was completely stunned by these and other documents that Ms. Bothe sent to me. The care and foresight that went into Naseman's deception was startling. For example, I now understand that the $5+ million tax returns were the ones that Naseman actually filed on our behalf

for tax year 1990. The federal tax that was shown to be owing on the $5+ million 1990 federal return was $260,573.74. (Ex. 3 hereto, at Bates No. TH 241, line 66). Naseman paid this tax with two checks: one drawn on the Joint Republic Acct. in the amount of $100,000, and the other check drawn on the secret Individual Republic Acct. in the amount of $160, 573.74. (*Compare* Ex. 3 hereto, at Bates Nos. 243 and 242). Tellingly, the tax that was showed to be owing on the fraudulent $1.2 million 1990 federal tax return was $105,258.12, or almost exactly the $100,000 figure that Naseman paid toward our 1990 federal taxes out of the Joint Account. *See* Ex. 1 to the Bothe Dec. at Bates No. TH 453. Naseman thus ensured that the 1990 tax payment from the Joint Republic Acct. that I could verify, *i.e.*, the $100,000 check, would closely correspond to the tax shown to be due on the fraudulent $1.2 million tax return. Therefore, Naseman was able to hide the fact that we had earned so much money in 1990 by concealing from me the additional $160,573.74 in income taxes we paid by writing a check for that amount on the secret Individual Republic Acct.

50. It was devastating to learn that my former husband had intentionally deceived me as to the true value of our marital estate, and that he had done so for the purpose of defrauding me out of my rightful share.

51. In or around January 2007, I commenced suit against Naseman in Nevada State Court. After Naseman was served with the Summons and First Amended Complaint in this action, he removed the case to United States District Court for the District of Nevada. Thereafter, Naseman brought a motion resulting in the transfer of this litigation to this Court.

14

### H.  The Failed Settlement Negotiations

52. In late December 2007, after this litigation was transferred here from Nevada I considered retaining Judd Burstein, P.C. ("JBPC") as my attorneys. However, the process had already been draining, and I contemplated moving on with my life and not pursuing the litigation. While I had not yet formally retained JBPC, Mr. Burstein conveyed this proposal to Naseman's attorneys on my behalf as a courtesy. I never authorized Mr. Burstein to engage in settlement negotiations on my behalf, however.

53. I was never advised that Naseman agreed to a exchange of standard general releases. Instead, Naseman insisted on various conditions that would allow him to argue that my fraud claims against him were dismissed because they had no merit. That was completely unacceptable to me.

54. I also reviewed a proposed release Naseman's attorneys provided in early January 2008. The proposed release required me to release the attorneys who had helped Naseman negotiate the fraudulent PSA, and further reaffirm that agreement, which I knew Naseman intended to use to argue that my claims had no merit. I did not know that Naseman was requiring me to provide a general release to his prior counsel at any time before his attorneys sent the proposed release in January 2008. The insertion of these wholly unacceptable conditions in the release confirmed for me that settlement was not possible and I proceeded with the litigation.

### CONCLUSION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of June, 2008, in New York County, New York.

_____
TOEHL HARDING

15