United States District Court
Southern District of New York
---------------------------------------------------x
Toehl Harding,

                Plaintiff,

      -against-

David Naseman,

              Defendant.
---------------------------------------------------x

Hon. Robert P. Patterson
07 Civ. 08767 (RPP)

**REPLY DECLARATION OF
ROBERT STEPHAN COHEN**

Robert Stephan Cohen hereby declares under the penalties of perjury pursuant to 28 U.S.C. § 1746:

1. I am a member of Cohen Lans LLP, attorneys for defendant David Naseman ("Naseman"). I submit this declaration in further support of defendant's motion to enforce a settlement or for summary judgment. Specifically, I submit this declaration to address some of the allegations made by plaintiff and her counsel in support of plaintiff's attempt to disavow a binding settlement agreement.

2. As set forth in my affidavit dated May 22, 2008, I received a phone call from plaintiff's counsel, Judd Burstein, on December 18, 2007 offering to resolve this case with each side "walking away" from any claim he or she may have against the other. Mr. Burstein most certainly did not tell me in that conversation that he was not authorized to make the offer. He also did not tell me, in words or substance, that the offer was to be deemed withdrawn if not accepted that day. The call was followed up later that day with an e-mail from Mr. Burstein to me, stating in its entirety:

> Bob –
>
> <u>If</u> there is any way to let me know today (email would be fine) whether your client will agree to the walk-away, <u>it would be much</u>

<u>appreciated</u>. Obviously, if he will not so agree, we need to get on the same page about a discovery schedule.

Regards

Judd Burstein.

Exhibit 12 (emphasis added).[1]

3. As further set forth in my earlier affidavit, I communicated defendant's acceptance of the offer to Mr. Burstein on December 19, 2007. I then wrote a letter to the Court that same day notifying it of the settlement which expressly stated that "Plaintiff has agreed to withdraw the action . . ." Exhibit 13.

4. Plaintiff's attorney <u>reviewed</u> my letter and <u>consented</u> to its contents <u>prior</u> to its being sent to the Court. Exhibit 13. The Court so-ordered the letter on the same day. Exhibit 14.

5. Notwithstanding the parties' "walk-away" settlement evidenced by, among other things, the so-ordered letter, plaintiff apparently had a change of heart. To defend her current position, plaintiff and her counsel have accordingly assembled a litany of after-the-fact conclusory assertions in an attempt to defeat the binding settlement agreement that was reached on December 19, 2008. The veracity of these assertions, however, is undermined by plaintiff's side's self-contradictions and by the documentary evidence.

**Plaintiff's Attorney's Contention that He Did Not Have Authority to Convey the December 18th "Walk-Away" Settlement Offer on Plaintiff's Behalf is Directly Contradicted by Plaintiff's Statements as well as His Own**

6. Mr. Burstein urges this Court to accept his assertion that, although he concededly called and emailed a settlement offer to me (Burstein Decl. ¶ 28(a)), and concedes that the parties through counsel actively engaged in settlement negotiations (<u>id.</u> at ¶ 13), he had no authority to

---

[1] All exhibits cited herein are included in defendant's Exhibit Volume filed in connection with his moving papers unless otherwise indicated.

2

convey the December 18th "walk-away" settlement offer on plaintiff's behalf or otherwise to negotiate because he had not yet been retained. Burstein Decl. ¶ 6; Plaintiff's Memorandum of Law, p. 4.

7.  Plaintiff Toehl Harding, however, directly contradicts her attorney's declaration. Ms. Harding states:

> In late December 2007, after this litigation was transferred here from Nevada I considered retaining Judd Burstein, P.C. ("JBPC") as my attorneys. However, the process had already been draining, and I contemplated moving on with my life and not pursuing the litigation. While I had not yet formally retained JBPC, Mr. Burstein conveyed this proposal to Naseman's attorneys on my behalf as a courtesy.

Harding Decl. ¶ 52 (emphasis added).

8.  In light of plaintiff's admission, it cannot be disputed that Mr. Burstein had actual authority to convey the December 18th "walk-away" settlement offer on Harding's behalf.[2]

**Plaintiff's Attorney's Contention that His December 18th "Walk-Away" Offer Expired as of December 19th has no Merit, for Three Reasons**

9.  After attempting to disavow the settlement by contending he lacked authority to make the December 18th "walk-away" settlement offer, Mr. Burstein next argues that, in any event, the offer "expired on December 19th by its own terms." Burstein Decl. ¶ 7.

10. To support this contention, Mr. Burstein relies on the language in his December 18th email that reads, "[i]f there is any way to let me know today (email would be fine) [w]hether your client will agree to the walk-away, it would be much appreciated." The documentary evidence establishes, however, that the December 18th "walk-away" settlement offer: (a) was accepted on December 19, and (b) did not "expire on December 19."

---

[2] Nothing in Mr. Burstein's December 18 email suggests a lack of authority, which one certainly would have expected if it were the case or the call were merely exploratory. Further evidencing that Mr. Burstein's offer of a "walk-away" was a firm offer -- and not merely exploratory -- is his statement that if defendant did not agree to the "walk-away" offer the parties would have to pursue a discovery schedule. Exhibit 12.

3

11. First, Mr. Burstein's contention that his December 18th offer expired as of December 19 is belied by his email on December 19 in which he confirms the offer. Specifically, Mr. Burstein's December 19th email to me, states "our offer is a walk-away with plain vanilla releases . . ." Exhibit 15 (emphasis added).

12. Second, the language used by Mr. Burstein -- "[i]f there is any way to let me know today . . ." -- indicates only Mr. Burstein's wish to hear back on December 18th, not a deadline. Thus, Mr. Burstein's assertion that his e-mail "required notification 'today', i.e., as of December 18" (Burstein Decl. ¶ 7), is contrary to the language Mr. Burstein used in his e-mail which is by its very terms is devoid of any timing "requirement".

13. Lastly, and perhaps most importantly, when I called Mr. Burstein and accepted the offer on the morning of December 19th he stated to me that we had a deal. Mr. Burstein does not and cannot dispute this.

14. This agreement is further evidenced by the fact that with Mr. Burstein's consent, I sent a letter to the Court (the contents of which were reviewed and approved by Mr. Burstein prior to transmittal to the Court) notifying it that "[p]laintiff agreed to withdraw the action." Exhibit 13. The Court received that letter also on the morning of December 19th and so-ordered the letter the very same day. Exhibit 14.[3]

---

[3] Perhaps recognizing that plaintiff's attorney's review and approval of a letter to the Court (and its subsequent so-ordering) informing it that "Plaintiff agreed to withdraw the action" makes it virtually impossible for plaintiff to deny the existence of the agreement, Mr. Burstein argues that at the time his office reviewed the letter -- December 19 -- they were not yet "plaintiff's attorneys." Burstein Decl. ¶¶ 15-17. Mr. Burstein, however, asserts the attorney-client privilege on Ms. Harding's behalf for a communication occurring on the very same day (December 19) as of which -- he attempts to convince the Court -- he was not yet plaintiff's attorney. Id. at ¶ 16, fn 1 and Exhibit 1 to Burstein Declaration.

**Plaintiff's Attorney Attempts to Manufacture Disputes in an
Attempt to Convince the Court That No "Meeting of the Minds" Occurred**

15. Mr. Burstein also attempts to convince the Court that there was no agreement because the Mutual General Release (the "Release") my office sent him included two provisions unacceptable to his client. First, I must emphasize that I never heard these objections from plaintiff's attorney at the time. The positions plaintiff <u>now</u> takes are ones she is just now airing. (Also see the Reply Declaration of Dan Rottenstreich at ¶ 7).

16. The first provision in the Release he contends plaintiff finds objectionable is the provision that reads "Harding and Naseman each hereby reaffirm the provisions of the Property Settlement Agreement..." Burstein Decl. ¶ 27. Mr. Burstein contends that this provision "runs afoul of the requirement set forth in [his] December 19th e-mail that any acknowledgement by Plaintiff that her allegations of fraud supposedly lacked merit was a "non-starter." <u>Id</u>. This provision, however, in no way requires plaintiff to acknowledge that her claim of fraud lacked merit. It is hornbook law that an agreement induced by fraud is voidable not void. This provision therefore would have allowed plaintiff to contend that her allegations of fraud were meritorious, but that she merely opted to reaffirm the agreement rather than void it. Mr. Burstein further contends this provision was objectionable because plaintiff "never agreed to reaffirm the provisions of that contract that she believes . . . were induced by fraud." <u>However, plaintiff's complaint seeks to do just that. Plaintiff concedes that her complaint does not seek to rescind the Property Settlement Agreement, but to reaffirm it</u>. Plaintiff's Memorandum of Law, p. 8. Indeed, in numerous places in her complaint, plaintiff expressly states that the Property Settlement Agreement "constitutes an enforceable contract between Harding and Naseman." Complaint ¶ 99; <u>see also</u> ¶¶ 107, 116. Thus, for plaintiff now to contend that the settlement was not agreed upon because she would not agree to reaffirm the terms of the Property Settlement

5

Agreement when her complaint seeks to do just that evidences the after-the fact and contrived nature of this disputed term in the Release.

17. The second provision in the Release Mr. Burstein points to as an alleged "disagreement" is the provision that sought the release by plaintiff of defendant's attorneys who represented him in the parties' divorce action and negotiated the Property Settlement Agreement (Burstein Decl. ¶ 25) and who are specifically referenced in plaintiff's complaint. He claims that this was inconsistent with his request for a "plain vanilla" release. I have been practicing law for approximately 45 years and it has been my experience that when one party releases another party, that release usually extends to, among other people, that party's agents and attorneys. I would therefore consider the release of another party's agents or attorneys "vanilla."

18. More importantly, however, Ms. Harding states in her declaration that the reason she offered the "walk-away" settlement was because "the process had already been draining, and [she] contemplated moving on with [her] life and not pursuing the litigation." Harding Decl. ¶ 52. The idea that she would release defendant because she wanted to "move on with her life", but pursue litigation against the attorneys that represented him 15 years earlier is simply not credible.

19. Finally, and underscoring that plaintiff's objection to the release of the attorneys is created after-the-fact in an attempt to manufacture a dispute, is that even under plaintiff's contention as to when the statute of limitations expired on her claims -- January 2008 (see plaintiff's memorandum of law, p. 20) -- the time for her to assert her claims against defendant's prior counsel expired less than 3 weeks after she had been sent the Release. To my knowledge, plaintiff has not filed any such claims against the attorneys she now contends she refused to release.

6

20.  In any event, plaintiff's attorneys raised the objection to these provisions for the first time in plaintiff's opposition papers, further evidencing the contrived nature of the "disagreements."

### Since the Settlement Has Been Reached, Defendant Has Conducted Virtually No Discovery

21.  Plaintiff also attempts to convince the Court that defendant's "continued participation" in the litigation evidences the absence of agreement. Plaintiff, however, fails to inform the Court that defendant has conducted <u>no discovery</u> during the 4 months from when plaintiff disavowed the settlement agreement and the filing of this motion. Since the filing of this motion, defendant has still conducted <u>no discovery</u> other than in connection with the deposition of plaintiff's expert witness -- Gus R. Lesnevich -- whose deposition was court-ordered at plaintiff's insistence. Even at the deposition, my associate, Ryan Weiner, asserted that his "presence here today in no way -- we reserve the argument that we put before the court that we believe that this case has reached a binding settlement, but because of court order we are present." See Exhibit A (Deposition of Gus R. Lesnevich) attached hereto at 104:4-9.

### Information Relevant in Marital Actions

22.  Throughout plaintiff's papers, she refers to the alleged concealment from her of the true level of defendant's 1990 income. Inasmuch as plaintiff was concededly a self-supporting spouse with a professional career, defendant's income *per se* was irrelevant to the marital action, as plaintiff was not eligible for an award of alimony. Since income *per se* is not allocated in a divorce -- and only marital assets are -- it is the assets that exist as of the parties' separation/divorce (in this case, in mid-1993) that are relevant.

**Usual Practice Concerning Disclosure**

23.     The nature and extent of the disclosure that is made in connection with a non-litigated divorce is a matter of negotiation between counsel. Exhibit B attached hereto includes materials from standard treatises on point. Usually, as stated therein, the parties at least exchange sworn statements of net worth.

24.     Those sworn financial statements, and sometimes any broader disclosure, are often either referenced or attached, to the parties' agreement and referred to as forming the basis of the negotiations, and the agreement then provides as to the ownership/division of any undisclosed or "later-disclosed" assets. Sample clauses providing for division of "later-discovered" assets from the standard marital form books are contained in Exhibit C attached hereto. That plaintiff's attorney in this matter did not follow these methods is a fact that should not create additional exposure for defendant; rather, it is, if anything, an issue between plaintiff and her attorney.

25.     Here, the pre-agreement correspondence between plaintiff's and defendant's attorneys contained in Naseman Exhibit 4 makes clear that plaintiff tacitly withdrew her request for more disclosure (except, she asserts, tax returns which she says she received)[4] in order to avoid having to give reciprocal disclosure concerning her accounts and holdings to defendant. Exhibit 4 (TH790- Of course, plaintiff was free to chart her own course in negotiating her deal in this manner.

**Speculative Nature of Damages**

26.     Plaintiff also asserts a right to damages of many millions of dollars as a result of the alleged fraud (Opp. Memo pp. 10-13). In fact, to determine damages a court would need to

---

[4] Harding Decl. ¶¶ 38-39.

8

determine what amount either (a) the parties would have negotiated assuming arguendo that the "secret accounts" had in fact been concealed from plaintiff at the time of the 1993 negotiations but, in the "but for" damages world, those accounts were known, or (b) what amount a judge[5] would have awarded plaintiff from the overall marital assets (plaintiff's still-undisclosed accounts in her own name included) in 1993 based on the 12 factors that New York's Equitable Distribution Law, Domestic Relations Law section 236B, enumerates and based upon the circumstances of the marital relationship. (A copy of the statute is attached hereto as Exhibit D).

27. In other words, to determine damages the judge in this action would have to try a marital action and speculate as to how a New York State matrimonial judge would have decided such an action in 1993 or the judge must speculate as to the outcome of a hypothetical negotiation. Since New York does not apply any formula to the division of assets and, as defendant's original memorandum of law states (at p. 3, fn. 3), based on the enumerated factors the courts may award any percentage deemed equitable, it is inconceivable that there is a non-speculative answer to the damages issue.

28. Moreover, although plaintiff now tries to gloss over this issue by claiming that she always insisted on a 50-50 division of assets, a reading of the letters constituting the negotiations (Exhibit 4) belies that assertion. To the contrary, in citing two specific cases (Kobylack and Delgado), defendant's then-lawyer was making clear the defendant's position that a disparate distribution was appropriate and should be based on a tracing of the cash in-flows during the parties' short, childless marriage.[6]

---

[5] In New York, only a judge may make the financial determinations.

[6] Kobylack v. Kobylack, 111 A.D.2d 221 (2d Dep't 1985); Del Gado v. Del Gado, 129 A.D.2d 426 (1st Dep't 1987). In Kobylack, the property was divided 78% to one spouse and 22% to the other. Del Gado confirms the principle set forth in Kobylack.

9

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 8 day of July, 2008.

_____
Robert Stephan Cohen