United States District Court
Southern District Of New York
---------------------------------------------------------x
Toehl Harding,

     Plaintiff,

  -against-

David Naseman,

     Defendant.
---------------------------------------------------------x

Hon. Robert P. Patterson
07 Civ. 08767 (RPP)

Reply Declaration of David Naseman

David Naseman hereby declares under the penalties of perjury pursuant to 28 U.S.C. § 1746:

1.   I am the defendant in this action. I submit this declaration in further support of my motion for summary judgment and related relief.

2.   My ex-wives, plaintiff Toehl Harding ("Harding") and Marcia Bothe ("Bothe"), have submitted lengthy declarations. There are a great many untrue statements and unsupported suppositions made by them (some of which are merely repetitive of unfounded allegations in the complaint), which I know to be provably false. Nevertheless and despite my strong inclination to refute these allegations one by one, I have instead confined this declaration solely to a discussion of facts directly material and relevant to the disposition of my motion for summary judgment. However, my silence as to other matters should not in any way be construed as acquiescence to any degree of veracity of any of Harding's or Bothe's assertions (certain of which are addressed in my initial affidavit).

**Harding's Argument**

3. The core of Harding's argument is that she is entitled to litigate the question of her marital property rights because in 1993 I purportedly concealed from her two assets -- an account at Republic National Bank and an account at Shearson Lehman Brothers, Inc. -- and that my concealment was aided by my having tendered to her fraudulent 1990 tax returns materially understating my income for that year. (Complaint ¶¶ 27-30). The amount of my 1990 income, in and of itself, is of course irrelevant, in that divorce courts do not divide income, they divide assets, a fact that Harding implicitly recognizes when she makes various convoluted arguments about how much of my 1990 income she believes remained (after tax, expenses, etc.) in 1993. (Harding Decl. ¶ 41).

4. However, Harding's own submission on this motion, as well as contemporaneous public filings, defeats her various claims that I concealed assets.

**Our 1991 Tax Returns**

5. In her declaration at ¶¶ 38-39, Harding states that she has "several distinct memories" that before our Agreement was entered into (the Agreement was signed May 4, 1993), she was at her New York attorneys' office in order "to review Naseman's financial disclosure." She recites a purported conversation in which my attorney called her attorney to ask if I could forego providing Harding with my 1992 tax returns because I "was traveling and did not have access to [them]." (Id.)[1] Harding then states: "I recall that the other tax returns requested by my attorneys had been produced." The "other returns requested" were for 1991,

---

[1] In fact, my 1992 federal tax return was not prepared or filed until August 14, 1993 (see Exhibit A attached hereto).

2

1990, 1989 and 1988. (See Naseman Ex. 4,[2] a letter dated February 5, 1993 from Harding's lawyer, Richard Cohen, to my lawyer, at p. 1, ¶ A(2) (TH790) ["We need the couple's last five years of tax returns."]). In the same paragraph of her declaration, Harding specifically acknowledges reviewing the 1988-1991 returns.[3]

6.  The 1991 tax return is submitted herewith as Exhibit B. It is beyond debate that by reviewing this return, which Harding acknowledges she did, she became aware – even if she alleges she was previously unaware -- of the allegedly "secret" Republic and Shearson Lehman accounts, because their existence is expressly disclosed in the 1991 return and because the existence of very significant assets and related income is also separately disclosed by the 1991

---

[2] All exhibits cited herein are included in the Exhibit Volume filed in connection with my moving papers unless otherwise indicated. Article 2, Section 6 of the Property Settlement Agreement (which plaintiff specifically states remains an enforceable contract between the parties) provides that certain documents involved in the negotiation of that Agreement (including this Exhibit 4) "may be admitted into evidence by the party *in order to defend the Agreement* ... if the other party attacks ... any of the provisions of this Agreement in any action." (Emphasis added.)

[3] Notably, Harding has now retreated from reliance on the claim (complaint ¶ 7, Naseman Exhibit 1) that Harding signed tax returns in blank and therefore lacked knowledge of their contents, as Harding now states she reviewed 4 years of tax returns (1988-91). As discussed here, her claim that the 1990 returns she received were fraudulent has also become irrelevant by reason of her acknowledgment of reviewing tax returns for the other years, since the 1989 return disclosed the so-called "secret" Republic account (see Exhibit 9 attached to Exhibit A of the Declaration of Peter B. Schalk at TH444) and the 1991 return discloses both that account and the so-called "secret" Shearson Lehman account that was opened after 1989 (see Exhibit B attached hereto). Further, the 1991 tax return plainly indicates, by the levels of income shown, that the funds held in those accounts had to be roughly $3 million. I should add that there is simply no logic to Harding's speculation that I created the fraudulent 1990 returns, since (a) it would have been pointless to do so if she had the 1988-91 returns, (b) if she had simply telephoned the IRS in 1993 to confirm the gross income figures, the settlement would have been disrupted if a false tax return had been provided, and (c) as expert Erich Speckin has found, the fraudulent returns bear signs that the numbers were traced -- and, I would hardly have been the one to trace figures, since I could simply have hand-written the false returns; only someone else would involve her- or him-self in tracing. Moreover, if I possessed 1990 tax returns signed in blank by Harding, I could have simply added my signature to create a valid looking tax return; only someone else would have to copy and transfer the original 1990 tax return signature block onto the bogus tax returns.

3

return. Based on Harding's own acknowledgement, she therefore became aware of these accounts and assets no later than 1993 prior to her entering into the Property Settlement Agreement.[4]

7. Schedule B to our joint 1991 Federal tax return, entitled "Interest and Dividend Income," at "Part 1. Interest Income" lists two Republic accounts. Indeed, there were two Republic accounts -- the joint account of which Harding concedes knowledge and a second account -- what she calls a "secret account." The first Republic account is reported to have generated interest income in 1991 of $58,217.13, and the second is reported to have generated interest income of $47,845.36. Since Harding admits knowing that the joint Republic account held about $900,000, then she had to know from these interest figures both that there was a second Republic account and that it held sizeable funds to generate the additional 1991 interest reported.

8. Furthermore, Schedule B also reported, in "Part 1. Interest Income," a Shearson Lehman Brothers, Inc. brokerage account that generated interest income alone of $58,588.86.

9. Furthermore, Schedule B "Part II: Dividend Income" disclosed the Shearson account again -- as generating dividend income of $60,361.32 -- another sizeable amount. (Exhibit B attached hereto, at Bates No. DN00439). It is inescapable that the assets generating interest and dividend income roughly three times greater than the interest income from the joint

---

[4] Of course, other evidence also establishes that Harding knew of these accounts prior to 1993. For example, although Harding previously tried to disavow knowledge of the content of the 1991 tax return (and therefore knowledge of the "secret accounts") by contending that she signed the parties' tax returns in blank before they were prepared for purposes of this action (Harding Decl. ¶ 23), her divorce attorney stated in 1993 during negotiations that Harding signed the tax returns after they were prepared. (Naseman Exhibit 4 at TH792 (Para. C.2)). This issue of purported signing blank tax returns is now essentially irrelevant, as Harding now admits having and reviewing the 1988-1991 tax returns in 1993 -- not 2006 or later.

4

Republic account during 1991 had to be roughly three times greater (i.e., $2.8 million) than the principal amount of about $925,000 Harding states to have been in the joint Republic account during the 1988-1992 period. (Harding Decl. at ¶ 38.)

10. Yet further, Schedule D ("Capital Gains and Losses") of the joint 1991 tax return (Ex. B attached hereto, at Bates No. DN00440) revealed that in 1991 I made capital asset sales aggregating $4,159,314.91 (see, Part 1, line 1c). Since we did not sell any real estate, Harding had to know that one or more sizeable brokerage trading accounts existed in which those securities sales were effected.

11. Indeed, Schedules D and D-1 lists all the securities transactions. The list spreads over three pages; 80 separate securities sales are listed under the category of "Short-Term Capital Gains and Losses" on those Schedules. (See, Exhibit B attached hereto, at Bates No. DN00442).

12. Since Harding unambiguously admits receiving and reviewing the 1991 tax return (among others) during our divorce negotiations, she cannot escape the fact that she knew of the so-called "secret" Republic and Shearson accounts in early 1993 (at the latest) and <u>before signing</u> our Property Settlement Agreement and knew or should have known that those accounts were quite sizeable in amount.[5]

---

[5] Harding also states that she obtained and reviewed our joint 1989 tax return (see paragraph 5 above). The 1989 tax return also reported interest from two separate accounts at Republic Bank, and combined interest of $53,985.53. (Exhibit 9 to Exhibit A of the Declaration of Peter B. Schalk at TH444). If (as Harding asserts in her Declaration at ¶ 38) the proceeds from the 1988 stock option sales were about $925,000 during the 1988-1992 period, then the non-employment (i.e., interest/dividend/capital gain) income in 1991 (roughly $300,000) represented an increase of well over 5 times the level of the 1989 interest income, which would be unexplainable without reference to a very significant increase in the asset base that occurred between 1989 and 1991. Based upon this comparison, Harding was certainly aware that something very substantial occurred in 1990 which would have been well in excess of only a 60-75% increase in the asset base in order to create a five-fold increase in passive income.

5

### Harding's Statements About the 1987 Loan
### Application and 1988 Stock Option Exercise

13. In my original moving papers, I pointed out that -- in addition to Harding's actual knowledge of the supposedly secret Republic and Shearson accounts that she derived from, among other things, reviewing our 1991 joint tax returns -- Harding was also, separately, on notice of the fact that I had significant options that were "cashed out" in the McCaw-LIN transaction, because (among other things) our 1987 loan application -- the accuracy of which she certified -- disclosed my then-LIN option holdings.

14. In response, Harding has constructed a convoluted and byzantine argument in an effort to claim that she thought that I exercised "the vast majority" of all my options in 1988. (Harding Decl., ¶¶ 14-17).

15. Like so many of her arguments, this is an obvious fabrication. Our 1987 loan application, which concededly bears Harding's signature, reflects two types of option holdings -- vested and unvested. (Naseman Ex. 5, also see, Naseman Ex. 6). Specifically, in the loan application Harding and I disclosed 27,750 vested LIN options and 45,250 unvested options; the vested options (representing 38% of all options listed) were reported under "Current Assets" and the unvested options (representing 62% of all options listed) were reported under "Non-Current Assets" in the accompanying Financial Statement (Naseman Ex. 6). Harding, a seasoned corporate attorney, knew and knows that unvested options cannot be exercised (and also knew that LIN's options vested 25% per year over four-year periods on the anniversary dates of their original grant). Thus, her explanation that she thought back in 1993 that all or virtually all of my options had been exercised in 1988 and none exercised in 1990 is an obvious sham, as the unvested options could not all have been exercised in 1988 (and, of course, her explanation also

ignores the fact of subsequent LIN options that were granted to me in December 1987 and December 1988, none of which could have been exercised (let alone sold) in July 1988).[6]

16. Since Harding had to know that I continued to hold a very sizeable number of LIN options at the time of the 1990 McCaw-LIN transaction, when we made our Property Settlement Agreement in 1993, she plainly knew or was on notice to inquire as to their post-1988 disposition. Again, that information was readily available to her -- a corporate/securities attorney -- through LIN's 1989 and 1990 proxy statements; indeed, the 1990 proxy statement (at page 13) specifically and plainly described the disclosed number of 29,750 exercisable options I had at that time, and the disposition of my exercisable LIN options in connection with the McCaw takeover, at a profit of more than $132 per share, i.e., for a gross sum of about $3,932,000 in option proceeds alone. (The 1990 proxy statement also refers to my separate, common stock ownership.) Harding also acknowledged that I had received a buyout package (Harding Decl. ¶ 28), and the elements of that package were described as severance arrangements in both the 1989 and 1990 LIN proxy statements which included, among other things, a buyout of any remaining unexercised LIN options upon my termination of employment.

17. Further, Harding evades the question of why she did not do this modicum of due diligence. What she says is that "[i]n or around 1990, I believed that Naseman and I had a successful marriage and I trusted him. I was unaware of any reason why I should refer to the public filings . . ." (Harding Decl. ¶ 27)

---

[6] Harding attempts to refute the foregoing by referencing a Coop Board application for approval to acquire Apt. 6A that purportedly "reflected that the LIN options were worth approximately $2 million in 1987." (Harding Decl. at ¶ 13). This is a fabrication as well. The only financial information regarding the LIN options that was submitted to the Coop Board was exactly the same loan application and Financial Statement submitted to Republic Bank. Attached hereto as Exhibit C is a copy of the letter the Coop Building Manager sent to the Coop Board members (including Harding) listing the information they received, which demonstrates that no other financial information was submitted to the Coop Board.

18.   But, Harding never explains why three years later, in 1993 when we were in divorce litigation and she was allegedly "facing a perilous financial future" (id., ¶ 34), she did not make the simple inquiry.

**Res Judicata**

19.   Attached hereto as Exhibit D is a true and correct copy of Toehl Harding's Answer and Counterclaim filed in the Family Division of the Second Judicial District Court of the State of Nevada in and for the County of Washoe on or about April 16, 1993.

**The Settlement Agreement**

20.   In the declaration of Peter B. Schalk, one of Harding's attorneys, Mr. Schalk states (at ¶ 5) that "Ms. Harding and Defendant had broached the possibility of settlement" prior to the time that his firm (JBPC) had been retained as counsel by Harding in this case. This statement is untrue. I have had no discussions or communications with Harding since 1993, and all matters relating to this litigation have been conducted solely through our respective counsel. At no time prior to being contacted by my attorney, Robert Cohen, Esq., on December 18, 2007 was I aware of any settlement proposal relating to this litigation, and nothing regarding the possibility of settlement had been "broached" between Harding and myself before her settlement offer was communicated by Mr. Burstein to my counsel on December 18, 2007.

**Conclusion**

21.   Because, among other things, Harding knew about the so-called "secret accounts" before we signed our Agreement, because Harding was on notice of those accounts from our joint 1989 and 1991 federal tax returns that her divorce attorney acknowledged she signed after they were prepared, because Harding was on notice of those accounts from our joint 1989 and 1991 federal tax returns that she acknowledges reviewing during our divorce negotiations in 1993, because the 1989 and 1991 returns not only specifically identified those accounts but also

8

the 1991 return revealed the sizeable nature of the accounts, and because Harding was at least on notice of my receipt of nearly $3.9 million in option proceeds alone in connection with the March 1990 LIN/McCaw transaction because it was a matter of public record, her action must be dismissed. Harding's knowledge and awareness of these facts at least by the Spring of 1993 and prior to signing the Property Settlement Agreement flows directly from her own admissions contained in her sworn Declaration in this proceeding and unequivocally demonstrates that there were no so-called "secret accounts" or undisclosed income or assets of mine, either during our property settlement negotiations or during our marriage.

Executed this 8th day of July, 2008 in Washington, D.C.

_____
David Naseman