# EXHIBIT D

1   J. Stephen Peek, Esq.
    Nevada Bar Number 1758
2   Patricia C. Halstead, Esq.
    Nevada Bar Number 6668
3   Hale Lane Peek Dennison and Howard
    5441 Kietzke Lane, Second Floor
4   Reno, Nevada 89511
    (775) 327-3000; (775) 786-6179-facsimile
5   Attorneys for Defendant David Naseman

6

7                          UNITED STATES DISTRICT COURT

8                              DISTRICT OF NEVADA

    TOEHL HARDING,
9
                Plaintiff,                    CASE NO.:  3:07-cv-00072
10
11  vs.
                                              **MOTION TO DISMISS FOR LACK OF**
    DAVID NASEMAN, and DOES 1-10, inclusive,  **PERSONAL JURISDICTION OR,**
12                                            **ALTERNATIVELY, MOTION TO**
                Defendants.                   **TRANSFER VENUE**
13  _____/

14          Defendant DAVID NASEMAN ("Mr. Naseman"), by and through his counsel of record, J.

15  Stephen Peek, Esq. and Patricia C. Halstead, Esq. of Hale Lane Peek Dennison and Howard, hereby

16  submit this Motion to Dismiss for Lack Personal Jurisdiction or, Alternatively, Motion to Transfer

17  Venue.  This Motion is supported by the following Points and Authorities.

18                              **POINTS AND AUTHORITIES**

19          1.      Introduction

20          After nearly fourteen years since the parties divorce in 1993, Plaintiff Toehl Harding ("Ms.

21  Harding"), a New York resident, filed suit against Mr. Naseman, an Arizona resident, before the

22  Second Judicial District Court for the State of Nevada in and for the County of Washoe (the "Second

23  Judicial District Court"), claiming to have been defrauded of certain property in connection with the

24  parties' divorce.  Mr. Naseman removed the action to this Court based upon diversity and now seeks

25  dismissal of this action for lack of personal jurisdiction.  Should this Court choose to exercise personal

26  jurisdiction over Mr. Naseman contrary to the arguments he raises herein, Mr. Naseman alternatively

27  requests that this matter be transferred to the United States District Court for the Southern District of

28

*Hale Lane Peek Dennison and Howard*
*5441 Kietzke Lane, Second Floor*
*Reno, Nevada 89511*

1  New York pursuant to 28 U.S.C. §1404(a).[1]

2      2.    Background

3      On April 21, 1993, the parties, who at the time were both practicing attorneys in New York

4  City, New York, were granted a divorce by order of the Second Judicial District Court. *See* a true and

5  correct copy of the April 21, 1993 Order attached hereto as **Exhibit "A"** (the "Divorce Decree"). At

6  the time the Divorce Decree was entered, the parties had not yet formally executed a property

7  settlement agreement, although material terms had been agreed upon; thus, as stated in the Divorce

8  Decree, the Second Judicial District Court maintained jurisdiction for the purpose of adjudicating

9  matters of property distribution. *Id.* Once the parties' property settlement agreement was executed,

10 the Divorce Decree specifically provided that the proceedings were to be deemed concluded in their

11 entirety. *Id.*

12     In May 1993, two weeks after the Divorce Decree was entered, the parties executed the

13 property settlement agreement (the "PSA"), a true and correct copy of which is provided herewith as

14 **Exhibit "B."** By and through the PSA, both parties acknowledge having been represented by New

15 York legal counsel, through whom the PSA was negotiated. *Id.* at pp. 25-26, Article 13.2 and 13.5; p.

16 29, Article 15.2. Both parties further agreed that the PSA is to be construed in accordance with New

17 York law and that "[b]oth parties consent to the personal jurisdiction of the State of New York over

18 them in any action or proceeding brought to enforce the terms or conditions of this Agreement." *Id.*, p.

19 34, Article 16.6(b). The PSA was also signed by both parties in New York as evidenced by the Notary

20 Public stamps on the final page of the PSA. *Id.*, p. 36.

21     Despite having "had the opportunity to make independent inquiry into the complete financial

22 circumstances of Mr. Naseman," and expressly acknowledging in no uncertain terms that she was

23 satisfied with her knowledge of the same after consultation with legal counsel (*Id.*, p. 25, Article 13.4),

24

---

25 [1] "The need to file a special appearance in order to object to jurisdiction or venue has vanished. A party can file a general appearance and object to personal jurisdiction or venue at any time before the answer is filed or in the answer."
26 *Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2nd Cir. 1972); *see also Shall v. Henry,* 211 F.2d 226, 231 (7th Cir. 1954). ("defenses to the merits may now be set up in the same pleadings which includes defenses of lack of jurisdiction of the
27 person and wrong venue, without waiving the latter defenses. . . . Accordingly, special appearances to challenge jurisdiction over the person or improper venue are no longer necessary"). It is also of note that a request for an extension of
28 time to respond to a complaint, such as was made by stipulation and order in this case, which permits Mr. Naseman to have up to and including March 1, 2007, to answer or otherwise respond to Ms. Harding's Complaint, does not constitute waiver of jurisdictional objections. *Grammenos,* 457 F.2d at 1070.

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1  Ms. Harding filed suit nearly fourteen years after the parties' divorce and execution of the PSA,

2  claiming, through her allegations, an interest in funds she purports were subject to division between

3  the parties in connection with the PSA.  Because, according to Ms. Harding's complaint, the sums at

4  issue total more than $75,000 and the parties are citizens of different states, Mr. Naseman removed

5  Ms. Harding's suit to this Court.  Mr. Naseman now asks this Court to dismiss the action against him

6  based upon lack of personal jurisdiction.  Alternatively, Mr. Naseman requests that this Court transfer

7  venue to the United States District Court for the Southern District of New York, which is located in the

8  forum where the PSA was negotiated and which also sits in the forum where the alleged fraud would

9  have taken place.

10         3.      This Court Cannot Properly Exercise Personal Jurisdiction Over Mr. Naseman.

11                 a.      *Applicable Legal Standard*

12         "In a diversity case, the power of a federal court to exercise personal jurisdiction over a non-

13  resident defendant depends on a two-step test.  First, the state's long arm statute must permit

14  jurisdiction.  Second, the exercise of jurisdiction must be consistent with due process."  *Tweet v.*

15  *Webster*,  596 F. Supp. 130, 132 (D. Nev. 1984) (*citing Greenspun v. Del E. Webb Corp.*, 634 F.2d

16  1204, 1207 (9th Cir. 1980)).  Nevada's long-arm statute allows a Nevada court to exercise personal

17  jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States

18  Constitution.  NRS 14.065(1) ("A court of this state may exercise jurisdiction over a party to a civil

19  action on any basis not inconsistent with the constitution of this state or the Constitution of the United

20  States").  Thus, "[b]ecause Nevada exercises jurisdiction to the extent permitted by the Constitution,

21  the Court need only determine whether personal jurisdiction in this case would meet the requirements

22  of due process."  *Fisher v. Professional Compounding Centers of America, Inc.*,  311 F. Supp. 2d

23  1008, 1013-1014 (D. Nev. 2004).

24         To be deemed to comport with Due Process, a defendants' contacts with the forum state must

25  be such that the defendant "should reasonably anticipate being haled into court there."  *World-Wide*

26  *Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  In making this determination, courts have

27  consistently looked to the two forms of personal jurisdiction over a non-resident defendant: general

28  jurisdiction and specific jurisdiction.

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1    General jurisdiction occurs where a defendant is held to answer in a forum for causes of action

2    unrelated to the defendant's forum-related activities. *See, e.g., Perkins v. Benguet Mining Co.*, 342

3    U.S. 437, 488 (1952). To exercise general jurisdiction, a sufficient relationship between the defendant

4    and the forum state must exist and a plaintiff must be able to demonstrate that the defendant's

5    activities within the forum state are "substantial" or "continuous and systematic" such that the

6    defendant may be deemed "present" in the forum state. *See Helicopteros Nacionales de Columbia,*

7    *S.A. v. Hall*, 466 U.S. 408, 415 (1984); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406,

8    413 (9th Cir. 1977).

9    Absent general jurisdiction, specific personal jurisdiction over a non-resident defendant may be

10    established by a plaintiff under appropriate circumstances. Such circumstances depend upon the

11    "relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186,

12    204 (1977). In particular, specific jurisdiction may be established over a non-resident defendant only

13    where: 1) the non-resident defendant does some act or consummates some transaction with the forum

14    by which he purposely avails himself of the privilege of conducting activities in the forum; 2) the

15    claim for relief arises out of the defendant's forum-related contacts; and 3) the exercise of jurisdiction

16    is not unreasonable. *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 416 (9th Cir. 1997); *see also*

17    *World-Wide Volkswagon Corp. et al*, 444 U.S. at 291.

18    Once personal jurisdiction is challenged, the burden of establishing whether the exercise of

19    personal jurisdiction is appropriate falls upon the plaintiff, who must make a prima facie showing of

20    jurisdiction to survive the motion to dismiss but who cannot simply rest on the bare allegations of his

21    or her complaint. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004);

22    *Mattel, Inc. v. Greiner and Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003). Ms. Harding cannot

23    meet this burden. Therefore, Mr. Naseman's motion to dismiss should be granted.

24        b.    <u>General Jurisdiction</u>: *Mr. Naseman Does Not Have Substantial or Continuous*

25    *and Systematic Contacts with the State of Nevada Sufficient to Confer this Court*
         *with General Jurisdiction.*

26    As provided above, "[g]eneral jurisdiction occurs where a defendant is held to answer in a

27    forum for causes of action unrelated to the defendant's forum activities. General jurisdiction over the

28    defendant 'is appropriate where the defendant's forum activities are so "substantial" or "continuous

1    and systematic" that it may be deemed present in the forum.'" *Trump v. Eighth Judicial Dist. Court of*

2    *State of Nev. in and for County of Clark*, 857 P.2d 740, 748 (Nev. 1993).

3      Notably, "[g]eneral jurisdiction will only lie where the level of contact between the defendant

4    and the forum state is high." *Id.*; *Budget Rent-A-Car v. Eighth Judicial Dist. Court in and for County*

5    *of Clark*, 835 P.2d 17, 19 (Nev. 1992) ("The level of contact with the forum state necessary to

6    establish general jurisdiction is high").

7      Here, Mr. Naseman has no "substantial" or "systematic and continuous" contacts with the State

8    of Nevada.  Mr. Naseman is an Arizona resident who works primarily in Washington, D.C.  *See* Mr.

9    Naseman's Affidavit in support of this Motion, attached hereto as **Exhibit "C."**  Mr. Naseman does

10   not conduct, nor has he ever conducted, any business in Nevada; he has never been employed in

11   Nevada; he does not own any real property in Nevada or any personal property located in Nevada; he

12   does not maintain any bank accounts or other accounts in Nevada; nor does Mr. Naseman derive any

13   business or profits from Nevada. *Id.*

14     Mr. Naseman's only activity in Nevada was to have come to the state in 1993 for purposes of

15   establishing the requisite residency to allow him to secure a divorce.  After the divorce was entered,

16   Mr. Naseman left the state and has not been a resident of Nevada for well over a decade. *Id.*  As a

17   result, Ms. Harding cannot establish that Mr. Naseman is engaged in any activities in the State of

18   Nevada, let alone establish any "substantial" or "continuous and systematic" contacts that could justify

19   the exercise of general personal jurisdiction. *See Helicopteros Nacionales de Columbia, S.A.*, 466 U.S.

20   at 415; *see also Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir. 1995).  Based upon the

21   foregoing, general personal jurisdiction over Mr. Naseman cannot be established.

22
    c. *Specific Jurisdiction: Ms. Harding's Claims Do Not Arise From Forum-Related*

23        *Activity.*

24     Just as this Court lacks general personal jurisdiction over Mr. Naseman, this Court likewise

25   cannot exercise specific personal jurisdiction.  "To subject a defendant to specific jurisdiction, this

26   court must determine if the defendant 'purposefully established minimum contacts' so that jurisdiction

27   would comport with 'fair play and substantial justice.'  For specific personal jurisdiction to exist, the

28   cause of action must have arisen from the defendant's contacts with the forum." *Burger King Corp. v.*

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1  *Rudzewicz*, 471 U.S. 462, 476-77 (1985) (*quoting International Shoe Co. v. Washington*, 326 U.S. 310,

2  320 (1945)); *see also Trump*, 857 P.2d at 748-49.

3          The following three-part test is applied to determine whether the defendant has sufficient

4  "minimum contacts" with the forum:  1) the nonresident defendant must purposefully direct his or her

5  activities or consummate some transaction with the forum or resident thereof; or perform some act by

6  which he purposefully avails himself of the privilege of conducting activities in the forum, thereby

7  invoking the benefits and protections of its laws; 2) the claim must be one which arises out of or

8  relates to the defendant's forum-related activities; and 3) the exercise of jurisdiction must comport with

9  fair play and substantial justice, i.e. it must be reasonable.  *See Core-Vent Corp. v. Nobel Industries*

10  *AB*, 11 F.3d 1482, 1485 (9th Cir. 1993).  Considering the factors established by this three-part test, an

11  exercise of personal jurisdiction by this Court is not proper in this case given that none of the three

12  required elements can be established as demonstrated below.

13                          i.          There Has Been No Purposeful Availment

14          In determining whether an out-of-state defendant can reasonably anticipate being haled into a

15  foreign forum, due process requires some act by which the defendant purposefully availed itself of the

16  privilege of conducting activities within the forum State, thus invoking the benefits and protections of

17  its laws.  This purposeful availment requirement has been interpreted to mean that "the defendant's

18  contacts with the forum must be more than random, fortuitous, or attenuated, it is the quality of the

19  contacts and not the quantity that confers personal jurisdiction."  *Trump v. District Court*, 857 P.2d

20  740 (Nev. 1993) (citations omitted).

21          "The purposeful availment prong is satisfied when a defendant takes deliberate actions within

22  the forum state" or otherwise purposefully directs efforts toward forum residents.  *See Hirsch v. Blue*

23  *Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1478-79 (9th Cir. 1986).  However, "the 'foreign-

24  acts-with-forum-effects jurisdictional principle must be applied with caution."  *Pacific Atlantic*

25  *Trading Co., Inc. v. M/V Main Exp.*, 758 F.2d 1325, 1330 (9th Cir. 1985).  Even further,

26  "foreseeability alone is never sufficient to establish personal jurisdiction."  *Plant Food Co-Op v.*

27  *Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 159 (9th Cir. 1980) (*citing World-Wide Volkswagen*

28  *Corp. v. Woodson*, 444 U.S. 286, 295-96 (1980)).

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1    Here, it is pivotal that the alleged activity undertaken by Mr. Naseman that serves as the basis

2    of Ms. Harding's complaint, i.e. alleged fraudulent conduct, was not undertaken "within the forum

3    state," nor did Mr. Naseman's alleged actions affect a forum resident (again, Ms. Harding is a New

4    York resident). Thus, it cannot be concluded that Mr. Naseman's alleged acts were taken with the

5    intention of purposefully availing himself of the privilege of conducting activities within Nevada or

6    even causing harm to a Nevada citizen, thus invoking the benefits and protections of its laws.

7    While Mr. Naseman did take actions within the forum to establish residency to secure the

8    parties' divorce, the divorce was bifurcated from resolution of the property division issues and granted

9    subject to the property division that was conducted and concluded solely in New York City, New

10   York, by and through the parties' respective New York counsel. *See* **Exhibit C.** Thus, any acts

11   undertaken with respect to the parties' property settlement as reflected by the PSA or as to related

12   negotiations cannot be deemed to relate to acts undertaken for purposeful availment of the protections

13   of the laws of the state of Nevada, particularly so when the PSA purposefully selects New York law to

14   govern its terms and conditions. Indeed, the Second Judicial District Court never even reviewed,

15   considered, approved, or took any action with respect to the parties' division of assets. *Id.*

16   Accordingly, it cannot be concluded that the relevant acts alleged by Ms. Harding were purposefully

17   directed to Nevada or to a Nevada resident.

18                    ii.    The Alleged Activities Are Not Forum-Related.

19   To satisfy the second requirement for specific jurisdiction and show that the cause of action

20   arose out of "acts purposefully engaged in by the defendants in the forum state," Plaintiffs' claims

21   must "have a specific and direct relationship or be intimately related to the forum contacts." *See*

22   *Firouzabadi v. District Court*, 110 Nev. 1348, 1355, 885 P.2d 616, 621 (1994) (citation omitted).

23   Here, there is no specific, direct, or intimate relationship between the claims set forth in Ms. Harding's

24   complaint and Mr. Naseman's alleged activities in Nevada; therefore, Ms. Harding cannot satisfy the

25   second requirement for specific jurisdiction.

26   In particular, Ms. Harding alleges that Mr. Naseman fraudulently undermined the PSA by

27   failing to disclose assets. The PSA, however, was negotiated in New York through New York counsel,

28   is controlled by New York law, and is subject to New York jurisdiction. Moreover, any alleged fraud

*Hale Lane Peek Dennison and Howard*
*5441 Kietzke Lane, Second Floor*
*Reno, Nevada 89511*

::ODMA\PCDOCS\HLRNODOCS\603356\1                    Page 7 of 19

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1    would have necessarily occurred in New York where the PSA was negotiated and executed.  It is

2    further notable that none of the property subject to division between the parties was or is located in

3    Nevada, and any resulting impact arising from the allegations would have had their effect upon Ms.

4    Harding solely in New York City.  Thus, the actions allegedly undertaken by Mr. Naseman that serve

5    as the basis of Ms. Harding's complaint cannot be deemed to have any relation to this forum,

6    precluding this Court from exercising personal jurisdiction.  *See Sieverding v. American Bar*

7    *Association*, 439 F. Supp. 2d 111, 120 (D. D.C. 2006) (holding that fraud occurring in Colorado did

8    not relate to forum-related activities and, therefore, could not suffice to allow court in the District of

9    Columbia to exercise personal jurisdiction); *Yarbrough v. Estate of Yarbrough*, 326 S.E. 2d 517, 518

10   (Ga. Ct. App. 1985) ("The appellee's alleged conversion of the estate's assets to her own use and her

11   alleged conspiracy with Mr. Yarbrough to defeat the appellant's rights under the divorce decree were

12   not alleged to have taken place in this state, nor was any of the property involved alleged to have been

13   located in this state at the time the alleged misconduct occurred.  Consequently, we find these

14   allegations to be insufficient to support the exercise of long-arm jurisdiction over the appellee").

15                    iii.    The Exercise of Jurisdiction Would Not Be Reasonable.

16          Even assuming *arguendo* that purposeful contacts may have existed, which is not the case as

17   established above, courts must consider in the third required inquiry a panoply of other factors that

18   bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal.  *See, e.g,*

19   *Harlow v. Children's Hosp.*, 432 F.3d 50, 66-67 (1st Cir. 2005).  "[G]auging fairness requires an

20   assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally

21   sufficient showing of relatedness and purposefulness." *Id.* (citations omitted).

22          The factors to be considered include: 1) the burden on the defendant, 2) the forum state's

23   interest in the dispute, 3) the importance of the chosen forum to the plaintiff's interest in obtaining

24   relief, 4) the most efficient forum for judicial resolution of the dispute, and 5) the "shared interest of

25   the several States in furthering fundamental substantive social policies." *Tuazon v. R.J. Reynolds*

26   *Tobacco Co.*, 433 F.3d 1163, 1175 (9th Cir. 2006).  In this case, all relevant factors reveal that

27   exercising specific personal jurisdiction over Mr. Naseman would be unreasonable.

28   ///

1     First, neither party resides in Nevada. Ms. Harding resides in New York and Mr. Naseman is

2    an Arizona resident who is currently working in Washington, D.C. Accordingly, litigating in Nevada

3    is a burden to not only Mr. Naseman, but also to Ms. Harding. The burden of litigating a matter in a

4    forum approximately 2,400 miles away from where Ms. Harding resides and from where Mr. Naseman

5    works is self-evident. Time zones are different; travel costs are incurred and are expensive; logistics

6    for document production, discovery, document review, signatures and all other paperwork are

7    implicated; communications with counsel are made more difficult and long-distance charges cannot be

8    avoided; scheduling is impacted by travel schedules; the availability of witnesses (who are principally

9    located in New York) and the legal and travel expenses associated with obtaining relevant information

10    and testimony from such witnesses would be substantial; etc.

11    It would further be unreasonable for this Court to assume jurisdiction when this forum has little

12    to no interest in the dispute as addressed above. This matter does not involve novel issues of Nevada

13    law or significant matters of Nevada public policy. Nor does the conflict involve Nevada residents or

14    Nevada property. Nor can there be deemed any Nevada implication given that the alleged improper

15    actions and events occurred in New York.

16    Even further, because the allegations in Ms. Harding's complaint center around the PSA and

17    the parties' rights and waivers with regard to knowledge of each other's assets and property, the very

18    terms of the PSA, which is controlled by New York law and contemplated to be subject to New York's

19    jurisdiction, is at issue, further evidencing that Nevada is not a reasonable forum for judicial resolution

20    of the dispute. **Exhibit B**, p. 34, Article 16.6(b). Since the PSA is governed by New York substantive

21    law and the allegations in Ms. Harding's complaint involve a myriad of issues that will arise in any

22    eventual litigation of this matter, a forum readily conversant with New York law is essential to avoid

23    unnecessary legal costs that will inevitably be incurred if Nevada counsel is required to become

24    conversant with New York law, which is the applicable law expressly contemplated by the parties in

25    the PSA.

26    In fact, given New York's more proximate interest in the suit based upon the allegations and in

27    light of Ms. Harding's New York residency, it is not readily apparent what Ms. Harding's interest is in

28    seeking to have this forum adjudicate the matter, unless it is an attempt by her at forum shopping.

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1    Indeed, Ms. Harding specifically took actions in 1993 designed to have all property issues resolved by

2    the parties in New York rather than in Nevada. Moreover, New York, unlike Nevada, has a more

3    proximate interest in the dispute as the forum where her allegations of improper conduct would have

4    occurred, the forum where relevant counsel practice, the forum with the controlling law, and the forum

5    where the complaining party resides and where any impact or effects of the alleged conduct would

6    have occurred. Accordingly, there should be little significance, if any, given to Ms. Harding's interest

7    in obtaining relief from this forum, assuming her motives for filing here can be deduced or will be

8    disclosed.

9        Finally, there is no reason to conclude that trying the case in Nevada would support "any

10   shared interest of the several States in furthering fundamental substantive social policies." Ms.

11   Harding's claims are not novel, nor do they implicate fundamental substantive social policies, and

12   Nevada does not have a shared interest with any other jurisdiction in adjudicating Ms. Harding's

13   claims.

14       Based upon the foregoing, and in consideration of each element of inquiry related to the

15   propriety of this Court exercising personal jurisdiction, it is evident that neither general nor specific

16   jurisdiction can or should be properly exercised over Mr. Naseman and that, even if it could, an

17   exercise of jurisdiction by this Court under the facts as pleaded would not be reasonable.

18       4.    Should this Court Choose to Exercise Personal Jurisdiction Despite the Foregoing, the
             Court Should Transfer this Matter to the Southern District for the District of New York
19           Pursuant to 28 U.S.C. §1404(a).

20       Mr. Naseman has amply demonstrated that this Court cannot and/or should not exercise

21   personal jurisdiction over him for the reasons provided above and that, therefore, Ms. Harding's

22   complaint against him should be dismissed. Should this Court reach a contrary conclusion despite the

23   foregoing arguments and, nevertheless, determine that it may properly exercise personal jurisdiction

24   over Mr. Naseman, Mr. Naseman then respectfully requests that this Court transfer this matter to the

25   United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1404(a).

26   Transfer is warranted based upon the convenience of the parties and witnesses and is supported by the

27   interest of justice as addressed below.

28   ///

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1

a.    _Applicable Legal Standard_

2        28 U.S.C. § 1404(a) provides, "[f]or the convenience of the parties and witnesses, in the

3    interest of justice, a district court may transfer any civil action to any other district or division where it

4    might have been brought." 28 U.S.C. § 1404(a).  To successfully move for transfer under this section,

5    the moving party must establish that the action could originally have been brought in the district to

6    which transfer is sought. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.

7    1979).  The moving party also bears the burden of "establishing that an action should be transferred."

8    *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,* 89 F.R.D. 497, 499 (C.D. Cal.

9    1981).

10        In ruling on a motion to transfer, courts make a "flexible and individualized analysis" and

11   weigh "a number of case-specific factors" to determine whether the proposed transferring district is a

12   more convenient forum for the pending action. *See Stewart Org, Inc. v. Ricoh Corp.,* 487 U.S. 22, 29

13   (1988).  A district court must consider each of the factors enumerated in § 1404(a), i.e., convenience of

14   the parties, convenience of the witnesses, and the interests of justice.  28 U.S.C. § 1404(a).  Other

15   relevant factors include, for example, the plaintiff's choice of forum, the local interest in the issue, the

16   relative ease of access to evidence, the availability of compulsory process for unwilling witnesses and

17   the cost involved in securing willing witnesses, and the practical issues that make a case easier or more

18   difficult to try in a given forum, such as familiarity of each forum with applicable law and the relative

19   court congestion in each forum. *See, e.g., Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498-99 (9th

20   Cir. 2000).  The Court has broad discretion over whether it would be in the interest of justice to

21   transfer the case. *See Wood v. Santa Barbara Chamber of Commerce, Inc.,* 705 F.2d 1515, 1523 (9th

22   Cir. 1983)); *see also* 17 Moore's Federal Practice 3D, § 111.13[1][a] (Matthew Bender 3rd).

23        Here, for the reasons detailed below, a "flexible and individualized analysis" of "case specific

24   factors" unquestionably supports the conclusion that "it would be in the interests of justice" to transfer

25   this case to the United States District Court for the Southern District of New York in the event that this

26   Court proceeds despite Mr. Naseman's above-arguments, which demonstrate that this Court lacks

27   personal jurisdiction over him.

28   ///

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

b.   *This Action Could and Should Have Been Brought Before the United States District Court for the Southern District of New York.*

Pursuant to 28 U.S.C. § 1404(a), a district court may transfer an action "to any other district or division where it might have been brought." The United States Supreme Court has interpreted this statutory language to mean that the proposed transferee district must be one in which the plaintiff properly could have filed the action at the onset. *See Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960). Accordingly, at the commencement of the action, the transferee district court had to have proper venue, personal jurisdiction, and subject matter jurisdiction. *Id.*; *see Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 413-14 (9th Cir. 1985).

In the present case, venue, personal jurisdiction, and subject matter jurisdiction are all proper in the United States District Court for the Southern District of New York. Venue is proper in New York City, New York, where all relevant events surrounding the negotiations and the execution of the PSA took place. 28 U.S.C. § 1391(a) (venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred"). The United States District Court for the Southern District of New York also has personal jurisdiction over Ms. Harding and Mr. Naseman, given that Ms. Harding is a New York resident and Mr. Naseman consented to personal jurisdiction by and through the PSA. **Exhibit B,** p. 34, Article 16.6(b). Diversity jurisdiction also exists because of the parties' differing state citizenship and, according to Ms. Harding's complaint, the amount in controversy exceeds the jurisdictional minimum of $75,000. Based upon the foregoing, this action could have, and undoubtedly should have, been brought before the United States District Court for the Southern District of New York.

c.   The United States District Court for the Southern District of New York Is the More Appropriate and Convenient Forum.

Pursuant to §1404(a), the district court has discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000) (*citing Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors in its determination whether transfer is appropriate in a particular case." *Id.* For

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1   example, the court may consider: 1) the location where the relevant agreements were negotiated and

2   executed, 2) the state that is most familiar with the governing law, 3) the plaintiff's choice of forum, 4)

3   the respective parties' contacts with the forum, 5) the contacts relating to the plaintiff's cause of action

4   in the chosen forum, 6) the differences in the costs of litigation in the two forums, 7) the availability of

5   compulsory process to compel attendance of unwilling non-party witnesses, and 8) the ease of access

6   to sources of proof. *Id.*   Consideration of each of these factors unequivocally establishes that the

7   Southern District of New York is the more appropriate venue to adjudicate Ms. Harding's claims.

8
9       i.      <u>New York City, New York, Is the Location Where the Relevant
             Agreement, the PSA, Was Negotiated and Executed.</u>

10      The agreement relevant to Ms. Harding's claims is the PSA, which was the document

11  negotiated by the parties through their respective New York counsel with respect to their property

12  settlement.  By and through the PSA, Ms. Harding acknowledges having had the full opportunity to

13  make independent inquiry into Mr. Naseman's complete financial circumstances, confirms that she

14  was satisfactorily informed of Mr. Naseman's income, assets, property and financial prospects, was

15  aware of all of the parties' separate property and marital property, was satisfied that full disclosure had

16  been made, and further acknowledged that she is precluded from making any claims against Mr.

17  Naseman on the basis of non-disclosure or for her failure to undertake sufficient independent inquiry

18  of Mr. Naseman's financial circumstances.  **Exhibit B, p. 25.**  Ms. Harding further represented in the

19  PSA that she had a full opportunity to consult with her counsel and that she was satisfied with the

20  information she possessed, and that she freely entered into the PSA.  Thus, with regard to her current

21  claims to the contrary, the terms of the PSA will undoubtedly be at issue as may matters concerning its

22  negotiation.  Accordingly, the PSA is a central document, and consideration of where it was negotiated

23  and executed supports a transfer of venue to the United States District Court for the Southern District

24  of New York.

25      ii.     <u>Pursuant to the PSA, New York Law Should Govern.</u>

26      To sustain her claims, Ms. Harding must attack her own representations and covenants

27  contained within the PSA, which is explicitly governed, per the agreement of the parties, by New York

28  law (**Exhibit B,** p. 34, Article 16.6(a)); and, because the United States District Court for the Southern

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1  District of New York sits in New York City and is routinely required to apply New York law, it is

2  apparent that it is the most appropriate Federal forum to apply New York law.

3      Moreover, New York counsel is readily conversant with the New York law governing the

4  issues that may be raised with respect to the allegations in Ms. Harding's complaint and can most

5  efficiently and cost effectively address those issues. This is a particularly important considering that

6  New York is not a community property state and, therefore, the parties' property division is not

7  controlled by the same standards it would be under Nevada law. Accordingly, adjudication of Ms.

8  Harding's claims in a New York forum is extremely important in ensuring that the issues raised are

9  dealt with consistent with New York law and precedent.

iii.    Ms. Harding Made an Inappropriate Forum Choice.

11     Although a plaintiff's choice of forum is entitled to consideration, it is less significant now than

12  before the passage of 28 U.S.C. §1404(a) given that dismissal of an action under a forum non

13  conveniens analysis was eliminated by 28 U.S.C. §1404(a) for matters properly subject to transfer.

14  *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (U.S. 1955). A plaintiff's choice of forum is especially

15  afforded little weight where, as in the present case, the chosen forum lacks significant contact with the

16  underlying cause of action. *See Environmental Services, Inc. v. Bell Lumber and Pole Co.*, 607 F.

17  Supp. 851, 853 (D. Ill. 1984) ("plaintiff's choice of forum has reduced value where the forum lacks any

18  significant contact with the underlying cause of action").

19     Here, because the parties' property settlement negotiations were undertaken in New York City,

20  New York, and, thus, any alleged fraud would be deemed to have occurred there, in addition to the fact

21  that Ms. Harding is now (and was during all periods relevant to the events described in her complaint)

22  a New York resident, Ms. Harding's choice to have filed in Nevada should be given little weight, if

23  any. *Trout Unlimited v. U.S. Department of Agriculture*, 944 F. Supp. 13, 17 (D. D.C. 1996) ("The

24  showing defendants must make is lessened when the plaintiff's choice of forum has no factual nexus to

25  the case and where, as in this case, transfer is sought to the forum with which plaintiffs have

26  substantial ties and where the subject matter of the lawsuit is connected to that state"); *Southern Utah

27  Wilderness Alliance, supra.*, 315 F. Supp. 2d at 86 (the plaintiff's forum deference is lessened when

28  plaintiff's forum choice lacks meaningful ties to the controversy and has no particular interest in the

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1   parties or subject matter); *Wallace v. Mercantile County Bank*, 2006 WL 3302490, \*5 (E.D. Pa. 2006)

2   (plaintiff's choice of forum is afforded less deference where that forum has little connection with the

3   operative facts of the lawsuit); *American Tel & Tel Co. v. MCI Comm.*, 736 F. Supp. 1294 (D. N.J.

4   1990). Other facts set forth herein that relate to the substantial nexus of the events in question to New

5   York, in addition to the respective parties' submission of any dispute related to the PSA to New York's

6   jurisdiction should further negate Ms. Harding's ill-conceived choice of venue.

7

8                   iv.    <u>The Respective Parties Have Little Contact With this Forum and Any Contact that Can Be Determined Is From Years Prior.</u>

9           Mr. Naseman's primary contact with this forum was to move here in 1993 for the statutory

10  residency period necessary to secure the parties' divorce. Ms. Harding, herself, has never resided in

11  Nevada and, to the best of Mr. Naseman's knowledge, has no connections to the State of Nevada other

12  than to have participated through her Nevada counsel in the parties' 1993 divorce proceeding. On the

13  other hand, both parties have significant connections to the State of New York. Ms. Harding resides

14  there and has for quite some time and Mr. Naseman formerly resided there. Further, New York City,

15  New York, is the local where the parties lived and worked for most of their marriage. Both have

16  counsel in New York City, New York, that assisted with the parties' divorce and through which the

17  PSA was negotiated. The PSA was executed in New York City, New York, and it is also notable that

18  both parties have practiced law as licensed professionals in New York.[2]   In evaluating the

19  appropriateness of this forum and the United States District for the Southern District of New York, it is

20  evident that the parties have virtually no contacts with this forum and a great deal more contacts with

21  New York. It is further evident that it is the New York contacts that serve as the basis for Ms.

22  Harding's complaint.

23                  v.    <u>Ms. Harding's Suit Originates From New York Contacts.</u>

24          Because all property negotiations took place in New York, where the parties resided while they

25  were married, and resulted in the PSA drafted by New York counsel and executed by the parties in

26  New York City, New York, there is no escaping the fact that Ms. Harding's suit originates from New

27

28

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

[2] Mr. Naseman continues to be a member in good standing with the New York Bar. Ms. Harding now works in New York, New York, as a real estate professional.

::ODMA\PCDOCS\HLRNODOCS\603356\1          Page 15 of 19

1   York contacts.  While she will no doubt argue that the alleged fraud occurred in relation to the parties'

2   Nevada divorce, it must be kept in mind that the Second Judicial District Court granted the divorce

3   subject to a property settlement being reached, at which time the Second Judicial District Court ruled

4   that the divorce proceeding was to be deemed completed in its entirety.  The property settlement

5   agreement was undertaken and finalized in New York City, New York, and never submitted to,

6   reviewed by, approved by, or otherwise acted upon by the Second Judicial District Court.  **Exhibit C.**

7   As such, all operative facts surrounding this controversy have no relation to Nevada and center solely

8   upon New York contacts.

9               vi.     It Is Much More Economical for All Involved to Litigate in New York.

10          Both parties have already worked with counsel in New York in relation to their divorce and

11  property settlement and both parties may be presumed to be familiar with New York law having

12  practiced in that jurisdiction for many years.  Ms. Harding lives and works in New York, and Mr.

13  Naseman works relatively near New York City, New York, given that he is currently working in

14  Washington, D.C.  All the witnesses, save and except for Nevada local counsel, will likely reside in

15  New York City, New York, or its surrounding areas.  Certainly, Ms. Harding herself falls into this

16  category, as do the New York legal counsel.

17          In consideration of the fact that the parties have no current ties to Nevada, Ms. Harding's

18  residency, location of witnesses, and Mr. Naseman working relatively near New York City, New York,

19  there is no question that it would be much more economical and logistically expedient and convenient

20  for the United States District Court for the Southern District of New York to deal with Ms. Harding's

21  claims in accordance with New York law.

22              vii.    Necessary Witnesses and Proof Are Found in New York.

23          Given that the alleged fraud occurred in New York City, New York, where the parties resided

24  while they were married, it is reasonable to conclude that all necessary witnesses and documents are

25  located in that forum.  Certainly the lawyers who aided with the negotiations for the parties' PSA were

26  New York lawyers that will likely still be in or have ties to that forum, accounts in question were

27  maintained in financial institutions located in New York, and Ms. Harding herself continues to live in

28  New York.

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

::ODMA\PCDOCS\HLRNODOCS\603356\1

1     On the flip side, aside from issuing the Divorce Decree, Nevada has no ties to the action and

2  there is certainly no indication that any relevant evidence may be found in this forum.  The only

3  evidence that may be tied to this forum is the involvement of local counsel; however, it is likely that

4  Nevada counsel's testimony will not be necessary or beneficial in consideration of issues of

5  attorney/client privilege and in consideration of the fact that Nevada counsel served primarily as local

6  counsel for purposes of the divorce only – not the parties' property settlement.  Further, even if

7  Nevada counsel's testimony was necessary, the involvement of two Nevada witnesses (Nevada

8  counsel for each side) does not outweigh the fact that the majority of necessary evidence and witnesses

9  are located in or around New York City, New York.

10     It is also imperative to consider that New York witnesses, who are those of primary concern to

11  Ms. Harding's allegations, are not subject to compulsory process of this Court.  The Southern District

12  of New York, however, could compel their testimony and, when necessary, their attendance at judicial

13  proceedings, and there is no indication that Nevada counsel would not cooperate in appearing in New

14  York if necessary (recognizing that Nevada counsel did not have a substantive role with the division of

15  property in the 1993 divorce proceeding).

16
            viii.    Weighing the Relevant Factors Supports Transfer of this Matter to the
17                   United States District Court for the Southern District of New York.

18     As the foregoing demonstrates, none of the factors necessary to determine the appropriateness

19  of a transfer of venue support this Court retaining venue in relation to Ms. Harding's lawsuit.  It cannot

20  be overlooked that all property negotiations were undertaken in New York City, New York, through

21  New York counsel, the events complained of occurred there, and the terms of the PSA are governed by

22  New York law.  Nevada's sole involvement was granting the parties their divorce, but neither the

23  Nevada court nor any Nevada third-parties had any direct involvement with the substantive division of

24  assets in the parties' property settlement, its negotiations, or the drafting and execution of the resulting

25  PSA, and it is the PSA and the parties' resulting settlement that serves as the heart of Ms. Harding's

26  allegations and claims.

27     Given Ms. Harding's New York residency and New York's more proximate interest and

28  affiliation to this matter, venue should properly be transferred to the United States District Court for

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1  the Southern District of New York should this case not be dismissed against Mr. Naseman based upon

2  lack of personal jurisdiction.

3                                  CONCLUSION

4         Based upon the foregoing, Mr. Naseman respectfully requests that Ms. Harding's complaint

5  against him be dismissed by this Court for lack of personal jurisdiction over Mr. Naseman.

6  Alternatively, Mr. Naseman respectfully requests that this Court transfer venue of this case to the

7  United States District Court for the Southern District of New York based upon convenience of the

8  parties and witnesses and in consideration of the interest of justice, as permitted by 28 U.S.C. §

9  1404(a).

10        DATED:  March 1, 2007.

11

12                                                    _____/s/_____
                                                      J. Stephen Peek, Esq.
13                                                    Nevada Bar Number 1758
                                                      Patricia C. Halstead, Esq.
14                                                    Nevada Bar Number 6668
                                                      Hale Lane Peek Dennison and Howard
15                                                    5441 Kietzke Lane, Tenth Floor
                                                      Reno, Nevada 89511
16                                                    (775) 327-3000; (775) 786-6179-facsimile
                                                      Attorneys for Defendant David Naseman

17

18

19

20

21

22

23

24

25

26

27

28

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

PROOF OF SERVICE

I, Liz Ford, declare:

I am employed in the City of Reno, County of Washoe, State of Nevada by the law offices of Hale Lane Peek Dennison and Howard.  My business address is 5441 Kietzke Lane, Second Floor, Reno, Nevada 89511.  I am over the age of 18 years and not a party to this action.

On March 1, 2007, the foregoing **MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE** was filed electronically with the U.S. District Court and therefore the Court's computer system has electronically delivered a copy of the foregoing document to the following person(s) at the following e-mail addresses:

Kent Robison, Esq.
Jennifer Baker, Esq.
Robison Belaustegui Sharp & Low
71 Washington Street
Reno, NV 89503

E-Mail: krobison@rbslattys.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on March 1, 2007.


            /s/
          Liz Ford

# EXHIBIT A

Case No. DV93— 00466

Department No. 2

FILED

93 APR 21 P1 59

IN THE FAMILY DIVISION
SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF WASHOE

DAVID M. NASEMAN,

       Plaintiff,

      vs.                           **DECREE OF DIVORCE**

TOEHL HARDING,

       Defendant.

_____/

    The verified Complaint for Divorce and proof of service of same being filed with this Court and an Answer being filed herein which admits all allegations therein, and the other evidence having been presented in support of the allegations of Plaintiff's Complaint, and this cause being thereupon submitted to this Court for decision after a hearing at which counsel for the parties was present, and the Court being satisfied that the requirements of the law have been met;

    IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

    1. That whereby Plaintiff is now and has been a resident of the State of Nevada for at least six weeks prior to the filing of the Complaint and this Court having jurisdiction over the parties by reason of said residence and Defenant's appearance herein, Plaintiff is hereby granted an absolute Decree of Divorce, forever dissolving the bonds of matrimony now and heretofore existing between him and the Defendant, and restoring

Silverman · Decaria, Chtd

Lawyers
290 South Arlington Avenue
Reno, Nevada 89501

(702) 322-3225

each of them to the status of a single, unmarried person.

2.    That this Court shall retain jurisdiction over all other issues, including but not limited to marital property, and upon execution of a marital settlement agreement by the parties, these proceedings shall be concluded in their entirety on dismissal of Defendant's Counterclaim.

DATED: this 21ˢᵗ day of April, 1993.

_____
DISTRICT JUDGE

DOCKET
4/21/93

DATE

INITIALS

2

**EXHIBIT B**

PROPERTY

SETTLEMENT AGREEMENT

BY AND BETWEEN

DAVID NASEMAN

AND

TOEHL HARDING

21479/0001/LGF/2953

AGREEMENT made this ___ day of May, 1993, by and between DAVID M. NASEMAN ("Mr. Naseman"), residing at 869 Freels Peak Drive, Incline Village, Nevada 89452, and TOEHL HARDING ("Ms. Harding"), residing at 425 East 51st Street, New York, New York 10022.

W I T N E S S E T H :

WHEREAS, the parties were duly married to each other in Lenox, Massachusetts on October 19, 1982; and

WHEREAS, there are no children of the marriage, and there are no expected children of the marriage; and

WHEREAS, the parties were granted a full and final decree of divorce on April 21, 1993 by a final Judgment of the Second Judicial District Court, State of Nevada, County of Washoe, (Index No. DV 93-00466, Dept. No. 2); and

WHEREAS, the parties desire to fix their respective financial and property rights, and all other rights, privileges, obligations and matters with respect to each other arising out of their former marital relationship and otherwise;

NOW, THEREFORE, it is agreed as follows:

## ARTICLE 1

### ARTICLE HEADINGS

The headings at the beginning of each Article of this Agreement are for reference purposes only and shall not, in any manner, constitute terms or conditions of this Agreement; nor shall they be applicable to any interpretation of the intention or meaning of any part of this Agreement.

21479/0001/LGF/2953

## ARTICLE 2

### NEVADA DIVORCE
### AND RELIGIOUS DIVORCE

1.    Ms. Harding acknowledges and represents that she was personally served with a summons and complaint on March 25, 1993 in an action entitled David M. Naseman v. Toehl Harding, in the Family Division of the Second Judicial District Court of the State of Nevada, in and for the County of Washoe (Case No. DV 93-00466; Dept. No. 2) (the "Nevada Action"). Ms. Harding further acknowledges that she appeared in the Nevada Action through counsel and expressly consented to the final Judgment of divorce referred to in paragraph 2  of this Article.

2.    Ms. Harding acknowledges that a final Judgment divorcing the parties (the "Nevada Divorce") was made and entered on the 21st day of April, 1993 in the Nevada Action.

3.    Ms. Harding agrees that:

(a)   She waives, releases, renounces and relinquishes, now and forever, any right to contest the jurisdiction (both subject matter and personal) of the Nevada Court to grant a final Judgment divorcing the parties in the Nevada Action;

(b)   She waives, releases, renounces and relinquishes, now and forever, any right she may have to appeal the granting of the final Nevada Divorce;

(c)   She waives, releases, renounces and relinquishes, now and forever, any right she may have to contest the validity of the final Nevada Divorce, whether directly or by

-2-

21479/0001/LAV/2953

collateral attack, or by plenary action, declaratory judgment action, or otherwise, in Nevada, in New York, in Massachusetts or in any other jurisdiction, domestic or foreign.

4.    Ms. Harding, by the execution of this Agreement, dismisses her counterclaims in the Nevada Action with prejudice and directs her counsel in Nevada immediately to execute and deliver any and all documents reasonably necessary to effectuate the said dismissal with prejudice. Moreover, she has, simultaneously, executed and delivered to Mr. Naseman a stipulation dismissing her counterclaim with prejudice.

5.    Ms. Harding acknowledges her understanding that having the Nevada Divorce entered on or about April 20, 1993, and the provisions of paragraphs 3 and 4 of this Article were a material, bargained-for aspect of this Agreement on Mr. Naseman's part when he agreed to the terms proposed by Ms. Harding in the letter from her counsel to Mr. Naseman's counsel dated April 15, 1993.

6.    The parties agree that, notwithstanding any language in the following documents, or any rule of law, to the effect that settlement negotiations are not admissible into evidence: (a) the draft Separation Agreement delivered to Ms. Harding by Mr. Naseman in November 1992; (b) the letter dated February 5, 1993 from Richard B. Cohen to Leonard G. Florescue; (c) the letter from Leonard G. Florescue to Richard B. Cohen dated March 29, 1993; (d) the letter from Richard B. Cohen to Leonard G. Florescue dated April 15, 1993; (e) the letter from Leonard G. Florescue to Richard B. Cohen dated April 19, 1993;

-3-

(f) the letter from Richard B. Cohen to Leonard G. Florescue and countersigned by both dated April 19, 1993 and (g) the letter form Ms. Harding to the court in the Nevada Action dated April 21, 1993, (all annexed as Exhibit A) may be admitted into evidence by the party in order to defend the Agreement or the Nevada Divorce if the other party attacks the final Nevada Divorce or any of the provisions of this Agreement in any action.

7.    Simultaneously with the execution of this Agreement Ms. Harding shall execute and deliver to Mr. Naseman a letter (in the form annexed as Exhibit B) stating that the parties' marriage was not sanctioned by the Roman Catholic Church.

### ARTICLE 3

### PRIVACY OF THIS AGREEMENT AND NONINTERFERENCE

1.    It is, and shall be, lawful for the parties to reside from time to time at such places as each may see fit and to contract, carry on and engage in any employment, profession, business or trade, which either may deem fit, free from control, restraint, or interference, direct or indirect, by the other. Neither party shall in any way molest, disturb, trouble, or interfere with the peace and comfort of the other.

2.    (a)  Neither party, nor their assigns, successors, associates, or their attorneys (collectively "Affiliates") shall divulge the terms and provisions of this Agreement or cause to be disseminated any of the provisions contained within this Agreement to any third party (including, without limitation

-4-

relatives of either party) not directly involved with this Agreement except those to whom the communication would be privileged.

(b)  Neither party nor their Affiliates shall discuss the other's personal or business matters with any other person(s) including, without limitation, relatives of either party;

(c)  Any violation of the terms of subparagraphs 2(a) and (b) shall constitute a material breach of this Agreement.  In addition, in the event of any such breach, both parties hereby consent to the granting of a temporary or permanent injunction against him or her (or against any agent or Affiliate acting at his or her behest) by any court of competent jurisdiction prohibiting him or her (or his or her agent or Affiliate) from violating the terms of this paragraph.  In any proceeding for an injunction and upon any motion for a temporary or permanent injunction, both parties agree that his or her ability to answer in damages shall not be a bar to, or be interposed as a defense to, the granting of such temporary or permanent injunction.  Both parties further agree that the other will not have an adequate remedy at law in the event of any breach of the provisions of this paragraph and that the other party will suffer irreparable damage and injury in the event of any such breach.

-5-

## ARTICLE 4

### SEPARATE OWNERSHIP

1.    Except as otherwise expressly provided in Article
12 of this Agreement, each party shall own, as his or her
separate property, free of any claim or right of the other, all
of the items of property, real, personal and mixed, of any kind,
nature or description and wheresoever situate, which are now,
either titularly or beneficially, in his or her name, control or
possession, with full power to dispose of the same as fully and
effectually in all respects and for all purposes as if never
married to each other.

2.    Except as otherwise expressly provided in Article
12 of this Agreement, Mr. Naseman acknowledges that he has no
right, title or interest in and to any bank or similar accounts,
business interests, licenses, degrees, securities, pension or
similar plans or other investments, now, or previously, owned
titularly or beneficially by Ms. Harding or subsequently acquired
by Ms. Harding, whether in her sole name or in trust for another.

3.    Except as otherwise expressly provided in Article
12 of this Agreement, Ms. Harding acknowledges that she has no
right, title or interest in and to any bank or similar accounts,
business interests, licenses, degrees, securities, pension or
similar plans or other investments, now, or previously, owned
titularly or beneficially by Mr. Naseman or subsequently acquired
by Mr. Naseman, whether in his sole name or in trust for another.

-6-

**ARTICLE 5**

**SEPARATE RESPONSIBILITY FOR DEBTS**

1.    Except as is otherwise expressly set forth in paragraph 4 of this Article, Ms. Harding represents that she has not heretofore incurred or contracted any debt, charge, obligation or liability whatsoever for which Mr. Naseman or his estate is or may become liable.  Ms. Harding shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, whether for necessaries or otherwise, upon the credit of Mr. Naseman or for which Mr. Naseman or his estate may become liable.  Ms. Harding shall satisfy and hold Mr. Naseman free and harmless from and indemnified against all debts, charges, obligations or liabilities of every kind and nature whatsoever which has been or may hereafter be incurred or contracted by her for the benefit of herself or for any other person than Mr. Naseman.

2.    Except as is otherwise expressly set forth in paragraph 4 of this Article, Mr. Naseman represents that he has not heretofore incurred or contracted any debt, charge, obligation or liability whatsoever for which Ms. Harding or her estate is or may become liable.  Mr. Naseman shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, whether for necessaries or otherwise, upon the credit of Ms. Harding or for which Ms. Harding or her estate may become liable.  Mr. Naseman shall satisfy and hold Ms. Harding free and harmless from and

-7-

indemnified against all debts, charges, obligations or liabilities of every kind and nature whatsoever which has been or may hereafter be incurred or contracted by him for the benefit of himself or any other person than Ms. Harding.

3.    Mr. Naseman or Ms. Harding, as the case may be, shall reimburse the other for all charges that he or she makes against the other's accounts or the other's business accounts after the execution of this Agreement, or for charges which he or she incurred before the execution of this Agreement but for which bills have not yet been received, to the extent that such charges were incurred without the other's consent.

4.    The parties acknowledge making a pledge of $2,000 to the Berkshire Playhouse Theater. Mr. Naseman represents that he has paid the first $1,000 of that pledge. Ms. Harding represents that she will pay the remaining $1,000. If either party's representation is untrue, he or she will indemnify the other against the same.

## ARTICLE 6

### SEPARATE RESPONSIBILITY FOR INCOME TAXES

1.    (a)  If in connection with any joint income tax returns heretofore filed by the parties there is any deficiency assessment, the amount ultimately determined to be due thereon, including penalties and interest, shall be paid by Mr. Naseman except to the extent that the deficiency has been caused by the inaccuracy of Ms. Harding's representation in subparagraph 2(a) of this Article.

-8-

(b)  Mr. Naseman, to the extent that the same has not been caused by the inaccuracy of Ms. Harding's representation in subparagraph 2(a) of this Article, indemnifies and holds Ms. Harding harmless against any tax assessment, penalty or interest and any expenses, including, without limitation, attorneys' and accountants' fees incurred in connection therewith.

2.  (a)  Ms. Harding represents and warrants that, to the best of her knowledge, she accurately and correctly advised Mr. Naseman (at the time of the preparation and filing of the said returns) of all income, deductions, tax bases and credits attributable solely to her.

(b)  To the extent that any assessment, penalty or interest is brought about by the failure of Ms. Harding to have accurately and correctly advised Mr. Naseman, as set forth in subparagraph 2(a), she indemnifies and hold Mr. Naseman harmless against any such assessment, penalty or interest and any expenses, including, without limitation, attorney's fees and accountant's fees incurred in connection therewith.

3.  (a)  Ms. Harding agrees to cooperate (in any reasonable manner) fully with Mr. Naseman in the event of any audit or examination of the said joint tax returns by a taxing authority and agrees to furnish to Mr. Naseman or his designee, promptly and without charge, such papers, records, documents, authorizations and information as may be reasonably appropriate in connection with said audit or examination including, without limitation, a power of attorney to negotiate and consummate any settlement of such audit or examination on her behalf, provided,

-9-

however, that if the audit or examination arises in whole or in part from any understatement of Ms. Harding's own income, or an overstatement of her deductions, bases or credits, such that she would be potentially liable under paragraph 2 of this Article to indemnify Mr. Naseman, then Mr. Naseman will "cooperate fully, etc.", as provided above in this subparagraph mutatis mutandis.

(b)   Any consent by either party required to reach a settlement with any taxing authority shall not be unreasonably withheld.

4.   All refunds or credits derived from previously filed joint income tax returns shall be shared equally by the parties.  Mr. Naseman represents that he is unaware of any anticipated refund.

5.   The parties will file separate income tax returns for 1992.

## ARTICLE 7

## MUTUAL EQUITABLE DISTRIBUTION WAIVER

1.   The parties hereby agree that all of their property, including all of their "marital property" as that term is defined in Section 236, Part (B) of the New York Domestic Relations Law, has been fairly and equitably divided between them pursuant to the terms of this Agreement.

2.   Except as otherwise expressly provided in Article 12 of this Agreement, each party waives any and all rights or claims (whether arising at law, in equity or by virtue of their former marital relationship) which he or she may have to

-10-

an award of equitable distribution or a distributive award in respect of any property now or previously owned (titulary or beneficially) by the other former-spouse (together with the appreciation and income thereof) or acquired jointly, either before, during or after the marriage and either before or after the execution of this Agreement.

3.    The payments and transfers of property that Mr. Naseman has obligated himself to make pursuant to the terms of this Agreement are in full satisfaction of Ms. Harding's claims for equitable distribution as the term is defined by §236(B) of the Domestic Relations Law of the State of New York and similar laws of any other jurisdiction where such property may be located and in full satisfaction of all of Ms. Harding's claims for attorneys' fees, accountants' fees, and other expenses that have been or may be incurred by her in reference to the execution of this Agreement, the Nevada Action, and the obtaining of the Nevada Divorce.

4.    The payments and transfers of property that Ms. Harding has obligated herself to make pursuant to the terms of this Agreement are in full satisfaction of Mr. Naseman's claims for equitable distribution as the term is defined by §236(B) of the Domestic Relations Law of the State of New York and similar laws of any other jurisdiction where such property may be located and in full satisfaction of all Mr. Naseman's claims for attorneys' fees, accountants' fees, and other expenses that have been or may be incurred by him in reference to the execution of

this Agreement, the Nevada Action, and the obtaining of the Nevada Divorce.

## ARTICLE 8

## MUTUAL RELEASE AND DISCHARGE OF GENERAL CLAIMS

     1.   Mr. Naseman hereby releases, and forever discharges Ms. Harding, her heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or equity, known or unknown, past, present, or future which Mr. Naseman, his heirs, executors, administrators, successors and assigns ever had or now has against Ms. Harding, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement, including (without limitation) claims with respect to all separate property and all marital property as those terms are defined in Domestic Relations Law §236(B) or arising out of the former marital relationship.

     2.   Ms. Harding hereby releases, and forever discharges Mr. Naseman, his heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements,

-12-

21473/0001/LGF/2953

promises, variances, trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or equity, known or unknown, past or present, which Ms. Harding, her heirs, executors, administrators, successors and assigns ever had or now have against Mr. Naseman, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this Agreement, including (without limitation) claims with respect to all separate property and all marital property as those terms are defined in Domestic Relations Law §236(B) or arising out of the former marital relationship.

## ARTICLE 9

### MUTUAL RELEASE AND DISCHARGE OF CLAIMS IN ESTATES

1.   Each party hereto waives, renounces, grants and releases to the other forever, and for all purposes whatsoever, any and all rights and claims against the other's estate including dower, curtesy and community property rights and interests, and any right of election, under the relevant provisions of the Estates, Powers and Trusts Law of the State of New York or under the laws of testacy or intestacy in any jurisdiction whatsoever, which he or she now has or may hereafter acquire in the real or personal property or estates of the other, wheresoever situated and whether before or subsequent to the date of this Agreement, by reason of inheritance or descent, or by virtue of any decedent's estate law or any other statute or custom, or arising out of the former marital relationship, or for any other reason whatsoever.

-13-

2.    The parties hereto expressly revoke their respective Wills insofar as the same may make any disposition (whether outright or in trust) to or for the benefit of the other and further revoke any nomination of the other party as an estate representative or in any other representative or fiduciary capacity thereunder, it being the intent of the parties that all Wills made and executed by either of them prior to the Nevada Divorce and the  acknowledgment of this Agreement shall be read and administered as if the other party had predeceased him or her for purposes of distribution of his or her respective estate or the property interests otherwise passing thereunder.

3.    Where a party may be designated a beneficiary or survivor in a testamentary substitute pursuant to which any interest in property does not pass under a Will, each of the parties hereby renounces and agrees to renounce any such designation and the beneficiary or survivor shall be deemed to be the estate of the party having originally made the designation.

4.    Each of the parties hereby further renounces and agrees to renounce any right of administration upon the estate of the other or nomination by the other as estate representative, as provided for by the laws or practices of any jurisdiction whatsoever.  Neither party shall object to the probate of the other's Last Will and Testament and in the event that either party dies intestate, the surviving party shall allow administration upon the estate and personal effects of the deceased party to be taken and received by any person who would

-14-

have been entitled thereto had the surviving party predeceased the deceased party unmarried.

    5.    Each party shall, upon request by the executors, administrators or other legal representatives of the other party, promptly (and without charge) execute, acknowledge and deliver any instrument which in the opinion of said executors, administrators or other legal representatives is necessary to effectuate the waiver of his or her right of election against the last will and testament of the other, and the waiver of all dower, curtesy and other rights to take as distributee, heir, next-of-kin and the like.

    6.    However, the foregoing shall not bar a claim on the part of either party against the estate of a deceased party for any cause arising out of a breach of this Agreement during the lifetime of the deceased party against whose estate such a claim may be made.

### ARTICLE 10

### SUPPORT AND MAINTENANCE OF THE PARTIES

    1.    Taking into consideration all relevant facts and circumstances, including but not limited to the employment and employment potential of Ms. Harding and Mr. Naseman, both of whom are attorneys, and the substantial assets to be held by each party following the execution of this Agreement, neither Mr. Naseman nor Ms. Harding seeks or requires any alimony, maintenance or spousal support from the other now or in the future. Therefore, no provision for the support or maintenance of either Mr. Naseman or Ms. Harding is made herein, and each

-15-

21479/0001/LGF/2953

forever waives any claim for support or maintenance or alimony in the future.

2.    As more expressly provided for in Article 2, Ms. Harding, simultaneously herewith, will dismiss, with prejudice, her counterclaim for spousal support, alimony or maintenance in the Nevada Action.

### ARTICLE 11

### MEDICAL INSURANCE AND RELATED EXPENSES

1.    Ms. Harding shall promptly execute all documents necessary to convert Mr. Naseman's present health insurance coverage, maintained under her employment with NYNEX to an individual policy providing the same benefits as those to which he was entitled prior to the divorce, consistent with the terms, conditions and requirements of the NYNEX policy.  Ms. Harding shall take all reasonable steps necessary to keep Mr. Naseman's health insurance in effect for the three (3) years following the date of divorce as provided by the Consolidated Omnibus Budget Reconciliation Act of 1985, Title X Pub.L. 99-272 effective April 7, 1986 ("COBRA").  The cost of such medical insurance shall be paid solely by Mr. Naseman and he shall indemnify Ms. Harding for any actual expense incurred by her in the implementation of this paragraph.

2.    Each party agrees to promptly fill out, execute and deliver to the other (at the address specified by Article 16, paragraph 8) all forms and provide all information in connection with any application that may be necessary for the other's

-16-

medical, dental and drug expenses under any insurance policies which the other may have.

## ARTICLE 12

### MARITAL PROPERTY

1.    The parties own as joint tenants with the right of survivorship, 630 shares of stock (par value $1) in the Beekman Hill House Apartment Corp. which represents their ownership of Apartment 6-A in premises located at 425 East 51st Street, New York, New York 10022.  The parties are also signatories to the proprietary lease appurtenant to said apartment.  Upon the execution hereof, Mr. Naseman shall convey to Ms. Harding, all of his right, title and interest in and to the said cooperative stock and the said proprietary lease and shall execute all documents necessary to effectuate said transfer including, but not limited to, an assignment of said stock (on the back of the stock certificate if available), assignment of the proprietary lease and any other documents that may be required by the Cooperative Board to effectuate said transfer.

2.    The parties presently own as joint tenants with the right of survivorship, another 625 shares of stock (par value $1) in the Beekman Hill House Apartment Corp. which represents their ownership of Apartment 5-A in premises located at 425 East 51st Street, New York, New York 10022.  The parties are also signatories to the proprietary lease appurtenant to that apartment.  Upon the execution hereof, Mr. Naseman shall convey to Ms. Harding, all his right, title and interest in and to the

-17-

said cooperative stock and the said proprietary lease and shall execute all documents necessary to effectuate said transfer including, but not limited to, an assignment of said stock (on the back of the stock certificate if available), assignment of the proprietary lease and any other documents that may be required by the Cooperative Board to effectuate said transfer.

3.    (a)  Mr. Naseman, at the time of execution of this Agreement, shall deliver to Ms. Harding a bank or certified check for three thousand seven-hundred thirty one and 37/100 ($3,731.37) as and for his complete contribution with respect to any taxes or expenses entailed in the transfer of the two cooperative apartments.

(b)  Ms. Harding shall be solely responsible for any expenses involved in the transfer of said stock and leases from Mr. Naseman and Ms. Harding to Ms. Harding including, but not limited to, New York City and New York State transfer taxes, recording fees, and charges of the Managing Agent and/or the Cooperative Board, and she shall indemnify him against the same. The parties each represent to the other that the said cooperative apartments are free and clear of any mortgages, liens or encumbrances occasioned by his or her individual acts of commission or omission.

4.    There shall be no adjustment for taxes, cooperative maintenance or apportionments and Mr. Naseman shall not be liable for any taxes, cooperative maintenance or apportionments in 1993.  From and after the said conveyances, Ms. Harding shall be solely liable for all expenses in connection

-18-

with said premises, including but not limited to maintenance payments, insurance, taxes, telephone, utilities and ordinary repairs. From and after the execution hereof, Mr. Naseman shall have no right or claim with respect to the said apartments, their use or their proceeds in the event of a sale or other disposition thereof.

5.    Ms. Harding shall indemnify and hold Mr. Naseman harmless of all loss, expenses (including reasonable attorneys' fees) and damages which he may incur as the result of a failure on the part of Ms. Harding to perform the obligations relating to, or as a result of, her occupancy and ownership of the premises.

6.    Ms. Harding shall be the sole owner of the contents and furnishings contained in the said cooperative apartments 5-A and 6-A free of any claim or right of Mr. Naseman thereto.

7.    (a)    Simultaneously with the execution of this Agreement Mr. Naseman shall transfer to Ms. Harding, by wire transfer to Republic National Bank Insured Money Director Account # 318251620, five hundred thousand dollars ($500,000) from the funds currently located in insured money director account #0318181371 located at the Republic National Bank of New York.

(b)    Mr. Naseman shall retain the balance of the funds currently located in the said account #0318181371 (approximately $425,000).

(c)    Simultaneously with the execution of this Agreement, Ms. Harding will execute and deliver to Mr. Naseman

-19-

documents necessary to waive, renounce and relinquish any and all rights she has in the balance of the funds in the said account #0318181371.

(d)  Following the said transfers, neither Mr. Naseman nor Ms. Harding shall have any claim or right (whether arising at law, in equity or by virtue of the former marital relationship) to any of the funds currently in the said account #0318181371 and transferred to, or retained by, the other as provided in subparagraphs 7(a) or 7(b).

8.    (a)  Mr. Naseman is the owner of: a 1989 Jaguar Vanden Plas, VIN No. SAJKY1547KC569398, a 1991 Ford F150 Pick-up, VIN No. 2FTEF14N8MCA86947; a 1989 Volvo 760 Sedan, VIN No. YV1GA874XK0067382; and, a 1923 Ford Model T Touring Car, (no VIN). Each party represents and warrants to the other that there are no liens or chattel mortgages outstanding with respect to the said four automobiles occasioned by his or her acts of omission or commission.

(b)  In full satisfaction of Ms. Harding's claims or rights to any of the automobiles, simultaneously with the execution of this Agreement, Mr. Naseman has executed and delivered to Ms. Harding all documents necessary to transfer the ownership and registration of the said Volvo to Ms. Harding (including, but not limited to, the certificate of title and a letter confirming the transfer), and Ms. Harding agrees to pay all expenses relating to the operation, insurance, maintenance and garaging of said vehicle after the execution of this Agreement. Ms. Harding acknowledges Mr. Naseman's advice that

-20-

the Volvo will be uninsured from and after May 14, 1993 and that she will, thereafter, be solely responsible for maintaining the insurance thereon. Ms. Harding agrees to return the Massachusetts plates for the said Volvo to Mr. Naseman by express mail upon her obtaining new insurance for the Volvo or on May 14, 1993, whichever is the sooner.

(c) Ms. Harding represents that the Volvo has not been involved in any accident, nor does it have any outstanding summonses for parking or moving violations, for which Mr. Naseman is, or may be, liable. If there, nonetheless, are any such liabilities, Ms. Harding agrees to indemnify and hold Mr. Naseman harmless from them. This representation and indemnity will apply through the date upon which Ms. Harding surrenders the license plates to Mr. Naseman as provided in subparagraph 8(b) above.

(d) Ms. Harding will promptly take all steps necessary to transfer the account with the garage where the said Volvo is parked in New York, New York into her sole name. She agrees to indemnify Mr. Naseman against all liability for the payment of this account whether arising on or after February 1, 1993 or after the date of this Agreement.

9. (a) The husband is the sole owner of Lots 34 and 35 located at Nine Mile Point Drive of Michigan Shores, Charlevoix, Michigan, and the residence erected on Lot 34, commonly known as 06452 Nine Mile Point Drive, Charlevoix, Michigan 49720.

(b) (i) Mr. Naseman represents that the said lots 34 and 35 and the said residence are free and clear of any

-21-

mortgages, liens or other encumbrances; (ii) Ms. Harding represents that she knows of no mortgages, liens or encumbrances upon the said lots and residence, placed there as a result of any act of omission or commission by her.

(c)  Mr. Harding waives any right, title or interest in and to the said Lots and residence, and any personalty located therein irrespective of whether such right, title or interest arises at law, in equity or by virtue of the former marital relationship.  Simultaneously herewith she has executed and delivered to Mr. Naseman a quitclaim deed transferring all of her right, title and interest in and to the said property to Mr. Naseman.

10.  (a)  The parties are the owners, as tenants in common with right of survivorship, of approximately 8.7 acres of land and a residence and barn located at 150 Lee Road, Lenox, Berkshire County, Massachusetts 01240.

(b)  Each of the parties represents to the other that the said 8.7 acres and residence and barn are free and clear of any mortgages, liens or encumbrances placed there as a result of any act of omission or commission by him or her.

(c)  Simultaneously with the execution of this Agreement, Ms. Harding has executed and delivered to Mr. Naseman, all documents necessary to transfer to Mr. Naseman all of her right, title and interest in and to the said 8.7 acres and residence and barn.

(d)  From and after the date of this Agreement, Mr. Naseman shall be the sole owner of any personal property

-22-

located at the said 8.7 acres and residence and barn free of any claim or right thereto of Ms. Harding.

11.    (a)  Mr. Naseman is the sole owner of a condominium described as Unit #603 and an undivided 1.93% share in the common elements appurtenant thereto, according to the Declaration of Condominium of the Venice Avenue Condominium, relating to 512 Venice Avenue West, Venice, Sarasota County, Florida 34285.

(b)    (i)  Mr. Naseman represents that the said condominium is free and clear of any mortgages, liens or encumbrances; (ii) Ms. Harding represents that she knows of no mortgage, lien or encumbrances upon the said condominium placed there as a result of any act of omission or commission by her.

(c)  Ms. Harding waives any right, title or interest in and to the said condominium and to any personalty located therein, irrespective of whether such right, title or interest arises at law, in equity or by virtue of the former marital relationship.  Simultaneously herewith she has executed and delivered to Mr. Naseman a quitclaim deed transferring all of her right, title and interest in and to the said condominium to Mr. Naseman.

12.  Without limiting the generality of the foregoing, with respect to any property which Mr. Naseman or Ms. Harding shall own following the transfers made pursuant to this Article, Mr. Naseman or Ms. Harding, as the case may be, agrees that he or she will indemnify and hold the other harmless of all loss, expenses (including reasonable attorneys' fees) and damages which

-23-

the other may incur as the result of a failure on his or her part to perform the obligations relating to, or as a result of, his or her occupancy and ownership of the premises, whether such failure arises before or after the execution of this Agreement.

13.    (a)  Mr. Naseman and Ms. Harding agree and understand, and have been so advised by their respective attorneys, that no taxable gain or loss is recognized by the conveyances pursuant to this Article as provided for in Section 1041 of the Internal Revenue Code of 1986.  Neither Mr. Naseman or Ms. Harding shall take any position on his or her federal, state or local income tax returns, with respect to the tax basis of the property conveyed, that is inconsistent with the preceding sentence of this paragraph.

(b)  Each party will promptly deliver to the other any documents (in his or her possession, custody or control) relating to the tax basis of the properties to be held by the other following the execution of this Agreement and the transfers contemplated herein.

## ARTICLE 13

### INQUIRY AND DISCLOSURE

1.    Mr. Naseman has had the opportunity to make independent inquiry into the complete financial circumstances of Ms. Harding and represents to Ms. Harding that: he is satisfactorily informed of the income, assets, property and financial prospects of Ms. Harding; he is aware of all separate property and all marital property as those terms are defined in

-24-

Domestic Relations Law §236(B); that he is satisfied that full disclosure has been made, and that he cannot appropriately make a claim against Ms. Harding by reason of her failure to disclose or his failure of knowledge of the financial circumstances of Ms. Harding.

2.   Mr. Naseman has had a full opportunity and has consulted at length with his attorneys, to wit:  Leonard G. Florescue, Esq., of Tenzer, Greenblatt, Fallon & Kaplan in New York, New York and Gary Silverman of Silverman, Decaria Chtd. in Reno, Nevada regarding all of the circumstances hereof.

3.   Mr. Naseman further acknowledges that this Agreement has been freely entered into by him, without fraud, duress or undue influence exercised by Ms. Harding or by any other person or persons upon him.

4.   Ms. Harding has had the opportunity to make independent inquiry into the complete financial circumstances of Mr. Naseman and represents to Mr. Naseman: that she is satisfactorily informed of the income, assets, property and financial prospects of Mr. Naseman; she is aware of all separate property and all marital property as those terms are defined in Domestic Relations Law §236(B); she is satisfied that full disclosure has been made, and that she cannot appropriately make a claim against Mr.Naseman by reason of his failure to disclose or her failure of knowledge of the financial circumstances of Mr. Naseman.

5.   Ms. Harding has had a full opportunity and has consulted at length with her attorneys, to wit: Richard B. Cohen

-25-

of Akabas & Cohen in New York, New York and Cassandra D. Campbell of Logar, Campbell in Reno, Nevada regarding all of the circumstances hereof.

6.    Ms. Harding further acknowledges that this Agreement has been freely entered into by her, without fraud, duress or undue influence exercised by Mr. Naseman or by any other person or persons upon her.

## ARTICLE 14

### PENSION RIGHTS

1.    Ms. Harding hereby consents to Mr. Naseman's election to waive a qualified joint and survivor annuity form of benefit and a qualified preretirement survivor annuity form of benefit under any plan of deferred compensation to which Section 401(a)(11)(B) of the Internal Revenue Code of 1986 (the "Code") and/or Section 205(b)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA") shall apply and in which Mr. Naseman currently or hereafter may be deemed a vested participant within the meaning of Section 417(f)(1) of the Code and Section 205(h)(1) of ERISA.

2.    Ms. Harding further consents to Mr. Naseman's current and future designation of any alternative form of benefit and of beneficiaries other than Ms. Harding under any of such plans (and to any revocation and/or modification of such designations) including any of such plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of ERISA.

-26-

3.    Ms. Harding hereby further agrees promptly to execute (and deliver without charge) any and all documents or forms which shall be required, at any time, and from time to time, by any or all such plans, including but not limited to, any consents required by Section 417(a)(2) of the Code or Section 205(c)(2) of ERISA to effect the payment of benefits in this manner.

4.    Ms. Harding hereby acknowledges that she understands the effect of Mr. Naseman's elections and her consents thereto. Ms. Harding further acknowledges that she understands that, absent the consent contained in this Article, she would have the right to limit her consent to the designation by Mr. Naseman of a specific beneficiary or a specific form of benefits, and Ms. Harding hereby voluntarily elects to relinquish both such rights.

5.    Mr. Naseman hereby consents to Ms. Harding's election to waive a qualified joint and survivor annuity form of benefit and a qualified preretirement survivor annuity form of benefit under any plan of deferred compensation to which Section 401(a)(11)(B) of the Code and/or Section 205(b)(1) of ERISA shall apply and in which Ms. Harding currently or hereafter may be deemed a vested participant within the meaning of Section 417(f)(1) of the Code and Section 205(h)(1) of ERISA.

6.    Mr. Naseman further consents to Ms. Harding's current and future designation of any alternative form of benefit and of beneficiaries other than Mr. Naseman under any of such plans (and to any revocation and/or modification of such

-27-

designations), including any of such plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of ERISA.

7.    Mr. Naseman hereby further agrees promptly to execute (and deliver without charge) any and all documents or forms which shall be required, at any time, and from time to time, by any or all such plans; including but not limited to, any consents required by Section 417(a)(2) of the Code or Section 205(c)(2) of ERISA to effect the payment of benefits in this manner.

8.    Mr. Naseman hereby acknowledges that he understands the effect of Ms. Harding's elections and his consents thereto. Mr. Naseman further acknowledges that he understands that, absent the consent contained in this Article, he would have the right to limit his consent to the designation by Ms. Harding of a specific beneficiary or a specific form of benefits, and Mr. Naseman hereby voluntarily elects to relinquish both such rights.

9.    Each party waives any interest that he or she may have to any pension plan, profit sharing plan, 401K plan or Individual Retirement plan or employee stock ownership or stock bonuses or other employee benefit or relevant plans in the other's name whether arising before or after the execution of this Agreement.

10.    The parties intend that this Agreement be accepted as a spousal consent by each of them as Releasee to a waiver of a Qualified Pre-Retirement Survivor Annuity pursuant to Internal Revenue Code Section 417(a).

## ARTICLE 15

### LEGAL REPRESENTATION

1.    (a)    Except as provided in subparagraph 1(b), each party agrees to pay his or her own counsel and expert fees for all services rendered and disbursements incurred in connection with the negotiation and execution of this Agreement or in connection with the Nevada Action or Nevada Divorce.

(b)    Notwithstanding the foregoing, against actual bills and time charge records for Mr. Cohen's legal services and Ms. Campbell's legal services, Mr. Naseman will pay to Ms. Harding up to a total of _____ dollars ($_____).

2.    The parties each represent to the other that Ms. Harding has been represented by AKABAS & COHEN, 1500 Broadway, New York, New York 10036 and by LOGAR, CAMPBELL, 243 South Sierra Street, Reno, Nevada 89501 and Mr. Naseman has been represented by TENZER, GREENBLATT, FALLON & KAPLAN, 405 Lexington Avenue, New York, New York 10174 and SILVERMAN, DECARIA CHTD., 290 South Arlington Avenue, Reno, Nevada 89501, as their respective attorneys. Except as specifically provided in subparagraph 1(b) of this Article, each party agrees to bear his or her own legal expenses in connection with the negotiation and preparation of this Agreement, the Nevada Action and the Nevada Divorce. Each party represents and warrants that he or she has dealt with no other attorney for which services the other party is or may become liable. Each part will indemnify and hold the other party harmless of all loss, expenses (including reasonable attorney

-29-

fees) and damages in the event of a claim by any attorney or other person(s) (including, without limitation, those listed in this paragraph) for counsel fees or any other fees on account of his or her representation by such attorney or person.

3.   If either party by any action, proceeding, defense, counterclaim or otherwise, seeks to vacate or set aside this Agreement or declare any of the terms and conditions to be invalid, void or against public policy, for any reason, including but not limited to fraud, duress, incompetency, overreaching or unconscionability, said party shall reimburse the other party and be liable for any and all of such party's reasonable attorney's fees and expenses, provided and to the extent that such action, proceeding, counterclaim or defense results in a settlement, decision, judgment, decree or order dismissing or rejecting said claims.

4.   If either party (the "defendant") shall be required to interpose the terms, conditions and covenants of this Agreement as a defense to an action or other proceeding instituted by the other party (the "plaintiff") and such defense shall result in a judgment, decree or order in favor of the defendant, or a settlement upon substantially the terms of this Agreement, the plaintiff shall pay to the defendant the costs and expenses incurred by the defendant including reasonable attorneys' fees.

5.   By signing below,

(a)   each counsel for Ms. Harding, for himself or herself and for his or her law firm waives any claim for counsel

-30-

fees against Mr. Naseman whether arising by statute, court order or common law.

        (b)   each counsel for Mr. Naseman, for himself and for his law firm waives any claim for counsel fees against Ms. Harding whether arising by statute, court order or common law.


_Leonard T. Florescue_
_____
Leonard G. Florescue
TENZER, GREENBLATT, FALLON &
  KAPLAN
Attorneys for Mr. Naseman


_____
Richard B. Cohen
AKABAS & COHEN
Attorneys for Ms. Harding


_____
Gary Silverman
SILVERMAN, DECARIA CHTD.
Attorneys for Mr. Naseman


_____
Cassandra D. Campbell
LOGAR, CAMPBELL
Attorneys for Ms. Harding


-31-

21479/0001/LGT/2953

## ARTICLE 16

### GENERAL PROVISIONS

1.    **Possible Invalidity**:  In case any provision of
this Agreement should be held to be contrary to or invalid under
the law of any country, state or other jurisdiction, such
illegality or invalidity shall not affect in any way any other
provisions hereof, all of which shall continue, nevertheless, in
full force and effect; and any provision which is held to be
illegal or invalid in any country, state or other jurisdiction
shall, nevertheless, remain in full force and effect in any
country, state or jurisdiction in which such provision is legal
and valid.

2.    **Independent Covenants**:  Each of the respective
rights and obligations of the parties hereunder shall be deemed
independent and may be enforced independently irrespective of any
of the other rights and obligations set forth herein.

3.    **Binding on Parties' Estates**:  This Agreement and
all the obligations and covenants hereof shall bind the parties
hereto, their heirs, executors, administrators, legal
representatives and assigns.

4.    (a)  **Reconciliation and Future Decrees and Orders**:
This Agreement shall not be invalidated or otherwise affected by
a reconciliation or a resumption of sexual relations between the
parties except in a writing duly subscribed and executed with the
same formality as this Agreement and expressly stating that the
parties are cancelling this Agreement.  This Agreement shall not
be invalidated or otherwise affected by any decree or judgment

-32-

made in any court in any pending or future action or proceeding
between the parties.

(b)    Both parties agree, stipulate and consent
that no Judgment, Order or Decree in any Action for divorce,
whether brought in the States of Nevada or of New York or in any
other state or country having jurisdiction of the parties hereto,
shall make any provision for alimony or maintenance or affect the
property rights of either party inconsistent with the provisions
of this Agreement, but if any provision be made in any Judgment,
Order or Decree which is inconsistent with the provisions of this
Agreement, or that imposes a different or greater obligation on
either of the parties hereto than provided in this Agreement, the
provisions of this Agreement shall take precedence and shall be
the only obligation of both of the parties hereto.

5.    **Modification and Waiver**:  Neither this Agreement
nor any provision hereof shall be amended or modified except by
an agreement in writing duly subscribed and acknowledged with the
same formality as this Agreement.  Any purported amendment or
modification not so subscribed and acknowledged shall be
ineffective even if substantially and detrimentally relied upon.
Any waiver by either party of any provision of this Agreement or
any right hereunder shall not be deemed a continuing waiver and
shall not prevent or estop such party from thereafter enforcing
such right, and the failure of either party to insist in any one
or more instances upon the strict performance of any of the
provisions of this Agreement by the other party shall not be

21479/0001/LGF/2953

construed as a waiver or relinquishment for the future of such provision, but the same shall continue in full force and effect.

6.    **Legal Interpretation and Jurisdiction**:

(a)    This Agreement and all of the rights and obligations of the parties hereunder shall be construed according to the laws of the State of New York as an agreement made and to be performed within said State and without consideration of the choice of law rules thereof.

(b)    Both parties consent to the personal jurisdiction of the State of New York over them in any action or proceeding brought to enforce the terms and conditions of this Agreement.

7.    **Implementation**:  Either party shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver, without charge, any and all other and further instruments as may be reasonably necessary or desirable for the purpose of giving full force and effect to the provisions of this Agreement.

8.    **Notices**:

(a)    All notices hereunder required to be sent to Ms. Harding shall be sent by certified mail, return receipt requested to her at 425 East 51st Street, New York, New York 10022, and to Akabas & Cohen, Attn: Richard B. Cohen, or to such other place or person as she may designate in writing by like notice.

(b)    All notices hereunder required to be sent to Mr. Naseman shall be sent by certified mail, return receipt

-34-

requested to: P.O. Box 8763, Incline Village, Nevada 89452, and
to Tenzer, Greenblatt, Fallon & Kaplan, Attn: Leonard G.
Florescue, or to such other place or person as he may designate
in writing by like notice.

    9.  **Counterpart Originals**:  This Agreement may be
executed in counterpart originals and shall become effective when
such originals subscribed to by parties and acknowledged have
been exchanged.

## ARTICLE 17

### ENTIRE UNDERSTANDING

    This Agreement contains the entire understanding of the
parties who hereby acknowledge that there have been and are no
promises, representations, warranties, covenants or undertakings
other than those expressly set forth herein.

    **IN WITNESS WHEREOF,** the parties hereto have hereunto
set their respective hands and seals the day and year first above
written to five (5) counterparts hereof, each of which shall
constitute an original.

_____
WITNESS FOR MS. HARDING

_____
TOEHL HARDING

_____
WITNESS FOR MR. NASEMAN

_____
DAVID M. NASEMAN

21479/0001/LGF/2953

STATE OF NEW YORK )
                          : ss.:
COUNTY OF NEW YORK )


        On this 4th day of May, 1993, before me personally
came, Toehl Harding, to me known and known to me to be the
individual described in and who executed the foregoing instrument
and she duly acknowledged to me that she executed the same.

                                   _____
                                   Notary Public

                    RICHARD B. COHEN
                Notary Public, State of New York
                          No. 4736055
                  Qualified in New York County
                  Term Expires May 31, 199__

STATE OF New York )
                          : ss.:
COUNTY OF New York )


        On this 4th day of May, 1993, before me personally
came, David M. Naseman, to me known and known to me to be the
individual described in and who executed the foregoing instrument
and he duly acknowledged to me that he executed the same.

                                   _____
                                   Notary Public

                    LEONARD G. FLORESCUE
                NOTARY PUBLIC, State of New York
                       No. 31-02FL45502587
                  Qualified in New York County
                Commission Expires November 30, 19 23

                              -36-

21475/0001/LAW/2953

### Amendment to
### Property Settlement Agreement

WHEREAS, David M. Naseman (Mr. Naseman) and Toehl Harding

(Ms. Harding) entered into a Property Settlement Agreement on

May 4, 1993, (the "Agreement"), and

WHEREAS, the parties desire to modify the Agreement as

set forth below,

NOW THEREFORE, it is agreed as follows:

1.    There shall be added to Article 12 of the Agreement,

a new paragraph 14 which shall read as follows:

"14. (a)  Mr.  Naseman  will  be  solely

responsible for all taxes, recording fees and

other charges incurred in connection with the

recording of the quitclaim deeds following the

transfers of the Massachusetts, Michigan and

Florida properties referred to earlier in this

Article.

(b)   Mr. Naseman represents that the

amounts, set forth as consideration on the

quitclaim deeds referred to in subparagraph

14(a) of this Article, are correct under the

applicable local laws;

(c)   Mr.  Naseman  indemnifies  Ms.

Harding against any and all costs, claims,

demands,  judgments,  penalties  and  other

charges (collectively "Charges") (as well as

reasonable attorneys fees) that she may incur

relating to the recording of the said quitclaim deeds provided that Mr. Naseman has not paid the Charges within ten (10) days after receiving notice that the Charges are due."

2.   Except for the aforesaid addition of paragraph 14 to Article 12 of the Agreement, the Agreement is in all respects and in all of its provisions expressly ratified and affirmed.

DAVID M. NASEMAN
by Leonard G. Florescue,
Attorney-in-fact


TOEHL HARDING

-2-

21479/0001/LGF/24662

STATE OF NEW YORK        )
                         :   ss:
COUNTY OF NEW YORK       )


On this 10ᵗʰ day of May, 1993, before me personally came Toehl Harding, to me known and known to me to be the individual described in and who executed the foregoing instrument and she duly acknowledged to me that she executed the same.


Notary Public

JEANETTE M. SULLIVAN
Notary Public, State of New York
No. 4889913
Qualified in Rockland County
Qualified in Westchester County
Commission Expires April 20, 19__


STATE OF NEW YORK        )
                         :   ss:
COUNTY OF NEW YORK       )


On this 5ᵗʰ day of May, 1993, before me personally came Leonard G. Florescue, to me known and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he, as attorney-in-fact for David M. Naseman, executed the same.


Notary Public

WILLIAM F. EDWARDS
Notary Public, State of New York
No. 31-4904237
Qualified in New York County
Commission Expires Oct. 26, 1993


-3-

**EXHIBIT C**

1   J. Stephen Peek, Esq.
  Nevada Bar Number 1758
2   Patricia C. Halstead, Esq.
  Nevada Bar Number 6668
3   Hale Lane Peek Dennison and Howard
  5441 Kietzke Lane, Second Floor
4   Reno, Nevada 89511
  (775) 327-3000; (775) 786-6179-facsimile
5   Attorneys for Defendant David Naseman

6

7                   UNITED STATES DISTRICT COURT

8                      DISTRICT OF NEVADA

9   TOEHL HARDING,

10            Plaintiff,           CASE NO.: 3:07-cv-00072

11   vs.

                      **AFFIDAVIT OF DAVID NASEMAN IN**
                      **SUPPORT OF MOTION TO DISMISS FOR**
12   DAVID NASEMAN, and DOES 1-10, inclusive,  **LACK OF PERSONAL JURISDICTION OR,**
                      **ALTERNATIVELY, MOTION TO**
13          Defendants.          **TRANSFER VENUE**

  _____/

14   STATE OF DISTRICT OF COLUMBIA    )
                              ) ss:
15   COUNTY OF WASHINGTON        )

16

17       I, David Naseman, being first duly sworn upon oath, deposes and says:

          1.     I am a named defendant in the above-entitled action.
18

19           2.    I am competent and have personal knowledge of the matters stated herein and as to

those matters stated upon information and belief, I believe them to be true.  If called as a witness, I
20
would be competent to testify as to the matters stated in this affidavit.
21
          3.    I have read the *Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively,*
22
*Motion to Transfer Venue* and believe the representations made therein to be true and correct to the
23
best of my knowledge, and I make this affidavit in support thereof.  I further state that the exhibits
24
attached to the *Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to*
25
*Transfer Venue* are true and correct copies of documents in my possession relevant to allegations
26
alleged in the above-entitled action.  In addition to the representations made in the *Motion to Dismiss*
27
*for Lack of Personal Jurisdiction or, Alternatively, Motion to Transfer Venue* I further state the
28
following.

*Hale Lane Peek Dennison and Howard*
*5441 Kietzke Lane, Second Floor*
*Reno, Nevada 89511*

4.     I do not do any business in Nevada.  I do not have any clients headquartered or organized in the State of Nevada, nor do I render any legal advise as to Nevada law or to any Nevada clients.

5.     I do not derive any income from Nevada through investments or otherwise.  I do not have any ownership interests in any business operating or headquartered in Nevada nor do I receive any income or profits from Nevada sources.

6.     I do not own any real property in Nevada, nor have I ever, and I do not own any personal property that is located in Nevada.

7.     I have no bank accounts, investment accounts, credit accounts, or any other kind of accounts in Nevada.  The small balances that remained in my First Interstate bank accounts while I was in Nevada in 1993 were, to the best of my recollection, consolidated with my First Interstate accounts in Arizona in either 1994 or 1995.

8.     Aside from having lived in Nevada for the purpose of establishing the requisite residency to allow me to secure my divorce from Ms. Harding during 1993, I have only been to Nevada on three subsequent occasions for very brief visits - one of those visits being for three days to celebrate a friend's birthday in Las Vegas; the second occasion being a one-day trip in 2002 to attend a legal seminar; and the third brief visit being a one-day trip in 2004, which was also for the purpose of attending a legal seminar.  I have not been back to Northern Nevada since having left subsequent to having been granted my divorce from Ms. Harding.

9.     Even though my divorce from Ms. Harding was granted in Nevada, all issues related to property division between Ms. Harding and me were negotiated and concluded in New York, New York, where we were both represented by New York counsel and where we were both licensed and practiced law.

10.     Upon Ms. Harding and I having reached a property settlement agreement through and with the assistance of our respective New York legal counsel, we executed the same, a true and correct copy of which is attached to the *Motion to Dismiss for Lack of Personal Jurisdiction or, Alternatively, Motion to Transfer Venue* as Exhibit B.

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1

    11.    To the best of my knowledge, the Second Judicial District Court never reviewed,

2   considered, approved, or took any action with respect to the property settlement agreement between

3   Ms. Harding and myself.

4       12.    I, David Naseman, do hereby swear under penalty of perjury that the foregoing

5   assertions are true.

6

7   Dated this 28th day of February 2007.

8

9                                                        _____
                                                         DAVID NASEMAN

10

11  SUBSCRIBED AND SWORN to before me this 28th day of February 2007.

12

13

14                                                       Notary Public

15                                                       My Commission Expires:    Janice E. Long
                                                                                   Notary Public, District of Columbia
16                                                                                 My Commission Expires 10/1/2010

17

18

19

20

21

22

23

24

25

26

27

28

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511