UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
TOEHL HARDING,

        Plaintiff,

                              07 Cv. 8767 (RPP)

        - against -                  **OPINION AND ORDER**

DAVID NASEMAN,

        Defendant.
---------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Plaintiff Toehl Harding filed this lawsuit in connection with a dispute over a property settlement agreement ("PSA") that was negotiated between Plaintiff and her ex-husband, Defendant David Naseman, in connection with their 1993 divorce. Plaintiff complains, in essence, that Defendant fraudulently misrepresented the amount of assets he held when he entered into divorce negotiations with Plaintiff. The core of Plaintiff's complaint is her assertion that, during property settlement negotiations, Defendant concealed the amount of their joint 1990 income by providing Plaintiff with false 1990 federal income tax forms that listed their joint income as $1,323,916, while in actuality, by reason of this nondisclosure of his income, it was $5,561,728. Discovery having closed on June 30, 2008, Defendant moves for summary judgment against Plaintiff, asking this Court to dismiss all of Plaintiff's claims, both those that sound in fraud (Claims 1-3), and those that do not. (Claims 4-12.)[1]

---

[1] A number of documents and exhibits are referred to throughout this opinion. "Compl." refers to Plaintiff's January 12, 2007 complaint; "Def.'s Mot." refers to Defendant's May 2008 motion for summary judgment; "Pl.'s Reply" refers to Plaintiff's June 20, 2008 memorandum in opposition to Defendant's motion; "Harding Aff." refers to Plaintiff's June 18, 2008 affidavit in opposition; "Bothe Aff." refers to Marcia Bothe's June 17, 2008 affidavit in opposition; "Schalk Aff." refers to Plaintiff's counsel's June 20, 2008 affidavit in opposition; "Naseman Aff." refers to Defendant's May 28, 2008 affidavit in support of his motion; "Naseman Reply Aff." refers to Defendant's June 8, 2008 reply affidavit in support of his motion; "Def.'s Ex." refers to the exhibits submitted by Defendant to the Court on May 28, 2008; "Tr." refers to the minutes from the oral argument held before this Court on September 29, 2008;

For the reasons set forth below, Defendant's motion for summary judgment against Plaintiff is granted in part and denied in part. Plaintiff's fraud-based claim may proceed to trial or settlement, while her remaining claims are dismissed.

## 1. Relevant Facts:

<u>Plaintiff's Claim</u>:

Plaintiff and Defendant, both attorneys, started dating in 1980 and were married in October 1982. (Def.'s Rule 56.1 ¶1; Pl.'s Rule 56.1 ¶1; Harding Aff. ¶6.) After marrying, they lived in New York City, first renting and then owning an apartment located at 425 East 51st Street. (Harding Aff. ¶¶7, 11-12.) Defendant worked as a General Counsel at LIN Broadcasting Company, while Plaintiff worked as a General Counsel for the NYNEX Corporation. (Harding Aff. ¶¶9, 33; Pl.'s Rule 56.1 ¶5.) As part of Defendant's pay package, he was granted stock options in LIN. (Harding Aff. ¶¶3-4, 15-16; Def. Ex. 8.) In 1987, these options were worth approximately $2 million. (Harding Aff. ¶¶13-14; Def. Ex. 5.) Defendant exercised the "vast majority" of his options in 1988, and used approximately $750,000 from the proceeds to pay off the mortgages on the couple's New York City apartment, their farmhouse in Massachusetts, and a residence in Michigan. (Harding Aff. ¶¶16, 18.) The remainder of the options proceeds, approximately $1 million, was deposited in a joint account at Republic National Bank. (Harding Aff. ¶17.)[2]

---

"Def.'s Rule 56.1" refers to Defendant's May 28, 2008 Rule 56.1 Statement of Material Facts Not in Dispute; "Pl.'s Rule 56.1" refers to Plaintiff's June 23, 2008 Rule 56.1 Statement of Material Facts Not in Dispute, and; "Def.'s Dep." refers to Defendant's May 12, 2008 Deposition by Plaintiff's counsel.

[2] As a result of the exercise of the stock options, the couple's income increased from $284,123 in 1987 to $2,486,666 in 1988. (Harding Aff. ¶21-22.)

During their marriage, Defendant prepared the parties' joint tax returns. (Harding Aff. ¶23.) Commencing in 1988, Defendant asked Plaintiff to sign her name to blank tax forms (IRS Form 1040) because Plaintiff "was often away on business," and Defendant would then be able to complete and file the tax returns himself while she was away. (Harding Aff. ¶¶22-23.)

In 1989, McCaw Communications purchased LIN Communications, making any unexercised options potentially very valuable. (Harding Aff. ¶¶24-26.) Plaintiff was aware that Defendant had received a "buyout package" as part of the McCaw takeover of LIN. (Id. ¶28.) Plaintiff asked Defendant how much money he was due to receive; he told her that because he had exercised the majority of his options in 1988, he would now get "very little." (Id. ¶26.) Because of Defendant's statements, Plaintiff believed that Defendant would receive a buyout package in the "hundreds of thousands of dollars range," but not in the "millions." (Id. ¶¶27-28.)

In August of 1992, Defendant moved to Nevada and told Plaintiff he wanted a divorce. (Harding Aff. ¶32.) Both parties hired counsel to negotiate a property settlement; by letter dated February 5, 2003, Plaintiff's counsel requested all of Defendant's investments, bank accounts, and tax forms for the years 1987-1991. (Harding Aff. ¶38; Schalk Aff. at TH790 [letter].)[3] Plaintiff was facing a "perilous financial future" due to the "impending loss" of her job; therefore, throughout these negotiations, Plaintiff told Defendant "repeatedly and unequivocally" that she "expected to receive 50% of the marital assets." (Harding Aff. ¶¶34, 36-37; Pl.'s Rule 56.1 ¶26.) Plaintiff's expectation for receiving 50% of the marital assets was confirmed in a letter her counsel sent to Defendant. (Harding Aff. ¶37; Pl.'s Rule 56.1 ¶22.)

---

[3] "TH790" refers to the bate-stamped page contained in the Schalk Affidavit as submitted by Plaintiff.

3

During the negotiations over the divorce settlement agreement, Plaintiff reviewed copies, furnished by Defendant, of their joint tax returns for the years 1987 through 1991. (Harding Aff. ¶39; Pl.'s Rule 56.1 ¶28.) Plaintiff did not recall seeing any 1991 tax return reporting more than $5 million in income, and she states that there was "no way" Plaintiff would have missed seeing a tax return reporting such an unusually large amount of income. (Harding Aff. ¶¶39-40; Pl.'s Rule 56.1 ¶¶26, 28.) The couple was granted a divorce in Nevada on April 21, 1993, and, as required by the divorce decree, on May 4, 1993 Plaintiff and Defendant signed a Property Settlement Agreement ("PSA"), which was filed with the Nevada court.[4] (Def.'s Rule 56.1 ¶¶7-8; Pl.'s Rule 56.1 ¶¶7-8.) It was Plaintiff's belief, when she signed the PSA, that she was being provided with "approximately 50% of the marital estate." (Harding Aff. ¶40; Pl.'s Rule 56.1 ¶26.)

Under the terms of the PSA, Plaintiff received the condominium she shared with Defendant in New York (valued at $500,000), $500,000 from their joint checking account, and all of the stock and bank accounts held in her own name. (Def's Rule 56.1 ¶24; Harding Aff. ¶42.) Based upon the representations made by Defendant during the negotiations over the PSA, Plaintiff believed that the proceeds from the exercise of the stock options had been "accounted for," and that she had received "slightly more than 50%" of the "marital pie" in the PSA. (Harding Aff. ¶41; Pl's Rule 56.1 ¶26.) Defendant's notes made during the time the PSA was negotiated indicated that he believed that he was receiving 74.78% of the marital pie, worth

---

[4] Specifically, the April 21, 1993 Decree of Divorce provided that "upon execution of a marital settlement agreement by the parties, these proceedings shall be concluded in their entirety." (Naseman Reply Aff. Ex. D [Divorce Decree].)

4

approximately $3.8 million,[5] while leaving the remaining 25.22%, worth $1 million, for Plaintiff. (Def.'s Dep. at 26; Schalk Aff. at TH817 [notes].)

In June 1993, three months after his divorce from Plaintiff, Defendant married Marcia Bothe. (Bothe Aff. ¶5.) Defendant filed for divorce from Bothe in 2005, and, according to Bothe, in connection with those divorce proceedings, Defendant provided Bothe with "incomplete financial information and tax returns." (Bothe Aff. ¶6.) Bothe, however, looked through numerous filing cabinets located in the house she shared with Defendant, and found two separate 1990 signed income tax returns, one showing a gross income of $1,323,916, and the other showing an income of $5,561,728. (Bothe Aff. ¶6; Bothe Aff. Exs. 1-2 [$1 million tax forms]; Harding Aff. Exs. 3-4 [$5 million tax forms].)

On January 18, 2006, Bothe telephoned Plaintiff and asked her whether she and Defendant had earned over $5 million in 1990. (Harding Aff. at ¶47; Harding Aff. Ex. 1 [note of call]; Bothe Aff. ¶9.) Plaintiff told Bothe that they never "earned anything close to $5 million," and it was at that point that Bothe told Plaintiff about the two 1990 income tax returns. (Harding Aff. ¶¶47-48; Bothe Aff. ¶9.) This was the first time that Plaintiff had heard about the existence of the $5 million income tax return. (Harding Aff. ¶41.) Bothe then sent copies of these returns to Plaintiff, along with a letter written by Defendant at the time of the parties' divorce negotiations indicating that Plaintiff "fe[lt]" that she had "won" by "taking most of everything." (Harding Aff. ¶¶42, 48; Harding Aff. Ex. 2 [shipping invoice]; Bothe Aff. ¶¶9-10; Bothe Aff. Ex. 4 [letter].) Upon receipt of these returns, Plaintiff concluded that the $5 million federal income

---

[5] The majority of these assets were hidden in an undisclosed Shearson Lehman Brothers account and in an undisclosed Republic National Bank account. (Harding Aff. at ¶3.)

tax return was the correct one filed with the IRS, while the $1 million tax return was the one presented to Plaintiff during their divorce negotiations to disguise the couple's true earnings. (Harding Aff. ¶49.)[6]

Plaintiff now alleges that because of Defendant's "fraudulent misrepresentations and fraudulent concealment," she was "fraudulently induced into signing the PSA by which the parties divided and distributed their marital property." (Harding Aff. ¶27-28.) As a result of Defendant's deceit, Defendant captured "75% of the 'marital pie' for himself, while he nonetheless made it appear" that Plaintiff "was receiving slightly more than 50%." (Harding Aff. ¶41.) Plaintiff's complaint, originally filed in Nevada, contains claims based on fraud, alleging fraudulent misrepresentation and fraudulent concealment (Compl. ¶¶59-97), as well as a number of other claims against Defendant, alleging: breach of a fiduciary duty, breach of contract, negligent misrepresentation, contractual and tortious breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, constructive trust/equitable lien, fraud on the court, and constructive fraud. (Compl. ¶¶98-152.)

Defendant's Claim:

Defendant does not dispute the central aspects of his relationship with Plaintiff, but he denies committing any fraud pertaining to the property settlement agreement. (Naseman Aff. ¶¶2-4; Naseman Reply Aff. ¶¶4-7.) Specifically, Defendant contends that Plaintiff knew or

---

[6] The $4 million in income difference on the 1990 tax returns stemmed from Defendant's exercise of undisclosed stock options he had been granted in connection with the takeover of LIN by McCaw Communications. (Harding Aff. ¶41-42.) Subsequent analysis performed by an expert witness hired by Plaintiff concluded that the $5 million tax return was a copy of the original tax form signed by Plaintiff, while the $1 million tax return had been fraudulently created; the signatures on that tax form had been copied from the $5 million tax return. (Schalk Aff. Ex. C [report of expert witness Gus Lesnevich].)

should have known about the exercise of his stock options in 1990, and that therefore, she was aware of his $5 million income for that year. (Naseman Aff. ¶¶9-12, 13-16; Naseman Reply Aff. ¶¶5-12; Def.'s Dep. at 21.) Defendant also contends that he never created false tax returns for 1990, and that he had given Plaintiff the $5 million tax return prior to filing and before she signed the PSA in 1993. (Naseman Aff. ¶16; Naseman Reply Aff. ¶5.)[7] An expert witness hired by Defendant concluded that the 1990 tax form showing $5 million was the original tax form that had been signed by Defendant and Plaintiff, while the tax form for $1 million was an "altered document that someone prepared by 'cutting' the signature block out of the accurate 1990" form and pasting it into the "fraudulent return." (Naseman Aff. ¶16; Speckin Affidavit ¶¶5-12; Def. Ex. 10 [1990 tax form].)

**2. Discussion**

While both parties agree that the 1990 tax return for $1 million was fraudulent, Plaintiff argues that Defendant created the doctored tax returns to defraud her during the course of negotiations of their PSA, while Defendant claims that his second ex-wife, Marcia Bothe, is to blame. (Harding Aff. ¶¶39-41; Naseman Aff. ¶16 fn. 2.) In his motion seeking summary judgment, Defendant argues that Plaintiff's fraud-based claim should be dismissed because: 1) a party who has ratified a separation agreement may not thereafter sue her ex-spouse for additional monies in connection with that agreement; 2) Plaintiff's current lawsuit is barred by the broad releases from liability contained in the PSA; and, 3) the claims are time-barred. (Def's Mot. at

---

[7] Defendant claimed during his May 12, 2008 deposition, however, that he had not provided Plaintiff with any tax returns during the negotiations over the PSA. (Def.'s Dep. at 34-35.)

11-14, 16-19.)[8] Defendant also contends that Plaintiff's non-fraud based claims must be dismissed because they are barred by the statutes of limitations and are not legally cognizable. (Def's Mot. at 20-22.)

Summary judgment may be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita v. Zenith, 475 U.S. 574, 587 (1986). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S.Ct. 1769, 1776 (2007). With this standard in mind, each of Defendant's arguments will be considered in turn.

A. Plaintiff's Non-Fraud Based Claims Are Dismissed.

Plaintiff has filed a number of claims not based on fraud, alleging: a breach of a fiduciary duty, negligent misrepresentation, breach of contract, contractual and tortious breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, constructive trust/equitable lien, and fraud on the court. (Compl. at 14-21.)

---

[8] In his motion seeking summary judgment, Defendant further argued that Plaintiff's complaint should be dismissed because the attorneys had previously reached a binding agreement to settle this case. (Def's Mot. at 7-11.) However, during the September 29, 2008 oral argument, this Court found that there was no "clear agreement between the attorneys" to settle the case. (Tr. at 21.) Rather, it was an "issue of fact as to whether there was a settlement." (Id.) Accordingly, Defendant's motion seeking summary judgment on that ground is denied.

These non-fraud based claims are dismissed because each of the aforementioned claims is governed by either a six or three-year statute of limitations, both of which have long since expired. See N.Y. Civil Practice Law and Rules ("CPLR") § 213(2) (six-year statute of limitations period for contract claims, including implied covenants of good faith and faith dealing); N.Y. CPLR § 213(1) (six-year statute of limitations period concerning actions for which no period is specifically prescribed by law); Mancini v. Hardscrabble Common Assoc., 31 A.D.3d 719 (N.Y. App. Div. 2d Dep't 2006) (six-year statute of limitations period for breach of a fiduciary duty claim); Elliott v. Qwest Communications Corp., 25 A.D.3d 897 (N.Y. App. Div. 3d Dep't 2006) (six-year statute of limitations period for unjust enrichment); Fandy Corp. v. Lung-Fong Chen, 262 A.D.2d 352 (N.Y. App. Div. 2d Dep't 1999) (six-year statute of limitations period for negligent misrepresentation claim); In re Wallace, 191 A.D.2d 638 (N.Y. App. Div. 2d Dep't 1993) (six-year statute of limitations period governs claims for constructive trust); Stacom v. Wunsch, 173 A.D.2d 401 (N.Y. App. Div. 1st Dep't 1991) (tort claims subject to three-year statute of limitations period); Bank Leumi Trust Co. v. John Malasky, Inc., 108 A.D.2d 1089 (N.Y. App. Div. 3d Dep't 1985) (actions for conversion governed by three-year statute of limitations).

Accordingly, all of Plaintiff's non-fraud based claims are dismissed.[9]

---

[9] Plaintiff argues that Defendant misrepresented and/or concealed marital assets and income that were subject to division and distribution by the Nevada Court, and therefore, committed fraud on the court. (Compl. at 19-20.) While any fraud on the court can be taken into account in determining whether to vacate a judgment or agreement, Plaintiff has cited no authority that under New York law fraud on the court is a separate cause of action available to a plaintiff.

B. <u>Plaintiff's Fraud-Based Claim</u>.

   i. <u>Plaintiff's fraud claim is not barred by her failure to seek recission of the PSA.</u>

Plaintiff claims that by misrepresenting his income and assets, Defendant committed fraud which induced her into signing the PSA negotiated in connection with their divorce. (Pl.'s Reply at 7-8.) Defendant counters that Plaintiff "accepted all of the considerable benefits" of the PSA for the 14 years "preceding the commencement of this lawsuit," and even now, more than two years since discovering his alleged fraud, Plaintiff has not "tendered back" any of the benefits provided to her through the PSA. (Def.'s Mot. at 14.) Hence, Defendant concludes, by not rescinding the agreement and returning any of the assets she received pursuant to the PSA, Plaintiff has effectively ratified the PSA, and therefore, her current fraud claim is "now barred." (<u>Id.</u>; Def.'s Reply Mot. at 4-7.)

Plaintiff responds that she did not know about the fraud for the first 14 years of the PSA's existence, and that she filed suit to modify the PSA within a year after she discovered the fraud. Plaintiff acknowledges that she is not seeking to "rescind the PSA," but rather, she is "bring[ing] an action sounding in fraud for the difference between a fair and honest divorce settlement and her fraudulently induced one." (Pl.'s Reply at 8.)

New York contract law is clear that "one who has been induced by fraudulent misrepresentation to settle a claim may recover damages without rescinding the settlement." <u>Slotkin v. Citizens Casualty Co.</u>, 614 F.2d 301, 312 (2d Cir. 1979); <u>Urtz v. New York C. & H.R.R. Co.</u>, 202 N.Y. 170 (N.Y. 1911); <u>Clearview Concrete Products v. S. Charles Gherardi, Inc.</u>, 88 A.D.2d 461, 466 (N.Y. App. Div. 2d Dep't 1982); <u>Byrnes v. National Union Insurance</u>, 34 A.D.2d 872 (N.Y. App. Div. 3d Dep't 1970); <u>Griffel v. Belfer</u>, 12 A.D.2d 609 (N.Y. App.

10

Div. 1st Dep't 1960). In such circumstances, the measure of damages is "the difference between what would have been a fair and honest settlement and the amount … accepted in reliance on the alleged misrepresentations of defendant." Griffel, 12 A.D.2d at 609.

The principle behind allowing claims of fraud without requiring recission is clear. "If all that will result from a misrepresentation [inducing a settlement] is a new trial, then the party making it has everything to gain and nothing to lose. The plaintiffs would be placed at a disadvantage by a new trial; the defendants would not." Slotkin, 614 F.2d at 312. Neither Defendant nor Plaintiff have put forward any New York cases which address whether the recognized principle that a Plaintiff "who has been induced by fraudulent misrepresentation to settle a claim may recover damages without rescinding the settlement," is applicable to negotiated divorce property settlement agreements, and Defendant has failed to set forth any grounds for finding a distinction with respect to negotiated property settlement agreements.

In Slotkin, the court pointed out that a "remedy which merely seeks to place the plaintiff back in the position [s]he was in before [the negotiated agreement] seems hardly adequate." Slotkin, 614 F.2d at 312. The Court can think of no grounds for reaching a different conclusion in considering divorce property settlement agreements. Indeed, to require Plaintiff to void the divorce property settlement agreement and disgorge the previously received property, as Defendant, in bringing a ratification defense, here claims, could result in an inequitable situation. Accordingly, it is proper for the plaintiff who brings a suit for fraud in the inducement to retain the proceeds from the negotiated settlement agreement and then request damages that are "the difference between what would have been a fair and honest settlement and the amount … accepted in reliance on the alleged misrepresentations of defendant." Griffel, 12 A.D.2d at 609.

Defendant's claim that Plaintiff may not bring her fraud claim without rescinding the PSA is denied.

> ii. Plaintiff's fraud claim is not barred by the terms and conditions of the PSA.

In his motion to dismiss, Defendant argues that the release and waiver provisions in the 1993 PSA bar the current lawsuit by Plaintiff. (Def.'s Mot. at 11-12, 14-16.) In that agreement, the parties each agreed to broad omnibus releases and waivers. Each party released and discharged the other from "including (without limitation) all actions … with respect to all separate property and all marital property." See PSA Article 8(2). It also provided that the parties had "waive[d] … all rights or claims … which [they] may have to an award of equitable distribution or distributive award in respect of any property now or previously owned … by the other spouse." See PSA Article 7(2).

Under New York law, a valid release or waiver constitutes a complete bar to an action on a claim which is the subject of the release. See Global Materials and Metals Corp. v. Holme, 35 A.D.3d 93, 98 (N.Y. App. Div. 1st Dep't 2006); Metals Hack v. United Capital Corp., 247 A.D.2d 300, 301 (N.Y. App. Div. 1st Dep't 1998); Metz v. Metz, 175 A.D.2d 938, 939 (N.Y. App. Div. 3d Dep't 1991); Matter of O'Hara, 85 A.D.2d 669 (N.Y. App. Div. 2d Dep't. 1981) (valid general release bars suit on any cause of action arising prior to the date of its execution); see also Allen v. Westpoint-Pepperell, 945 F.2d 40, 44 (2d Cir. 1991); Branch v. Wassel, 779 F. Supp. 310, 319 (S.D.N.Y. 1991); National Union Fire Ins. Co. v. Walton Ins. Ltd., 696 F. Supp. 897, 901 (S.D.N.Y. 1988). And where the "language" of a settlement agreement "is clear, effect must be given to the intent of the parties as indicated by the language employed." Rocanova v. Equitable Life, 83 N.Y.2d 603, 616 (N.Y. 1994); Metz, 175 A.D.2d at 939 (same); see also

Denburg v. Parker Chapin, 82 N.Y.2d 375, 383 (N.Y. 1993) ("strong policy considerations favor the enforcement of settlement agreements").

However, otherwise valid releases or waivers may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress. Mangini, 24 N.Y.2d at 563; Lobel v. Maimonides Med. Ctr., 39 A.D.3d 275, 276 (N.Y. App. Div. 1st Dep't 2006) (in denying motion for summary judgment, held that "release may be voided on the basis of fraud in the inducement, even when it results from prolonged negotiations by represented parties"); Global Materials and Metals Corp., 35 A.D.3d at 98; see also C3 Media and Marketing v. Firstgate Internet, 419 F. Supp. 2d 419, 429 (S.D.N.Y. 2005); Knoll v. Equinox Fitness Clubs, 2003 U.S. Dist. LEXIS 23086, at *21 (S.D.N.Y. 2003). This principle applies regardless of whether the contract involves a complex commercial dispute, or, as pertinent here, matrimonial-related property settlement agreements. See, e.g., Littman v. Magee, 54 A.D.3d 14, 17 (N.Y. App. Div. 1st Dep't 2008) ("broad omnibus release" did not bar Plaintiff's claim of fraudulent inducement); Chapin v. Chapin, 12 A.D.3d 550 (N.Y. App. Div. 2d Dep't 2004) (waiver did not bar the plaintiff's claim of fraudulent inducement in divorce property settlement); Cruciata v. Cruciata, 10 A.D.3d 349 (N.Y. App. Div. 2d Dep't 2004); Metz, 175 A.D.2d at 928; Cherfas v. Wolf, 17 Misc. 3d 1102A (N.Y. Sup. Ct. King's Co. 2007).

This principle is particularly applicable here because Defendant owed Plaintiff, his wife, a fiduciary duty during the negotiations over the PSA. See Magee, 54 A.D.3d at 14 (plaintiff was entitled to expect the defendants to disclose any information in their possession that could reasonably bear on the plaintiff's consideration of the defendants' offer because "when a fiduciary, in furtherance of its individual interests, deals with the beneficiary of the duty in a

matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make full disclosure of all material facts"); see also Colello v. Colello, 9 A.D.3d 855, 859 (N.Y. App. Div. 4th Dep't 2004) (husband had fiduciary duty to his wife); Blue Chip Emerald v. Allied Partners, 299 A.D.2d 278, 279 (N.Y. App. Div. 1st Dep't 2002) (fiduciary is obligated to make "full disclosure" of all material facts).

Other provisions in the PSA likewise do not bar Plaintiff's current fraud claim. In the PSA Article 13(4) Plaintiff acknowledged her satisfaction that "full disclosure ha[d] been made, and that she cannot appropriately make a claim against [Defendant] by reason of his failure to disclose or her failure of knowledge of the financial circumstances of [Defendant]." This clause, however, says nothing about the unique situation presented here, where Defendant failed to disclose a newly opened security account and bank accounts and purportedly made full disclosure of his 1990 income by providing a "copy" of a self-authenticating document -- their joint income tax returns -- whereas in actuality, this "disclosure" was intended to deceive Plaintiff. Indeed, the PSA does not contain a disclaimer of reliance on any oral or written statements or documents (the tax returns) produced by Defendant.

Additionally, even though in Article 13(6) of the PSA Plaintiff represents that the Agreement was entered into freely and "without fraud," this was simply a representation made by Plaintiff as to her knowledge at that time; it was not a waiver of her right to sue for fraud on knowledge which came to her attention later. Since Plaintiff alleges reliance on Defendant's disclosure and asserts that she "did not have express knowledge of [Defendant's] assets, she cannot be said to have waived her right" to vacate or modify the PSA. Chapin, 12 A.D.3d at 550.

14

These circumstances extinguish any similarity to the situation in <u>Kojovic v. Goldman</u>, 35 A.D.3d 65 (N.Y. App. Div. 1st Dep't 2006), a case relied upon by Defendant. In <u>Kojovic</u>, the plaintiff moved to rescind the property settlement agreement based on the defendant's alleged misrepresentation of the value of his ownership stake in an IT company. The court granted summary judgment to the defendant because his equity stake, although not the exact value, had been fully disclosed to the plaintiff during settlement negotiations, and the terms of the agreement provided that the Plaintiff had "specifically acknowledged that she had made her own independent investigation of [the defendant's] business affairs and was waving further disclosure." Hence in <u>Kojovic</u>, after being accurately informed by the defendant of the identity of his assets, the agreement put the burden on the plaintiff to correctly appraise the assets.

In the final analysis, this case is more akin to <u>Chapin v. Chapin</u>, 12 A.D.3d 550 (N.Y. App. Div. 2d Dep't 2004), where, despite the wife's general release and waiver of her right to vacate the settlement agreement, the court set aside the agreement as the product of fraudulent inducement because the husband claimed during settlement negotiations to have virtually no assets and he concealed the fact that he had recently purchased valuable real estate. It is also consistent with the broader rule that where the "alleged misrepresentations supporting a claim of fraud arise from facts within the 'peculiar knowledge' of a party, even a specific disclaim as to reliance on those representations does not bar a fraud claim." <u>Solutia Inc. v. FMC Corp.</u>, 385 F. Supp. 2d 324, 341 (S.D.N.Y. 2005); <u>see also</u> <u>Warner Theatre Assocs. v. Metro Life</u>, 149 F. 3d 134, 13 (2d Cir. 1998); <u>Tahini Investment Ltd. v. Bobrowsky</u>, 99 A.D.2d 489, 490 (N.Y. App. Div. 2d Dep't 1984) (even where parties specifically disclaim reliance on seller's misrepresentations, waiver does not apply if facts are particularly within knowledge of party

making them). Defendant's 1990 income as stated on the income tax forms that he submitted to the IRS fell within his "peculiar knowledge," as did his knowledge of his undisclosed bank and security accounts.

Accordingly, the terms and conditions of the PSA do not bar Plaintiff's current fraud claim against Defendant, and Defendant's request for summary judgment on this ground is denied.

iii) The Applicable Statute of Limitations Does Not Bar Plaintiff's Fraud-Based Claims.

Defendant next argues that Plaintiff's fraud-based cause of action must be dismissed because it is barred by the applicable statute of limitations. (Def.'s Mot. at 16-19.) Under New York law, claims based on fraud must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the Plaintiff … discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); Prestandrea v. Stein, 262 A.D.2d 621, 622 (N.Y. App. Div. 2d Dep't 1999). Here, Plaintiff seeks to rely on the two-year discovery rule, arguing that she filed her lawsuit less than two years after Defendant's second ex-wife Marcia Bothe informed her of the alleged fraud.[10] In response, Defendant contends that Plaintiff, by the exercise of "reasonable diligence," should have known about any alleged fraud at the outset.

The test as to when a plaintiff should have discovered an alleged fraud is an objective one. Security Mut. Ins. Co. v. Acker-Fitzsimons Corp., 31 N.Y.2d 436, 441-443 (N.Y. 1972);

---

[10] According to her papers, Plaintiff discovered the fraud on January 21, 2006, and she filed her complaint on January 12, 2007, well within the two-year deadline.

Prestandrea, 262 A.D.2d at 621. As the Second Circuit has declared, "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983).

In support of his motion to dismiss, Defendant primarily points to his 1991 tax forms, copies of which he submitted to the Court and which bear the signatures of both Defendant and Plaintiff. (Naseman Reply Aff. Ex. B [1991 tax forms]; Naseman Reply Aff. ¶¶5-6.) There was more than $145,000 in dividend income on these returns, which was more than ten times the amount reported on the 1990 tax form, and which was derived from the profit from his options in 1990. (Naseman Reply Aff. Ex. B; Naseman Reply Aff. ¶¶6-8.) Further, Defendant contends, two bank accounts he had allegedly hidden from Plaintiff and which contained a substantial amount of "hidden" assets, were also listed on this form. (Naseman Reply Aff. ¶¶6-10.) Furthermore, Defendant asserts, McCaw's takeover of LIN was a story that received widespread attention in the press, and a proxy statement filed with the Securities and Exchange Commission detailed exactly how many options Defendant had been awarded by LIN. (Def. Ex. 8 [proxy statement]; Naseman Reply Aff. ¶¶16-17.) Thus, Defendant concludes, Plaintiff should have known, when she entered into the settlement agreement, that Defendant had received significant income in 1990 from the takeover of his company by McCaw. (Naseman Reply Aff. ¶¶12, 21.)

Plaintiff argues that she exercised "reasonable diligence" prior to entering into the settlement agreement and thereafter she did not discover any of Defendant's alleged fraud. At the very least, it is clear from both Defendant and Plaintiff's presentation of their respective versions of

17

events that it is a question of fact as to whether Plaintiff exercised "reasonable diligence" to discover the alleged fraud. This question of fact should be determined at trial, and not through averments in a motion for summary judgment. See Silvershein v. Furman, 1997 U.S. Dist. LEXIS 12909, at *20-21 (S.D.N.Y. 1997) ("question of fact as to whether person of ordinary intelligence would have known that they had been defrauded"); see also Todd v. Pearl Woods, 20 A.D.2d 911 (N.Y. App. Div. 2d Dep't 1964) ("where, as here alleged, the facts were peculiarly within the knowledge of the defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by inspecting public records is not fatal to their actions"). Accordingly, Defendant's motion for summary judgment based on his statute of limitations defense is denied.

In sum, Plaintiff's claims of fraudulent misrepresentation and fraudulent concealment may proceed to trial or settlement. The parties shall submit a pretrial order, *voir dire* requests and requests to charge the jury by Monday, November 24, 2008, with trial to commence shortly thereafter.

IT IS SO ORDERED.

Dated: New York, New York
November 13 2008

Robert P. Patterson, Jr.
U.S.D.J.