UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
TOEHL HARDING,

               Plaintiff,

                                        07 Cv. 8767 (RPP)

             - against -                   **OPINION & ORDER**

DAVID NASEMAN,

               Defendant.
--------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On December 29, 2006 Plaintiff Toehl Harding filed this lawsuit in the Second Judicial District Court of Nevada, alleging that her ex-husband, Defendant David Naseman, committed fraud during the parties' negotiations over a Property Settlement Agreement ("PSA") they entered into pursuant to their 1993 divorce. Specifically, Plaintiff complains that Defendant fraudulently misrepresented the amount of income the couple had earned in 1990 by providing her with false 1990 federal income tax forms that listed their joint income for that year as $1,323,916, while in actuality, and as reflected on the tax returns the parties filed with the Internal Revenue Service, it was $5,561,728. Defendant counterclaimed to recover attorneys' fees and damages for Plaintiff's alleged breach of the confidentiality provisions contained in the couple's PSA. This action was removed by Defendant to the United States District Court for the District of Nevada, and on October 1, 2007, it was transferred to this Court on Defendant's motion.[1]

---

[1] On August 4, 2008, the parties were ordered to submit simultaneous briefs on the question of the Court's subject matter jurisdiction to resolve this matter in view of the "domestic relations exception" to federal diversity jurisdiction, and on August 25, 2008, this Court determined that it had subject matter jurisdiction over this action. See Harding v. Naseman, 2008 U.S. Dist. LEXIS 65341 (S.D.N.Y. 2008).

After the close of discovery on June 30, 2008, Defendant moved for summary judgment against Plaintiff.  In an opinion and order issued on November 13, 2008, this Court allowed Plaintiff's claims for fraudulent concealment and fraudulent misrepresentation to proceed to trial or settlement; Plaintiff's remaining claims were dismissed.  See Harding v. Naseman, 2008 U.S. Dist. LEXIS 92813, *29 (S.D.N.Y. 2008).  The Parties did not settle, and from December 16 to December 19, 2008, a bench trial was held before this Court.  Defendant, Plaintiff, Marcia Bothe (Defendant's third wife), Leonard Florescue, Esq. (Defendant's lawyer during his divorce from Plaintiff), Richard Cohen, Esq. (Plaintiff's lawyer during her divorce from Defendant), and document experts Gus Lesnevich and Erich J. Speckin, all testified at trial.  Upon the close of the evidence, this Court reserved decision pending receipt of proposed findings of facts and conclusions of law.[2]  This opinion now follows.

For the reasons stated below, Plaintiff's claims of fraudulent concealment and fraudulent misrepresentation are DISMISSED.  Defendant's counter-claims for attorneys' fees and for breach of the confidentiality provisions of the PSA are likewise DISMISSED.

**FINDINGS OF FACT**

1. *The Parties and Overview of Events Leading to this Lawsuit*

   A. Plaintiff Toehl Harding

Upon graduating from the New York University School of Law in 1972, Plaintiff Toehl Harding ("Plaintiff" or "Harding") went to work for Dewey, Ballantine, Bushby & Wood ("Dewey"), a New York law firm.  (Harding Tr. 454.)  Harding practiced corporate law at

---

[2] Defendant's Proposed Findings of Fact and Conclusions of Law is referred to as "Def. PFF," and Plaintiff's Proposed Findings of Fact and Conclusions of Law is referred to as "Pl. PFF."  Both memoranda were submitted on January 16, 2009.

Dewey, which involved drafting "buy/sell agreements" and "merger agreements," conducting "due diligence," negotiating "sophisticated business transactions," and reviewing stock option documentation, such as option grants and option plans.[3]  (Harding Tr. 518-19.)  Plaintiff left Dewey in 1978 and went to work at U.S Industries (Harding Tr. 454), where she continued her practice as a "corporate attorney" with a particular focus in "securities."  (Harding Tr. 519.)  Part of her job at U.S. Industries was to "review option[s] documentation" such as "option[s] grants" and "option[s] plans."  (Harding Tr. 520.)  U.S. Industries was subject to a corporate takeover in 1984 and Harding's position was eliminated; subsequently, Plaintiff went to work as a corporate counsel for the NYNEX Corporation, where she remained until 1994.  (Harding Tr. 454.)

In 1993, when Plaintiff negotiated and executed the PSA, she had been practicing corporate law for 20 years.  (Harding Tr. 454.)

### B. Defendant David Naseman

Defendant David Naseman ("Defendant" or "Naseman") was born in Lansing, Michigan, and when he was 13, his family moved to Schenectady, New York, where he went to public schools, graduating from high school in 1967.  (Naseman Tr. 774.)  With the help of "loans and scholarships," Defendant enrolled at Boston University, where he earned a joint degree in political science and economics in 1971.  (Naseman Tr. 172, 774.)  After a year off to work and for service in the National Guard, Defendant went to Tulane law school, where he was the managing editor of the law review, graduating with honors in 1975.  (Naseman Tr. 775.)

---

[3] Through her practice, Plaintiff learned that public companies are required to make filings with the SEC, and she never would have counseled her clients to enter into a transaction without conducting due diligence.  (Harding Tr. 519.)

After law school, Defendant moved to New York, where he practiced corporate and securities law at the Fried Frank law firm for seven and a half years.  (Naseman Tr. 774-775.)  In September of 1983, Defendant went to work at LIN Broadcasting Company ("LIN") (Naseman Tr. 173, 775), where he remained until October of 1990, when the Company was sold to McCaw Communications.   (Naseman Tr. 174, 775.)   At the time of this trial in December 2008, Defendant was employed as a senior counsel at Crowell and Moring, a Washington, D.C.-based law firm, where he practiced corporate and health care law and retained a Martindale-Hubbell AV-rating. (Naseman Tr. 174, 776.)

### C. The Relationship Between Plaintiff and Defendant

In the summer of 1979, Plaintiff met Defendant, who lived in a house rented by Plaintiff's friends.  (Harding Tr. 455.)  In late 1979, the pair became "romantically involved" and a year later, Defendant moved into Plaintiff's rented apartment, located at 425 East 51st Street, Apt. 5A in Manhattan, New York.  (Harding Tr. 455, 461; Pl. Ex. 27 ["Gross Income and Assets Memorandum" drafted by Defendant during Divorce Negotiations] at TH820.)  On October 19, 1982, Defendant and Plaintiff were married.  (Harding Tr. 456, 469; Naseman Tr. 828.)   In August 1992, Defendant asked Plaintiff for a divorce.  (Id.)

From September 1992 through April 1993, the parties, represented by New York counsel Leonard Florescue, Esq. for Defendant and Richard Cohen for Plaintiff, negotiated the terms of the distribution of their marital property, and on April 19, 1993, the parties agreed to the terms of how to divide their property.  (Pl. Ex. 5 [Property Settlement Agreement and Accompanying Letters] at TH806-10 [April 19, 1993 correspondence].)  On April 21, 1993, a divorce decree between Defendant and Naseman was entered by a Nevada court (subject to the signing of the

PSA), and on May 4, 1993, in New York City, Plaintiff and Defendant signed the PSA and

ancillary documents, which memorialized the terms of the marital property distribution that the

parties and counsel had arrived at through negotiations.  (Plaintiff's Ex. 5 at TH709-745 [Signed

Property Settlement Agreement]; Naseman Tr. 174, 858.)

　　　　When Plaintiff and Defendant married in the fall of 1982, Defendant's net worth was less

than $50,000; Plaintiff's net worth was a "good deal" greater than that of Defendant.  (Harding

Tr. 460-61.)  Neither party separately owned any real property at the time of their marriage.

(Harding Tr. 461; Pl. Ex. 27 at TH820.)   The parties' income during their marriage was as

follows:

| Year | Plaintiff | Defendant |
|------|-----------|-----------|
| 1982 | $84,154 | $68,137 |
| 1983 | $81,908 | $85,783 |
| 1984 | $131, 023 | $110,450 |
| 1985 | $87,945 | $136,701 |
| 1986 | $101,597 | $114,097 |
| 1987 | $117,448 | $169,395 |
| 1988 | $133,041 | $2,386,125 |
| 1989 | $143,183 | $318,974 |
| 1990 | $153,713 | $5,408,015 |
| 1991 | $167,860 | $289,743 |

(Pl. Ex. 27 at TH818; Pl. Exs. 6, 7 [1987 tax returns]; Pl. Exs. 8, 9 [1988 tax returns]; Pl. Exs. 10,

11 [1989 tax returns]; Pl. Exs. 12, 14 [1990 tax returns].)  The parties filed joint tax returns for

every year of their marriage except for 1992, and for the years 1988 through 1991, Plaintiff

signed the parties' joint tax returns in blank prior to their completion.[4]  (Pl. Ex. 27 at TH818;

Harding Tr. 462, 601.)

---

[4] Plaintiff testified that beginning in 1988 Defendant asked her to sign tax returns in blank because she was often
traveling, and that she acceded to his request to facilitate his filing of the parties' tax returns.  (Harding Tr. 462,

The significant increase in income that Defendant earned in 1988 and 1990 arose from the exercise of stock options he accrued during his employment as an officer at LIN. (Naseman Tr. 182, 185.)   In 1988, Defendant exercised LIN stock options, and from this, netted approximately $2.1 million. (Naseman Tr. 182; Harding Tr. 469, 776.)  The proceeds from this exercise of options were used to pay off the mortgages on the couple's real properties, described *infra*; the remainder was deposited into an account with Republic National Bank bearing the names of both Defendant and Plaintiff (the "Joint Republic Account"). (Harding Tr. 466; Pl. Ex. 27 at TH820-21.)  In 1990, after LIN Broadcasting was purchased by McCaw Communications, Defendant received more than $4 million for retiring LIN stock options that he held at the time of the takeover. (Harding Tr. 467-68; Naseman Tr. 815-16.)  The proceeds from this exercise of options, approximately $2.7 million after taxes, were paid into a second account maintained at Republic National Bank, although this account was in Defendant's name only ("Individual Republic Account"). (Naseman Tr. 823-24; Pl. Ex. 28 [cover sheet from Individual Republic Account].)  Shortly thereafter, in February through May 1991, Defendant transferred the money he earned in 1990 into an account that he had set up in early 1991 at Shearson Lehman ("Shearson Account"), which was also in his name only. (Naseman Tr. 823-24.)

---

601.)  Defendant denies that he ever made Plaintiff sign blank tax forms. (Naseman Tr. 777-78, 782-83.)  Although Plaintiff's lawyer (Cohen) wrote in a letter to Defendant's counsel (Florescue) during negotiations over the PSA that Plaintiff's role was to "sign [ ] the prepared returns" (Pl. Ex. 5 at TH792), and the 1988 state and federal tax returns, which Plaintiff produced, had been completed and signed by Defendant but lacked Plaintiff's signature, indicating that she signed the tax returns after they had been prepared (P. Ex. 8 at TH426; Pl. Ex. 9 at TH437), for general credibility reasons, which include Defendant's conversations with Florescue indicating that Plaintiff was unaware of the extent of Defendant's 1990 income (see infra), as well as Marcia Bothe's testimony that she too signed blank tax returns (see infra), the Court credits Plaintiff's testimony that from 1988 to 1991 she signed tax returns prior to their completion by Defendant.

The couple's combined incomes allowed them to support a relatively luxurious lifestyle, and they regularly vacationed abroad, golfed and skied, dined out, owned and maintained multiple residences and automobiles, and amassed wealth.  (Harding Tr. 512, 622-23; Pl. Ex. 27 at TH819-22.)  The couple placed their accumulated monies in a number of investment and bank accounts.  (Pl. Ex. 27 at TH819-20.)   At the time when the parties' divorce negotiations commenced in the fall of 1992, the couple had one jointly-held bank account: the Joint Republic Bank account, which contained $925,000.   (Id. at TH819.)   Defendant also held four investment/bank accounts in his name: a First Interstate Bank of Nevada account contained approximately $9,000; a Lee (Massachusetts) Bank money market account contained $14,000; a First Florida Bank account, co-owned by Defendant's mother, contained $4,616, and; the Shearson account, which held $2,770,002.  (Pl. Ex. 27 at TH819-20.)

The couple's income also allowed them to purchase a number of properties both before and during their marriage.  In April 1982, six months prior to their nuptials, Defendant and Plaintiff purchased a home in Lenox, Massachusetts for $97,500.  (Pl. Ex. 27 at TH821.)  The parties split the down payment on this house, while Defendant paid for 80% of the $175,000 in improvements made to the property.  (Pl Ex. 27 at TH821.)  In July 1988, Defendant paid off the $67,000 mortgage on the property.  (Pl. Ex. 27 at TH821.)  This property was worth $225,000 at the time of the couple's divorce.

In 1985, the apartment building at which Plaintiff and Defendant resided, 425 East 51st Street, converted to cooperative apartments, and the couple purchased Apartment 5A, the apartment at which Plaintiff resided prior to Defendant moving-in, at the "insider" price of $150,000.  (Naseman Tr. 176; Harding Tr. 456-57; Pl. Ex. 27 at TH820.)  Plaintiff provided the

7

entire 20% down payment ($30,000) for that apartment. (Pl. Ex. 27 at TH818-820.) The couple split the rent and expenses on that apartment until July 1988, when Defendant paid off the mortgage of $115,000. (Pl. Ex. 27 at TH820.) In 1987, the couple jointly purchased Apartment 6A in that same building for $395,000; Plaintiff provided the 10% down payment. (Naseman Tr. 178; Pl. Ex. 27 at TH820-21.) Defendant paid off the mortgage on Apartment 6A ($356,000) in July 1988. (Pl. Ex. 27 at TH821.) Each of these apartments was worth $375,000 at the time of the couple's divorce. (Id. at TH820-21.)

In addition to the aforementioned properties, Defendant purchased two other properties, both of which were listed in his name only. (Pl. Ex. 27 at TH820-21.) In 1987, Defendant purchased a home for his parents in Clarlevoix, Michigan for $105,000; at the time of purchase, Plaintiff executed a waiver of dower for this property. (Pl. Ex. 27 at TH821; Def. Ex. PP [1987 Mortgage Agreement] at DN00525, DN00527.) Defendant paid off a mortgage of $66,000 on that property in July 1988, and at the time of the couple's divorce in 1993, the house was worth $120,000. (Id.) In March 1990, Defendant purchased a condominium in Venice, Florida, also for his parents, for $105,000; at the time of purchase, Plaintiff executed a waiver of dower for this property. (Pl. Ex. 27 at TH821.) At the time of the couple's divorce, this apartment was worth $107,500. (Id.)

### D. Marcia Bothe

Marcia Bothe ("Bothe") attended Creighton University and Northern Illinois University, from which she graduated with a degree in broadcast journalism and English, and a minor in marketing. (Bothe Tr. 92.) After college, Bothe worked at a radio station, at Hilton Hotels, and then at Canyon Ranch, which was in Western Massachusetts. (Bothe Tr. 92, 142-43.) Bothe

8

successfully sued Canyon Ranch for sexual harassment, and she used the proceeds from this suit to open a bridal business.  (Bothe Tr. 93, 142-43.)  Subsequent to the lawsuit, Bothe worked for a few years for the Boston Symphony Orchestra at Tanglewood.  (Id.)

Defendant and Bothe first met in the summer of 1991 in Lenox, Massachusetts, where Defendant and Plaintiff maintained a summer home, and they became "romantically involved" in the summer of 1992.  (Bothe Tr. 93-94.)  In December of 1992, the couple decided to marry in June of 1993, and on June 12, 1993, less than two months after Defendant divorced Plaintiff, Defendant and Bothe were married.  (Bothe Tr. 98; Def. Ex. OOOO [Bothe declaration dated June 17, 2008].)  During their marriage, Bothe would sign three or four tax forms in blank; Defendant would then complete the couple's taxes and mail the tax forms to the IRS.  (Bothe Tr. 99.)

In January of 1997, Defendant and Bothe moved to Scottsdale, Arizona, where they purchased a home ("Lot 56").  (Bothe Tr. 101.)  In November of 2004, divorce proceedings began between Defendant and Bothe, and from November 19, 2004 to October 31, 2005, Defendant was excluded from Lot 56, the "marital home" that he shared with Bothe in Scottsdale, pursuant to court order.  (Bothe Tr. 101.)

### E. Bothe's Discovery of Financial Information

Shortly after Defendant was excluded from Lot 56, Bothe began a search of that home for financial documents to assist her in her divorce.  (Bothe Tr. 101-02.)  In the master bedroom closet, Bothe found a file box containing a number of financial documents.  (Bothe Tr. 102.)  Inside that box was a packet of documents, held together by a black "Acko" binder clip, relating to the 1993 divorce of Defendant and Plaintiff.  (Id.)  Included in this packet was: a) the signed

9

PSA and accompanying letters between counsel (Pl. Ex. 5); b) a six-page History of Gross Income Memorandum ("Gross Income and Assets Memorandum") listing all of Defendant and Plaintiff's assets at the time of their divorce (Pl. Ex. 25) along with a one-page attached Supplemental Information Memorandum ("Supplemental Information Sheet") (Pl. Ex. 26),[5] and c) a hand-written set of notes prepared by Naseman for Florescue concerning the division of Defendant and Plaintiff's assets ("Defendant's Handwritten Notes") (Pl. Ex. 24).   (Bothe Tr. 102-08.)  Bothe photocopied these documents at the time of their discovery.  (Bothe Tr. 109.)

Bothe had known that Defendant kept all of his tax records in a crawl space under the stairs at Lot 56.  (Bothe Tr. 110-111; Naseman Tr. 175.)  On the Friday after Thanksgiving of 2004, Bothe went into a footlocker located in the crawl space under the stairs, and from that footlocker, located a number of tax returns for years that preceded her marriage to Defendant. (Bothe Tr. 111.)   Specifically, Bothe found Defendant and Plaintiff's joint 1987 federal and New York State tax returns (Pl. Exs. 6 [1987 federal return] and 7 [1987 state return]), their 1988 federal and New York State tax returns (Pl. Exs. 8 [1988 federal return] and 9 [1988 state return]), their 1989 federal and New York State tax returns (Pl Exs. 10 [1989 federal return] and 11 [1989 state return]), their 1990 federal and New York State tax returns showing an income of $5,561,728 ("$5.5 million return") (Pl. Exs. 12 [1990 federal return] and 14 [1990 state return]), and, a 1990 federal tax return showing an income for the couple of $1,323,916 ("$1.3 million return") (Pl. Ex. 13 [1990 $1.3 million federal return].)[6]  (Bothe Tr. 112-113.)

---

[5] The parties dispute as to whether it was Defendant or Bothe who created the Supplemental Information Sheet.  (Pl. Ex. 26.)  For the reasons explained *infra*, the Court finds that Defendant authored the Supplemental Information Sheet.

[6] The $5.5 million tax return showed that the couple had earned interest of $54,502 from the Joint Republic Account and $160,073 in interest from the Individual Republic Bank account.  (Pl. Ex. 12 at DN00425; Pl. Ex. 13 at TH459.)

On January 18, 2006, the day after Defendant's deposition in connection with his divorce from Bothe, Bothe contacted Plaintiff and told Plaintiff that she had discovered two different 1990 tax returns -- one reflecting $5.5 million in income and one reflecting $1.3 million in income.[7]   (Bothe Tr. 114-16; Def. Ex. OOOO.)   Upon hearing of the $5.5 million tax return, Plaintiff became upset and told Bothe that it was "absolutely false" that she and Defendant had ever earned $5.5 million.   (Bothe Tr. 116; Harding Tr. 485.)   Bothe then asked Plaintiff if she signed ever blank tax returns, and Plaintiff responded that she did in the later years of her marriage to Defendant.   (Bothe Tr. 116-17.)   Plaintiff's contemporaneous notes indicate that Bothe also informed her of the existence of an account at Shearson Lehman containing $2.8 million.   (Pl. Ex. 43 [Plaintiff's notes from 01/18/06 conversation with Bothe].)   Bothe then asked Plaintiff if she would review the documents, and two days later, Bothe mailed Plaintiff copies of the PSA (Pl. Ex. 5), Defendant's Handwritten Notes (Pl. Ex. 24), the Gross Income and Assets Memorandum and the Supplemental Information Sheet (Pl. Exs. 25, 26), as well as copies of the tax returns from 1987 through 1992 (including both the $1.3 million and $5.5 million returns from 1990).   (Bothe Tr. 117; Harding Tr. 491; Def. Ex. RRRR [mailing receipts].)

In a cover letter that Bothe sent accompanying the documents, dated January 20, 2006, Bothe wrote that:

> I think that you will agree that when you and David did your property settlement back in 1993 there were significant assets that you knew nothing about.  Yet his letter (enclosed) to you stresses his "fairness" to you.  It is apparent to me that David [Defendant] has been lying at least since 1990.

---

The $1.3 million tax return reflected only the $54,502 in interest income earned from the Joint Republic Account. (Pl. Ex. 13 at TH453.)

[7] Bothe waited more than a year to contact Plaintiff because when she initially found the documents and discussed them with her attorney, her attorney told her that it "was of no consequence in [Bothe's] case; that it just meant that he either cheated [Plaintiff] or cheated the government."  (Bothe Tr. 113-14.)

In his deposition the other day David … stated that you knew that the return was for $5.5 [million] and that you signed it knowing that it was $5.5.  He accused me of "copying or scanning" his name to the other 1990 return that shows an amount of $1.3 [million].

I was a small business owner and had a CPA complete my Schedule C every year – so I don't know how he can even think that anyone would believe that I could come up with figures for a $1.3 return! I have never copied or scanned anyone's signature, including my own.  Ludicrous for him to suggest that I did and why would I want to do that anyway? Sounds like something maybe he has done don't you think?

(Def. Ex. VVVV [Bothe letter] at TH6239-40.)

In August 2007, Defendant and Bothe divorced.  (Bothe Tr. 101.)

2. *The Evidence Demonstrates that Defendant Created the $1.3 Million 1990 Tax Return*

It is undisputed that Defendant and Plaintiff filed a joint 1990 tax return with the IRS and the New York State tax authorities reflecting an income of $5,561,728.19.  (Pl. Exs. 12 [1990 federal tax return], 14 [1990 New York State tax return].)  It is similarly undisputed that Plaintiff and Defendant both signed the parties' genuine 1990 $5.5 million tax return (Naseman Tr. 782; Harding Tr. 464),[8] which was authored by Defendant (Naseman Tr. 203), and that the signature block of the false 1990 $1.3 million federal tax return was copied from the parties' genuine $5.5 million 1990 federal return and placed there by some form of mechanical reproduction (i.e. scanning, copying, or cutting and pasting).  (Speckin Tr. 638; Lesnevich Tr. 40.)  The parties dispute who created the false $1.3 million tax return.  (Pl. Ex. 13.)  Plaintiff claims that Defendant created the tax return to trick her into believing that they had earned approximately $4 million less than they had in 1990.  (Pl. PFF ¶¶102-116.)  Defendant unequivocally denies

_____

[8] Plaintiff testified that even though she signed the $5.5 million tax return, she was unaware of its contents because, as noted, she signed the tax return in blank before it was completed by Defendant.  (Harding Tr. 462, 599.)

creating the $1.3 million return (Naseman Tr. 791-92); instead, Defendant pins the blame on Marcia Bothe, alleging that she created the $1.3 million by tracing various numerals from a number of different documents to produce the $1.3 million return.  (Def. PFF ¶¶142-166; Def. Ex. VVVV.)  Defendant denies having ever seen the $1.3 million return until it was produced by Bothe in relation to this action.  (Naseman Tr. 791.)

At trial, both sides presented expert witnesses -- Gus Lesnevich for Plaintiff and Erich J. Speckin for Defendant. Lesnevich testified that the "written text" on the $1.3 million 1990 tax return by the same individual who completed the $5 million tax return.  (Lesnevich Tr. 27.)  In contrast, Speckin testified that "several of the numbers" from the $1.3 million tax return had been traced from the $5.5 million return.  (Speckin Tr. 644-45.)  Speckin did testify, however, that if "there was no tracing of the numerals [on the tax form], then [the $1.3 million return] would be written by the same author" as the $5.5 million return.  (Speckin Tr. 680.)  For the reasons discussed below, the Court credits the testimony of Lesnevich.  Accordingly, as Defendant acknowledged at trial that he drafted the $5 million return, the Court concludes that Defendant created the $1.3 million return.

Speckin's conclusion that the $1.3 million tax return was traced by a third-party from the genuine $5.5 million return is flawed for a number of reasons.  First, Speckin testified that due to the fact that the $1 million return involved different sets of numbers than the $5 million return, the $5 million tax return could not have been the only source the tracer used to trace the numerals onto the $1 million tax return.  (Speckin Tr. 654-55.)  However, no other potential source for the tracing has ever been identified.  (Id.)  Simply put, for this Court to credit

Speckin's testimony, it would have to conclude that some other, as yet undiscovered document, was used by the tracer. The Court is not willing to engage in such speculation.

Next, while Speckin ascribed the numerals on the false $1.3 million return to tracing, Speckin had no explanation for the handwritten words on the tax returns (i.e. the names and addresses appearing at the top of the first page of the $1.3 million return). (Speckin Tr. 670, 679.) In fact, Speckin testified that it was not his opinion that the words on the $1.3 million return were traced from the $5 million return, "even in piecemeal." (Speckin Tr. 670.) Notably, Defendant's counsel never asked Speckin to render an opinion as to whether the handwritten names and addresses on the top of the $1.3 million tax return -- which he conceded were not traced from the $5 million return and could have been "naturally written" -- were written by the same person as the $5.5 million return. (Speckin Tr. 679.) The obvious inference from this is that Defendant did not want Speckin to provide an answer to that question. Accordingly, to accept Speckin's analysis as true, either the tracer used an entirely undiscovered source to create the handwritten words on the top of the $1.3 million tax return, or the tracer miraculously discovered tax returns that had already been partially completed by Defendant, and used those returns to create the false $1.3 million return. Again, the Court is not willing to engage in such speculation.

Additionally, the ASTM has established standards for document analysis, which are, in descending order of certainty: positive, highly probably, probable, indications, and no opinion. (Speckin Tr. 667-68; Lesnevich Tr. 13-14.) Speckin testified at trial that it would have been "misleading" to testify that it was "probable" that the $1.3 million return had been traced (Speckin Tr. 668-69), but he did not want to use the "indications" standard, as that would have

14

been too weak.  (Speckin Tr. 669.)  Speckin instead developed his own "more likely than not" standard, which is not accepted by ASTM.  (Speckin Tr. 669.)   Lesnevich, on the other hand, credibly testified that under the ASTM standards there was a "positive" match; the same person who wrote the $5.5 million tax return also wrote the $1.3 million return.[9]  (Pl Exs. 300-302 [Lesnevich's analysis of 1990 tax returns].)   Accordingly, Lesnevich, who had more than 40 years of experience as a forensic document examiner (Lesnevich Tr. 10),[10] and who this Court believes to be a highly credible and competent witness, was far more certain about his conclusions than Speckin.

Further mitigating against a finding that the $1.3 million return was traced was Lesnevich's credible testimony that the numbers on the $1.3 million return were not "tracings," and that he saw no evidence of tracing.  (Lesnevich Tr. 77, 79.)  A more plausible explanation for similarities between the numbers on the $5.5 million return and the $1.3 million return, which Defendant claims shows tracing, is that Defendant has a very limited range of variation in his handwriting; he has a "unique ability to write almost the same every time he writes."  (Lesnevich Tr. 28-29, 50; Speckin Tr. 661.)  At trial, Lesnevich demonstrated this by showing that numbers from within the $5 million return, which Defendant admitted that he wrote, were written with such a limited range of variation that they could have appeared to have been traced from other numbers from within the $5 million return.[11]  (Pl. Ex. 300 at p. 4; Lesnevich Tr. 31-32.)

---

[9] The reason Speckin did not provide a "positive" opinion that the $1 million return was a tracing was because the $1 million and $5 million returns could have been "naturally written by the same person."  (Speckin Tr. 684-85.)

[10] For an overview of Lesnevich's vast experience and expertise see United States v. Rutland, 372 F.3d 543, 545 fn. 2 (3d Cir. 2004).

[11] It is apparent to the naked eye from a survey of Defendant's known writings that Defendant's handwriting appeared to be very similar, indeed almost a carbon copy, on nearly every document he authored.

Of course, there would have been no reason for Defendant to trace numbers that he himself had previously written within the same document.  Lesnevich also compared known examples of Defendant's signature, which showed a high degree of overlap in the writings (Pl. Ex. 300 at p. 3; Lesnevich Tr. 30-31).  From this, Lesnevich credibly concluded that Naseman's signature had such limited variation that it appeared that Defendant had been using a rubber stamp.  (Lesnevich Tr. 30.)

Accordingly, this Court concludes that Defendant created the false $1.3 million tax return found by Bothe in her Scottsdale home in November 2004.

3. *Defendant's Employment at LIN Broadcasting and His Exercise of Stock Options in 1988 and 1990.*

From September of 1993 through the end of October 1990, Defendant worked at LIN Broadcasting ("LIN"), serving in an officer capacity as Vice President, General Counsel and Secretary.[12]  (Naseman Tr. 775.)  Throughout his tenure at LIN, Naseman accrued options to purchase LIN stock.  (Naseman Tr. 185, 800-01.)  Plaintiff was aware that Naseman was accruing LIN stock options as part of his compensation.  (Harding Tr. 465.)  A mortgage loan agreement from the Republic National Bank, signed by both parties and dated June 1, 1987, disclosed that Defendant had accrued 27,750 options for LIN Common Stock that had already vested.  (Def. Ex. PP [1987 mortgage application].)  The application also disclosed that Defendant had 45,250 unvested options for LIN Common Stock (vesting between October 26, 1987 and December 15, 1990), which were valued at $1,032,311.  (Id. at DN00524, DN00526.) The information concerning the nearly $2 million value of the options was submitted to the co-

---

[12] After his employment as a director ended at LIN in October, 1990, Defendant served for as an outside consultant at LIN through May of 1991.  (Naseman Tr. 775-76.)

operative board in connection with the couple's purchase of apartment 6A in 1987, and Plaintiff was aware, at that time, that Defendant had unvested options that could not then be exercised. (Harding Tr. 543-44.)

In early 1988, Defendant and Plaintiff discussed whether Defendant should exercise his stock options because the share price of LIN stock had been increasing, and upon conferring, the parties jointly decided to do so. (Harding Tr. 465.) Defendant told Plaintiff that he was exercising the vast majority of his options at this time.[13] (Harding Tr. 465, 467.) The couple's 1988 jointly filed tax return evinces that Defendant exercised 33,000 options to purchase LIN stock,[14] resulting in a total gain of $2,102,500 after he sold the resulting LIN stock. (Pl. Ex. 8 at TH431.) When Defendant exercised the options in 1988, Plaintiff understood that the couple was due to receive approximately $2 million. (Harding Tr. 465; Naseman Tr. 182.)

As described, the couple used the options proceeds to cash out all of the mortgages on their jointly and separately held real property (Apartments 5A and 6A, the farmhouse in Lenox, MA, and the Michigan property of Defendant's parents). (Harding Tr. 466; Pl. Ex. 27 at TH820-21.) Plaintiff understood that after taxes and the mortgage payments, approximately $1 million remained from the income Defendant earned from the 1988 exercise of LIN stock options, and that this money was deposited into the parties' Joint Republic Account. (Harding Tr. 466; Pl. Ex. 27 at TH819.) The couple's jointly filed tax returns from 1988 demonstrate that the couple earned $2,516,168 in income that year. Pl. Ex. 8 at TH425; Pl. Ex. 9 at TH437.)

---

[13] Defendant denies telling Plaintiff that he was exercising the vast majority of his options. (Naseman Tr. 808, 812.)

[14] In his June 1, 1987 mortgage loan application (Def. Ex. PP), Defendant indicated that at that time he held 73,000 options. Even assuming that Defendant had not received any subsequent options grants between June 1, 1987 and January 4, 1988, when he exercised a number of options, the record demonstrates that Defendant exercised less than half of his options in 1988. Put differently, even after exercising options in 1988, Defendant still held approximately 40,000 options.

When the couple filed their 1988 tax forms in April 1989, the couple owed the federal government an additional $152,873 in tax liability, and also owed New York State an additional $108,679.  (Pl Exs. 8, 9.)   Both of those amounts were paid out of Defendant's Individual Republic Bank Account.  (Pl. Ex. 8 at TH434 [check for $152,873]; Pl. Ex. 9 at TH439 [check for $108,679].)  The address on Defendant's individual account was listed as 1370 Avenue of the Americas, New York, NY 10019, which was the address of Defendant's employer, LIN Broadcasting.  (Pl. Ex. 8 at TH434.)  The Individual Republic Account had been established by Defendant in August or September 1988.  (Naseman Tr. 1988.)

In June 1989, McCaw Cellular Communications ("McCaw") launched a takeover bid for LIN.  (Harding Tr. 469; Naseman Tr. 776.)  The news of the takeover bid, including the financial payouts made to the Company's officers, received significant attention in the media.  (Def. Ex. FFF.)  Due to the takeover of LIN by McCaw, Plaintiff asked Defendant whether they were due to receive any money from the exercise of stock options pursuant to the takeover, although she never asked Defendant exactly how many vested or unvested options remained.  (Harding Tr. 467-68, 550.)  Defendant responded that they would get "very little" money due to the fact that they had exercised the vast majority of the options in 1988.  (Id. at 467-68.)  When asked how they would have done had they not exercised the options in 1988, Defendant responded that they would have made $4 million.[15]  (Harding Tr. 467.)

---

[15] Defendant denies telling Plaintiff that they would receive "very little" money due to the exercise of the options, and instead states that he told her the number of shares he had as well as the current stock price of LIN.  (Naseman Tr. 812-13.)  In effect, Defendant claims that he told Plaintiff on "numerous occasions" that they would receive a "great deal of money when the options got cashed."  (Naseman Tr. 812.)

The couple's jointly filed 1989 federal income tax form listed that the couple earned $462,182, of which $53,985 came from interest income.  (Pl. Ex. 10 at TH441.)  The tax return reflected that the couple earned $34,999 in income from their joint account at Republic National Bank, with the rest of the interest income flowing from Defendant's Individual Republic Bank Account.  (Pl. Ex. 10 at TH444, 447.)

Defendant received more than $4 million in 1990 for retiring LIN stock options that he held at the time of McCaw's takeover of LIN.  (Harding Tr. 467-68; Naseman Tr. 816; Pl. Ex. 12; Pl. Ex. 27 at TH824.)   In total, the couple earned $5,561,728 in 1990, of which all but $153,000 was earned by Defendant.  (Pl. Ex. 27 at TH818.)   The net proceeds Defendant received from retiring his LIN options in 1990 (approximately $2.7 million after taxes) were paid into Defendant's Individual Republic Account.[16]  (Naseman Tr. 819, 823.)  Thereafter, in three separate transfers of approximately $1 million each (taking place from February through May of 1991), Defendant transferred the $2.7 million in after-tax proceeds into his Shearson account, which he had established in early 1991.  (Naseman Tr. 823; Pl Ex. 27 at TH820).  The couple claimed $5.5 million in total income for 1990, which was reflected on the couple's joint 1990 tax form and filed with the IRS.  (Pl. Ex. 12 at TH419-21, 424, 426.)  The couple's joint 1991 federal tax form discloses the individual Republic account, the existence of the Shearson Lehman account and $60,361 in interest earned on that account in 1991, and stock trades aggregating millions of dollars. (Def. Ex. II at TH518, 519-22.)

---

[16]   Initially, Defendant's Individual Republic Account was registered to the couple's home address, but shortly before the infusion of the $4 million in 1990, Defendant changed the address on the account to his work address. (Naseman Tr. 233, 267, 482.)  At trial, Defendant failed to put forth a credible reason for why this change was made. (Id. at 233-35.)

Plaintiff was aware, prior to the completion of the merger between McCaw and LIN, that Defendant was due to receive a payout as a result of the merger. (Harding Tr. 509-10.) Plaintiff believed, however, that the money Defendant was due to receive was approximately $1 to $1.2 million (not $4 million). (Harding Tr. 509-10, 573.) Specifically, Plaintiff testified at trial that she believed that Defendant would receive about $250,000 for a consulting arrangement with LIN after he left the Company, that he would receive another $250,000 in severance, and that he would also be surrendering stock options in connection with the McCaw/LIN transaction, although she did not know how many. (Harding Tr. 509-10, 533-34, 550-53; Naseman Tr. 812, 815-16.) Plaintiff further testified that she knew, both at the time when Defendant received the money and later when she signed the PSA, that these funds had been deposited into a bank account held solely in Defendant's name.[17] (Harding Tr. 509-10, 533-534, 552-54, 573-75, 578-82.) When Plaintiff signed the PSA in 1993, she did not know the balance of the account into which Defendant had deposited his earnings from 1990, which included the income Defendant had earned from the exercise of his options.[18] (Harding Tr. 533-34; Pl. Ex. 5 at TH790.)

The 1990 LIN Broadcasting proxy statement, a public document filed with the SEC on April 19, 1990, detailed the amount earned by each of the Company's officers following the completion of the McCaw tender offer. (DX JJJ at TH5371.) Specifically, the proxy statement disclosed that Defendant had surrendered 29,750 options having an average exercise price of

---

[17] Likewise, Plaintiff knew that prior to signing the PSA that Defendant maintained accounts in his individual name. (Harding Tr. 569, 574-75, 509-10, 533-34.) Further, during the parties' marriage, Plaintiff deposited her salary and any year-end cash bonus she received into a bank account in her individual name (Harding Tr. 522-23), and when she received a severance payment from U.S. Industries in 1984, she also deposited this money into an account held separately in her name. (Harding Tr. 522-23.)

[18] Plaintiff testified that before she signed the PSA in 1993, she reviewed the couple's latest statement from the Joint Republic Account, which reflected that the proceeds from Defendant's income in 1990 (including his exercise of options) had not been deposited into that account, but rather had been placed somewhere else. (Harding Tr. 554-55.)

$21.93.  (Id.)  At an exchange price of $154 per share (Naseman Tr. 813-14), this would have resulted in a net proceeds of approximately $4 million for Defendant.  (DX JJJ at DN00546.)  A copy of this proxy statement was sent to the couple's home.  (Naseman Tr. 815.)  Plaintiff knew that she could have obtained a copy of this proxy statement from the SEC, but did not, and that this statement would have revealed Defendant's earnings from the merger.  (Harding Tr. 550-51.)  Plaintiff further understood in 1990 that the McCaw-LIN transaction would be lucrative for LIN executives, possibly including Defendant.  (Harding Tr. 557-58.)

In December 1990, LIN shareholders launched a derivative suit against LIN management, and Defendant was named as a defendant in the civil complaint.  (Naseman Tr. 816-17.)  The complaint initially alleged that Defendant had been paid $4.5 million as part of the LIN-McCaw transaction, but it was amended a month later to reflect that Defendant had actually been paid $4 million in connection with the transaction.  (Naseman Tr. 817-18.)  Plaintiff knew that Defendant was named as a Defendant in the shareholders derivative suit by virtue of the fact that he had signed the proxy statement related to the McCaw-LIN transaction that had been filed with the SEC.  (Harding Tr. 558, 560; Naseman Tr. 816-18.)  Plaintiff also knew that it was possible that this derivative suit concerned the accuracy of statements in the Proxy Statement related to the exercise of options by LIN executives.  (Harding Tr. 560.)

4. *The Divorce Negotiations and the PSA*

Defendant claims that Plaintiff was aware at the time that the parties negotiated the PSA that he had earned more than $4 million in income from his exercise of options to purchase LIN stock in 1990.  (See Pl. Ex. 12 at TH419-21, 424, 26 [1990 tax return]; Naseman Tr. 185-89, 771-778, 782-83, 811-12.)  Defendant further asserts that Plaintiff knew about the Shearson

21

account that he established in February 1991, and into which he had transferred from his Individual Republic Account (in February-May of 1991) the approximately $2.7 million in post-tax proceeds.   (Naseman Tr. 823-25; Florescue Tr. 346; Def. Ex. II [1991 tax form which discloses Shearson account]; Pl. Ex. 100 [Defendant's Deposition] at 83-84.)   Plaintiff denies knowing at the time she executed the PSA of the $4 million in income Defendant received in 1990 from retiring his LIN stock options, or that those proceeds had funded the $2.7 million Shearson account.  (Harding Tr. 471, 489.)

Based on the evidence presented at trial, the Court finds that Defendant did not disclose to Plaintiff that he earned more than $4 million in 1990, or that he then transferred the post-tax remainder of his income, which amounted to approximately $2.7 million, into his individual account at Shearson.   Hence, the Court concludes that Plaintiff was not aware, in late 1992 and early 1993 when the parties negotiated the terms of the PSA, that Defendant maintained a brokerage account at Shearson containing $2.7 million.

A.   The Divorce Negotiations

In August 1992, Defendant told Plaintiff that he did not love her anymore and that he wanted a divorce.  (Harding Tr. 469-70.)  Plaintiff asked Defendant if they could "make some efforts at reconciliation," but Defendant refused that request.  (Id. at 470.)  Divorce negotiations then progressed, during which, Plaintiff told Defendant that she wanted 50% of the couple's total assets.[19]  (Harding Tr. 470.)

---

[19] At trial, Defendant denied that Plaintiff ever told him that she wanted 50% of the marital assets.  (Naseman Tr. 194.)  However, on April 15, 1993, Plaintiff's counsel, Richard Cohen, wrote in a letter to defense counsel that Plaintiff had told Defendant that she wanted "a distribution of at least one-half of the total assets."  (Pl. Ex. 5 at TH803.)  This assertion went unchallenged in Florescue's April 19, 1993 response.  (Pl. Ex. 5 at TH806-07.)  Further, while at trial Florescue unconvincingly sought to downplay the statement in Cohen's April 15, 1993 letter

Defendant was represented during the divorce proceedings by his close friend of 20-years, Leonard Florescue ("Florescue"), who drafted the PSA.  (Florescue Tr. 260, 263.) Florescue was a 1972 graduate of NYU law school, where he finished second in his class and won a number of awards.  (Florescue Tr. 340.)  After graduation, Florescue was employed by Fried Frank, which was where he first met Defendant in 1973.  (Florescue Tr. 260, 340.) Florescue was the coach of the Fried Frank softball team, and Defendant was the team's "best player."  (Florescue Tr. 260.)  In 1978, Florescue became a matrimonial specialist, and since 1983, he has been writing the matrimonial law column for the New York Law Journal. (Florescue Tr. 340.)  In addition to his law practice, Florescue has co-authored a book on matrimonial taxation, he has lectured throughout the United States on matrimonial issues, he has served as an adjunct professor at both Cardozo and Fordham law schools, and he has been appointed to serve on the board of various groups in the field of matrimonial law.  (Florescue Tr. 340-41.)  At the time of trial, Florescue was a partner in the New York office of Blank Rome LLP.  (Florescue Tr. 259.)

Defendant provided Plaintiff with a first settlement offer in September/October of 1992, which offered Plaintiff $250,000 in cash from the Joint Republic account, a Volvo 760 sedan, and Apartments 5A and 6A in New York City.  (Pl. Ex. 22 [March 1993 letter from Defendant].) Plaintiff rejected this initial offer, demanding $575,000 in cash (Pl. Ex.5 at TH803; Def. Ex. CCCCC [description of initial offer] at LF 001215).  In November of 1992, Defendant responded with a draft of the PSA, which provided her with the same real property but increased the cash

---

that Harding was seeking 50% of the "total assets" as "pure chatter" and "puffing language."  (Florescue Tr. 299, 360), this explanation is not credible.  Accordingly, the Court concludes that Plaintiff had told Defendant during their divorce negotiations that she wanted 50% of the marital assets.

amount from the Joint Republic Account to $350,000.  (Harding Tr. 473-75; Pl. Ex. 5 at TH751-789 [November 1992 PSA]; Pl Ex. 22 [March 1993 letter from Defendant to Plaintiff which detailed terms of draft PSAs].)  While the initial draft of the PSA mentioned assets held solely by Defendant -- the four automobiles and the Michigan and Florida properties -- stating that Plaintiff would have no right to these separately held properties, no mention was made of the $2.7 million Shearson account, which was by far the largest unaccounted for asset of Defendant. (Pl. Ex. 5 at TH772-774.)

Defendant played an active role in editing drafts of the PSA prior to when the first draft was sent to Plaintiff.  (Pl. Ex. 311 [11/11/1992 letter from Florescue to Defendant, attaching Draft of PSA].)  For example, Article 13 of the PSA was originally entitled "FULL DISCLOSURE" (Pl. Ex. 312 [Draft of PSA] at LF 001034), but Defendant changed this to read "INQUIRY AND DISCLOSURE."  (Id. at LF 001008.)  Defendant further directed that Florescue remove the representations which stated that "agreement has been achieved after full disclosure, competent legal representation and honest negotiation," as well as the requirement that the parties exchange net worth statements acceptable under Domestic Relations Law 236(b).[20]  (Id. at LF 001034-35.)

After presenting Plaintiff with the draft of the PSA in November 1992, Defendant repeatedly telephoned Plaintiff to persuade her to sign the PSA.  (Harding Tr. 471.)  Defendant

---

[20] Under New York Domestic Relations Law 236(b), marital property is defined as "all property acquired by either or both spouses during the marriage … regardless of the form in which title is held."  See Van Kipnis v. Van Kipnis, 11 N.Y.3d 573, 578 n.2 (N.Y. 2008).  Accordingly, compliance with 236(b) would have required Defendant to disclose the existence of and amount of money contained in his individual accounts, including the Shearson account.

then moved to Nevada for the purpose of moving forward on the divorce proceedings.  (Pl. Ex. 115 [March 23, 1993 letter from Florescue to Cohen].)

In January 1993, Plaintiff retained Mr. Richard Cohen as her lawyer, and she brought the November 1992 draft of the PSA to him for his review.  (Harding Tr. 475-76.)  Plaintiff reviewed the draft agreement with Cohen, and on February 5, 1993, Cohen faxed Florescue a letter with comments on Defendant's draft Separation Agreement.  (Pl. Ex. 5 at TH790-93 [02/05/1993 letter].)  The letter asked for information on Defendant's "financial affairs," in particular, his bank and investment accounts, as well as the couple's last 5 years of tax returns. (Id. at TH790.)  The letter noted that Plaintiff's role during their marriage was "merely that of signing the prepared [tax] returns."  (Id. at TH792.)  Additionally, the letter stated that Defendant's proposed division of the couple's Joint Republic Account was "totally unacceptable," and that an equitable distribution would give "$350,000" to Defendant and "$575,000" to Plaintiff.  (Id. at TH793.)

On February 25, 1993, Defendant, living in Nevada, faxed Florescue a seven-page document. (Pl. Ex. 25 [History of Gross Income and Assets Memo]; Pl. Ex. 26 [Supplemental Information Sheet]; Pl. Ex. 127 [02/25/1993 fax].)  The first six pages of the fax provided Florescue with a history of Plaintiff's and Defendant's earnings, and a statement of their assets and liabilities ("Statement of Salary and Assets").  (Pl. Ex. 25 TH818-824.)  The Statement of Salary and Assets listed the amount of income earned by both Plaintiff and Defendant for the years 1982 through 1992, see supra, although it gave an estimate (+/- 10%) of the income earned by each party in 1988, and a "guesstimate" of what each party earned in 1992.  (Id. at TH818.)

25

In pertinent part, the Statement of Salary and Assets detailed that in 1990 Defendant had earned $5,408,014 and Plaintiff had earned $153,713.  (Id.)

The letter further provided Florescue with a detailed overview of the bank and investment accounts held in both Defendant's name (the Shearson account containing $2.7 million,[21] the Nevada account containing $9,000, the Lee Bank account containing $14,000, and the First Florida account containing $4,616), as well as the one account held jointly by the parties (the Joint Republic Account containing $925,000).  (Pl. Ex. 25 at TH819-20.)  The letter then listed the real estate jointly owned by the parties: a) 425 East 51st, Apt. 5A valued at $375,000 b) 425 East 51st St., Apt. 6A valued at $375,000; c) 150 Lee Road in Lenox, Mass valued at $225,000; as well as the real estate owned solely by Defendant: a) Nine Mile Point, Clarlevoix, Michigan valued at $120,000, and; b) 512 Venice Avenue West, Unit 603, valued at $107,500.  (Id. at TH820-21.)   Lastly, the letter listed Defendant's retirements benefits amounting to approximately $70,000, and the couple's four motor vehicles, all of which were in Defendant's name only: a) 1989 Jaguar valued at $20,000, b) 1989 Volvo valued at $12,000, c) a 1991 Ford pick-up valued at $9,000, and d) a 1922 Ford Model T valued at $5,500.  (Id. at TH822.)

The seventh page of the fax, which was in the same typed font and format as the first six pages, was a one-page sheet entitled "Supplemental Information."  (Pl. Ex. 26.)  This read:

> 1. Credit Cards/Retail Accounts.  TH (Plaintiff) and DMN (Defendant) maintain separate credit cards and retail accounts and each is responsible for his or her respective balances.  Neither TH nor DMN has ever used the other's credit cards or charged merchandise to the other's retail accounts.

---

[21] The memo noted that the Shearson account had been established in February 1991, and that "$2,750,000 was transferred to SLB in three wire transfers from a separate Republic National Bank account in [Defendant's] name only that was closed in the Fall of 1992."  (Pl. Ex. 25 at TH820.)

2. TH Information.  DMN has never had access to, and does not presently know, any of TH's bank accounts, investment instruments or her corporate benefit plans, and DMN does not know any of TH's balances in any of the foregoing.  Based upon tax information she has provided at year end, I believe that TH's balances could by [sic] substantial.

3.   **For various reasons, TH is unaware of the existence of the Shearson Lehman Bros. account or the income that has been generated by that account over the last two years.  Similarly, TH is not presently aware of the extent of my income for the 1990 and 1991 tax years, nor for the year 1992 just completed.  We can discuss the reasons for this at your convience. [sic]** (emphasis added).

4.   During the marital period, DMN has earned over 80% of the total income generated by TH and DMN.  This has been primarily due to LIN Broadcasting stock options, which were exercised or otherwise cashed in 1988 and 1990.  TH has received NYNEX stock options periodically since 1985, but DMN is not aware of any of the details of her option grants.  Similarly, TH had options from U.S. Industries, which she cashed in and deposited in her account in 1984 in connection with the takeover of USI. [22]

(emphasis added).  Upon receipt of this fax, Florescue tallied the income earned by each

party during their marriage and determined that Defendant had earned 87% of the parties' joint

income ($9,167,000) while Plaintiff had earned 13% ($1,374,000).  (Florescue Tr. 320; Court

Ex. 2 [Florescue's notes] at LF 001201.)

---

[22] At trial, Defendant admitted that he created the first six pages of the financial and asset disclosure memorandum that he faxed to Florescue in February of 1993.  (Naseman Tr. 213-14; Pl. Ex. 25.)  Defendant denied creating the seventh page entitled "Supplemental Information," which disclosed that Plaintiff was unaware of the parties' income in 1990 and the Shearson Account.  (Naseman Tr. 213-14, 844.)  Likewise, Florescue denied both prior to trial and at trial -- although he backtracked on that claim at trial (Florescue Tr. 324, 334) -- that Defendant had written the Supplemental Information sheet or that the Supplemental Information sheet had been faxed to him by Defendant.  (Florescue Tr. 320-334.)  Defendant's claim that he did not write the Supplemental Information sheet is rejected for a number of reasons: the document, which was created on a typewriter, appeared to be very similar in type and font to the first six-pages; Defendant admitted that paragraphs 1, 2, and 4 of the document were accurate, and that due to the detailed financial information contained within, only Defendant, Bothe and Plaintiff could have created this document  (Naseman Tr. 213-14, 219); the fax sent to Florescue in 1993 indicated that eight pages were attached (including the cover sheet), and the Supplemental Information sheet was the obvious missing eighth page, and; Defendant's claim that he found the missing eighth page (under a bed in his father's house), which bore little relation to the content or subject of the financial information contained in the first six pages of the fax, a week and a half prior to the 2008 trial, and a full 15 years after it was faxed, was simply not credible and is not credited  by the Court.  (Naseman Tr. 887; Def Ex. BBBBBB.)

In a March 11, 1993 fax to his counsel, Defendant laid out his plans for obtaining a divorce from Plaintiff, which included his transfer of $700,000 from the Joint Republic account to his own bank account, as well as the removal of Plaintiff's name from the Joint Account.  (Pl. Ex. 308.)   A subsequent undated letter by Defendant to Florescue confirmed that he had "completed the transfer of $700,000 from Republic Bank to [his] account in Massachusetts." (Pl. Ex. 307.)   On March 23, 1993, Florescue wrote Cohen, telling him that Defendant had relocated to Nevada and had "commenced an action to dissolve the marital relationship."[23]  (Pl. Ex. 115.)

On March 29, 1993, Florescue wrote Cohen a letter that was supposed to be a response to Cohen's February 5, 1993 letter.  (Pl. Ex. 5 at TH794-798.)  The letter stated that Defendant had "probably earned at least 70% of the couple's income throughout the length of the marriage."[24] (Id. at TH794.)  Further, relying on New York State case law which provides for the distribution of marital assets based upon the percentage contributed by each party when there is no "economic partnership" between the parties (see Kobylack v. Kobylack, 111 A.D.2d 221, 222-23 (N.Y. App. Div. 2d Dept. 1985); Florescue Tr. 317), Florescue wrote that Plaintiff was entitled to at most 30% of the $925,000 (approximately $280,000) contained in the joint Republic account.

---

[23] Defendant had moved to Nevada in late January/early February of 1993 in order to obtain an expedited divorce from Plaintiff.  (Pl. Ex. 308.)  On April 12, 1993, Florescue filed an affidavit in the Nevada divorce action in support of Defendant's alleged residency in Nevada.  (Pl. Ex. 116.)

[24] Florescue wrote that Defendant had earned at least 70% of the marital income even though, as noted, he had earlier calculated that Defendant had actually earned 87% of the marital income.  (Florescue Tr. 320-21.)  Florescue wrote this despite his reliance on the Kobylack theory, under which, as explained infra, the more a party contributes to the marital estate during the marriage, the more that party retains upon divorce.  (Pl. Ex. 5 at TH794.) Consequently, it would have made no sense strategically for Florescue to underestimate Defendant's contribution to the parties' joint marital income by 17%.  At trial, Florescue justified this underestimation by stating that "people try to settle cases by giving people points in the case."  (Florescue Tr. 321.)  This explanation is incredible.  As a matter of common sense, one gives "points" in a negotiation by setting forth a client's "best case scenario" and then moving off of it.  No competent lawyer starts a negotiation by claiming his client's case is weaker than it actually is.

(Pl. Ex. 5 at TH797.)   However, Defendant would offer Plaintiff $375,000 (an increase of $25,000 from the November offer) from the joint Republic account in exchange for her signing the separation agreement.   (<u>Id.</u> at TH797.)   Lastly, in response to Plaintiff's demand for Defendant's tax and bank account information, the letter stated:

> We will exchange all financial information reasonably quickly after you are prepared to do so too.  That will include Ms. Harding's investments, and last pension statement as well.  Her information should also include each aspect of her severance arrangement with NYNEX.  I think we may well have omitted very considerable assets, in Ms. Harding's hands, in our proposal.[25]

(Pl. Ex. 5 at TH797.)  Specifically, Defendant requested information on Plaintiff's "investments and her pension, which included each aspect of her severance arrangements with NYNEX." (<u>Id.</u>) The letter further noted that the couple had maintained separate bank accounts during their marriage: "as you know (I presume), Mr. Naseman and Ms. Harding have never had joint accounts or pooled monies whether for bill paying, investment or any other purpose."  (Pl. Ex. 5 at TH795.)  Plaintiff reviewed this letter.[26]  (Harding Tr. 505.)

Cohen responded to Florescue's letter on April 15, 1993.  (Pl. Ex. 5 at TH799-TH805.) In that letter, Cohen reiterated Plaintiff's demand for one-half of the "total assets," and he explained that under New York law, "equitable distribution" must consider "more than just 'who brought more money into the family,'" as Florescue had suggested in the March 29, 1993 letter. (<u>Id.</u> at TH799, TH803.)  In light of that demand, Cohen stated that in determining an equitable

---

[25] Plaintiff acknowledges reviewing this section of the letter prior to entering into the PSA, and that she discussed it with her attorney.  (Plaintiff Tr. 523, 525.)

[26] During the parties' negotiations over the PSA, Defendant did not make any financial representations to Plaintiff with respect to the value of any accounts in his individual name, including those that held the proceeds of the surrender of his stock options in 1990.  (Harding Tr. 503.)

distribution, Plaintiff would accept $500,000 from the joint Republic account.  (Id. at TH803.)

No mention was made in the letter of the $2.77 million contained in the Shearson account.[27]

In response to Defendant's demand in the March 29, 1993 letter for financial disclosure

from Plaintiff, Plaintiff's attorney stated that:

> Please note that we have not included in our proposals the value of the two houses
> purchased by Mr. Naseman for his parents during the marriage or the gifts that he
> has made to his family, which we calculate are well into the six figures.  Ms.
> Harding specifically asked that these assets not be made an issue of controversy
> out of consideration for Mr. Naseman and his family.  If you now wish to raise the
> issue of Ms. Harding's investments, than Mr. Naseman's other assets [referring to
> houses and gifts to family] must also come into play.  We hope that this will not
> be the case.
>
> Putting that aside, however, you should understand that approximately 75% of
> Ms. Harding's pension and personal investments are in the IRS and 401(k) plans,
> and are unavailable to her before she reaches the age of 59½, without the
> incurring of significant penalties.  Further, her corporate pension plan is of de
> minimis value to her since she will be unemployed very shortly and will receive
> no distribution that is available for investment, and she must wait until the age of
> 65 to receive any payments (which would only come to about $1500/month, in
> any event).
>
> (Pl. Ex. 5 at TH801-02.)

Upon receipt of Cohen's April 15, 1993 counter-demand for $500,000, Defendant faxed

Florescue a six-page handwritten document ("Written Notes") containing comments concerning

his response to this counter-demand.[28]  (Pl Ex. 24 [handwritten notes]; Pl. Ex. 100 at 102-111

[Defendant's 05/18/08 Deposition].)  In that letter, Defendant wrote that: "TH feels she has won

---

[27] In fact, both Defendant and Florescue both admitted at trial that there was no communications between counsel
during divorce negotiations specifically mentioning the $2.77 million Shearson account, and there was no document
provided to Plaintiff during all of 1993 mentioning the $2.77 million account (Florescue Tr. 230-31; Naseman Tr.
431), which was certainly marital property.  See Price v. Price, 69 N.Y.2d 8, 11 (N.Y. 1986) (marital property is
"broadly defined as 'all property acquired by either or both spouses during the marriage").

[28] Defendant testified that he had sent the Written Notes to Florescue (Naseman Tr. 219-220); however, these Notes
were not found in Florescue's files.  (Naseman Tr. 221, 227, 269.)

by taking most of everything (c) she has deal that she gets (a) maj. of cash, (b) maj. of real estate value (at her $500,000 valuation), (c) I pay all costs." (Pl. Ex. 24 at TH813.) Only by taking the $2.77 million Shearson account out of the negotiations equation, could Plaintiff have believed that under the PSA she was receiving a majority of the marital assets. (Harding Tr. 229-230.) In fact, Defendant's detailed calculations on the last page of the Handwritten Notes demonstrate that by his own calculations he was to receive 74.8% of the marital property ($3,590,000), which included the $2.7 million Shearson account, while Plaintiff was to receive 25.2% of the marital property ($1,230,000.) (Pl. Ex. 24 at TH817.)

The next day, on April 16, 1993, Defendant and Florescue had a phone conversation, during which Florescue took notes. (Pl. Ex. 306 [Florescue's notes from call] at LF001237.) Florescue wrote down with respect to the property distribution that: "to her [Plaintiff] as to what she knows – majority of re [real estate], majority of bank act., David [Defendant] pays costs." (Id.) (emphasis added). This confirmed Defendant's intention to make Plaintiff believe that she was getting a majority of the marital assets based on what she knew at that time.[29]

On April 19, 1993, Florescue wrote Cohen a letter stating that Defendant would accept Plaintiff's counteroffer, which included the demand for $500,000 in cash. (Pl. Ex. 5 at TH806.) Cohen replied to Florescue's letter that same day indicating that they had arrived at an agreement. (Id. at TH808.)

---

[29] At trial, Florescue initially denied that Defendant had ever told him that it was his goal to have Plaintiff believe that she had received 50% of the marital assets, when in reality, Defendant was going to keep about 75%. (Florescue Tr. 313-14.) However, after the Court ruled that Defendant had waived attorney-client privilege with respect to the entirety of Florescue's case file, Defendant produced Florescue's notes from the April 16, 1993 telephone conversation, which demonstrated that Florescue was well-aware that Defendant intended to make Plaintiff believe that she was receiving the majority of the marital assets during the negotiations. (Pl. Ex. 306 at LF 001237.) Moreover, Florescue had recently performed a privilege review of his file; thus, he knew about Plaintiff's Exhibit 306 and its contents. (Florescue Tr. 750.)

31

B. <u>The Property Settlement Agreement</u>

A final judgment divorcing the parties was entered on April 21, 1993 in the County of Washoe, Nevada (Pl. Ex. 5 at TH711), and on May 4, 1993, the parties signed the Property Settlement Agreement ("PSA").[30]   (Pl. Ex. 5 at TH744.)   The Agreement first provided that each party "shall own, as his or her separate property," all of the "items of property, real, personal and mixed, of an kind … which are now, either titularly or beneficially, in his or her name, control or possession, with full power to dispose of the same."   (<u>Id.</u> at TH715.)   The parties also acknowledged that they had "no right, title or interest in and to any bank or similar accounts, business interests, licenses, degrees, securities, pension or similar plans or other investments, now, or previously, owned titularly or beneficially by" the other party.   (<u>Id.</u>)

Next, the agreement provided that the parties agreed that all "marital property," as defined by New York Domestic Relations Law Section 236, Part B, had been "fairly and equitably divided between them," and that the "payments and transfers of property" between the parties were in "full satisfaction" of each of the parties claims for "equitable distribution" under Section 236(B).   (Pl. Ex. 5 at TH719-20.)   In the section entitled "Inquiry and Disclosure," both parties also acknowledged that they had the "opportunity to make independent inquiry into the complete financial circumstances" of the other party, that they were "satisfactorily informed of the income, assets, property and financial prospects" of the other, that they were "aware of all

---

[30]      At the time when she signed the PSA, Plaintiff believed she was not receiving any of the monies from any accounts in Defendant's individual name that held his 1990 income, including the proceeds from the surrender of his stock options in 1990, and that she did not know the value of such accounts.  (Harding Tr. 509-10, 533-34.)  Plaintiff knew that Defendant had deposited the proceeds from his exercise of stock options in 1990 into his own individual account.  (Harding Tr. 533-34, 553-54, 569, 574-75.)  Plaintiff did not obtain or request her attorney to obtain copies of the parties' joint federal tax returns from the Internal Revenue Service prior to entering into the PSA.  (Harding Tr. 478.)

separate and all marital property," that they were "satisfied that full disclosure has been made," that they could not make a claim against the other "by reason of [the other's] failure to disclose or [their own] failure of knowledge of the financial circumstances" of the other, and that each party had had a "full opportunity and has consulted at length" with their attorney.  (Pl. Ex. 5 at TH733-34.)

Article 12 of the PSA provided for the division of the couple's marital property.  (Id. at TH726-733.)   The agreement provided that upon execution of the PSA, Defendant would transfer his half-interest in Apartments 5-A and 6-A to Plaintiff.  (Pl. Ex. 5 at TH726-28.) Additionally, Defendant would wire $500,000 from the Joint Republic National Bank account to Plaintiff, while Defendant would retain the balance (approximately $425,000).  (Pl. Ex. 5 at TH728.) The agreement also noted that Defendant was the sole owner of four automobiles: the 1989 Jaguar, a 1991 Ford pick-up, a 1989 Volvo, and a 1923 Ford Model T.  (Pl. Ex. 5 at TH729.)  Defendant would transfer the Volvo to Plaintiff upon execution of the agreement, and Plaintiff waived any claim to any of the other three automobiles.  (Id. at TH729.)

Next, the agreement stated that Defendant was the "sole owner" of lots 34 and 35 in Charlevoix, Michigan as well as an apartment in Venice, Florida, and that he would retain this ownership after the execution of the PSA.  (Pl. Ex. 5 at TH730-32.)  Plaintiff was to exercise a "quitclaim deed" transferring any rights or title she had in those properties to Defendant.  (Id.) Lastly, the agreement stated that the parties were the joint owners of 8.7 acres and a residence in Lenox, Massachusetts, and that after the agreement was signed, Plaintiff would sign documents

transferring any rights or interest she might have had in the property to Defendant.[31]   (Id. at TH731-32.)

Lastly, and as described in more detail, _infra_, the PSA provided for the payment of attorneys' fees if either party sought to "vacate or set aside" the PSA or a party was "required to interpose" the terms of the PSA to successfully defend against an action (Pl. Ex. 5 at TH739), and the PSA further provided that it would be a breach of contract if any party divulged the terms of the PSA to any other party or "discuss[ed] the other's personal or business matters with any other person(s)."  (Id. at TH713-14.)

4. _Discovery Attendant to the PSA_

The main issue at this trial concerned whether during the course of negotiations over the PSA, Defendant provided Plaintiff with a fraudulent tax form reflecting that in 1990 the couple had earned $1.3 million, instead of $5.5 million, which was what was actually earned and what was listed on the tax forms filed with the Internal Revenue Service.

As explained, Plaintiff's counsel requested Defendant's investment and bank accounts, as well as the couple's last five years of tax returns on February 5, 1993.  (Pl. Ex. 5 at TH790.)  In a March 29, 1993 response, Defendant's counsel wrote that "We _will_ exchange all financial information reasonably quickly after you are prepared to do so too."  (Id. at TH797.)  Plaintiff's

---

[31] That Plaintiff was not made aware of the $2.77 million Shearson account is bolstered by the terms of the PSA which divide the couple's marital property.  In that regard, Defendant asked Plaintiff to provide waivers for three automobiles held in Defendant's name only, as well as separate waivers for two parcels of real estate (valued at $120,000 and $107,500) that were also held in Defendant's name, but he did not ask Plaintiff to sign a waiver as to the $2.77 million Shearson account that was also held only in Defendant's name. (Pl. Ex. 5 at TH709-745.)  Hence, although Defendant asserts that Plaintiff knew about the $2.77 million Shearson account, and that no waiver was needed due to the general waiver contained in the PSA as to assets held by Defendant individually, this explanation cannot be squared with the fact that Defendant insisted that Plaintiff sign a separate waiver as to automobiles of relatively minimal value, including a Ford valued at $5,500, but did not make Plaintiff sign a similar waiver as to a bank account worth $2.77 million.  Rather, it is apparent that had Plaintiff been apprised of the $2.77 million account, Defendant would have made her sign a separate waiver for this account as well.

counsel replied on April 15, 1993 to the point concerning Defendant's requested financial disclosure, writing that Plaintiff's pension and investments, which were *de minimus*, should not come into play because Defendant's gifts to this family, which included two houses, were similarly not coming into play.  (Id. at TH801.)  The parties exchanged letters again on April 19, 1993, at which point they agreed to the terms of the separation agreement.  (Id. at TH806-09.) There were no other letters between the parties concerning the terms of the divorce settlement, nor was there any mention of any received or provided financial disclosure (i.e. tax forms). Accordingly, from the substance of the exchange between counsel, if Defendant had provided Plaintiff with any financial disclosure -- the joint bank account information and tax forms -- it would have taken place between April 19, 1993, when the parties reached an agreement on the terms of their separation, and May 4, 1993, when the PSA was signed.

Indeed, Plaintiff testified at trial that a week or two prior to her signing the PSA on May 4, 1993, she reviewed financial disclosure provided by Defendant, which included the 1988-1991 tax forms as well as a recent statement from the couple's joint Republic bank account.  (Harding Tr. 476, 478-80.)  Plaintiff viewed these documents in the office of her attorney.  (Id.)  Plaintiff did not testify that she was certain that the 1990 tax return she viewed was the $1.3 million account, but she was certain that she had not reviewed the $5.5 million tax return prior to executing the PSA.  (Id. at 482-83.)  Plaintiff further recalled feeling hurt when she reviewed the account statement for what had been the joint Republic Account because she realized that Defendant had removed her as a signatory on the account.  (Id. at 477; Pl. Ex. 305 [wire transfer form for account in Defendant's name].)  Plaintiff was upset that Defendant had thought that she might "raid the bank accounts" once he advised her that she wanted a divorce.  (Id.)

35

According to Plaintiff, her reason for insisting upon reviewing the parties' tax returns was not limited to obtaining financial disclosure from Defendant.  (Harding Tr. 486-87.)  Rather, in Article 6 Paragraph 2(a) of the PSA, Plaintiff represented that she had accurately advised Defendant "of all income, deductions, tax bases and credits attributable solely to her."  (Pl. Ex 5 at TH718.)   And she further agreed to indemnify Defendant for any inaccuracies in the tax information she provided to him.  (Id.)  While her lawyer at the time of the divorce negotiations, Richard Cohen, remembered almost nothing from the divorce negotiations, he testified that his general practice would have been to consult with clients and review the actual tax returns if his clients were making any representations as to the accuracy of information they provided in connection with the preparation of such tax returns.[32]  (Cohen Tr. 252; Def. Ex. S [05/26/1993 letter from Florescue to Cohen].)

In contrast to Plaintiff's claim that she viewed the tax returns in her counsel's office prior to signing the PSA, Defendant unequivocally denies providing tax returns to Plaintiff, Plaintiff's counsel in New York or Nevada, Florescue, or Defendant's Nevada counsel.  (Naseman Tr. 830-31; Pl. Ex. 100 [Defendant's 05/18/08 Deposition] at 39.)  In support of Defendant's claim is the fact that no tax returns were found in the files of Florescue, who represented Defendant during the divorce negotiations.  (Florescue Tr. 267-68.)  Further, Florescue's files contain no letters or notes memorializing the transmission of tax returns to anyone, and Florescue testified at trial that

---

[32] The file of Richard Cohen, who had been paid by Defendant for his work on behalf of Plaintiff during the parties' negotiations over the PSA, had been discarded in this matter between October and December 2006, prior to the commencement of the current lawsuit. (Cohen Tr. 252; Harding Tr. 502; Def. Ex. S.)  Plaintiff did not produce any tax returns from her own files.  (Harding Tr. 566.)

he did not provide any financial information to Plaintiff's counsel.[33]  (Florescue Tr. 267-68, 352, 380-81.)  Moreover, there is no correspondence between either the parties or their New York or Nevada counsel reflecting the transmission or receipt of tax returns.  (Florescue Tr. 352; PX5 at TH790-811; DX S.)  Nor did the copy of the false 1990 tax form that Plaintiff produced come from her own files, rather, it was produced by Bothe.  (Harding Tr. 484-85.)  Lastly, none of the extensive correspondence between counsel (Cohen and Florescue) subsequent to the signing of the PSA indicates that any financial disclosure had been made.  (Def. Ex. EEEEE [closing notes].)

Cohen's billing records for his services rendered to Plaintiff provide no evidence that Cohen or Plaintiff reviewed any financial documents in the weeks proceeding the signing of the PSA, or even that a meeting took place in Cohen's office, as Plaintiff claimed.  (Def. Ex. S [Cohen's billing records].)  The only reference to anything on Cohen's billing records potentially relevant was an undated charge for "review[ing] numerous documents."  (Def. Ex. S at DN00598.)  However, considering that Cohen was careful in other instances to accurately label his interactions with Plaintiff on his bills (i.e. "calls T. Harding," and "conf. T. Harding"), it is highly unlikely that this charge referred to a meeting with Plaintiff in his office at which Plaintiff reviewed provided tax forms.  (Def. Ex. S at DN00597.)  Additionally, while Plaintiff claims that a February 1993 messenger charge on Florescue's bill to Naseman could have been the transmittal of the tax returns from Defendant to Plaintiff (Florescue Tr. 304-06), as explained, if

---

[33] However, that no tax returns were found in Florescue's files and there was no transmittal letter with respect thereto is not conclusive as there were a number of documents -- including Exhibit 24 (the Handwritten Notes) and the 8th page of Exhibit 25 (the History of Income and Assets Memorandum)  -- that were missing from Florescue's files.

the tax returns were turned over, this disclosure occurred sometime between April 19, 2003 and May 5, 1993, well after the February 1993 messenger charge.

Next, while Plaintiff's memory is that she reviewed tax returns for the years 1988 to 1991 in Cohen's office (Harding Tr. 585, 590-91), the 1991 tax form, which reflects $457,602 in income for that year, discloses the existence of the Shearman account and millions of dollars worth of trading therein, and also discloses the existence of the two accounts (the Individual and the Joint Account) at Republic National Bank.  (Def. Ex. II [1991 federal tax form].)  At trial, Plaintiff testified "definitively" that she did not see the genuine 1991 tax form in Cohen's office because she would have noticed the Shearson account reference and the trading that's reflected in that document.  (Harding Tr. 585, 589.)  Rather, she had been shown a tax return reflecting "slightly less" than three and four hundred thousand dollars in come.   (Harding Tr. 585.)  Accordingly, Defendant would have had had to provide her with a second fraudulent tax form (for 1991) which had none of this account activity written on it.

No evidence of a false 1991 tax form was found in Defendant's files which had been discovered by Bothe, and Plaintiff made no mention that she had reviewed a false joint federal 1991 tax form in her Complaint, her Amended Complaint, or in her Summary Judgment Declaration.  (Harding Tr. 583-90.)  Rather, it was not until after Defendant responded to Plaintiff's complaint, and pointed out that the 1991 tax form reflected the existence of the Shearson account and the Individual Republic Account (inquiry into the Individual Republic Account also would have revealed the existence of Defendant's receipt of millions of dollars in 1990) that Plaintiff then asserted that she had been shown a false 1991 tax form as well. (Harding Tr. 585-93.)

Finally, the circumstances surrounding the execution of the PSA evince that Plaintiff was not provided with disclosure.  The parties entered into the terms of the agreement memorialized in the PSA on or about April 19, 1993.  The PSA was then signed on May 4, 1993.  Plaintiff's claim is that she viewed the financial disclosure after the terms of the PSA were agreed upon but before the PSA was actually signed.[34]  However, even accepting Plaintiff's contention that she viewed a 1990 tax return reflecting $1.3 million of income, it is unlikely that she would have then proceeded to sign the agreed-upon PSA considering that she had just been apprised that the couple had earned $1.3 million of marital income in 1990, of which she was not only being kept in the dark as to where this additional money was being held, but she was also not to receive one cent of this income in her separation agreement.[35]  (Harding Tr. 552-54.)  Rather, the correct conclusion from viewing the entirety of the presented evidence is that prior to signing the PSA Plaintiff and her counsel simply forewent her earlier request that Defendant provide her with full financial disclosure.

---

[34] There is nothing in the actual PSA itself -- either in Article 13 (the "Inquiry and Disclosure" section) or anywhere else -- which indicates that Defendant had provided Plaintiff with any of the financial disclosure she alleged took place.  This is despite the fact that Article 2 Section 6 of the PSA specifically mentions each of the letters exchanged between the parties during the "settlement negotiations" (e.g. "the letter dated February 5, 1993 from Richard B. Cohen to Leonard G. Florescue"), but mentions nothing about any financial disclosure either before or subsequent to April 19, 1993, which was when the parties agreed to the terms of the PSA.  (Pl. Ex. 5 at TH712-13.)

[35] Indeed, as there was only $925,000 (the proceeds from the 1988 exercise of options) in the Joint Republic Account at the time of the divorce negotiations, if Plaintiff had seen the $1.3 million 1990 tax return, Plaintiff had to have realized that the $1.3 million (or the remains of it after taxes) was being held in some other account in Defendant's name only.  (Harding Tr. 552-54.)  In fact, Plaintiff admitted as much at trial.  (Harding Tr. 509-10, 552-54, 573-75, 578-82.)  Yet Plaintiff made no efforts to ascertain where this account was located or how much money was in the account.  (Harding Tr. 509-10, 533-34.)  At trial, Plaintiff excused her failure to ascertain where the money from the 1990 exercise of options was being held was due to the fact that she "understood [it] to be a small amount."  (Harding Tr. 533-34, 554.)

Accordingly, a preponderance of the credible evidence does not evince that Plaintiff viewed the tax returns and the Joint Republic account information prior to signing the PSA.[36]

**CONCLUSIONS OF LAW**

    1. <u>Plaintiff's claims of fraudulent concealment and misrepresentation</u>

        A. *Applicable Law*

"Although 'tested carefully when subjected to attack to make sure that the agreement was 'just and fair' … a stipulation of settlement in a divorce action, competently entered into, is entitled to the recognition accorded any other contract." <u>See</u> <u>Kojovic v. Goldman</u>, 35 A.D.3d 65, 71 (N.Y. App. Div. 1st Dept. 2006) (citing <u>Christian v. Christian</u>, 42 N.Y.2d 63, 65 (N.Y. 1977)).  Indeed, "judicial review is to be exercised circumspectly, sparingly and with a persisting view to the encouragement of parties settling their own differences in connection with the negotiation of property settlement provisions."   <u>Christian</u>, 42 N.Y. at 72.  Accordingly, New York courts will generally not modify, set aside, or award damages pertaining to the execution of a separation agreement between spouses, absent a showing of fraud, duress, overreaching, or unconscionability.  <u>See</u> <u>Christian</u>, 42 N.Y.2d at 65; <u>Cosh v. Cosh</u>, 45 A.D.3d 798, 799 (N.Y. App. Div. 2d Dept. 2007); <u>Cantilli v. Cantilli</u>, 40 A.D.3d 1023, 1024 (N.Y. App. Div. 2d Dept. 2007).

Here, in seeking damages from Defendant, Plaintiff puts forth two claims of fraud: fraudulent misrepresentation and fraudulent concealment.[37]  To recover on a claim of fraudulent

---

[36] The Court is not suggesting that Plaintiff knowingly testified falsely at trial.  Rather, sixteen years passed between the signing of the PSA and the trial.  In that lengthy period of time, witnesses' memories can fade and their recollection of events can become warped.  <u>See, e.g.</u>, <u>Ratka v. St. Francis Hospital</u>, 44 N.Y.2d 604, 612 (N.Y. ) (acknowledging that in the fifteen year delay between the event and trial "memories have faded, witnesses have died or disappeared, and the evidence has been lost.")

misrepresentation, the evidence must show that the: 1) defendant made a material misrepresentation of fact; 2) that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; 3) that the plaintiff reasonably relied on the misrepresentation; 4) that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation.  See P.T. Bank Cent. Asia v. ABN AMRO Bank, 301 A.D.2d 373, 376 (N.Y. App. Div. 1st Dept. 2003); Swersky v. Dreyer and Traub, 219 A.D.2d 321, 326 (N.Y. App. Div. 1st Dept. 1996); see also Moriarity v. Small World Adoption Foundation of Missouri, 2008 U.S. Dist. LEXIS 2309, *3-4 (N.D.N.Y. 2008).

The elements of the fraudulent concealment cause of action are: 1) the defendant failed to disclose information to the plaintiff; 2) defendant was under a duty to disclose such information; 3) that this failure was intended to defraud or mislead the plaintiff; 4) that the plaintiff acted as a result of this concealment; and 5) that the plaintiff was injured.  See P.T. Bank Cent. Asia, 301 A.D.2d at 376; Strasser v. Prudential Securities, Inc., 218 A.D.2d 526, 527 (N.Y. App. Div. 1st Dept. 1995); Davis v. Cornerstone Tel. Co., LLC, 19 Misc. 3d 1142A, *7-8 (N.Y. Sup. Ct.

---

[37] New York CPLR Section 213 provides for a statute of limitations period for fraud claims of six years or two years from the time the plaintiff discovered the fraud "or could with reasonable diligence have discovered" the fraud. Here, the fraud by Defendant was allegedly committed in 1993, and Plaintiff filed suit in December 2006, well outside of the six year period of limitations.  However, the Court credits Plaintiff's testimony that she first learned of the fraud in January 2006, and therefore, the action was commenced within two years of Plaintiff's discovery of the fraud.  (Harding Tr. 487-488.)  Moreover, while Defendant asserts that Plaintiff's claim is barred because she could have with "reasonable diligence" discovered the alleged fraud relating to the tax returns, Plaintiff was under no obligation to search through the available public records to discover that she had been presented with a fraudulent tax form.  See, e.g., Guedi v. Dana, 11 A.D.3d 368 (N.Y. App. Div. 1st Dept. 2004) ("This action, alleging fraudulent conveyance by Celine Dana, was commenced within two years of plaintiff's discovery of the transfers, and thus within the statute of limitations (CPLR 203[g]).  The mere fact that deeds had earlier been recorded was insufficient to constitute constructive notice of the conveyances in the absence of some knowledge that would have required plaintiffs to investigate the public records.")  Rather, the obligation to make inquiry and ascertain all the relevant facts arises only where the plaintiff possesses "timely knowledge" that fraud might have been committed. See Harris v. Wilmorite, 266 A.D.2d 902 (N.Y. App. Div. 4th Dept. 1999).  Here, Plaintiff had no such knowledge until Bothe presented Plaintiff with the allegedly fraudulent tax form in January 2006.  Accordingly, Defendant's statute of limitations defense is rejected.

Albany Co., 2008); see also Travelers Indemnity Co. of Illinois v. CDL Hotels USA, 322 F.

Supp. 2d 482, 499 (S.D.N.Y. 2004) ("[w]hen dealing with a claim of fraud based on material

omissions, it is settled that a duty to disclose arises only when one party has information that the

other party is entitled to know because of a fiduciary or other similar relation of trust and

confidence between them").

Fraud must be proven by clear and convincing evidence, see, e.g., Merrill Lynch & Co. v.

Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007); Jo Ann Homes at Bellmore v.

Dworetz, 25 N.Y.2d 112, 119 (1969), and the burden of proving such fraud falls on the plaintiff.

Kojovic, 35 A.D.3d at 71 (citing Brassey v. Brassey, 154 A.D.2d 293, 295 (N.Y. App. Div. 1st

Dept. 1989) (the plaintiff must present a "high order of evidence" to overcome "presumption"

that separation agreement was entered into fairly); see also Kavner v. Geller, 49 A.D.3d 281

(N.Y. App. Div. 1st Dept. 2008) (burden of proving fraud with respect to the execution of a

separation agreement between spouses falls on the party asserting fraud); Empie v. Empie, 46

A.D.3d 1008 (N.Y. App. Div. 3d Dept. 2007) (same); Cosh, 45 A.D.3d at 800 (same); Berman v.

Berman, 217 A.D.2d 531 (N.Y. App. Div. 2d Dept. 1995) (same);  Stoerchle v. Stoerchle, 101

A.D.2d 831 (N.Y. App. Div. 2d Dept. 1984) (same).[38]

---

[38] Relying on In re Estate of Hunter, 190 Misc. 2d 593, 599 (N.Y. Sur. Ct. 2002) and In re Greiff, 92 N.Y.2d 341,
345 (N.Y. 1998), Plaintiff argues that "where fraud is alleged in the context of a fiduciary relationship, fraud is
presumed and the burden shifts to the fiduciary to demonstrate, by clear and convincing evidence, the absence of
fraud or other misconduct."  In essence, Plaintiff asserts that it is Defendant's burden here to prove the absence of
fraud.  However, the application of this burden-shifting principle is extremely limited.  As the Appellate Division,
Third Department recently noted, "under the doctrine of constructive fraud, where a fiduciary relationship existed
between two parties *such that they were dealing on unequal terms due to one party's weakness, dependence or trust
justifiably reposed upon the other and unfair advantage is rendered probable*, the 'burden is shifted, the transaction
is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced,
no undue influence was used, and that all was fair, open, voluntary and well understood."  Mazza v. Fleet Bank, 16
A.D.3d 761 (N.Y. App. Div. 3d Dept. 2005) (emphasis added) (citing Matter of Gordon v. Bialystoker & Bikur
Cholim, 45 N.Y.2d 692, 699 (N.Y. 1978)).  This principle is invoked only in circumstances characterized by

### B. *Plaintiff's Claim of Fraudulent Misrepresentation*

As noted, a claim for fraudulent misrepresentation requires that the plaintiff prove that the defendant made a material misrepresentation of fact.  See Simonds v. Simonds, 45 N.Y.2d 233, 242 (1978) ("separation agreement based on one party's misrepresentation of financial condition is voidable").  Here, Plaintiff argues that by providing her with the false 1990 tax form, Defendant "falsely represented that the parties' joint income for 1990 was approximately $1.3 million, when in fact it was in excess of $5.5 million."  However, as the Court concluded in its Findings of Fact, Plaintiff has failed to meet her burden of proof that she viewed the false $1.3 million tax return during the settlement negotiations.   Accordingly, Plaintiff's claim for fraudulent misrepresentation is dismissed.

### C. *Plaintiff's Claim of Fraudulent Concealment*

To prevail on a claim of fraudulent concealment, a plaintiff must first prove that the defendant failed to disclose information to the plaintiff.  As explained in this Court's findings of fact, Plaintiff here has presented clear and convincing evidence that Defendant failed to disclose to Plaintiff either in 1990, when he exercised the remainder of his LIN options and reaped over $4 million, or during the divorce settlement negotiations in 1992/1993, that the couple earned approximately $5.5 million in income in 1990 from Defendant's exercise of his stock options, and that the proceeds from the options, which amounted to approximately $2.7 million after taxes, were secreted in a Shearson account that was listed in Defendant's name only.

---

dominance and control by one party over another party, such as between a guardian and ward, social worker and patient, and nursing home and patient.  See, e.g., Matter of Gordon, 45 N.Y.2d at 699. Here, as in the vast majority of cases cited above involving fraud-based challenges to separation agreements entered into between a husband and wife, there was not such a relationship between the parties.  Accordingly, the burden remains with Plaintiff to prove fraud.

Accordingly, the first element of fraudulent concealment, failure to disclose, has been satisfied by Plaintiff.

However, Plaintiff must still prove that Defendant had a duty to disclose such information at the time of their divorce negotiations.  See, e.g., Dayton v. Dayton, 175 A.D.2d 427, 428 (N.Y. App. Div. 3rd Dept. 1991) (nondisclosure of assets by one party during property settlement negotiations is "not the equivalent of fraud"); Panossian v. Panossian, 172 A.D.2d 811 (N.Y. App. Div. 2d Dept. 1991) ("failure to disclose does not, standing alone, constitute fraud or overreaching sufficient to vitiate an antenuptial agreement."); Hoffman v. Hoffman, 100 A.D.2d 704, 705 (N.Y. App. Div. 3d Dept. 1984) (same).

The proper starting place for this inquiry is the recent Appellate Division, First Department decision of Kojovic v. Goldman, 35 A.D.3d at 65 ("Kojovic").  In Kojovic, during divorce negotiations between the parties, the parties exchanged financial information, which included the defendant's disclosure that he had a 7 or 8 percent interest in a closely held company, "Capital IQ."  Id. at 66-67.  The parties then reached a settlement, whereby the plaintiff received $1.15 million in cash plus $350,000 payable over four years.  The settlement agreement further provided, as here, that each party had inquired into the financial circumstances of the other, was sufficiently informed of the other's income and assets, and waived any further inquiry.  Shortly after agreeing to settle the divorce action, Standard & Poor's submitted a nonbinding expression of interest to buy Capital IQ, and one month after the execution of the settlement agreement, on September 8, 2004, Standard and Poor's announced plans to purchase Capital IQ for $225 million, of which the defendant was due to receive $18 million.  The plaintiff sued for fraud, claiming that the settlement agreement was "procured through fraud

44

based on: her husband's affirmative misrepresentations as to the non-liquidity of his Capital IQ shares; an "obligation on the husband's part to have disclosed to her the value and potential sale of Capital IQ"; and, his knowledge of the "imminent sale of Capital IQ at the time of the settlement," and his "conceal[ment]" of this information from her." Id. at 67-68.

The Appellate Division rejected the plaintiff's fraud claim, holding that a "party may not challenge the validity of a settlement agreement based on a claim that she undervalued assets which … were … known to her at the time." Kojovic, 35 A.D.3d at 65 (emphasis added). Rather, the plaintiff, who was an intelligent former financial analyst at a major investment bank and who was represented by experienced counsel, should have used the tools available to her during divorce negotiations, which included the "right to inquire into her husband's finances" by the "taking of depositions and a forensic evaluation," to ascertain the value of the known assets, which, in this case, was the husband's 7 or 8% share of his company. Id. at 69. Instead, the plaintiff signed the settlement agreement and waived any further disclosure. Accordingly, under First Department precedent, alleging that a party failed to disclose the true value of known assets during settlement negotiations is insufficient to establish a claim of fraudulent concealment.

The reasoning of the First Department was followed by the Second Department in the recent case of Etzion v. Etzion, 2009 N.Y. Slip Op. 3690 (N.Y. App. Div. 2d Dept. May 5, 2009). In Etzion, a husband and wife divided their marital party, the most valuable piece of which was a warehouse located on the Greenpoint-Williamsburg waterfront in Brooklyn, which had been valued by an independent appraiser at $6.5 million. Taking this valuation into account, the plaintiff received approximately $6.1 million from the settlement agreement. Six months after the settlement agreement was signed, the defendant sold the warehouse for $85 million.

45

The increase in market value of the warehouse property resulted from the adoption of a comprehensive waterfront plan proposed by New York City two years <u>prior</u> to the settlement negotiations, and adopted by the City two months <u>after</u> the settlement agreement had been signed.  The plaintiff sued for fraudulent concealment and breach of fiduciary duty, amongst other claims.

In holding that the defendant did not have to apprise the plaintiff of the potential appreciated value of the warehouse, and thereby could not be held liable for a breach of a fiduciary duty, the Court ruled that:

> the defendant, as a party to the underlying matrimonial action, had a duty to make full and complete disclosure of information requested by the plaintiff in proper discovery demands, he did not have a duty arising out of the marital relationship to volunteer information freely available in the public domain regarding the possibility that the Greenpoint-Williamsburg waterfront might be rezoned for residential development, and that such a rezoning could lead to a possible increase in the market value of the warehouse property.  The plaintiff chose to forego an updated appraisal of the value of the warehouse property in favor of reliance on the neutral appraisal that was two years old when the memorandum agreement was negotiated and executed.  That she subsequently determined that the defendant sold the warehouse property, after the entry of the judgment of divorce, for a sum much greater than the appraised value as of March 2003, and realized that her execution of the agreement may have been improvident, is not a basis to set aside the agreement.

Similarly, in <u>Cosh</u>, 45 A.D.3d at 800, the Appellate Division, in rejecting a claim of fraudulent concealment during the execution of the separation agreement, held that "the defendant was fully aware of the parties' assets and … chose to forego an independent appraisal of their real property and the plaintiff's business interest.  Under these circumstances, the defendant's claim that the plaintiff concealed or misstated the value of those assets lacks merit."

Accordingly, New York law requires a party in divorce settlement negotiations to disclose the existence of assets or material information that could not be discovered by the other party through reasonable diligence; however, the law places no affirmative duty on a party to accurately disclose the valuation of an asset that is known or should have been known, through reasonable diligence, by the other party.[39] See Cherfas v. Wolf, 17 Misc. 3d 1102A, *6-7 (N.Y. Supreme Ct. King's Co., 2007) (summarizing state of New York divorce disclosure law); see also DiSalvo v. Graff, 227 A.D.2d 298 (N.Y. App. Div. 1st Dept. 1996) (dismissing fraud claim where wife contended that the husband had failed to disclose the value of his interest in an asset known to her, and settlement agreement specifically acknowledged that wife had "made her own independent investigation of [the husband's] business affairs and was waiving further disclosure."); Martin v. Martin, 74 A.D.2d 419 (N.Y. App. Div. 4th Dept. 1980) (in rejecting plaintiff's claims of fraudulent concealment, the Court held that the wife had been fully aware of the asset's (their marital residence) existence, and that the value of the home was "easily ascertainable," even if the husband had "concealed" it); cf. Chapin v. Chapin, 12 A.D.3d 550 (N.Y. App. Div. 2d Dept. 2004) (court set aside a settlement agreement as the product of

---

[39] The principle that parties bound by a fiduciary relationship have a duty to disclose information to the other party only when such information could not have been readily discoverable, is hardly unique to divorce settlement negotiations.  Rather, under the "special facts doctrine," which is inherent in all fiduciary relationships, a duty to disclose arises where one "party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair."  P.T. Bank Central Asia, 301 A.D.2d at 378; see also Travelers Indem. Co. v. CDL Hotels USA, 322 F. Supp. 2d 482, 489 (S.D.N.Y. 2004).  To establish a duty to disclose under the "special facts doctrine," a plaintiff must prove that "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge."  Travelers Indem. Co., 322 F. Supp. 2d at 489 (emphasis added).  Accordingly, New York law requires all parties entering into a transaction to use all readily available means to ascertain information potentially material to negotiations.  See Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 322 (N.Y. 1959) ("if the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.")

"fraudulent inducement" because the husband claimed to have virtually no assets and concealed the fact that he had purchased valuable real estate).

Claims of fraudulent concealment are particularly frowned upon in New York when each party is represented by independent counsel during the negotiations and execution of a settlement agreement.  See, e.g., McFarland v. McFarland, 70 N.Y.2d 916 (1987) (in rejecting fraudulent concealment action by wife which claimed that husband had understated value of partnership interest in investment firm and had failed to disclose a profitable restructuring of firm, held that "while favorable to the husband, [settlement agreement] was neither facially irregular nor unconscionable, and that the wife had been represented by independent counsel of her own choosing at the time of its execution"); Kavner, 49 A.D.3d at 281 (in rejecting claim of fraudulent concealment or misrepresentation, ruled that plaintiff was an "intelligent professional separately represented by counsel in the negotiations in this adversarial proceeding, and chose to forgo any discovery in the bankruptcy action, out of which arose the settlement of her claims seeking to enforce the divorce judgment"); Martin, 74 A.D.2d at 424 (a "husband's failure or refusal to disclose his financial circumstances when the agreement is executed is not sufficient to void an agreement fair on its face, particularly when the wife was represented by counsel during negotiations and execution").

Applying those principles here, the evidence at trial conclusively demonstrated that Plaintiff knew about the assets allegedly concealed here -- the proceeds from Defendant's exercise of his stock options in 1990.  At trial, Plaintiff admitted that when she entered into the PSA she knew that LIN had been purchased by McCaw in 1990 (Harding Tr. 467, 469, 558-59), and that Defendant had exercised or exchanged options in 1990 in connection with the

McCaw/LIN transaction.  (Harding Tr. 467, 533-34, 552-53.)  Plaintiff also knew that Defendant maintained bank accounts in his individual name.  (Harding Tr. 509-10, 533-34, 569, 574-575.)  Plaintiff further admitted that prior to entering into the PSA she knew that Defendant deposited the proceeds from the 1990 surrender of his LIN stock options, along with his other income from 1990, which included a severance payment and earned salary, into an account in his individual name, and that she did not know, when she entered into the PSA, what amount of money remained in that account.  (Harding Tr. 509-10, 533-34, 553-54, 574-75.)

As a corollary, Plaintiff knew that the money Defendant earned in 1990 from the exercise of his options had not been deposited into the Joint Republic bank account, and further, that some principle and all the interest had been "stripped out" of the Joint Republic account by Defendant.  (Harding Tr. 476-77, 553-54.)   Hence, Plaintiff was aware that Defendant had received substantial moneys from the exercise of his options, and at the time she signed the PSA, she valued those monies at between $1 to $1.2 million.  (Harding Tr. 471, 573-74, 578-82; Pl. PFF ¶79.)   Thus, by Plaintiff's own admissions at trial, the issue presented here was not the concealment of assets from Plaintiff, but rather the valuation of assets admittedly known by Plaintiff to exist.

Moreover, it would not have been difficult for Plaintiff and her counsel to have ascertained how much money Defendant received in 1990 for the exercise of his options because such information was publicly available.  In that regard, the 1990 LIN Proxy Statement, which was filed with the SEC and mailed to the parties' home, stated Defendant had surrendered 29,750 vested options at $154.11 per share with an average exercise price of $21.93.  (DX JJJ at DN00546.)   This represented approximately $4 million in net proceeds.  Plaintiff, who was a

49

corporate attorney with more than 20 years of experience, testified at trial that she knew how to obtain such proxy statements from the SEC.  (Harding Tr. 550-51.)  A simple request for this one document would have immediately apprised Plaintiff of the amount of money Defendant received in 1990 for exercising his options.  Further, the complaint in the derivative lawsuit filed by LIN shareholders also informed that Defendant had earned $4 million from his options in 1990.  (Naseman Tr. 816-18.)

The proxy statement and complaint were not the only documents that would have alerted Plaintiff and her counsel to Defendant's $4 million windfall.  The parties' 1987 mortgage loan application disclosed that Defendant had earned 73,000 options through his employment at LIN Broadcasting, of which, 45,250 were vesting between October 26, 1987 and December 15, 1990.  (Def. Ex. PP; Harding Tr. 541-46.)  The parties' 1988 jointly filed tax return evinces that Defendant had exercised some 33,000 of those options in 1988, leaving approximately 40,000 to be exercised at a later date.  (Pl. Ex. 8.)  Prior to signing the PSA, Plaintiff and her counsel failed to discover what became of the nearly 40,000 remaining options.

The parties' jointly filed tax returns for 1988 through 1991, readily available to Plaintiff and her counsel from the IRS, also would have made Plaintiff aware of Defendant's earnings. The parties paid their 1988 tax bill with funds drawn on a check from Defendant's Individual Republic National Bank account, and interest earned from this account was listed on the couple's signed 1989 tax form.  (Pl. Ex. 8 at TH434; Pl. Ex. 10 at TH444, 447.)  It was into this account that Defendant initially deposited the $2.7 million in after-tax earnings.  Accordingly, had Plaintiff requested the account records of the Individual Republic Bank account from Defendant, she would have seen the infusion of $2.7 million into this account in early 1990.  The genuine

1990 income tax forms filed with the IRS listed, of course, the $4 million in proceeds Defendant received, and the couple's jointly filed 1991 federal tax form disclosed the Individual Republic account, the existence of the Shearson Lehman account and $60,361 in interest earned on that account in 1991, and stock trades aggregating millions of dollars.  (Def. Ex. II at TH518-22.) Hence, if Plaintiff had requested from the IRS the tax returns filed between 1988 and 1991, which she did not do (Harding Tr. 478), she would have been aware of: the individual bank account into which Defendant had deposited the $2.7 million; the brokerage account into which Defendant had transferred the $2.7 million in February-May 1991, and; the receipt of the $4 million in income in 1990.

Thus, the facts adduced at trial show that Plaintiff had a number of different avenues available to her for ascertaining the extent of Defendant's individually held assets at the time of the parties' divorce negotiations in 1992/1993.  Yet without conducting such discovery, Plaintiff, who was an experienced corporate attorney and who was represented by counsel, signed the PSA, which specifically provided that she had the opportunity to "make independent inquiry into the complete financial circumstances" of Defendant, that she was "satisfactorily informed of the income, assets, property and financial prospects of" Defendant, that she was "satisfied that full disclosure has been made," and that she "cannot appropriately make a claim against [Defendant] by reason of his failure to disclose or her failure of knowledge of the financial circumstances" of Defendant.  (Pl. Ex. 5 at TH734.)

In effect, Plaintiff waived any further disclosure either from Defendant or from publicly available sources.  For this, Plaintiff "has only herself to blame."  See Kojovic, 35 A.D.3d at 40-41 (in holding that husband did not fraudulently conceal assets, the value of which could have

51

been ascertained by the wife through discovery, the court noted that "[w]hat is significant is that the wife, a former equity research assistant at Morgan Stanley with a degree in finance, along with her experienced counsel and accountant, could have freely availed themselves of any number of valuation and discovery procedures during the divorce proceeding but declined to do so, as is expressly acknowledged in the settlement agreement.  Thus, the wife has only herself to blame for her failure to inquire further.  Such failure is not, however, a basis upon which to vacate the settlement.")

Accordingly, as the evidence demonstrates that Plaintiff was aware or should have been aware of Defendant's separately held assets at the time she signed the PSA, and failed to take action to ascertain how much these assets were worth, Plaintiff's claim of fraudulent concealment is dismissed.

2. Defendant's counter-claims for attorneys' fees and breach of contract

A. *Defendant's counterclaim for attorneys' fees*

Article 15 Section 3 of the PSA provides:

If either party by any action, proceeding, defense, counterclaim or otherwise, seeks to vacate or set aside this Agreement or declare any of the terms and conditions to be invalid or against public policy, for any reason, including but not limited to fraud, duress, incompetency, overreaching or unconscionability, said party shall reimburse the other party and be liable for any and all of such party's reasonable attorney's fees and expenses, provided and to the extent that such action, proceeding, counterclaim or defense results in a settlement, decision, judgment, decree or order dismissing or rejecting said claims.

Article 15 Section 4 of the PSA provides:

If either party (the "defendant") shall be required to interpose the terms, conditions and covenants of this Agreement as a defense to an action or other proceeding instituted by the other party (the "plaintiff") and such defense shall result in a judgment, decree or order in favor of the defendant, or a settlement

upon substantially the same terms of this Agreement, the plaintiff shall pay to the defendant the costs and expenses incurred by the defendant including reasonable attorneys' fees.

"New York public policy disfavors any award of attorneys' fees to the prevailing party in a litigation." Horwitz v. 1025 Fifth Avenue, 34 A.D.3d 248, 249 (N.Y. App. Div. 1st Dept. 2006); Gottlieb v. Such, 293 A.D.2d 267, 268 (N.Y. App. Div. 1st Dept. 2002). This rule "is based upon the high priority accorded free access to the courts and a desire to avoid placing barriers in the way of those desiring judicial redress of wrongs." Matter of A.G. Ship Maintenance Corp. v. Lezak, 69 N.Y.2d 1, 5 (1986). Accordingly, provisions for the recovery of attorneys' fees written into separation agreements "should be construed strictly." Gottlieb, 293 A.D.2d at 268.

Here, Section 3 provides that a prevailing party may recover reasonable attorneys' fees when the other party "seeks to vacate or set aside [the PSA] or declare any of the terms and conditions to be invalid or against public policy, for any reason." Here, as this Court previously ruled, and as Defendant admits in his Proposed Findings of Fact (¶45), Plaintiff is not seeking to set aside or vacate the PSA. See Harding v. Naseman, 2008 U.S. Dist. LEXIS 92813, *16-17. Nor is she seeking to declare any of the terms and conditions contained in the PSA to be invalid. Rather, she is seeking damages for Defendant's alleged fraud during the negotiations prior to execution of the PSA. Id. Accordingly, Defendant's application for attorneys' fees on this ground is denied.

Under Section 4, a prevailing party is only awarded attorneys' fees if he is "required to interpose the terms, conditions and covenants" of the PSA "as a defense to an action." In interpreting this provision, the Court is guided by the New York legal principle that provisions

providing for the award of attorneys' fees are to be "construed strictly." <u>Gottlieb</u>, 293 A.D.2d at 268. And the key word here, chosen and agreed upon by both parties, is the word "required."

Here, Defendant did interpose the terms and conditions of the PSA in putting forth his successful defense. However, in responding to Plaintiff's claims of fraud, by no means was Defendant "required to interpose" such terms. Rather, a successful fraud defense, as explicated, involves either a showing that no fraud occurred or a showing that the plaintiff should have exercised more diligence before entering into the transaction. Defendant was successful here due to the fact that the evidence demonstrated that Plaintiff knew or should have known of the existence of the disputed assets. Conversely, if Plaintiff had put forth a claim that Defendant had failed to comply with a specific provision of the PSA, a successful defense would have <u>required</u> Defendant to "interpose" the terms of the PSA. Simply put, had the parties intended this provision to permit reimbursement for <u>any</u> action where the defendant interposed the terms and conditions of the PSA as part of a successful defense, as opposed to an action where the defendant was "required" to interpose the terms and conditions of the PSA, it "would have been simple enough to have stated as much" in the PSA. <u>Id.</u>; <u>Reiss v. Financial Performance Corp.</u>, 97 N.Y.2d 195, 199 (N.Y. 2001) ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").

Hence, Defendant's counterclaim for attorneys' fees is denied.

B. *Defendant's counterclaim for breach of contract*

Under New York law, confidentiality agreements contained in separation agreements are enforceable.  See Anonymous v. Anonymous, 233 A.D.2d 162, 163 (N.Y. App. Div. 1st Dept. 1996); Trump v. Trump, 179 A.D.2d 201 (N.Y. App. Div. 1st Dept. 1992).

Article 3 Section 2(a) of the separation agreement provides that:

Neither party, nor their assigns, successors, associates, or their attorneys (collectively "Affiliates") shall divulge the terms and provisions of this Agreement or cause to be disseminated any of the provisions contained within this Agreement to any third party (including, without limitation, relatives of either party) not directly involved with this Agreement except those to whom the communication would be privileged.

Article 3 Section 2(b) provides that "neither party nor their Affiliates shall discuss the other's personal or business matters with any other person(s) including, without limitation, relatives of either party," and Article 3 Section 2(c) provides that "any violation of the terms of subparagraphs 2(a) and (b) shall constitute a material breach" of the PSA.

Defendant first claims that Plaintiff violated the provisions of Article 3 Paragraph 2(a) by divulging the terms of the PSA to Bothe and Bothe's counsel.  However, the evidence at trial established that Bothe discovered the PSA on her own volition during her search for financial documents related to her own divorce.  (Bothe Tr. 102-108.)  The PSA was fastened together with a number of other documents and hidden in a box in the closet of the master bedroom of Bothe's Arizona home.  (Bothe Tr. 102-108.)  Accordingly, Plaintiff did not divulge the terms of the PSA to Bothe or her counsel; rather, Bothe discovered the PSA through her own detective work, and thereafter contacted Plaintiff to discuss the found documents.  Defendant's claim for breach of confidentiality based on Article 3 Paragraph 2(a) is denied.

Article 3 Paragraphs 2(b) and (c) state that it is a material breach of the PSA for either party to discuss the "other's personal or business matters" with any other person, including relatives.  This is a very broad-sweeping provision that may be too broad to be enforced as written.  See, e.g., Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 499 (N.Y. 1977) (recognizing in employment context that even mutually agreed upon confidentiality provisions are void as against public policy if they are too broadly worded).  Moreover, there is evidence that Defendant too violated the terms of this confidentiality provision during his marriage to Bothe.  (See Bothe Tr. 99-100 [Bothe testified that when she was married to Defendant, Defendant had relayed to her that Plaintiff "came into the marriage [to Defendant] penniless and [Defendant] left her a millionaire"].)

Regardless, even assuming that Plaintiff did violate this provision of the PSA when she discussed Defendant's personal and business matters at length with Bothe, Defendant's claim is still unsuccessful.  This is because under New York law an action for breach of contract requires that the party prove that they had sustained damages due to the other party's breach of the contract.  See Wharton v. Duke Realty, 467 F. Supp. 2d 381, 393 (S.D.N.Y. 2006) ("In New York, the elements of a breach of contract claim are: (1) the existence of contract; (2) performance by the party seeking recovery; (3) non-performance by the other party, and (4) damages attributable to the breach"); Marks v. New York Univ., 61 F.2d 81, 89 (S.D.N.Y. 1999).  Damages are recoverable "where the loss or injury is the natural and proximate consequences, and not the remote consequences, of a wrongful act."  See Rose Lee Mfg. v. Chem. Bank, 186 A.D.2d 548 (N.Y. App. Div. 2d Dept. 1992).  Indeed, "compensation shall be made for the injury directly and proximately caused by the breach of the contract or duty."  Id.; see also Weiss v. TD

Waterhouse, 45 A.D.3d 763, 764 (N.Y. App. Div. 2d Dept. 2007) ("to satisfy the damages element of a cause of action for breach of contract, the pleadings must allege that the breach directly and proximately caused plaintiff's injury").

Here, Defendant has failed to show that Plaintiff's discussions with Bothe concerning his business and personal affairs directly resulted in injury to him. (Def. PFF at p.125.)  Rather, by the time Plaintiff discussed Defendant's "business and personal affairs" with Bothe, Bothe had already discovered, through her own volition, the PSA and its attendant documents, as well as the fraudulent 1990 tax forms.  It was this discovery, and not the later discussions between Bothe and Plaintiff, that provided the genesis for the current lawsuit.  Accordingly, any "damage" caused by Bothe and Plaintiff's discussions was largely incidental to Bothe's discovery of the aforementioned documents, which, as explained, is not covered by the PSA's confidentiality clauses.

Moreover, in assessing his damages at trial, Defendant testified that his legal problems had "taken [him] away from [his law] practice," and "his hours [we]re way down for … this year … so it's had an adverse effect on [his] ability to earn."   (Naseman Tr. 876.)  However, Defendant presented no proof that specific business was lost to him or that he missed out on billable hours due to Plaintiff's breach.  And while Defendant in his proposed findings of fact asserts that his damages included "impairment of his professional achievement," at trial he clarified that his partnership prospects were diminished because "over the last five years" he has "always been dealing with legal matters, either this legal matter or the divorce in Arizona." (Naseman Tr. 876.)  Considering that this legal matter became active only in 2008 (although it began in 2006), it is clear that the legal matter that has undermined his partnership prospects was

his divorce proceedings with Bothe, which has involved extensive discovery, a trial, and an appeal, and not the present action by Plaintiff.

Further, in providing a monetary assessment for the amount of damages he has suffered, Defendant postulates only that his damages "can be quantified as at least equivalent to the fees he has expanded." (Def. PFF at p. 125.) Such speculative damages are insufficient to satisfy New York law, which mandates that the party putting forth a breach of contract claim present proof showing that "the breach directly and proximately caused plaintiff's injury." Rose Lee Mfg., 186 A.D.2d at 548. And here, it is apparent that any damages, as noted, are the result of Bothe's discovery of Defendant's documents (including the fraudulent tax form) in Arizona, and do not stem from any breach by Plaintiff.[40]

Accordingly, Defendant's breach of contract claim based on Plaintiff's alleged failure to comply with confidentiality provisions of the PSA is dismissed.

## CONCLUSION

Plaintiff's claims of fraud are DISMISSED in their entirety. Defendant's counterclaims for breach of contract and attorneys' fees are likewise DISMISSED in their entirety. This matter is thereby closed.

IT IS SO ORDERED.

Dated: New York, New York
       July 8, 2009

Robert P. Patterson, Jr.
U.S.D.J.

---

[40] Additionally, in view of the nature of the inquiry from Bothe which suggested strongly that Plaintiff had been defrauded during the parties' negotiations of the PSA, it would be inequitable to assess damages against Plaintiff for breach of the PSA concerning her discussions of the alleged fraud with Bothe.

Copies of this Opinion and Order were faxed to:

**_For Plaintiff_**
Judd Burstein
1790 Broadway
New York, New York 10019
Fax: (212) 974-2944

**_For Defendant_**
Deborah Lans
Ryan Weiner
Cohen Lans
885 Third Avenue, 32nd Floor
New York, NY 10022
Fax: (212) 980-3448